## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN W. SAMPSON, TRUSTEE,<br><br>Plaintiff,<br><br>- against -<br><br>JAMES D. ROBINSON III, LEWIS B. CAMPBELL, JAMES M. CORNELIUS, LAURIE H. GLIMCHER, M.D., VICKI L. SATO, PH.D., LEIF JOHANSSON, LOUIS J. FREEH, MICHAEL GROBSTEIN, and R. SANDERS WILLIAMS, M.D.,<br><br>Defendants,<br><br>and<br><br>BRISTOL-MYERS SQUIBB COMPANY,<br><br>Nominal Defendant. | Civil Action No. 07 CIV 6890<br><br>**VERIFIED SHAREHOLDERS' DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br> |

Plaintiff Steven W. Sampson, Trustee, by and through his attorneys, derivatively on behalf of Bristol-Myers Squibb Company ("Bristol-Myers" or the "Company"), alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding Bristol-Myers, as follows:

### SUMMARY OF THE ACTION

1.      This is a shareholders' derivative action brought on behalf of Nominal Defendant Bristol-Myers against its Board of Directors James D. Robinson III, Lewis B. Campbell, James M. Cornelius, Laurie H. Glimcher, M.D., Vicki L. Sato, Ph.D., Leif Johansson, Louis J. Freeh,

Michael Grobstein, and R. Sanders Williams, M.D. (collectively, "Director Defendants"), seeking to remedy Director Defendants' breaches of fiduciary duties and other violations of law.

2.      This shareholders' derivative action seeks redress for the harm caused to the Company (economic and otherwise) arising out of Director Defendants' unlawful actions and/or inactions relating to the unlawful agreement whereby Bristol-Myers and France's Sanofi-Aventis ("Sanofi"), the third largest pharmaceutical drug company in the world, agreed to pay Apotex Corporation ("Apotex"), a subsidiary of Apotex, Inc., a closely-held company and Canada's largest generic drug manufacturer, not to market a generic version of Bristol-Myers' blockbuster brand-name prescription drug, Plavix.

3.      Plavix gained approval from the Food and Drug Administration ("FDA") on November 17, 1997, and is currently protected by at least one United States patent through 2011. Jointly marketed by Bristol-Myers and Sanofi, Plavix is a brand name prescription drug that inhibits platelets in the blood from sticking together and forming clots, which reduces the risk of heart attack, stroke or vascular death. Bristol-Myers began selling Plavix throughout the United States pursuant to its business partnership with Sanofi. Plavix is the world's second best-selling drug, with 2005 worldwide sales of over $6 billion. Plavix is the top-selling drug for Bristol-Myers, whose sales account for approximately 30% of its earning per share.

4.      Like most drugs, Plavix eventually goes off patent and is subject to generic competition. The result is that the primary manufacturer will lose substantial revenues because most third party payors will insist that patients switch to the less expensive generic assuming it is bioequivalent to the non-generic version. By all accounts, the generic is bioequivalent to Plavix.

5.      Initially, the Company took an aggressive posture and threatened litigation against Apotex. Fearing a finding of patent invalidity and the loss of their ability to keep generic

2

competition out of the market for Plavix, however, on or around March 21, 2006, Bristol-Myers and Sanofi negotiated a settlement of the Plavix patent litigation with Apotex (the "Apotex Agreement").

6.    The Company, however, failed to disclose that the Company relinquished material legal rights in order to induce the patent litigation settlement with Apotex and negotiated improper side agreements with Apotex to induce settlement.

7.    Moreover, the Company failed to disclose that its upper management team's entry into these side agreements, like the Apotex Agreement, exposing the Company to serious criminal charges and to massive liability in the form of class action lawsuits, as well as failing to disclose that senior executives of the Company had made criminally false statements to the FDA in connection with the FDA's review of the Apotex patent litigation settlement.

8.    Although the precise terms of the Apotex Agreement were not disclosed at the time, it was later reported that in a secret side-agreement Bristol-Myers and Sanofi agreed to pay Apotex $40 million, and Apotex agreed not to enter the market with its generic version until some time in 2011 – only several months before the expected expiration of the Plavix patent.

9.    Director Defendants knew that the Apotex Agreement was nothing more than a naked restraint of trade among horizontal competitors.

10.    The impropriety of this "pay not to play" deal was recognized in July 2006, when the Apotex Agreement was rejected by all 50 state attorneys general who said it did not comply with a consent decree signed by Bristol-Myers. That consent decree limited Bristol-Myers' ability to enter into agreements delaying generic versions of its drugs because Bristol-Myers had violated antitrust rules on prior occasions (discussed in further detail below).

11.    On July 28, 2006, it was reported that the antitrust division of the U.S.

3

Department of Justice ("DOJ") was investigating allegations that Bristol-Myers deceived federal antitrust enforcers about the events surrounding the rejected Apotex Agreement. Reportedly, the Federal Trade Commission ("FTC"), which was reviewing the proposed Apotex Agreement, requested a criminal investigation begin after officials at Apotex contradicted statements Bristol-Myers made to the FTC.

12.    As part of this on-going criminal investigation into to the Apotex Agreement, agents for the DOJ and the Federal Bureau of Investigation ("FBI") raided Bristol-Myers' New York City offices, including the office of its former Chief Executive Officer ("CEO"), Peter R. Dolan, for documents and emails that might provide evidence to support the FTC complaint.

13.    The DOJ investigation was not premised on the formal publicly announced Apotex Agreement, rather upon information and belief, it arises out of the secret side-agreement between Apotex and Bristol-Myers. The side-agreement provided that Bristol-Myers would pay Apotex a secret $40 million fee to delay until 2011 the launch of its generic drug, in addition to reinforcing the provision giving Apotex a six-month head-start to introduce the generic version before Bristol-Myers or any other manufacturers would launch their generic versions of Plavix.

14.    On August 8, 2006, the Company revealed that it had substantially modified its settlement agreement with Apotex to the Company's detriment. Bristol-Myers revealed that it had waived its right to seek treble damages in the patent litigation, and had also agreed not to seek a temporary restraining order or a preliminary injunction against Apotex's launch of its generic Plavix drug.

15.    Subsequently, Bristol-Myers terminated its CEO and General Counsel for their roles in the negotiation of the settlement agreement with Apotex – though these Board actions came after the damage had already been done. To resolve the criminal investigation by the DOJ,

4

the Company pleaded guilty to multiple counts of making false statements to the FDA in connection with the settlement negotiations and subsequent agreement with Apotex.

16.    Director Defendants, along with Sanofi's executives, engaged in illegal conduct designed to circumvent the antitrust laws and avoid compliance with Bristol-Myers' consent decree with respect to generic competition. Moreover, Director Defendants should have taken steps to prevent its former CEO, Mr. Dolan, from negotiating and then trying to follow through on a deal – the Apotex Agreement -- that was on its face a violation of law and violated the Company's consent decree. This is especially egregious given the Company's well-documented history of anticompetitive conduct when dealing with generic competition. The Bristol-Myers Board of Directors' failure to actively oversee events at the Company has, in part, left Bristol-Myers exposed to criminal and regulatory sanctions, severe harm to its reputation, and a massive market capitalization decline.

17.    Accordingly, Plaintiff, derivatively on behalf of Bristol-Myers, seeks relief for the damages sustained, and to be sustained by Bristol-Myers, as a result of Director Defendants' breaches of the duty of care and fiduciary duty. As alleged herein, these breaches caused Bristol-Myers to be sued for, and exposed to liability for, violations under the anti-trust and anti-fraud laws, as well as exposure to criminal and regulatory sanctions and damage the Company's reputation and goodwill.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise in part under the Constitution and the laws of the United States. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). Jurisdiction over the subject matter of this action is also conferred upon this Court by Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(a)(1) because one or more of Defendants either resides or maintains executives offices in this Judicial District, and a substantial portion the acts and transactions constituting the violations of law alleged in this Complaint occurred in substantial part in this Judicial District. Moreover, Defendants have received compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## THE PARTIES

### The Plaintiff

21.     Plaintiff Steven W. Sampson, Trustee, has owned at times relevant to this action, and continues to own, Bristol-Myers common stock.

### The Nominal Defendant

22.     Nominal Defendant Bristol-Myers is incorporated in the state of Delaware and maintains its principal executive office in this County at 345 Park Avenue, New York, New York 10154. Bristol-Myers common stock trades and has traded on the New York Stock Exchange under the symbol "BMY." The Company engages in the discovery, development, licensing, manufacture, marketing, distribution, and sale of pharmaceutical and other health care products in the United States and internationally.

### The Director Defendants

23.     The following parties, sometimes referred to herein as the "Director Defendants," during the relevant time period, served as members of the Board of Directors of Bristol-Myers as follows:

6

James D. Robinson III

24.     Director Defendant James D. Robinson III has served as a director of Bristol-Myers since 1976, and since June 12, 2005, Mr. Robinson has served as the Chairman of the Board, having taken over for Mr. Dolan.  He serves as a member, *ex-officio*, of all Board committees, which include: (1) the Audit Committee; (2) the Compensation and Management Development Committee; (3) the Committee on Directors and Corporate Governance; and (4) the Science and Technology Committee. Moreover, in November 2006, the Bristol-Myers Board established a Securities Issuance Committee to determine and approve the terms and provisions of securities issued by the Company in the fourth quarter of 2006. Following the completion of its responsibilities, the Securities Issuance Committee was dissolved on December 31, 2006. Mr. Robinson served as a member of this Committee. In addition, Mr. Robinson is Co-founder and General Partner of RRE Ventures, a private information technology venture investment firm, since 1994. He previously served as Chairman and CEO of American Express Company, a financial services company, from 1977 to 1993, and is also a director of Novell, Inc., The Coca-Cola Company and First Data Corporation. Mr. Robinson is a member of The Business Council, the Council on Foreign Relations and the Committee for Economic Development.  For serving in his Bristol-Myers capacities, upon information and belief, Mr. Robinson was paid $286,583, which combined the annual $45,000 non-management directors' retainer with a prorated non-executive Chairman retainer, for fiscal year ending December 31, 2005.

25.     As Chairman of the Board, Mr. Robinson owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill these important fiduciary duties Mr. Robinson owed to Bristol-Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its

shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Mr. Robinson's positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

Lewis B. Campbell

26.    Director Defendant Lewis B. Campbell has served as a director of Bristol-Myers since 1998. Mr. Campbell is Chairman of Bristol-Myers' Compensation and Management Development Committee, and a member of both the Company's Audit Committee and Committee on Directors and Corporate Governance. He is Chairman, President and CEO of Textron Inc., a multi-industry company serving the aircraft, fastening systems, industrial products and components and financial industries, since February 1999. Mr. Campbell is also a director of Dow Jones & Company. Mr. Campbell is a member of the G 100 Group, The Business Council, The Business Roundtable and the Defense Industry Initiative Steering Committee. For serving in his Bristol-Myers capacities, upon information and belief, Mr. Campbell was paid $120,417, which included the annual $45,000 non-management directors' retainer, for fiscal year ending December 31, 2005.

27.    As a member of the Board, Mr. Campbell owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Mr. Campbell owed to Bristol-Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or

omissions. Because of Mr. Campbell's positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

James M. Cornelius

28.    Director Defendant James M. Cornelius has served as a director of Bristol-Myers since 2005. Mr. Cornelius was elected CEO of Bristol-Myers on April 30, 2007, after serving as interim CEO since September 12, 2006. In its 2007 Proxy Statement filed with the SEC on Form DEF-14A, the Bristol-Myers Board determined that Mr. Cornelius qualified as an "audit committee financial expert" under the applicable SEC rules. Moreover, Mr. Cornelius had served on the aforementioned Securities Issuance Committee, together with Mr. Robinson. In addition, effective November 15, 2005, Mr. Cornelius became Chairman Emeritus of Guidant Corporation, a U.S. cardiac and vascular medical device company, as the Company is being acquired. Previously, Mr. Cornelius served as Chairman of the Board (Non-Executive) since 2000. From 1995 until 2000, Mr. Cornelius served as the Senior Executive and Chairman of Guidant Corporation. From 1983 to 1994, Mr. Cornelius was a Director, a member of the Executive Committee and Chief Financial Officer of Eli Lilly and Company. Mr. Cornelius is also a director of The Chubb Corporation, The DirecTV Group, Inc. and Given Imaging, Ltd. He is a Managing Partner at Twilight Ventures Partners and a Board member of Leerink Swann & Company and a member of The National Bank of Indianapolis. He serves as Board Trustee and Treasurer of the Indianapolis Museum of Art. The Bristol-Myers Board has determined that Mr. Cornelius qualifies as an "audit committee financial expert" based on the Board's understanding of the applicable SEC rules. For serving in his Bristol-Myers capacities, upon

9

information and belief, Mr. Cornelius was paid $101,000, which included the annual $45,000 non-management directors' retainer, for fiscal year ending December 31, 2005.

29.    As a member of the Board, Mr. Cornelius owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Mr. Cornelius owed to Bristol-Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Mr. Cornelius' positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

<u>Laurie H. Glimcher, M.D</u>

30.    Director Defendant Laurie H. Glimcher, M.D. has served as a director of Bristol-Myers since 1997. Dr. Glimcher is a member of both the Company's Audit Committee and Committee on Directors and Corporate Governance. She is Chairperson of Bristol-Myers' Science and Technology Committee. Dr. Glimcher is an Irene Heinz Given Professor of Immunology at the Harvard School of Public Health and Professor of Medicine at Harvard Medical School, since 1991. Dr. Glimcher is also a director of Waters Corporation. She is a Fellow of the American Academy of Arts and Sciences and a member of the National Academy of Sciences and the Institutes of Medicine of the National Academy of Sciences and the Irvington Institute Fellowship Committee. For serving in her Bristol-Myers capacities, upon information and belief, Dr. Glimcher was paid $107,000, which included the annual $45,000

non-management directors' retainer, for fiscal year ending December 31, 2005.

31.    As a member of the Board, Dr. Glimcher owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill these important fiduciary duties Dr. Glimcher owed to Bristol-Myers, she actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached her fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Dr. Glimcher's positions, she knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to her in connection therewith.

Vicki L. Sato, Ph.D.

32.    Director Defendant Vicki L. Sato, Ph.D. has served as a director of Bristol-Myers since July 11, 2006, and is a member of the Company's Science and Technology Committee. Dr. Sato is currently a Professor of Management Practice at the Harvard Business School and a Professor of Molecular and Cell Biology at Harvard University.  In 2005, she retired as President of Vertex Pharmaceuticals. Dr. Sato also served as chief scientific officer, senior vice president of research and development and chair of the Scientific Advisory Board at Vertex before being named president in 2000. Prior to joining Vertex, Dr. Sato was vice president of research at Biogen, Inc. and served on the Biogen Scientific Board. Dr. Sato is also a member of the Board of Directors of PerkinElmer Corporation, Infinity Pharmaceuticals and Alnylam Pharmaceuticals.

33.    As a member of the Board, Dr. Sato owed a duty to Bristol-Myers and its

shareholders to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Dr. Sato owed to Bristol-Myers, she actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached her fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Dr. Sato's positions, she knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to her in connection therewith.

Leif Johansson

34.    Director Defendant Leif Johansson has served as a director of Bristol-Myers since 1998. Mr. Johansson is a member of both the Company's Audit Committee and Committee on Directors and Corporate Governance. He is President of AB Volvo, an automotive company and CEO of The Volvo Group since 1997. Mr. Johansson is Chairman of the Board of ACEA, Commercial Vehicles as well as a director of The Confederation of Swedish Enterprise, Royal Swedish Academy of Engineering Sciences, the Association of Swedish Engineering Industries and the Association des Constructeurs Europeens d'Automobiles. He is also a member of the European Business Roundtable of Industrialists. For serving in his Bristol-Myers capacities, upon information and belief, Mr. Johansson was paid $103,000, which included the annual $45,000 non-management directors' retainer, for fiscal year ending December 31, 2005.

35.    As a member of the Board, Mr. Johansson owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Mr. Johansson owed to Bristol-

12

Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Mr. Johansson's positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

Louis J. Freeh

36.    Director Defendant Louis J. Freeh has served as a director of Bristol-Myers since 2005. Mr. Freeh is a member of both the Company's Audit Committee and Committee on Directors and Corporate Governance. He served as Vice Chairman, General Counsel, Corporate Secretary and Ethics Officer to MBNA Corporation from 2001 until its acquisition by Bank of America in January 2006. Mr. Freeh also served as FBI Director from 1993 to 2001 and previously as a U.S. District Judge, Assistant U.S. Attorney and FBI Special Agent. He is also a director of L-1 Identity Solutions, Inc.

37.    As a member of the Board, Mr. Freeh owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Mr. Freeh owed to Bristol-Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Mr. Freeh's positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via

access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

Michael Grobstein

38.    Director Defendant Michael Grobstein has served as a director of Bristol-Myers since March 2007. Mr. Grobstein is a member of the Company's Audit Committee. In its 2007 Proxy Statement filed with the SEC on Form DEF-14A, the Bristol-Myers Board determined that Mr. Grobstein qualified as an "audit committee financial expert" under the applicable SEC rules. He is also Retired Vice Chairman of Ernst & Young LLP. Mr. Grobstein is also a director of Given Imaging Ltd. and serves on the Board of Trustees and Executive Committee of the Central Park Conservancy and on the Board of Directors of New Yorkers for Parks.

39.    As a member of the Board, Mr. Grobstein owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Mr. Grobstein owed to Bristol-Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Mr. Grobstein's positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

R. Sanders Williams, M.D.

40.    Director Defendant R. Sanders Williams, M.D. has served as a director of Bristol-

Myers since September 11, 2006, and is a member of the Company's Science and Technology Committee. Dr. Williams is Senior Vice Chancellor for Academic Affairs at Duke University Medical Center since 2007 and Dean of Duke University School of Medicine since 2001. He serves on the Director's Advisory Committee of the National Institutes of Health and the Board of External Advisors to the National Heart, Lung and Blood Institute, and is also a member of the Institutes of Medicine of the National Academy of Sciences and a fellow of the American Association for the Advancement of Science.

41.     As a member of the Board, Dr. Williams owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Dr. Williams owed to Bristol-Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Dr. Williams' positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

**Additional Relevant Non-Defendant Individuals**

Peter R. Dolan

42.     Former Director Peter R. Dolan served as Bristol-Myers' CEO in May 2001, until September 12, 2006, one day after a federal monitor recommended that he be fired. Mr. Dolan had also served as a director of the Company since 2000, until his resignation from the Board in September 2006. Mr. Dolan was Chairman of the Bristol-Myers Board from September 2001 to

June 2005.

Robert E. Allen

43.    Former Director Defendant Robert E. Allen served as a director of Bristol-Myers since 1986, until his retirement from the Board on March 22, 2007. Mr. Allen was, at relevant times, Chairman of Bristol-Myers' Directors and Corporate Governance Committee, and a member of the Company's Audit Committee and Executive Committee.

Vance D. Coffman

44.    Former Director Defendant Vance D. Coffman served as a director of Bristol-Myers since 1998, until his retirement from the Board on March 22, 2007. Mr. Coffman was, at relevant times, Chairman of Bristol-Myers' Audit Committee, and a member of the Company's Compensation and Management Development Committee.

**Additional Relevant Non-Defendant Entities**

Sanofi-Aventis

45.    Sanofi is a French corporation headquartered in Paris, France and maintains a domestic headquarters in Bridgewater, New Jersey. Sanofi is the third largest pharmaceutical manufacturer in the world, and develops, manufactures and sells brand-name pharmaceutical products throughout the United States and elsewhere. Sanofi jointly markets Plavix with Bristol-Myers.

Apotex Corporation

46.    Apotex is a private corporation that is incorporated in the state of Delaware and maintains its principal executive office at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326. Apotex is a wholly-owned subsidiary of Apotex, Inc., Canada's largest generic drug manufacturer, with more than 260 generic pharmaceutical products in approximately 4000 dosages and formats, distributed worldwide. Apotex developed a generic version of Plavix.

## OBLIGATIONS OF DIRECTOR DEFENDANTS

47.    Each of the Director Defendants owed to Bristol-Myers the duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed the duty of full and candid disclosure of all material facts related thereto.  Further, Director Defendants owed a duty to Bristol-Myers and its shareholders to ensure that Bristol-Myers operated in compliance with all applicable federal and state laws, rules, and regulations; and that Bristol-Myers not engage in any unsafe, unsound, or illegal business practices.

48.    To discharge these duties, Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Bristol-Myers.  By virtue of this obligation of due care and diligence, Director Defendants were required, among other things, to:

(a)    manage, conduct, supervise, and direct the employees, businesses and affairs of Bristol-Myers in accordance with laws, rules and regulations, and the charter and by-laws of Bristol-Myers;

(b)    neither violate nor knowingly or recklessly permit any officer, director or employee of Bristol-Myers to violate applicable laws, rules and regulations and to exercise reasonable control and supervision over such officers and employees; ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Bristol-Myers;

(c)    remain informed as to how Bristol-Myers was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice;

(d)     supervise the preparation, filing and/or dissemination of any SEC filing, press

releases, audits, reports or other information disseminated by Bristol-Myers and to

examine and evaluate any reports of examinations or investigations concerning

the practices, products or conduct of officers of Bristol-Myers and to make full

and accurate disclosure of all material facts, concerning *inter alia*, each of the

subjects and duties set forth above; and

(e)     preserve and enhance Bristol-Myers's reputation as befits a public corporation

and to maintain public trust and confidence in Bristol-Myers as a prudently

managed institution fully capable of meeting its duties and obligations.

## BACKGROUND

**The Regulatory Structure Pursuant To Which Generic**
**Substitutes For Brand-Name Drugs Are Approved**

49.     Under the Federal Food, Drug, and Cosmetics Act (21 U.S.C. §§ 301-392),

manufacturers who create a new drug must obtain the approval of the U.S. Food and Drug

Administration ("FDA") to sell the new drug by filing a New Drug Application ("NDA"). An

NDA must include the submission of specific data concerning the safety and effectiveness of the

drug, as well as any information on applicable patents.

50.     In 1984, Congress amended the Food, Drug and Cosmetics Act with the

enactment of the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417,

98 Stat. 1585 (1984), otherwise known as the Hatch-Waxman amendments ("Hatch-Waxman").

51.     Hatch-Waxman simplified the regulatory hurdles for prospective generic

manufacturers by eliminating the need to file a lengthy and costly NDA to obtain FDA approval.

The FDA instead provides an expedited review process by which generic manufacturers may file

an Abbreviated New Drug Application ("ANDA") assuming certain criteria are satisfied.

52.     The ANDA references and relies upon the scientific findings of safety and effectiveness included by the brand-name drug manufacturer in the original NDA. The ANDA filer must demonstrate to the FDA that the generic drug it is taking to market is at least bioequivalent to the referenced brand-name drug.

53.     Generic drugs are drugs that the FDA has found to be "bioequivalent" to their corresponding brand name drug.  A generic drug is bioequivalent if it provides the identical therapeutic benefits, and it has the same active chemical composition as its brand name counterpart.  When a generic drug is completely equivalent to a pioneer or brand name drug, the FDA assigns the generic drug an "AB" rating.

54.     Generic drugs are invariably priced substantially below the branded drugs to which they are bioequivalent.  Typically, the first generic drug is sold at a modest discount compared to the brand name drug, with discounts increasing, as per normal competitive dynamics, as more companies begin selling the generic. As additional generic competitors come to market, the price of the generic equivalents continues to fall, and the combined market share of the generic manufacturers continues to grow.  In some cases, generic competitors sell products equivalent to brand name prescription drugs for as little as 15 percent of the price of the brand name drug, and capture as much as 90 percent of the market for that drug in very short order. Specifically, unless the branded manufacturer lowers prices to meet competition, a branded drug loses a significant portion of its market share to generic competitors less than a year after the introduction of generic competition.

55.     Hatch-Waxman also streamlined the process for a brand-name manufacturer to enforce its patents against generic manufacturers, and provided the brand-name manufacturer with what is essentially a self-executing preliminary injunction against generic competition, in

the form of an automatic stay of FDA approval of the ANDA that may last as long as thirty months.

56.    Under Hatch-Waxman, the NDA holder submits a list of patents, if any, that "claim[] the drug for which the applicant submitted the application or which claim[] a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1).    Under FDA regulations, the only types of patents that can be submitted by the NDA filer are drug substance patents, drug product patents and method of use patents. Drug product patents may be submitted only if they claim "a drug product that is the subject of a pending or approved application." Drug substance patents may be submitted only if they claim "a drug substance that is a component of [the drug product that is the subject of the NDA]." Method of use patents may be submitted only if they claim an approved (or pending) use of the drug product.

57.    When the FDA approves a brand-name manufacturer's NDA, the FDA publishes the patents, any, submitted by the NDA filer in a publication entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations," known as the "Orange Book." 21 U.S.C. §355(j)(7)(A)(iii).    In listing patents in the Orange Book, the FDA merely performs a ministerial act. The FDA does not check the facts supplied to it by the brand-name manufacturer, but trusts that the manufacturer will be truthful. The FDA does, however, require that the NDA holder submit a certification attesting to the propriety of the Orange Book listing. After the NDA is approved, the brand-name manufacturer may list other newly-issued patents in the Orange Book under the NDA, if the brand-name manufacturer similarly certifies, inter alia, that the new patents claim either the approved (or pending) drug product, a drug substance in that drug

product, or an approved (or pending) method of using that drug product.

58.    Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications: (1) that no patent for the brand-name drug has been filed with the FDA (a "Paragraph I Certification"); (2) that the patent for the brand-name drug has expired (a "Paragraph II Certification"); (3) that the patent for the brand-name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or (4) that the patent for the brand-name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV Certification"). 21 U.S.C. §355(j)(2)(A)(vii).

59.    To obtain FDA approval of an ANDA (and thus the legal right to sell a generic version of a brand-name drug) prior to the expiration of a patent listed in the Orange Book for the referenced NDA, a generic manufacturer must certify that the generic drug addressed in its ANDA does not infringe any valid claim in that patent (*i.e.*, file a Paragraph IV Certification).

60.    If a generic manufacturer files a Paragraph IV Certification asserting that the patent is invalid or will not be infringed, then the brand-name manufacturer has the opportunity to delay the generic manufacturer's receipt of final FDA approval, and thus, the ability to come market.    This is because a generic manufacturer filing a Paragraph IV Certification must promptly give notice of its ANDA Certification to both the NDA owner and the owner of the patent(s) at issue. The generic manufacturer's act of filing a Paragraph IV Certification triggers the time by which a patent owner may file action for patent infringement, and take advantage of the self-executing stay of FDA's ability to finally approve the generic version of the NDA owner's drug.

61.    If the patent owner fails to initiate a patent infringement action within 45 days

after receiving the generic manufacturer's Paragraph IV Certification, then the FDA may grant final approval to the generic manufacturer's ANDA once it concludes that the generic is bioequivalent to the brand-name drug. If, however, the patent owner initiates an infringement action against the ANDA filer within 45 days, then the FDA may not finally approve the ANDA until the earlier of either 30 months or the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. §355(j)(5)(B)(iii).

62.    Additionally, the Hatch-Waxman statutory scheme in place at all relevant times provided a 180-day period of market exclusivity to the first generic manufacturer that filed an ANDA containing a Paragraph IV Certification, commencing on the date the generic manufacturer began marketing the new drug or, if there was a patent infringement claim against it, from the date the generic manufacturer received a patent infringement decision in its favor, whichever was earlier. If neither of these conditions occurred, the exclusivity period would not expire and no other generic manufacturer could market its generic version of the affected drug.

63.    Typically, generic versions of brand-name drugs are initially priced significantly below their corresponding brands. As a result, direct purchasers substitute generic versions of the drug for some or all of their purchases. As more generic manufacturers enter the market, prices for generic versions of a drug predictably decrease even further because of competition among the generic manufacturers. Moreover, the brand-name drug continues to lose market share to the generics. This price competition enables direct purchasers of the drugs to: (a) purchase generic versions of a drug in substitution for the brand at lower prices and/or (b) purchase the brand-name drug at reduced prices. Consequently, brand-name drug manufacturers have a substantial and compelling financial interest in delaying generic competition.