## SUBSTANTIVE ALLEGATIONS

**The Plavix Patent**

64.    Bristol-Myers and Sanofi jointly market Plavix, a brand-name prescription blood thinner used to ward off stroke and heart attack. The active ingredient in Plavix is clopidogrel bisulfate, the hydrogen sulfate salt of clopidogrel.

65.    Sanofi submitted an NDA for Plavix tablets, 75 mg, on April 28, 1997. On November 17, 1997, the FDA approved Sanofi's NDA. Bristol-Myers then began selling Plavix throughout the United States pursuant to its business partnership with Sanofi.

66.    On November 16, 2001, Apotex filed an ANDA seeking FDA approval to market a generic version of Plavix in the United States. Apotex was the first generic applicant to seek such approval. In connection with its ANDA, Apotex submitted a Paragraph IV Certification stating that each patent listed in the Orange Book for Plavix was invalid, unenforceable or would not be infringed by Apotex's proposed generic product. Apotex notified Sanofi of its Paragraph IV Certification with respect to these patents.

67.    Shortly thereafter, on March 21, 2002, Bristol-Myers and Sanofi commenced the Plavix patent litigation -- a patent infringement action against Apotex under 35 U.S.C. § 271(e)(2)(A), in the Southern District of New York, triggering a 30-month delay in FDA approval of Apotex's ANDA. As originally filed, the Plavix patent litigation alleged Apotex's infringement of both the '265 patent and the '328 patent, but subsequently withdrew the claim for infringement of the latter patent, with prejudice, leaving only the claim for infringement of the '265 patent.

68.    The Plavix patent litigation was set for trial in April 2006.

69.    By late 2005, Apotex was aware that FDA approval of its ANDA was imminent and began preparing to launch generic Plavix as soon as it received that approval. At that time,

23

Apotex contacted its customers to obtain pre-launch commitments and purchase orders for generic Plavix. Apotex stated that it intended to launch upon receipt of FDA approval and was not concerned about launching generic Plavix "at risk," even though it knew that in the unlikely event that Bristol-Myers and Sanofi won the Plavix patent litigation it would be liable for treble damages.

70.     On January 20, 2006, Apotex received final FDA approval to market its generic version of Plavix. The FDA also advised Apotex that it had been the first to file an ANDA for generic Plavix and was entitled to 180 days of marketing exclusivity that would begin to run from the earlier of commercial marketing by Apotex or the dates of certain court decisions identified in the Hatch-Waxman Act.

71.     On this same day, Apotex issued a press release announcing its receipt of FDA approval. Apotex's press release stated that Apotex was confident that Bristol-Myers' and Sanofi's '265 patent would be found invalid in the Plavix patent litigation - then set for trial in April 2006.

72.     Bristol-Myers and Sanofi were aware that Apotex had received final FDA approval and either knew or suspected that Apotex intended to launch "at risk." Bristol-Myers and Sanofi were concerned about this because of the large contribution that Plavix made to their profits. Bristol-Myers and Sanofi could have asked the district court in New York to issue a preliminary injunction maintaining the status quo until the Plavix patent litigation was tried, but did not do so. Bristol-Myers and Sanofi knew that they could not demonstrate a probability of success on the merits because the '265 patent was in fact invalid and unenforceable.

73.     Aside from Sanofi's own internal conclusion (dating back as early as 1991) that the '265 patent was anticipated and invalid, Bristol-Myers and Sanofi were aware that

24

independent analysts and observers had concluded that the patent was subject to a strong invalidity challenge. For example, in March 2004, Aventis, which was then subject to a hostile takeover bid from Sanofi, obtained and filed with the SEC an opinion letter prepared by Patterson, Belknap, Webb & Tyler LLP, a New York law firm. The Patterson, Belknap opinion letter concluded that Apotex and Dr. Reddy (another generic applicant) "have raised a substantial defense to the validity of Bristol-Myers' and Sanofi's '265 patent."

**The Apotex Agreement**

74.    As a result of the foregoing developments regarding Apotex, in a strategic move, instead of filing a motion for preliminary injunction, Bristol-Myers and Sanofi entered into negotiations with Apotex.  This was a calculated effort by Bristol-Myers and Sanofi to have Apotex delay its the launch of generic Plavix, and in return Bristol-Myers and Sanofi would pay Apotex a portion of the profits they would earn as a result of that delay – a "pay not to play" deal. Such an agreement would maintain Bristol-Myers' and Sanofi's ability to earn profits by depriving purchasers of the benefits of generic competition. Indeed, Bristol-Myers and Sanofi could share a significant portion of their profits with Apotex, and still be far better off than if they faced generic competition.

75.    On March 21, 2006, after the market had closed for the day, Bristol-Myers issued a press release entitled "Sanofi-Aventis and Bristol-Myers Squibb Announce Agreement to Settle U.S. PLAVIX Litigation with Apotex Subject to Certain Conditions," which announced that they had entered into the Apotex Agreement, and, in return, Apotex would agree not to enter the market with its FDA-approved generic version of Plavix until September 17, 2011, just two months before the scheduled expiration of the '265 patent. The Apotex Agreement further provides that Bristol-Myers and Sanofi would grant Apotex a license to sell its generic product that would become effective on September 17, 2011, and that Bristol-Myers and Sanofi would

hold-off on launching their own "authorized" generic during Apotex's 180-day period of exclusivity.

76.    Because of prior similar misconduct, Bristol-Myers is under a 10-year court order until 2013, requiring it to get approval from all the states attorney generals when it enters into an agreement to settle a patent infringement case. The Company had been accused of using patents to thwart low-cost rivals for the cancer medicine TAXOL® and anti-anxiety drug BUSPAR®. Accordingly, pursuant to this consent decree, Bristol-Myers was required to submit the Apotex Agreement to the FTC for its approval. Additionally, the Apotex Agreement was also provided to, and its effectuation was contingent upon the approval of, all 50 state attorneys general.

77.    The press releases issued by Bristol-Myers and approved by Director Defendants on March 21, 2006, did not disclose the size of the payments to Apotex. However, Bristol-Myers subsequently disclosed that pursuant to a secret side-agreement Apotex would receive up to *$40 million* even if the Apotex Agreement was not approved by the FTC and the 50 state attorneys general. In these later press releases, Bristol-Myers and Sanofi indicated that the $40 million payment was a "reimbursement payment from the companies for certain short-dated inventories of Apotex's clopidogrel bisulfate product." The "short-dated" inventories related to some of Apotex's generic Plavix inventory that Apotex was prepared to launch just prior to entering into the Apotex Agreement with Bristol-Myers and Sanofi.

78.    If the Apotex Agreement was approved, payment due to Apotex from Bristol-Myers and Apotex Agreement would have been considerably higher. In general, the payment from Bristol-Myers and Sanofi to Apotex was payment for Apotex's acquiescence to delay its launch of the generic Plavix pending review by the FTC and all 50 state attorneys general.

79.    As per the Apotex Agreement, Apotex consented to the postponement of the

previously set April 2006 trial date in the Plavix patent litigation until after the FTC and all 50 state attorneys general provided their opinions on the Apotex Agreement.

80.    Bristol-Myers and Sanofi knew that there was a "significant risk" that the settlement with Apotex would not be consummated because it would not be approved by the FTC. Similarly, *The New York Times* reported on August 9, 2006 that Apotex's CEO, Mr. Dolan, said that "he had never expected the American government to approve the deal...."

81.    On June 25, 2006, in a press release entitled "Update on Plavix® Litigation Settlement," Bristol-Myers and Sanofi announced that they had *revised* the Apotex Agreement, in response to concerns raised by the FTC and the state attorneys general to the previously announced March 21, 2006 proposed settlement. Among other revisions, under the terms of the modified agreement, Apotex agreed not to enter the market with its FDA-approved generic version of Plavix until June 1, 2011, rather than September 17, 2011.

82.    Again, the Company's press release was silent as to Apotex's secret fee. In an effort to evade the scrutiny of federal and state regulators reviewing the arrangement, this secretive side-deal to the Apotex Agreement provided that Bristol-Myers would pay Apotex a secret $40 million fee to delay the launch of the drug, in addition to reinforcing the provision giving Apotex a six-month head start to introduce a generic version before Bristol-Myers launched its own. Published reports further state that the secret deal was negotiated by Mr. Dolan's chief assistant with Mr. Dolan's consent and with the approval of Director Defendants.

83.    On July 27, 2006, the Company issued a press release entitled "Bristol-Myers Squibb Company Reports Financial Results for the Second Quarter and First Half of 2006." Therein, the Company, in relevant part, stated:

> In the response to concerns raised by the FTC and state attorneys general to that proposed settlement agreement, the company, sanofi-aventis and Apotex have

amended the agreement.

*       *       *

The company learned yesterday that the Antitrust Division of the United States Department of Justice is conducting a criminal investigation regarding the proposed settlement of the Apotex litigation described above.

84.     All 50 state attorneys general had informed Bristol-Myers, Sanofi and Apotex that they would not approve the Apotex Agreement, even in its revised form. Because effectuation of the Apotex Agreement was contingent upon the approval of both the FTC and all 50 state attorneys general, the deal was effectively dead.

85.     On July 28, 2006, while the Company issued a press release entitled "PLAVIX® Litigation Settlement Fails to Receive Antitrust Clearance From States Attorneys General," numerous news sources reported that the DOJ's antitrust division was investigating allegations that Bristol-Myers deceived federal antitrust enforcers about the events surrounding the rejected Apotex Agreement to limit generic competition for Plavix. Reportedly, the FTC sought this criminal investigation after officials at Apotex contradicted statements Bristol-Myers made to the FTC.

86.     It was also reported on this same day that, as part of its on-going criminal investigation into to the Apotex Agreement, FBI agents raided Bristol-Myers' New York City offices, including the office of its CEO, Defendant Peter Dolan, for documents and emails that might provide evidence to support the FTC complaint.

87.     In light of the foregoing events, on August 8, 2006, Apotex announced that is was launching its generic version of Plavix in the United States.

88.     That same day, Bristol-Myers filed its Quarterly Report with the SEC, and for the first time revealed that it had substantially modified the Plavix settlement agreement with

28

Apotex, to the Company's detriment. Therein, the Company, in relevant part, stated:

> The March Agreement included the following provisions, among others: The companies would grant Apotex a royalty-bearing license under the '265 patent to manufacture and sell its FDA-approved generic clopidogrel bisulfate product in the United States, and Apotex would agree not to sell a clopidogrel product in the United States until the effective date of the license.

> \*       \*       \*

> In addition, the companies waived their right to seek treble damages under applicable patent laws if they were to prevail in the pending patent litigation. The companies also agreed not to seek a temporary restraining order or a preliminary injunction against a launch by Apotex of its generic clopidogrel bisulfate product (which could not occur until five business days after failure to obtain antitrust clearance) until either they had first given Apotex five business days prior notice of their intention to do so, or Apotex had initiated a launch.

> \*       \*       \*

> In response to concerns expressed by the FTC and state attorneys general, the parties modified the March Agreement. A copy of the modified proposed settlement agreement (the Modified Agreement) is filed as an exhibit to this Form 10-Q. **Under the terms of the Modified Agreement, Apotex's license would be effective on June 1, 2011, or earlier in certain circumstances. The companies' agreement not to launch an authorized generic product during the term at the Apotex license was also deleted.** The provisions relating to a payment to Apotex in the event U.S. sales of PLAVIX were lower than specified amounts and to a payment to Apotex in the event the required antitrust clearances were not obtained also were deleted. **The limitation on damages in the event Apotex launched at risk and the companies prevailed in the pending litigation was reduced to 40% of Apotex's net sales if the companies had launched an authorized generic clopidogrel bisulfate product and otherwise 50% of Apotex's net sales.** In addition, the companies again waived their right to seek treble damages under applicable patent laws if they were to prevail in the pending patent litigation. The companies agreed not to seek a temporary restraining order and agreed they could seek a preliminary injunction only after giving Apotex five business days' notice, which notice could be given only after Apotex had initiated a launch. (Emphasis added.)

89.    As of August 22, 2006, it was reported that 78% of all new U.S. prescriptions filled for the blood clot medicine were for the Apotex generic.

90.    On September 12, 2006, Bristol-Myers announced the sudden departure of two

key executives. In addition to stating that Mr. Dolan "will leave the position of chief executive officer, effective immediately," and that Richard Willard "will leave the position of senior vice president and general counsel, effective immediately," the Company, in relevant part, also stated:

> At a previously scheduled meeting of the company's Board yesterday, the Board received reports from the company's outside counsel on issues relating to the PLAVIX® patent litigation with Apotex Inc. and Apotex Corp. These reports were prepared and delivered at the request of the Board as part of its ongoing assessment of this matter. **During the Board's deliberations, the Board also heard from former Federal Judge Frederick B. Lacey, the Monitor under the company's deferred prosecution agreement with the office of the U.S. Attorney for the District of New Jersey, who made his own preliminary recommendation to the Board that the employment of both Mr. Dolan and Mr. Willard be terminated.** The U. S. Attorney for New Jersey, Christopher J. Christie, also attended a portion of the Board meeting.

> Judge Lacey's recommendation followed an inquiry by the Monitor and the U.S. Attorney into issues related to corporate governance in connection with the negotiation of a settlement agreement of the pending PLAVIX patent litigation with Apotex Inc. and Apotex Corp.

91.    On December 21, 2006, Bristol-Myers announced that it had reached an agreement in principle with the United States Department of Justice and the Office of the United States Attorney for the District of Massachusetts to settle several investigations involving the Company's drug pricing, and sales and marketing activities, subject to approval by the DOJ. These investigations began several years ago. The agreement in principle provided for a *civil* resolution and an expected payment of *$499 million*. The Company noted in its press release that: "There would be no criminal charges against the Company."

92.    On May 10, 2007, the *Associated Press* reported, what the Company also confirmed by press release, that "Bristol-Myers to Admit to False Statements." In particular, Bristol-Myers announced that it had agreed to plead guilty to federal charges of making false statements to a government agency and pay a fine of up to $1 million in connection with its failed attempt to resolve the Plavix patent dispute in 2006. The agreement in principle, subject to

court approval, would essentially resolve a criminal investigation launched by the U.S. Justice Department's antitrust division last year, which centered on Bristol-Myers' actions in trying to settle the Plavix patent dispute with Apotex.

93.    The *Associated Press* article further noted, in relevant part:

Last year, Apotex alleged in court documents that a Bristol executive involved in the negotiations, Andrew Bodnar, reached certain side agreements with Apotex that weren't included in the written settlement agreement submitted to government regulators.

Bristol said Thursday it would plead guilty to two counts of violating a federal law prohibiting making false statements to a government agency. Bristol said "the charges relate to representations made by a former Bristol-Myers Squibb senior executive during the renegotiation of the proposed settlement agreement in May 2006 that were not disclosed to the U.S. Federal Trade Commission."

94.    On June 11, 2007, the Company issued a press release announcing that Bristol-Myers pleaded guilty to two counts of violating 18 U.S.C. Section 1001 in United States District Court for the District of Columbia. This guilty plea resolved the aforementioned disclosed investigation by the Antitrust Division of the DOJ into the proposed settlement of the Plavix patent litigation with Apotex. As a result of the plea, the Company paid a fine of $1 million.

95.    Then, on June 19, 2007, the U.S. District Court for the Southern District of New York upheld the validity and enforceability of the Plavix patent, thereby permanently blocking the sale of its generic version from Apotex. The Court ruled that Apotex's generic infringes Bristol-Myers' patent, and enjoined Apotex from marketing this product in the United States until the patent expires in November 2011.

**A Prior History Of Anticompetitive Behavior**

96.    As previously alleged, this was not the first time Bristol-Myers engaged in such illegal conduct. In fact, Bristol-Myers engaged in similar conduct when seeking to prolong its monopoly for two of its other blockbuster drugs, BUSPAR® and TAXOL®.

31

97.    As a result of its earlier behavior regarding BUSPAR®, Bristol-Myers was sued by the FTC, the Attorney Generals of over 35 states, and nationwide classes of direct and indirect purchasers. Bristol-Myers recently agreed to pay $535 million to settle those charges.

98.    Nevertheless, Director Defendants gave Mr. Dolan the green-light to once again expose Bristol-Myers to further liability, including massive liability in the form of class action lawsuits and criminal conduct, by approving the Apotex Agreement.

99.    Additionally, as referenced above, Bristol-Myers was also enjoined from resolving or settling a patent infringement action in which an ANDA filer receives anything of value unless Bristol-Myers obtains an advisory opinion from the FTC that the settlement agreement would not raise issues under Section 5 of the Federal Trade Commission Act.

100.    Regarding its scheme to block generic competition for TAXOL®, Bristol-Myers was similarly sued by the FTC, the Attorney Generals of all 50 states, and nationwide classes of direct purchasers and third party payors. Bristol-Myers agreed to pay over $335 million to settle those charges, and also agreed to the entry of permanent injunctive relief barring it from engaging in similar misconduct in the future. Bristol-Myers was enjoined from, *inter alia*:

(a)    Improperly listing any patent in the Orange Book in the future;

(b)    Taking any action in connection with any Bristol-Myers patent improperly listed in the Orange Book, or encouraging any other person to take any action, that initiates, maintains, or causes to be initiated or maintained, a 30-Month Stay of FDA approval of any competing generic application;

(c)    Making any statements to the FDA that are (i) false and misleading; and (ii) material to either the approvability of a competing generic application;

(d)    Asserting any fraudulent or objectively baseless claim, or otherwise engaging in

32

sham litigation for the purpose of injuring a competing generic application;

(e)    Enforcing or seeking to enforce any patent that it knows is invalid, unenforceable, or not infringed; and

(f)    Acquiring from another person a patent or an exclusive license to a patent if Bristol-Myers seeks or secures the patent's listing in the Orange Book in reference to an already approved drug without providing prior written notification to the States.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

101.    Plaintiff brings this action derivatively in the right and for the benefit of Bristol-Myers to redress injuries suffered and to be suffered by Bristol-Myers as a result of the breaches of fiduciary duty and violations of law, and gross mismanagement, as well as the aiding and abetting thereof, by Director Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

102.    Plaintiff will adequately and fairly represent the interests of Bristol-Myers and its shareholders in enforcing and prosecuting its rights.

103.    Plaintiff is an owner of Bristol-Myers common stock and was an owner of Bristol-Myers common stock at all times relevant to Director Defendants' wrongful course of conduct alleged herein.

104.    Plaintiff has not made any demand upon the current Bristol-Myers Board of Directors, consisting of Director Defendants James D. Robinson III, Lewis B. Campbell, James M. Cornelius, Laurie H. Glimcher, M.D., Vicki L. Sato, Ph.D., Leif Johansson, Louis J. Freeh, Michael Grobstein, and R. Sanders Williams, M.D., to bring an action asserting the claims herein to recover damages for the injuries suffered by Bristol-Myers, since such demand would be futile, and is therefore excused, for the following reasons:

105.    Demand is excused because the acts and practices alleged herein constitute

unlawful misconduct that is not within the protection of the business judgment rule.

106.   Demand is excused because the unlawful acts and practices alleged herein cannot be approved by Director Defendants and are not subject to the protection of the business judgment rule because Director Defendants knowingly approved Bristol-Myers' violations of law and illegal conduct, and were aware of the consequences to Bristol-Myers and its shareholders from their earlier experiences with BUSPAR® and TAXOL®.

107.   Demand is also excused because the Bristol-Myers Board of Directors has demonstrated a sustained and systematic failure to manage and oversee the Company's operations. As a result of this failure, all of Directors Defendants face a substantial likelihood of liability for their breaches of duties.

108.   Demand is further excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by Bristol-Myers' Board of Directors, and are incapable of ratification by the current Board of Directors. Director Defendants are subject to liability for breaching their fiduciary duties to Bristol-Myers by, *inter alia*: (i) participating in the unlawful Apotex Agreement, described herein; and/or (ii) to failing detect, prevent and/or halt the violations of law relating to the unlawful Apotex Agreement, described herein.

109.   Demand is also excused because a majority of Directors Defendants serving on the Bristol-Myers Board of Directors consciously and knowingly ignored numerous "red flags" regarding the unlawfulness surrounding the Apotex Agreement. Ignoring these multiple red flags has caused the Company to suffer damages.

110.   For example, the Company's prior anti-competitive conduct in connection with generic competition resulted in heightened regulatory scrutiny. Indeed, the Company entered into a consent decree that restricted its ability to take affirmative action in response to generic

34

competition absent approval from regulators. For example, its prior anti-competitive conduct resulted in the Company paying hundreds of millions of dollars in settlements and fines in connection with BUSPAR® and TAXOL®. Accordingly, the Bristol-Myers Board was obligated – given this record – to take affirmative action to stop the Company's management from entering into any agreement with Apotex that was even remotely a violation of law. In a similar vein, the Bristol-Myers Board, premised on the Company's long history of anti-competitive conduct, was obligated to monitor the Company's practices.

111. With respect to the Apotex Agreement, Director Defendants approved an announcement that omitted details about the $40 million payment. This occurred in March 2006, and the Board did nothing to either correct the omission or reinvestigate the Apotex Agreement so that it did not contain the illegal provisions. Given the Company's history of anti-competitive conduct, the Bristol-Myers Board remaining supine in the face of such an agreement was a blatant violation of its fiduciary duties.

112. Demand is also excused because the overwhelming majority of Directors Defendants have ratified the egregious actions outlined herein, and these same Directors Defendants cannot be expected to prosecute claims against themselves, and persons with whom they have extensive business and personal entanglements, if plaintiff demanded that they do so.

113. Demand is also excused because Director Defendants participated in, approved, and/or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly and/or negligently disregarded them, and are therefore not disinterested parties and lack sufficient independence to exercise business judgment as alleged herein. Specifically, given the amount of money obtained by virtue of the wrongs alleged, it was of such significance to the Company that Director Defendants must have known of and approved it or were so grossly

uninformed as to abdicate their responsibility as directors of Bristol-Myers.

114.    The Sarbanes-Oxley Act of 2002 (the "SOX") placed significant additional responsibilities on the boards of directors of public companies subject to the Act, like Bristol-Myers, to improve corporate financial accounting and internal controls and to improve corporate financial responsibility and disclosure.  This new law was a disaster for the Bristol-Myers Board, since, despite its public posture of concern over good corporate governance, controls, disclosure and integrity; it was sitting atop a massive ongoing scheme to keep its generic competition off the market as evidenced by, *inter alia,* the Apotex Agreement.  Any real compliance with the SOX would have exposed this scheme, brought it to an end and resulted in embarrassing discharges.  Thus, the Bristol-Myers Board of Directors did not enforce or comply with the SOX, despite its legal obligation under federal law to do so.  Clearly, the Bristol-Myers Board of Directors will not sue themselves for this failure.

115.    Demand is also excused because insurance policies covering the liability of a Company's directors and officers purport to exclude legal claims asserted directly by the Company against such persons.  Thus, there was, and is, a substantial disincentive for Bristol-Myers to bring any action directly against Director Defendants.  Generally, under the terms of such directors' and officers' insurance policies, a company would be required by the carriers to cooperate in the defense of any claims, such as the present action, which seek to impose liability upon certain officers and directors of Bristol-Myers, including Director Defendants in this action, for misconduct and mismanagement.  Thus, if the policy or policies which Bristol-Myers maintains contain the foregoing provision, the insurance carriers would argue that Bristol-Myers and its Board of Directors are thereby contractually disabled from complying with any demand that would cause Bristol-Myers to institute, and/or prosecute any action against Director

Defendants for such misconduct and mismanagement; because to do so could result in the loss to Bristol-Myers of its insurance coverage.  Similarly, Bristol-Myers would be disabled from pursuing Director Defendants as it would not benefit from any insurance they may have.

116.    In addition, Director Defendants suffer from irreconcilable conflicts. As members of the Board of Directors of Bristol-Myers during this relevant time period, they were privy to Bristol-Myers' improper practices, and had personal and financial interests in the actions challenged herein. Since Director Defendants took no action at the time the relevant breaches and frauds were perpetrated, they cannot be expected to take action now.  Furthermore, given Director Defendants' personal exposure to liability from the conduct described herein, they suffer from an irreconcilable conflict in considering the prosecution of those involved.  As such, Director Defendants will not take any steps on behalf of the Company since such a corrective action would necessitate that the Bristol-Myers initiate litigation against themselves.

117.    Finally, demand is futile because the Bristol-Myers Board of Directors cannot be presumed to exercise independent judgment in assessing the merits of a demand due to their personal and financial interest in the subject matter of many of the claims raised in this Complaint.  The Bristol-Myers Board of Directors would thus be required potentially to investigate and bring claims against themselves for their own misconduct. No shareholder demand could or would prompt the Bristol-Myers Board of Directors to take action. As such, demand is excused.

118.    Demand is futile as to Director Defendants James D. Robinson III, Lewis B. Campbell, James M. Cornelius, Laurie H. Glimcher, M.D., Vicki L. Sato, Ph.D., and Leif Johansson, *six of nine members*, constituting a majority of the Bristol-Myers Board as required under the law.

## COUNT I

## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
## (Against Director Defendants)

119.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

120.    Director Defendants all owed a fiduciary duty to Bristol-Myers and its shareholders, the duty to exercise due care and diligence in the management and administration of the affairs of the Company, as well as in the auditing and reporting of the Company, and owed the duty of full and candid disclosure of all material facts thereto.

121.    As fiduciaries, to discharge these duties, Director Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Bristol-Myers.

122.    In performing the aforementioned services, Director Defendants all breached, and continue to breach, their fiduciary duties, causing damages to Bristol-Myers, by, *inter alia*, (i) failing to discover and prevent Bristol-Myers's violations of law (ii) failing to properly implement, oversee and maintain appropriate and adequate internal controls, practices and procedures for Bristol-Myers; (iii) failing to ensure that Bristol-Myers operated in compliance with all applicable federal and state laws, rules, and regulations the development, marketing and distribution of Plavix; (iv) failing to ensure that Bristol-Myers not engage in any unsafe, unsound, or illegal business practices; and (v) causing Bristol-Myers to be sued for, and exposed to, liability for anti-trust and anti-fraud violations, as well as exposure to criminal and regulatory sanctions, as previously described herein.

123.    Director Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Bristol-Myers to suffer substantial monetary damages as a result of the wrongdoing herein, as well as further and even greater damage in the future, including

38

exposure to forfeitures, fines and penalties (including the potential for massive monetary damages resulting from its anti-trust violations), damage to Bristol-Myers's reputation and good will, the resulting loss of business, increased costs of capital, and otherwise.

124.    Bristol-Myers has been directly and substantially injured by reason of Director Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiff, as a shareholder and representative of Bristol-Myers, seeks damages and other relief for the Company, in an amount to be proven at trial.

## COUNT II

### DERIVATIVE CLAIM FOR CONTRIBUTION AND INDEMNIFICATION
### (Against Director Defendants)

125.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

126.    Bristol-Myers is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Director Defendants' liability to Bristol-Myers.

127.    In addition, Director Defendants' misconduct and wrongdoing, and the disclosures and events described herein, have had, and will continue to have, a series of deleterious effects on Bristol-Myers, including but not limited to:

(a)    Loss of confidence of the investing public in the integrity and management of Bristol-Myers, thereby resulting in Bristol-Myers losing market value; and

(b)    As a result of Director Defendants' misconduct, Bristol-Myers is now exposed to criminal and regulatory scrutiny, as well as anti-fraud anti-trust lawsuits resulting from their misconduct and fraudulent activities and anticompetitive behavior, thereby, at a minimum, causing the Company to incur unnecessary direct and indirect investigatory, litigation and administrative costs, and potentially resulting in awards, judgments or

settlements against Bristol-Myers.

128.    By reason of the misconduct described herein, Bristol-Myers's alleged liability arises, in whole or in part, from the intentional, knowing, reckless, disloyal and bad faith acts or omissions of Director Defendants as previously alleged herein.

129.    Bristol-Myers is therefore entitled to contribution and indemnification from each of the Director Defendants in connection with all such claims that have been, are or may in the future be asserted against Bristol-Myers by virtue of Director Defendants' misconduct and wrongdoing.

## COUNT III

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH IN CONNECTION WITH MANAGEMENT OF BRISTOL-MYERS
### (Against Director Defendants)

130.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

131.    Each of the Director Defendants had a duty to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct.

132.    As alleged in detail herein, Director Defendants have failed to seek recompense from any of the Director Defendants named herein for any of the claims alleged herein that to remedy the damages that Bristol-Myers has suffered.

133.    As a direct and proximate result of Director Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## COUNT IV

## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH FOR DISSEMINATION OF MISLEADING AND INACCURATE INFORMATION
### (Against Director Defendants)

134.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

135.    As alleged in detail herein, each of the Director Defendants had a duty to ensure that Bristol-Myers disseminated accurate, truthful, and complete information to the market.

136.    As alleged in detail herein, Director Defendants failed to issue timely disclosures regarding the Company's procurement of the Plavix patent and the details surrounding the agreed-to terms of Apotex Agreement.

137.    Each of the Director Defendants violated the fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to the market materially misleading and inaccurate information through public statements, including, but not limited to, press releases and SEC filings, as described herein.  Each of the Director Defendants also failed to ensure that the Company provided accurate and truthful disclosures of material information to the market in a timely manner.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's legitimate corporate interests.

138.    As a direct and proximate result of Director Defendants' foregoing breaches of fiduciary duties, Bristol-Myers has suffered damages, as set forth herein.

## COUNT V

## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH FOR FAILURE TO ESTABLISH ADEQUATE INTERNAL CONTROLS
### (Against Director Defendants)

139.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

140.    As alleged in detail herein, each of the Directors Defendants had a duty to Bristol-Myers and its shareholders to establish and maintain adequate internal controls to ensure that the

41

Company's valuable franchise was adequately protected.

141.    Director Defendants, despite being on notice of the red flags described herein, abdicated their responsibility to establish and maintain adequate internal controls at Bristol-Myers, having made no good faith effort to fulfill their fiduciary duties.

142.    As a direct and proximate result of Director Defendants' failure to perform their fiduciary duties, Bristol-Myers engaged in imprudent and unlawful activities that have caused it to suffer damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf, and derivatively on behalf of Bristol-Myers, demands judgment as follows:

A.    As to Counts I, III, IV and V, Breaches of Fiduciary Duty, against all Director Defendants: An award of monetary damages to Plaintiff, on behalf of Bristol-Myers, against all of Director Defendants, for all losses and/or damages suffered by Bristol-Myers as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial.

B.    As to Count II, Contribution and Indemnification, against all Director Defendants: Contribution and indemnification from each of Director Defendants in connection with all such claims that have been, are or may in the future be asserted against Bristol-Myers by virtue of Director Defendants' misconduct and wrongdoing alleged herein.

C.    Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts; and

D.    Granting Plaintiff such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable

Dated:  July 30, 2007

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By: _____

Daniel W. Krasner (DK-6381)
Gregory Mark Nespole (GN-6820)
Paulette S. Fox (PF-2145)
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**LAW OFFICES OF BRUCE G. MURPHY**

Bruce G. Murphy, Esq.
265 Llwyds Lane
Vero Beach, Florida  32963
Telephone:  (772) 231-4202
Facsimile:  (772) 492-1044

**GAINEY & MCKENNA**

Thomas J. McKenna, Esq.
485 Fifth Avenue, 3rd Floor
New York, New York 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383

**ATTORNEYS FOR PLAINTIFF**

/483060v3

43

## VERIFICATION

I, Steven W. Sampson, Trustee, declare that I am a shareholder of Bristol-Myer Squibb Company ("Bristol-Myers") common stock and have so owned Bristol-Myers common stock during the relevant times pertinent hereto.

I have reviewed the foregoing Verified Shareholders' Derivative Complaint, and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of perjury under the laws of the United States.

Dated: July 30 , 2007

Steven W. Sampson, Trustee