UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN W. SAMPSON, TRUSTEE,<br><br>Plaintiff,<br><br>- against -<br><br>JAMES D. ROBINSON III, LEWIS B. CAMPBELL, JAMES M. CORNELIUS, LAURIE H. GLIMCHER, M.D., VICKI L. SATO, PH.D., LEIF JOHANSSON, LOUIS J. FREEH, MICHAEL GROBSTEIN, and R. SANDERS WILLIAMS, M.D.,<br><br>Defendants,<br><br>and<br><br>BRISTOL-MYERS SQUIBB COMPANY,<br><br>Nominal Defendant. | Case No. 1:07-CV-06890-PAC<br><br>Related Case No. 1:07-cv-05867-PAC<br><br>**AMENDED VERIFIED<br>SHAREHOLDER<br>DERIVATIVE COMPLAINT** |

Plaintiff Steven W. Sampson, Trustee, by and through his attorneys, derivatively on behalf of Bristol-Myers Squibb Company ("Bristol-Myers" or the "Company"), alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, the May 30, 2007 Felony Information filed by the Antitrust Division of the United States Department of Justice ("DOJ") in the United States District Court for the District of Columbia (Criminal No.: 07-140 (RMU)), the May 31, 2007 Plea Agreement between the DOJ and Bristol-Myers filed in United States District Court for the District of Columbia (Criminal No.: 07-140 (RMU)), and other publicly available documents regarding Bristol-Myers, as follows:

## SUMMARY OF THE ACTION

1.     This is a shareholders' derivative action brought on behalf of Nominal Defendant Bristol-Myers against its Board of Directors James D. Robinson III, Lewis B. Campbell, James M. Cornelius, Laurie H. Glimcher, M.D., Vicki L. Sato, Ph.D., Leif Johansson, Louis J. Freeh, Michael Grobstein, and R. Sanders Williams, M.D. (collectively, "Director Defendants"), seeking to remedy Director Defendants' breaches of fiduciary duties and other violations of law.

2.     This shareholders' derivative action seeks redress for the harm caused to the Company (economic and otherwise) arising out of Director Defendants' unlawful actions and/or inactions relating to the illegal agreement whereby Bristol-Myers and France's Sanofi-Aventis ("Sanofi"), the third largest pharmaceutical drug company in the world, (1) agreed to pay Apotex Corporation ("Apotex"), a subsidiary of Apotex, Inc., a closely-held company and Canada's largest generic drug manufacturer, not to market a generic version of Bristol-Myers' blockbuster brand-name prescription drug, Plavix; (2) agreed to forego a valuable right to collect treble damages in a patent suit against Apotex in which Bristol-Myers ultimately prevailed; and (3) agreed to permit Apotex temporarily to flood the market with a generic version of Plavix, which cost Bristol-Myers more than $1 billion in Plavix sales.

3.     Plavix gained approval from the Food and Drug Administration ("FDA") on November 17, 1997, and is currently protected by at least one United States patent through 2011. Jointly marketed by Bristol-Myers and Sanofi, Plavix is a brand name prescription drug that inhibits platelets in the blood from clotting, which reduces the risk of heart attack, stroke or vascular-related death. Bristol-Myers began selling Plavix throughout the United States pursuant to its business partnership with Sanofi.  Plavix is the world's second best-selling drug, with worldwide 2005 sales of over $6 billion. Plavix is the top-selling drug for Bristol-Myers, whose sales account for approximately 30% of its earning per share.

2

4.     Like most drugs, Plavix eventually goes off patent and is subject to generic competition. The result is that the primary manufacturer will lose substantial revenues because most third party payors will insist that patients switch to the less expensive generic, assuming it is bioequivalent to the non-generic version.    By all accounts, Apotex's generic is the bioequivalent to Plavix in all material aspects.

5.     Initially, Bristol-Myers was protective of the Plavix patent and took an aggressive posture and threatened litigation against Apotex. In fact, the Company filed a patent infringement lawsuit against Apotex in the United States District Court for the Southern District of New York on March 21, 2002. However, on March 17, 2006, Bristol-Myers and Sanofi negotiated a settlement of the Plavix patent litigation with Apotex (the "Apotex Agreement"), purportedly fearing a finding of patent invalidity and losing their ability to keep generic competition out of the market for Plavix.

6.     The Company, however, failed to disclose that Bristol-Myers relinquished material legal rights in order to induce the patent litigation settlement with Apotex, and negotiated improper side-agreements with Apotex in order to induce settlement.

7.     Moreover, the Company failed to disclose that its upper management team's entry into these side-agreements, like the Apotex Agreement, exposed Bristol-Myers to serious criminal charges and liability from class action lawsuits, in addition to heightened regulatory scrutiny. Furthermore, members of Bristol-Myers' management failed to disclose that senior executives of the Company made criminally false statements in connection with the FDA's review of the Apotex Agreement.

8.     Although the precise terms of the Apotex Agreement were not disclosed at the time, it was later reported that in a secret side-agreement Bristol-Myers and Sanofi agreed to pay

3

Apotex an estimated *$60 million fee*, and Apotex agreed not to enter the market with its generic version until some time in 2011 – which was only several months before the expected expiration of the Plavix patent. In addition, the Company agreed to forego treble damages if it prevailed in the patent litigation against Apotex, and it agreed not to seek an injunction prohibiting Apotex from selling its then-existing inventory of generic Plavix.

9.    Director Defendants knew, or in the exercise of their ordinary duties should have known, that the Apotex Agreement was nothing more than a naked restraint of trade among horizontal competitors that violated both federal and state antitrust regulations.

10.    The impropriety of this "pay-not-to-play" deal was first recognized on or about May 5, 2006, when the Federal Trade Commission ("FTC"), in lieu of rejection, told Bristol-Myers to withdraw the first incarnation of the Apotex Agreement because of several objectionable provisions. The Company was required to submit the Apotex Agreement to the FTC pursuant to a consent decree entered into by Bristol-Myers and the FTC, which limited Bristol-Myers' ability to enter into agreements delaying competitors from marketing generic versions of its drugs because Bristol-Myers had violated antitrust rules on prior occasions (discussed below) (the "FTC Consent Order").

11.    The Apotex Agreement's continued impropriety was again recognized towards the end of July 2006, when it was rejected by all 50 state attorneys general who said it still did not comply with the FTC Consent Order.

12.    On July 28, 2006, it was reported that the Antitrust Division of the DOJ was investigating allegations that Bristol-Myers deceived federal antitrust enforcers about the events surrounding the rejected Apotex Agreement. Reportedly, the FTC, which was reviewing the proposed Apotex Agreement, requested that a criminal investigation begin after officials at

4

Apotex contradicted statements Bristol-Myers made to the FTC.

13.    As part of this on-going criminal investigation into to the Apotex Agreement, two day earlier, on July 26, 2006, agents for the DOJ and the Federal Bureau of Investigation ("FBI") raided Bristol-Myers' New York City offices, including the office of its former Chief Executive Officer ("CEO"), Peter R. Dolan, for documents and emails that might provide evidence to support the FTC complaint.

14.    The DOJ investigation was not premised on the formal publicly announced Apotex Agreement, rather upon information and belief, it arises out of the secret side-agreement between Apotex and Bristol-Myers, which provided that Bristol-Myers would pay Apotex a secret $60 million fee so it would delay launching its generic until 2011, in addition to reinforcing the provision giving Apotex a six-month head-start to introduce the generic version before Bristol-Myers or any other manufacturers could launch their generic versions of Plavix.

15.    On August 8, 2006, Bristol-Myers revealed that it had substantially modified its settlement agreement with Apotex to the Company's detriment. Bristol-Myers admitted that it had waived its right to seek treble damages in the patent litigation, and also had agreed not to seek a temporary restraining order or a preliminary injunction against Apotex's launch of its generic Plavix drug.

16.    Subsequently, Bristol-Myers terminated its CEO and General Counsel for their roles in the negotiation of the settlement agreement with Apotex – though these Board actions came after the damage had already been done.

17.    To resolve the criminal investigation by the DOJ, in May 2007, Bristol-Myers pleaded guilty to two violations of the federal False Statements Act for making false statements to the FDA in connection with the settlement negotiations and subsequent agreement with

5

Apotex. The Company also paid the maximum permissible criminal fine, in the amount of $1 million.

18.    Director Defendants engaged in illegal conduct designed to circumvent the antitrust laws and avoid Bristol-Myers' compliance with the FTC Consent Order with respect to generic competition. Director Defendants should have taken steps to prevent its former CEO, Mr. Dolan, and his lieutenants, from negotiating and then trying to follow through on a deal – the Apotex Agreement – that was on its face a violation of law and violated the FTC Consent Order. This is especially egregious given the Company's well-documented history of anti-competitive conduct when dealing with generic competition. The Bristol-Myers Board's failure to actively oversee events at the Company has, in part, left Bristol-Myers exposed to criminal and regulatory sanctions, severe harm to its reputation, and a massive market capitalization decline.

19.    Accordingly, Plaintiff, derivatively on behalf of Bristol-Myers, seeks relief for the damages sustained, and to be sustained, by Bristol-Myers as a result of Director Defendants' breaches of the duty of care and fiduciary duty. As alleged herein, these breaches caused Bristol-Myers to be sued for, and exposed to liability for, violations under the anti-trust and anti-fraud laws, exposed Bristol-Myers to criminal and regulatory sanctions, and damaged the Company's reputation and goodwill.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy in this matter exceeds $75,000, exclusive of interest and costs.

21.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

6

22.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(a)(1), because one or more of Defendants either resides or maintains executives offices in this Judicial District, and a substantial portion of the acts and transactions constituting the violations of law alleged in this Complaint occurred in substantial part in this Judicial District.    Moreover, Defendants have received compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## THE PARTIES

### The Plaintiff

23.    Plaintiff Steven W. Sampson, Trustee, is a resident of Florida and has owned at times relevant to this action, and continues to own, Bristol-Myers common stock.

### The Nominal Defendant

24.    Nominal Defendant Bristol-Myers is incorporated in the state of Delaware and maintains its principal executive office in this County at 345 Park Avenue, New York, New York 10154.    Bristol-Myers common stock trades and has traded on the New York Stock Exchange under the symbol "BMY."    The Company engages in the discovery, development, licensing, manufacture, marketing, distribution, and sale of pharmaceutical and other health care products in the United States and internationally.

### The Director Defendants

25.    The following parties, sometimes referred to herein as the "Director Defendants," during the relevant time period, served as members of the Board of Directors of Bristol-Myers as follows:

James D. Robinson III

26.    Director Defendant James D. Robinson III is a citizen of New York.    He has served as a director of Bristol-Myers since 1976, and since June 12, 2005, Mr. Robinson has

7

served as the Chairman of the Board. He serves as a member, *ex-officio*, of all Board committees, which include: (1) the Audit Committee; (2) the Compensation and Management Development Committee; (3) the Committee on Directors and Corporate Governance; and (4) the Science and Technology Committee. Moreover, in November 2006, the Bristol-Myers Board established a Securities Issuance Committee to determine and approve the terms and provisions of securities issued by the Company in the fourth quarter of 2006. Following the completion of its responsibilities, the Securities Issuance Committee was dissolved on December 31, 2006. Mr. Robinson served as a member of this Committee. In addition, Mr. Robinson is Co-founder and General Partner of RRE Ventures, a private information technology venture investment firm, since 1994. He previously served as Chairman and CEO of American Express Company, a financial services company, from 1977 to 1993, and is also a director of Novell, Inc., The Coca-Cola Company and First Data Corporation. Mr. Robinson is a member of The Business Council, the Council on Foreign Relations, and the Committee for Economic Development. For serving in his Bristol-Myers capacities, upon information and belief, Mr. Robinson was paid $286,583, which combined the annual $45,000 non-management directors' retainer with a prorated non-executive Chairman retainer, for fiscal year ending December 31, 2005.

27.    As Chairman of the Board, Mr. Robinson owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations, and finances of the Company. Rather than fulfill these important fiduciary duties Mr. Robinson owed to Bristol-Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Mr. Robinson's positions, he knew the adverse non-public information

8

about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

Lewis B. Campbell

28.     Director Defendant Lewis B. Campbell has served as a director of Bristol-Myers since 1998. Mr. Campbell is currently registered to vote in three states, and until a few months ago was a citizen of Michigan. On information and belief, Mr. Campbell now resides in and is a citizen of Rhode Island.  Mr. Campbell is Chairman of Bristol-Myers' Compensation and Management Development Committee, and a member of both the Company's Audit Committee and Committee on Directors and Corporate Governance.  Since February 1999, he has been Chairman, President and CEO of Textron Inc., a multi-industry company based in Providence, Rhode Island, serving the aircraft, fastening systems, industrial products and components, and financial industries. Mr. Campbell is also a director of Dow Jones & Company. Mr. Campbell is a member of the G 100 Group, The Business Council, The Business Roundtable, and the Defense Industry Initiative Steering Committee.  For serving in his Bristol-Myers capacities, upon information and belief, Mr. Campbell was paid $120,417, which included the annual $45,000 non-management directors' retainer, for fiscal year ending December 31, 2005.

29.     As a member of the Board, Mr. Campbell owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations, and finances of the Company.  Rather than fulfill these important fiduciary duties Mr. Campbell owed to Bristol-Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or

9

omissions. Because of Mr. Campbell's positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

James M. Cornelius

30.    Director Defendant James M. Cornelius is, on information and belief, a citizen of Indiana. He has served as a director of Bristol-Myers since 2005. Mr. Cornelius was elected CEO of Bristol-Myers on April 30, 2007, after serving as interim CEO since September 12, 2006. In its 2007 Proxy Statement filed with the SEC on Form DEF-14A, the Bristol-Myers Board determined that Mr. Cornelius qualified as an "audit committee financial expert" under the applicable SEC rules. Moreover, Mr. Cornelius had served on the aforementioned Securities Issuance Committee, together with Mr. Robinson. In addition, effective November 15, 2005, Mr. Cornelius became Chairman Emeritus of Guidant Corporation, a U.S. cardiac and vascular medical device company, as the Company is being acquired. Previously, Mr. Cornelius served as Chairman of the Board (Non-Executive) since 2000. From 1995 until 2000, Mr. Cornelius served as the Senior Executive and Chairman of Guidant Corporation. From 1983 to 1994, Mr. Cornelius was a Director, a member of the Executive Committee and Chief Financial Officer of Eli Lilly and Company. Mr. Cornelius is also a director of The Chubb Corporation, The DirecTV Group, Inc., and Given Imaging, Ltd. He is a Managing Partner at Twilight Ventures Partners and a Board member of Leerink Swann & Company and a member of The National Bank of Indianapolis. He serves as Board Trustee and Treasurer of the Indianapolis Museum of Art. For serving in his Bristol-Myers capacities, upon information and belief, Mr. Cornelius was paid $101,000, which included the annual $45,000 non-management directors' retainer, for fiscal

year ending December 31, 2005.

31.    As a member of the Board, Mr. Cornelius owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations, and finances of the Company. Rather than fulfill these important fiduciary duties Mr. Cornelius owed to Bristol-Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Mr. Cornelius' positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

Laurie H. Glimcher, M.D

32.    Director Defendant Laurie H. Glimcher, M.D. is a citizen of Massachusetts. She has served as a director of Bristol-Myers since 1997. Dr. Glimcher is a member of both the Company's Audit Committee and Committee on Directors and Corporate Governance. She is Chairperson of Bristol-Myers' Science and Technology Committee. Dr. Glimcher is an Irene Heinz Given Professor of Immunology at the Harvard School of Public Health and Professor of Medicine at Harvard Medical School since 1991. Dr. Glimcher is also a director of Waters Corporation. She is a Fellow of the American Academy of Arts and Sciences and a member of the National Academy of Sciences and the Institutes of Medicine of the National Academy of Sciences and the Irvington Institute Fellowship Committee. For serving in her Bristol-Myers capacities, upon information and belief, Dr. Glimcher was paid $107,000, which included the annual $45,000 non-management directors' retainer, for fiscal year ending December 31, 2005.

11

33.    As a member of the Board, Dr. Glimcher owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations, and finances of the Company. Rather than fulfill these important fiduciary duties Dr. Glimcher owed to Bristol-Myers, she actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached her fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Dr. Glimcher's positions, she knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to her in connection therewith.

Vicki L. Sato, Ph.D.

34.    Director Defendant Vicki L. Sato, Ph.D. is a citizen of Massachusetts. She has served as a director of Bristol-Myers since July 11, 2006, and is a member of the Company's Science and Technology Committee. Dr. Sato is currently a Professor of Management Practice at the Harvard Business School and a Professor of Molecular and Cell Biology at Harvard University. In 2005, she retired as President of Vertex Pharmaceuticals. Dr. Sato also served as chief scientific officer, senior vice president of research and development, and chair of the Scientific Advisory Board at Vertex before being named president in 2000. Prior to joining Vertex, Dr. Sato was vice president of research at Biogen, Inc. and served on the Biogen Scientific Board. Dr. Sato is also a member of the Board of Directors of PerkinElmer Corporation, Infinity Pharmaceuticals, and Alnylam Pharmaceuticals.

35.    As a member of the Board, Dr. Sato owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations, and finances of the

Company. Rather than fulfill these important fiduciary duties Dr. Sato owed to Bristol-Myers, she actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached her fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Dr. Sato's positions, she knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to her in connection therewith.

Leif Johansson

36.    Director Defendant Leif Johansson is a citizen of Sweden. He has served as a director of Bristol-Myers since 1998. Mr. Johansson is a member of both the Company's Audit Committee and Committee on Directors and Corporate Governance. He is President of AB Volvo, an automotive company and CEO of The Volvo Group since 1997. Mr. Johansson is Chairman of the Board of ACEA, Commercial Vehicles as well as a director of The Confederation of Swedish Enterprise, Royal Swedish Academy of Engineering Sciences, the Association of Swedish Engineering Industries, and the Association des Constructeurs Europeens d'Automobiles. He is also a member of the European Business Roundtable of Industrialists. For serving in his Bristol-Myers capacities, upon information and belief, Mr. Johansson was paid $103,000, which included the annual $45,000 non-management directors' retainer, for fiscal year ending December 31, 2005.

37.    As a member of the Board, Mr. Johansson owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations, and finances of the Company. Rather than fulfill these important fiduciary duties Mr. Johansson owed to Bristol-

Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Mr. Johansson's positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

<u>Louis J. Freeh</u>

38.    Director Defendant Louis J. Freeh is, on information and belief, a citizen of Virginia. He has served as a director of Bristol-Myers since 2005. Mr. Freeh is a member of both the Company's Audit Committee and Committee on Directors and Corporate Governance. He served as Vice Chairman, General Counsel, Corporate Secretary and Ethics Officer to MBNA Corporation from 2001 until its acquisition by Bank of America in January 2006. Mr. Freeh also served as FBI Director from 1993 to 2001 and previously as a U.S. District Judge, Assistant U.S. Attorney, and FBI Special Agent. He is also a director of L-1 Identity Solutions, Inc.

39.    As a member of the Board, Mr. Freeh owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations, and finances of the Company. Rather than fulfill these important fiduciary duties Mr. Freeh owed to Bristol-Myers, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts complained of herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Mr. Freeh's positions, he knew the adverse non-public information about

the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

Michael Grobstein

40.    Director Defendant Michael Grobstein is a citizen of New York. He has served as a director of Bristol-Myers since March 2007. Mr. Grobstein is a member of the Company's Audit Committee. In its 2007 Proxy Statement filed with the SEC on Form DEF-14A, the Bristol-Myers Board determined that Mr. Grobstein qualified as an "audit committee financial expert" under the applicable SEC rules. He is also Retired Vice Chairman of Ernst & Young LLP. Mr. Grobstein is also a director of Given Imaging Ltd. and serves on the Board of Trustees and Executive Committee of the Central Park Conservancy and on the Board of Directors of New Yorkers for Parks.

41.    As a member of the Board, Mr. Grobstein owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations, and finances of the Company. Rather than fulfill these important fiduciary duties Mr. Grobstein owed to Bristol-Myers, he has done nothing substantively to remedy the Company's injuries caused by the malfeasance described herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Mr. Grobstein's positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

15

R. Sanders Williams, M.D.

42.    Director Defendant R. Sanders Williams, M.D. is a citizen of North Carolina. He has served as a director of Bristol-Myers since September 11, 2006, and is a member of the Company's Science and Technology Committee. Dr. Williams is Senior Vice Chancellor for Academic Affairs at Duke University Medical Center since 2007 and Dean of Duke University School of Medicine since 2001. He serves on the Director's Advisory Committee of the National Institutes of Health and the Board of External Advisors to the National Heart, Lung and Blood Institute, and is also a member of the Institutes of Medicine of the National Academy of Sciences and a fellow of the American Association for the Advancement of Science.

43.    As a member of the Board, Dr. Williams owed a duty to Bristol-Myers and its shareholders to be reasonably informed about the business, operations, and finances of the Company. Rather than fulfill these important fiduciary duties Dr. Williams owed to Bristol-Myers, he has done nothing substantively to remedy the Company's injuries caused by the malfeasance described herein, and/or breached his fiduciary duties to Bristol-Myers and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Dr. Williams' positions, he knew the adverse non-public information about the business of Bristol-Myers, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.

**Additional Relevant Non-Defendant Individuals**

Peter R. Dolan

44.    Former Director Peter R. Dolan served as Bristol-Myers' CEO in May 2001, until September 12, 2006, one day after a federal monitor recommended that he be fired. Mr. Dolan

had also served as a director of the Company since 2000, until his resignation from the Board in September 2006. Mr. Dolan was Chairman of the Bristol-Myers Board from September 2001 to June 2005.

Robert E. Allen

45.    Former director Robert E. Allen served as a director of Bristol-Myers since 1986, until his retirement from the Board on March 22, 2007. Mr. Allen was, at relevant times, Chairman of Bristol-Myers' Directors and Corporate Governance Committee, and a member of the Company's Audit Committee and Executive Committee.

Vance D. Coffman

46.    Former director Vance D. Coffman served as a director of Bristol-Myers since 1998, until his retirement from the Board on March 22, 2007. Mr. Coffman was, at relevant times, Chairman of Bristol-Myers' Audit Committee, and a member of the Company's Compensation and Management Development Committee.

Dr. Andrew G. Bodnar

47.    Former Bristol-Myers employee, Dr. Andrew G. Bodnar, was Senior Vice President of Strategy and Medical & External Affairs, as well as a Corporate Staff Member of the Company's Executive Committee. Dr. Bodnar, upon information and belief, is believed to be "BMS Executive-1" (discussed below).

Bernard C. Sherman

48.    Bernard C. Sherman is chief executive of Apotex and owner of the privately held company. Mr. Sherman, upon information and belief, is believed to be "Apotex Executive-1" (discussed below).

**Additional Relevant Non-Defendant Entities**

Sanofi-Aventis

49.     Sanofi is a French corporation headquartered in Paris, France and maintains a domestic headquarters in Bridgewater, New Jersey.  Sanofi is the third largest pharmaceutical manufacturer in the world, and develops, manufactures, and sells brand-name pharmaceutical products throughout the United States and elsewhere.  Sanofi jointly markets Plavix with Bristol-Myers.

Apotex Corporation

50.     Apotex is a private corporation that is incorporated in the state of Delaware and maintains its principal executive office at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326. Apotex is a wholly-owned subsidiary of Apotex, Inc., Canada's largest generic drug manufacturer, with more than 260 generic pharmaceutical products in approximately 4000 dosages and formats, distributed worldwide.  Apotex developed a generic version of Plavix.

## OBLIGATIONS OF DIRECTOR DEFENDANTS

51.     Each of the Director Defendants owed to Bristol-Myers the duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed the duty of full and candid disclosure of all material facts related thereto.  Further, Director Defendants owed a duty to Bristol-Myers and its shareholders to ensure that Bristol-Myers operated in compliance with all applicable federal and state laws, rules, and regulations; and that Bristol-Myers did not engage in any unsafe, unsound, or illegal business practices.

52.     To discharge these duties, Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Bristol-Myers.  By virtue of this obligation of due care and

18

diligence, Director Defendants were required, among other things, to:

    (a)    manage, conduct, supervise, and direct the employees, businesses and affairs of Bristol-Myers in accordance with laws, rules and regulations, and the charter and by-laws of Bristol-Myers;

    (b)    neither violate nor knowingly or recklessly permit any officer, director or employee of Bristol-Myers to violate applicable laws, rules and regulations and to exercise reasonable control and supervision over such officers and employees; ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Bristol-Myers;

    (c)    remain informed as to how Bristol-Myers was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice;

    (d)    supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by Bristol-Myers and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of Bristol-Myers and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above; and

    (e)    preserve and enhance Bristol-Myers's reputation as befits a public corporation and to maintain public trust and confidence in Bristol-Myers as a prudently managed institution fully capable of meeting its duties and obligations.

## BACKGROUND

### The Regulatory Structure Pursuant To Which Generic Substitutes For Brand-Name Drugs Are Approved

53.    Under the Federal Food, Drug, and Cosmetics Act (21 U.S.C. §§ 301-392), manufacturers who create a new drug must obtain the approval of the U.S. Food and Drug Administration ("FDA") to sell the new drug by filing a New Drug Application ("NDA"). An NDA must include the submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.

54.    In 1984, Congress amended the Food, Drug and Cosmetics Act with the enactment of the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984), otherwise known as the Hatch-Waxman amendments ("Hatch-Waxman").

55.    Hatch-Waxman simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need to file a lengthy and costly NDA to obtain FDA approval. The FDA instead provides an expedited review process by which generic manufacturers may file an Abbreviated New Drug Application ("ANDA") assuming certain criteria are satisfied.

56.    The ANDA references and relies upon the scientific findings of safety and effectiveness included by the brand-name drug manufacturer in the original NDA.  The ANDA filer must demonstrate to the FDA that the generic drug it is taking to market is at least bioequivalent to the referenced brand-name drug.

57.    Generic drugs are drugs that the FDA has found to be "bioequivalent" to their corresponding brand name drug.  A generic drug is bioequivalent if it provides the identical therapeutic benefits, and it has the same active chemical composition as its brand name counterpart.  When a generic drug is completely equivalent to a pioneer or brand name drug, the FDA assigns the generic drug an "AB" rating.

58.    Generic drugs are invariably priced substantially below the branded drugs to which they are bioequivalent.  Typically, the first generic drug is sold at a modest discount compared to the brand name drug, with discounts increasing, as per normal competitive dynamics, as more companies begin selling the generic.  As additional generic competitors come to market, the price of the generic equivalents continues to fall, and the combined market share of the generic manufacturers continues to grow.  In some cases, generic competitors sell products equivalent to brand name prescription drugs for as little as 15 percent of the price of the brand name drug, and capture as much as 90 percent of the market for that drug in very short order. Specifically, unless the branded manufacturer lowers prices to meet competition, a branded drug loses a significant portion of its market share to generic competitors less than a year after the introduction of generic competition.

59.    Hatch-Waxman also streamlined the process for a brand-name manufacturer to enforce its patents against generic manufacturers, and provided the brand-name manufacturer with what is essentially a self-executing preliminary injunction against generic competition, in the form of an automatic stay of FDA approval of the ANDA that may last as long as thirty months.

60.    Under Hatch-Waxman, the NDA holder submits a list of patents, if any, that "claim[] the drug for which the applicant submitted the application or which claim[] a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1).  Under FDA regulations, the only types of patents that can be submitted by the NDA filer are drug substance patents, drug product patents and method of use patents. Drug product patents may be submitted only if they claim "a drug product that is the

subject of a pending or approved application." Drug substance patents may be submitted only if they claim "a drug substance that is a component of [the drug product that is the subject of the NDA]." Method of use patents may be submitted only if they claim an approved (or pending) use of the drug product.

61.    When the FDA approves a brand-name manufacturer's NDA, the FDA publishes the patents, if any, submitted by the NDA filer in a publication entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations," known as the "Orange Book." 21 U.S.C. §355(j)(7)(A)(iii). In listing patents in the Orange Book, the FDA merely performs a ministerial act. The FDA does not check the facts supplied to it by the brand-name manufacturer, but trusts that the manufacturer will be truthful. The FDA does, however, require that the NDA holder submit a certification attesting to the propriety of the Orange Book listing. After the NDA is approved, the brand-name manufacturer may list other newly-issued patents in the Orange Book under the NDA, if the brand-name manufacturer similarly certifies, inter alia, that the new patents claim either the approved (or pending) drug product, a drug substance in that drug product, or an approved (or pending) method of using that drug product.

62.    Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications: (1) that no patent for the brand-name drug has been filed with the FDA (a "Paragraph I Certification"); (2) that the patent for the brand-name drug has expired (a "Paragraph II Certification"); (3) that the patent for the brand-name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or (4) that the patent for the brand-name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV Certification"). 21 U.S.C. §355(j)(2)(A)(vii).

22

63.    To obtain FDA approval of an ANDA (and thus the legal right to sell a generic version of a brand-name drug) prior to the expiration of a patent listed in the Orange Book for the referenced NDA, a generic manufacturer must certify that the generic drug addressed in its ANDA does not infringe any valid claim in that patent (*i.e.*, file a Paragraph IV Certification).

64.    If a generic manufacturer files a Paragraph IV Certification asserting that the patent is invalid or will not be infringed, then the brand-name manufacturer has the opportunity to delay the generic manufacturer's receipt of final FDA approval, and thus, its ability to come to market.  This is because a generic manufacturer filing a Paragraph IV Certification must promptly give notice of its ANDA Certification to both the NDA owner and the owner of the patent(s) at issue. The generic manufacturer's act of filing a Paragraph IV Certification triggers the time by which a patent owner may file an action for patent infringement, and take advantage of the self-executing stay of FDA's ability to finally approve the generic version of the NDA owner's drug.

65.    If the patent owner fails to initiate a patent infringement action within 45 days after receiving the generic manufacturer's Paragraph IV Certification, then the FDA may grant final approval to the generic manufacturer's ANDA once it concludes that the generic is bioequivalent to the brand-name drug.  If, however, the patent owner initiates an infringement action against the ANDA filer within 45 days, then the FDA may not finally approve the ANDA until the earlier of either 30 months or the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. §355(j)(5)(B)(iii).

66.    Additionally, the Hatch-Waxman statutory scheme in place at all relevant times provided a 180-day period of market exclusivity to the first generic manufacturer that filed an ANDA containing a Paragraph IV Certification, commencing on the date the generic

manufacturer began marketing the new drug or, if there was a patent infringement claim against it, from the date the generic manufacturer received a patent infringement decision in its favor, whichever was earlier. If neither of these conditions occurred, the exclusivity period would not expire and no other generic manufacturer could market its generic version of the affected drug.

67.    Typically, generic versions of brand-name drugs are initially priced significantly below their corresponding brands. As a result, direct purchasers substitute generic versions of the drug for some or all of their purchases. As more generic manufacturers enter the market, prices for generic versions of a drug predictably decrease even further because of competition among the generic manufacturers. Moreover, the brand-name drug continues to lose market share to the generics. This price competition enables direct purchasers of the drugs to: (a) purchase generic versions of a drug in substitution for the brand at lower prices and/or (b) purchase the brand-name drug at reduced prices. Consequently, brand-name drug manufacturers have a substantial and compelling financial interest in delaying generic competition.

## SUBSTANTIVE ALLEGATIONS

### The Plavix Patent

68.    Bristol-Myers and Sanofi jointly market Plavix, a brand-name prescription blood thinner used to ward off stroke and heart attack. The active ingredient in Plavix is clopidogrel bisulfate, the hydrogen sulfate salt of clopidogrel.

69.    Sanofi submitted an NDA for Plavix tablets, 75 mg, on April 28, 1997. On November 17, 1997, the FDA approved Sanofi's NDA. Bristol-Myers then began selling Plavix throughout the United States pursuant to its business partnership with Sanofi.

70.    On November 16, 2001, Apotex filed an ANDA seeking FDA approval to market a generic version of Plavix in the United States. Apotex was the first generic applicant to seek such approval. In connection with its ANDA, Apotex submitted a Paragraph IV Certification

24

stating that each patent listed in the Orange Book for Plavix was invalid, unenforceable or would not be infringed by Apotex's proposed generic product. Apotex notified Sanofi of its Paragraph IV Certification with respect to these patents.

71.    Shortly thereafter, on March 21, 2002, Bristol-Myers and Sanofi commenced the Plavix patent litigation -- a patent infringement action against Apotex under 35 U.S.C. § 271(e)(2)(A), in the Southern District of New York, triggering a 30-month delay in FDA approval of Apotex's ANDA. As originally filed, the Plavix patent litigation alleged Apotex's infringement of both the '265 patent and the '328 patent.  Subsequently, the claim for infringement of the latter patent was withdrawn, with prejudice, leaving only the claim for infringement of the '265 patent.

72.    The Plavix patent infringement litigation was set for trial in April 2006.

73.    By late 2005, Apotex was aware that FDA approval of its ANDA was imminent and began preparing to launch generic Plavix as soon as it received that approval. At that time, Apotex contacted its customers to obtain pre-launch commitments and purchase orders for generic Plavix. Apotex stated that it intended to launch upon receipt of FDA approval and was not concerned about launching generic Plavix "at-risk," even though it knew that in the event that Bristol-Myers and Sanofi won the Plavix patent litigation it would be liable for treble damages.

74.    On January 20, 2006, Apotex received final FDA approval to market its generic version of Plavix. The FDA also advised Apotex that it had been the first to file an ANDA for generic Plavix and was entitled to 180 days of marketing exclusivity that would begin to run from the earlier of commercial marketing by Apotex or the dates of certain court decisions identified in the Hatch-Waxman Act.

25

75.   On this same day, January 20, 2006, Apotex issued a press release announcing its receipt of FDA approval.   Further, Apotex's press release stated that it was confident that Bristol-Myers' and Sanofi's '265 patent would be found invalid in the upcoming Plavix patent litigation.

76.   Bristol-Myers and Sanofi were aware that Apotex had received final FDA approval and either knew or suspected that Apotex intended to launch "at-risk."   Bristol-Myers and Sanofi were concerned about this because of the large contribution Plavix made to their profits. Bristol-Myers and Sanofi could have asked the district court in New York to issue a preliminary injunction maintaining the status quo until the Plavix patent litigation was resolved, but did not do so.

**The Apotex Agreement**

77.   Instead of filing a motion for preliminary injunction, Bristol-Myers (and Sanofi) commenced negotiations with Apotex.  This was a calculated effort by the Company to have Apotex delay its launch of the generic competition, and, in return, Bristol-Myers would pay Apotex a portion of the profits it would earn as a result of that delay – a "pay-not-to-play" deal. Such an agreement would maintain Bristol-Myers' ability to earn profits by depriving consumers of the benefits of generic competition. Indeed, Bristol-Myers could share a significant portion of its profits with Apotex, and still be far better off than if it faced generic competition from Apotex.

**The Initial Apotex Agreement**

78.   According to the DOJ's Felony Information, filed on May 30, 2007 (discussed below), in or about January 2006, Bristol-Myers approached Apotex about the possibility of settling the Plavix patent litigation, which was then scheduled for trial in April 2006.

79.   Bristol-Myers and Apotex negotiated the terms of the initial Plavix patent

26

settlement agreement from January to March 2006 (the "initial Apotex Agreement"). During the negotiations, Apotex insisted Bristol-Myers commit *not* to launch an authorized generic during the period of any license granted to Apotex.

80.    On March 17, 2006, Bristol-Myers and Apotex executed the initial Apotex Agreement.

81.    On March 21, 2006, after the market closed, Bristol-Myers issued a press release entitled "Sanofi-Aventis and Bristol-Myers Squibb Announce Agreement to Settle U.S. PLAVIX Litigation with Apotex Subject to Certain Conditions." The press release detailed the terms surrounding the parties' entry into the initial Apotex Agreement, including Apotex's agreement not to enter the market with its FDA-approved generic version of Plavix until September 17, 2011, just two months before the scheduled expiration of Bristol-Myers' '265 patent. The initial Apotex Agreement further provided that Bristol-Myers would grant Apotex an exclusive license to sell its generic product that would become effective on September 17, 2011, and that Bristol-Myers would delay launching its own "authorized" generic during Apotex's 180-day exclusivity period.

82.    The press release issued by Bristol-Myers and approved by the Director Defendants on March 21, 2006, did not disclose the size of the payments to Apotex.

83.    It was not until August 2006, after the settlement deal with Apotex was effectively dead, that Bristol-Myers disclosed Apotex would receive an estimated *$60 million* pursuant to a secret side-agreement, even if the Apotex Agreement was not approved by the FTC and the 50 state attorneys general. In these later press releases, Bristol-Myers indicated that the estimated $60 million payment was a "reimbursement payment from the companies for certain short-dated inventories of Apotex's clopidogrel bisulfate product." The "short-dated" inventories

related to some of Apotex's generic Plavix inventory that Apotex was prepared to launch just prior to entering into the Apotex Agreement with Bristol-Myers (discussed below).

84.   In the past, Bristol-Myers has been accused of using patents to thwart low-cost rivals for the cancer medicine TAXOL® and anti-anxiety drug BUSPAR®. Because of this prior similar misconduct, in April 2003, the FTC and Bristol-Myers entered into the FTC Consent Order that, among other things, prohibited Bristol-Myers from settling any patent infringement litigation with any generic drug producer without first submitting the settlement agreement to the FTC, who would review it for anti-competitive provisions. The FTC Consent Order is in effect for 10 years, running through 2013. It requires Bristol-Myers to obtain approval from the FTC and all 50 states' attorneys general before it enters into any agreement to settle a patent infringement case.

85.   Accordingly, pursuant to the FTC Consent Order, Bristol-Myers was required to submit the initial Apotex Agreement to the FTC and all 50 state attorneys general for approval before it became effective.

86.   Apotex therefore consented to the postponement of the Plavix patent litigation's previously set April 2006 trial date until after the FTC and all 50 state attorneys general reviewed the initial Apotex Agreement.

87.   If the initial Apotex Agreement was approved, the payment due to Apotex from Bristol-Myers would have been considerably higher. In effect, the payment from Bristol-Myers to Apotex was payment for Apotex's acquiescence to delay its launch of the generic Plavix pending review by the FTC and all 50 state attorneys general.

88.   However, on April 4, 2006, according to the DOJ's Felony Information, the FTC met with outside counsel for Bristol-Myers regarding the initial Apotex Agreement. At this

meeting, the FTC objected to three provisions in the initial Apotex Agreement. Specifically, the FTC objected to the provisions: (i) prohibiting Bristol-Myers from launching an authorized generic version of Plavix during the period of Apotex's exclusive license under the initial Apotex Agreement; (ii) requiring that Bristol-Myers make a payment to Apotex of $60 million if there was a "regulatory denial" (as that term was defined in the Apotex Agreement) on or before June 30, 2006 ("break-up fee provision"); and (iii) requiring that Bristol-Myers compensate Apotex if annualized Plavix sales did not reach specified minimum levels in the three months preceding Apotex's market entry in accordance with the initial Apotex Agreement ("market guarantee provision").

89.    On or around May 5, 2006, the FTC informed Bristol-Myers that it was prepared to reject the initial Apotex Agreement because of these three objectionable provisions. But, rather than reject the initial Apotex Agreement, the FTC allowed Bristol-Myers to withdraw it and try to reach a lawful agreement with Apotex.

90.    The FTC's repudiation of the initial Apotex Agreement (because it contained objectionable provisions) was a "red flag" that, at a minimum, either put the Bristol-Myers Board on notice or should have triggered an inquiry given the Company's history of anti-competitive conduct and that it was subject to the FTC Consent Order. Once it was apparent that members of management – including, Mr. Dolan – tried to circumvent the FTC, the Bristol-Myers Board was duty-bound to actively participate in the process and forbid Mr. Dolan and his lieutenants from negotiating a subsequent agreement with Apotex, absent the Board's hands-on involvement.

91.    Indeed, given the Company's checkered history and problems in this area, the Board was under an affirmative duty to oversee any subsequent incarnations of the initial Apotex Agreement. As evidenced below, the Bristol-Myers Board failed to perform this task.

**The Revised Apotex Agreement**

92.    According to the DOJ Felony Information, the negotiations leading to the second iteration of the Apotex Agreement took place primarily during face-to-face meetings on May 12 and May 24, 2006, at Apotex's offices in Toronto, Canada (the "revised Apotex Agreement"). These meetings were attended on behalf of Bristol-Myers by only one individual, referred to by the DOJ as "BMS Executive-1," and they were attended on behalf of Apotex by one individual, referred to by the DOJ as "Apotex Executive-1." Two other Apotex officers participated in portions of the May 12 meeting.

### *"BMS Executive-1"*

93.    The DOJ describes the "BMS Executive-1" as a former senior executive of Bristol-Myers who, in 2006, reported directly to the Company's then-CEO, Mr. Dolan, and was a member of Bristol-Myers' Executive Committee.

94.    The DOJ's Felony Information provides that, in 2006, BMS Executive-1 "had primary responsibility for negotiating a settlement of patent litigation involving Plavix®. During that same time, he also represented [Bristol-Myers] on the Alliance Steering Committee of the Bristol-Myers Squibb Sanofi Pharmaceuticals Holding Partnership, which was a committee responsible for handling strategic issues relating to sales and marketing of Plavix® worldwide."

95.    While "BMS Executive-1" has not been formally identified by the DOJ, a May 11, 2007 article in *The New York Times*, "Bristol-Myers Agrees to Plead Guilty in Plavix Case," pointed to Mr. Dolan's assistant at the time, Dr. Andrew G. Bodnar, as the one who negotiated the secret agreement with Apotex. According to the Company's Annual Report for Fiscal Year 2005, filed on Form 10-K with the SEC on March 24, 2006, Dr. Bodnar was Senior Vice President of Strategy and Medical & External Affairs, as well as a Corporate Staff Member of the Company's Executive Committee.

30

96.     During the relevant time period, according to the Company's, Proxy Statement, filed with the SEC on Form DEF 14A on March 22, 2006, the Bristol-Myers Executive Committee, which reported directly to the Board of Directors, consisted of the following four (4) individuals: Mr. Dolan (as Chairman), Mr. Allen, Louis V. Gerstner, Jr. and Director Defendant Robinson. In addition, at one time, BMS Executive-1 (or Dr. Bodnar), was a member as well.

97.     According to the Company's next annual Proxy Statement, filed with the SEC on Form DEF 14A on March 22, 2007, Bristol-Myers announced that it had eliminated its Executive Committee. Further, of the previous year's Executive Committee members, only Director Defendant Robinson currently remains with the Company.

### *"Apotex Executive-1"*

98.     "Apotex Executive-1" also was not formally identified by the DOJ, but referred to as a senior executive of Apotex and an owner of the privately held company, with primary responsibility for overseeing patent litigation involving Plavix and the proposed settlement of that litigation. On August 18, 2006, *The New York Times* reported in an article "New Details in Reported Secret Deal Over Generic Drug," that Apotex's chief executive, Bernard C. Sherman, had lied to the federal government about the secret agreement to sabotage the settlement agreement and clear the way for his company's sales of the product.

99.     During the aforementioned meeting on May 12, 2006, between Bristol-Myers' BMS Executive-1 and Apotex's Executive-1 (upon information and belief, Dr. Bodnar and Mr. Sherman, respectively), the parties discussed the FTC's refusal to approve a revised settlement agreement that contained a written term committing Bristol-Myers not to launch an authorized generic. However, during that May 12 meeting, according to the DOJ, "BMS Executive-1 made oral representations to Apotex for the purpose of causing Apotex to conclude that [Bristol-Myers] would not launch an authorized generic in the event that the parties reached a final

revised settlement agreement."

100.    In fact, according to the DOJ, BMS Executive-1's oral representations to Apotex resulted in an understanding that Bristol-Myers would not launch an authorized generic version of Plavix in the event that the parties reached a final settlement.

101.    On May 24, 2006, BMS Executive-1 met with Apotex Executive-1 again, and at this meeting, the parties came to an agreement on the remaining terms of the revised Apotex Agreement, subject to review of a final draft of the agreement.

102.    The revised Apotex Agreement was formally executed by Bristol-Myers on May 25, 2006, and by Apotex on May 26, 2006.  It no longer included any mention of the three provisions from the initial Apotex Agreement to which the FTC had objected: (i) the commitment not to launch an authorized generic version of Plavix during Apotex's license period; (ii) the break-up fee; and (iii) the market guarantee.

103.    Bristol-Myers then submitted the revised Apotex Agreement to the FTC for review and approval on May 30, 2006, pursuant to the FTC Consent Order.  However, according to the DOJ, this submission did *not* disclose any of the oral representations or understandings regarding the launch of an authorized generic that occurred during the May 12, 2006 meeting.  In short, Bristol-Myers' submission to the FTC omitted referencing the illegal oral agreement to refrain from launching an authorized generic.

104.    Then, on June 5, 2006, Apotex submitted the revised Apotex Agreement to the FTC, as required under the Medicare Prescription Drug Improvement and Modernization Act of 2003, Pub. L. No. 108-173, Title XI, § 1112, 117 Stat. 2066 (Dec. 8, 2003), together with a letter *disclosing certain oral agreements* reached between Apotex and Bristol-Myers relating to the revised Apotex Agreement.

32

105.    In its letter, according to the DOJ, Apotex reported that it had reached an oral agreement with Bristol-Myers, whereby Bristol-Myers agreed that it would not launch an authorized generic version of Plavix during the license period granted to Apotex under the revised Apotex Agreement. This information materially contradicted Bristol-Myers' submission.

**FTC Certification**

106.    After receiving Apotex's disclosure, according to the DOJ, the FTC requested a written certification from Bristol-Myers confirming that Bristol-Myers "ha[d] not made any representation, commitment, or promise to Apotex, whether oral or written, that is not explicitly set forth in the Revised Agreement, including the representation that [DEFENDANT] would not launch an authorized generic version of Plavix during Apotex's period of exclusivity" (the "FTC Certification").

107.    The FTC Certification was executed and submitted by Bristol-Myers to the FTC on June 12, 2006. According to the DOJ, the certification was signed on behalf of Bristol-Myers by BMS Executive-1 and outside counsel, and did not disclose any of those oral representations or understandings regarding the launch of an authorized generic from the May 12, 2006 meeting, which were subsequently disclosed by Apotex in its June 5, 2006 letter to the FTC. Bristol-Myers' FTC Certification was plainly false.

**The Unraveling of the Apotex Agreement**

108.    Shortly after signing the FTC Certification, Bristol-Myers and Sanofi announced in a June 25, 2006 press release entitled "Update on Plavix® Litigation Settlement," that they had revised the Apotex Agreement in response to concerns raised by the FTC and the state attorneys general over the previously announced initial Apotex Agreement. According to the press release, under the terms of the revised Apotex Agreement, Apotex shortened the period by which it agreed not to enter the market with its generic version of Plavix to last through June 1,

2011, instead of September 17, 2011.

109.   Yet again, Bristol-Myers' press release was silent as to Apotex's secret $60 million fee, among other things, in a purported effort to evade the scrutiny of federal and state regulators reviewing the arrangement.

110.   Almost one month later, on July 27, 2006, the Company issued a press release announcing Second Quarter financial results for Fiscal Year 2006, entitled "Bristol-Myers Squibb Company Reports Financial Results for the Second Quarter and First Half of 2006." Therein, the Company, in relevant part, revealed:

> In the response to concerns raised by the FTC and state attorneys general to that proposed settlement agreement, the company, sanofi-aventis and Apotex have amended the agreement.

*     *     *

> The company learned yesterday that the Antitrust Division of the United States Department of Justice is conducting a criminal investigation regarding the proposed settlement of the Apotex litigation described above.

111.   Shortly thereafter, all 50 state attorneys general informed Bristol-Myers, Sanofi, and Apotex that they would not approve the Apotex Agreement, even in its revised form. Because effectuation of the Apotex Agreement was contingent upon the approval of both the FTC and all 50 state attorneys general, the deal was effectively dead.

112.   On July 28, 2006, as the Company issued a press release entitled "PLAVIX® Litigation Settlement Fails to Receive Antitrust Clearance From States Attorneys General," numerous news sources reported the Antitrust Division of the DOJ's investigation into allegations that Bristol-Myers deceived federal antitrust enforcers about the events surrounding the rejected Apotex Agreement to limit generic competition for Plavix. Reportedly, the FTC sought this criminal investigation after officials at Apotex seriously contradicted statements

Bristol-Myers made to the FTC.

     113.   It was also reported on this same day that, as part of its on-going criminal investigation into to the Apotex Agreement, two days earlier, on July 26, 2006, FBI agents executed a search warrant at the headquarters of Bristol-Myers in Manhattan and raided the Company's New York City offices, with their search focusing on the offices of Mr. Dolan and Dr. Bodnar for documents and emails that might provide evidence to support the FTC complaint.

     114.   The DOJ summarized the basis of the investigation, as well as Bristol-Myers' wrongdoing, as follows:

> In 2006, BMS and another company, Apotex Inc., were engaged in litigation over the validity of the patent for Plavix and were negotiating a settlement of that litigation. At the time, BMS was subject to a separate consent decree for unrelated conduct with the Federal Trade Commission (FTC) that required BMS to submit any proposed patent settlements for review and approval by the FTC. The FTC warned BMS that it would not approve a settlement of the Plavix litigation if BMS agreed not to launch its own generic version of Plavix that would compete against Apotex for generic sales. A former senior BMS executive made oral representations to Apotex with the purpose of causing Apotex to conclude that BMS would not launch its own generic version of Plavix in the event that the parties reached a final settlement agreement. The [Antitrust] Division further alleged that these representations ultimately resulted in an understanding between BMS and Apotex that BMS would not launch its own generic version of Plavix. Finally, the [Antitrust] Division charged that ***BMS took steps deliberately to mislead the FTC by first concealing and then later lying about the existence of its representations to and understanding with Apotex Inc.***

*See* Statement Of Thomas O. Barnett, Assistant Attorney General, Antitrust Division, Before The Task Force On Antitrust And Competition Committee On The Judiciary, United States House Of Representatives Concerning Oversight Of The United States Department Of Justice, Antitrust Division, http://www.usdoj.gov/atr/public/testimony/226322.htm (presented Sept. 25, 2007) (emphasis added).

     115.   In light of the foregoing events of late-July 2006, the chances of a settlement fell apart and on August 8, 2006, Apotex announced that is was launching its generic version of

Plavix in the United States. By the end of August 2006, it was reported that 78% of all new U.S.

prescriptions filled for the blood clot medicine were for the Apotex generic.

116.   That same day, Bristol-Myers filed its Quarterly Report with the SEC, and for the

first time revealed that it had substantially modified the Plavix settlement agreement with

Apotex, to the Company's detriment.  Therein, the Company, in relevant part, stated:

> The [initial Apotex] Agreement included the following provisions, among others:
> The companies would grant Apotex a royalty-bearing license under the '265
> patent to manufacture and sell its FDA-approved generic clopidogrel bisulfate
> product in the United States, and Apotex would agree not to sell a clopidogrel
> product in the United States until the effective date of the license.

*      *      *

> *In addition, the companies waived their right to seek treble damages under
> applicable patent laws if they were to prevail in the pending patent litigation.
> The companies also agreed not to seek a temporary restraining order or a
> preliminary injunction against a launch by Apotex of its generic clopidogrel
> bisulfate product* (which could not occur until five business days after failure to
> obtain antitrust clearance) *until either they had first given Apotex five business
> days prior notice of their intention to do so, or Apotex had initiated a launch.*

*      *      *

> In response to concerns expressed by the FTC and state attorneys general, the
> parties modified the [initial Apotex] Agreement.... Under the terms of the
> Modified Agreement, Apotex's license would be effective on June 1, 2011, or
> earlier in certain circumstances. The companies' agreement not to launch an
> authorized generic product during the term at the Apotex license was also deleted.
> The provisions relating to a payment to Apotex in the event U.S. sales of
> PLAVIX were lower than specified amounts and to a payment to Apotex in the
> event the required antitrust clearances were not obtained also were deleted. *The
> limitation on damages in the event Apotex launched at risk and the companies
> prevailed in the pending litigation was reduced to 40% of Apotex's net sales if
> the companies had launched an authorized generic clopidogrel bisulfate
> product and otherwise 50% of Apotex's net sales. In addition, the companies
> again waived their right to seek treble damages under applicable patent laws if
> they were to prevail in the pending patent litigation. The companies agreed not
> to seek a temporary restraining order and agreed they could seek a preliminary
> injunction only after giving Apotex five business days' notice, which notice
> could be given only after Apotex had initiated a launch.*

(Emphasis added.)

117.    Bristol-Myers and Sanofi knew that there was a "significant risk" that the settlement with Apotex would not be consummated because it would not be approved by the FTC. Indeed, *The New York Times* reported on August 9, 2006 that the Company's CEO, Mr. Dolan, said that "he had never expected the American government to approve the deal...."

118.    Then, on August 18, 2006, *The New York Times* reported in an article titled "New Details in Reported Secret Deal Over Generic Drug," that on August 17, 2006, lawyers for Apotex filed allegations against Bristol-Myers in the Federal District Court in Manhattan accusing Bristol-Myers of making the secret side-agreement part of a proposed settlement of the patent lawsuit with Apotex. The secret deal, Apotex asserted, was an effort to evade the scrutiny of the federal and state regulators who were reviewing the settlement.

119.    In this filing, Apotex came forward and admitted that Dr. Bodnar, "a top assistant to Bristol-Myers's chief executive, Peter R. Dolan, negotiated the secret deal after regulators objected to an earlier version of the patent settlement because it would have restricted competition." In fact, Apotex's filing provided many new details about its agreement with Bristol-Myers, which were concealed from the public until August 17, 2006, including Apotex's admission of the $60 million secret fee. Specifically, according to *The New York Times* article:

> The side deal, the filing said, contained two provisions that had been in the original version of the settlement agreement but that were not included when the companies formally submitted their revised version.
>
> One provision called for Bristol-Myers and Sanofi to give Apotex a six-month head start to introduce its generic version of Plavix in 2011 before the two big companies would introduce their own generic, according to today's court filing.
>
> Under the other provision, ***Bristol-Myers and Sanofi would secretly give Apotex a $60 million fee that had been part of the original settlement agreement.***

(Emphasis added.)

120.    Furthermore, *The New York Times* article reported that, in a hearing before Judge Stein in early August 2006, a lawyer for Bristol and Sanofi asserted that Apotex's chief executive, Bernard C. Sherman, "had lied to the federal government about the secret agreement to sabotage the settlement agreement and clear the way for his company's sales of the product."

121.    However, the August 17, 2006 filing by Apotex fired back in its own defense and alleged the following with respect to the roles played by Dr. Bodnar and Mr. Sherman in the unraveling of the Apotex Agreement, according to *The New York Times* article:

> [T]hat to induce Mr. Sherman to go along with the new arrangement, Dr. Bodnar made a number of oral commitments not included in the written document submitted to the government. The filing asserts that Dr. Bodnar had told Apotex that the oral agreements should not be included in the written document because their inclusion might hinder attempts to obtain regulatory clearance.

> When Mr. Sherman relayed the new agreement to his lawyers, they advised him that it was necessary to disclose both the written and oral agreements to the Federal Trade Commission, according to the document filed yesterday. The filing cites an e-mail message from Dr. Bodnar to Mr. Sherman on May 27, the day after the revised agreement was signed, as evidence of an oral side agreement.

> The e-mail message, the filing said, was a response to a demand by an Apotex lawyer, Robert S. Silver, that Bristol-Myers and Sanofi pay the $60 million fee that had been included in the original settlement submitted to the government but omitted from the revised written agreement. The payment was a break-up fee that Apotex would receive if the government rejected the initial settlement deal.

> In the e-mail message to Mr. Sherman, Dr. Bodnar objected to the request for the $60 million payment: "You explicitly assured me that you would not initiate such action at this point and would wait until matters had resolved themselves. Unless Silver immediately withdraws his demand, I will consider myself not bound by any restriction as to this issue to which I am bound by agreement with you."

122.    On September 12, 2006, Bristol-Myers announced the sudden departure of two key executives. The Company stated that Mr. Dolan "will leave the position of chief executive officer, effective immediately," and that Richard Willard "will leave the position of senior vice president and general counsel, effective immediately." The Company also stated:

At a previously scheduled meeting of the company's Board yesterday, the Board received reports from the company's outside counsel on issues relating to the PLAVIX® patent litigation with Apotex Inc. and Apotex Corp. These reports were prepared and delivered at the request of the Board as part of its ongoing assessment of this matter. *During the Board's deliberations, the Board also heard from former Federal Judge Frederick B. Lacey, the Monitor under the company's deferred prosecution agreement with the office of the U.S. Attorney for the District of New Jersey, who made his own preliminary recommendation to the Board that the employment of both Mr. Dolan and Mr. Willard be terminated.* The U.S. Attorney for New Jersey, Christopher J. Christie, also attended a portion of the Board meeting.

Judge Lacey's recommendation followed an inquiry by the Monitor and the U.S. Attorney into issues related to corporate governance in connection with the negotiation of a settlement agreement of the pending PLAVIX patent litigation with Apotex Inc. and Apotex Corp.

(Emphasis added.)

123.    Eight months later, on May 10, 2007, the *Associated Press* reported and the Company confirmed by press release, that "Bristol-Myers to Admit to False Statements." In particular, Bristol-Myers announced that it had agreed to plead guilty to federal charges of making false statements to a government agency and pay a fine of up to $1 million in connection with its failed attempt to resolve the Plavix patent dispute in 2006. The agreement in principle, subject to court approval, would essentially resolve the criminal investigation launched by the U.S. Justice Department's Antitrust Division, which centered on Bristol-Myers' actions in trying to settle the Plavix patent dispute with Apotex.

124.    The *Associated Press* article further noted, in relevant part:

Last year, Apotex alleged in court documents that a Bristol executive involved in the negotiations, Andrew Bodnar, reached certain side agreements with Apotex that weren't included in the written settlement agreement submitted to government regulators.

Bristol said Thursday it would plead guilty to two counts of violating a federal law prohibiting making false statements to a government agency. Bristol said "the charges relate to representations made by a former Bristol-Myers Squibb senior executive during the renegotiation of the proposed settlement agreement in May

2006 that were not disclosed to the U.S. Federal Trade Commission."

125.    On May 30, 2007, the Antitrust Division of the DOJ filed a Felony Information with the United States District Court for the District of Columbia (Criminal No.: 07-140 (RMU)) charging Bristol-Myers with the wrongdoing alleged herein.

126.    The next day, on May 31, 2007, the DOJ entered into a Plea Agreement with Bristol-Myers, whereby Bristol-Myers pleaded guilty to two counts of violating 18 U.S.C. Section 1001. This guilty plea resolved the investigation by the Antitrust Division of the DOJ into the proposed settlement of the Plavix patent litigation with Apotex. As a result of the plea, the Company paid a fine of $1 million.

127.    On June 11, 2007, the Company issued a press release entitled "U.S. Department of Justice Investigation of Bristol-Myers Squibb in Proposed Plavix Patent Settlement Is Resolved," announcing its May 31, 2007 Plea Agreement with the DOJ.

128.    Then, on June 19, 2007, the U.S. District Court for the Southern District of New York upheld the validity and enforceability of the Plavix patent, thereby permanently blocking the sale of Apotex's generic version. The Court ruled that Apotex's generic infringes Bristol-Myers' patent, and enjoined Apotex from marketing this product in the United States until the patent expires in November 2011.

129.    The Court stated it would calculate damages relating to Apotex's "at-risk" launch of its generic in August 2006, at a later date.  Press reports estimate those damages to be $1.2 billion to $1.4 billion in 2006, and $250 million to $350 million in 2007.

130.    Consequently, by waiving treble damages as part of its "pay-not-to-play" deal with Apotex, Bristol-Myers' officers and directors unreasonably vitiated the Company's right to recover more than $3 billion.

**A Prior History Of Anti-competitive Behavior**

131.    As previously alleged, this was not the first time Bristol-Myers engaged in such illegal and anti-competitive conduct.  In fact, Bristol-Myers engaged in similar conduct when seeking to prolong its monopoly for two of its other blockbuster drugs, BUSPAR® and TAXOL®.

132.    As a result of its earlier behavior regarding BUSPAR®, Bristol-Myers was sued by the FTC, the attorney generals of over 35 states, and nationwide classes of direct and indirect purchasers.

133.    While the Apotex Agreement fallout was on-going, on December 21, 2006, Bristol-Myers announced that it had reached an agreement in principle with the DOJ and the Office of the United States Attorney for the District of Massachusetts to settle several separate investigations into the Company's drug pricing and sales and marketing activities, subject to approval by the DOJ. These investigations began several years ago. The agreement in principle provided for a civil resolution and a tentative settlement payment by Bristol-Myers of $499 million.

134.    On September 28, 2007, it was announced that Bristol-Myers agreed to pay *more than $515 million* to settle these fraud charges involving kickbacks to doctors and inflated drug prices.  Michael Sullivan, the U.S. Attorney in Boston, said Bristol-Myers agreed to settle charges that the Company illegally compensated doctors to induce them to prescribe Bristol-Myers drugs, ostensibly for their participation in various programs which included trips to luxurious resorts. Other allegations included that a Bristol-Myers unit, Apothecon, paid retailers and wholesalers to stock its drugs, and that it promoted the sale and use of the schizophrenia drug Abilify for use in children for dementia-related psychosis.

135.    As part of that approximate $515 million settlement, Bristol-Myers said that it

entered into a five-year "corporate integrity agreement" with the Office of the Inspector General of the U.S. Department of Health and Human Services.

136.    Additionally, as referenced above, Bristol-Myers was also enjoined from resolving or settling patent infringement actions in which an ANDA filer receives anything of value unless Bristol-Myers obtains an advisory opinion from the FTC that the settlement agreement would not raise issues under Section 5 of the Federal Trade Commission Act.

137.    Regarding its scheme to block generic competition for TAXOL®, Bristol-Myers was similarly sued by the FTC, the Attorney Generals of all 50 states, and nationwide classes of direct purchasers and third-party payors. Bristol-Myers agreed to pay over $335 million to settle those charges, and also agreed to the entry of permanent injunctive relief barring it from engaging in similar misconduct in the future. Bristol-Myers was enjoined from, *inter alia*:

(a)    Improperly listing any patent in the Orange Book in the future;

(b)    Taking any action in connection with any Bristol-Myers patent improperly listed in the Orange Book, or encouraging any other person to take any action, that initiates, maintains, or causes to be initiated or maintained, a 30-Month Stay of FDA approval of any competing generic application;

(c)    Making any statements to the FDA that are (i) false and misleading; and (ii) material to either the approvability of a competing generic application;

(d)    Asserting any fraudulent or objectively baseless claim, or otherwise engaging in sham litigation for the purpose of injuring a competing generic application;

(e)    Enforcing or seeking to enforce any patent that it knows is invalid, unenforceable, or not infringed; and

(f)    Acquiring from another person a patent or an exclusive license to a patent if

Bristol-Myers seeks or secures the patent's listing in the Orange Book in reference to an already approved drug without providing prior written notification to the States.

138.    Notwithstanding this track record, Director Defendants gave Mr. Dolan the green-light, absent meaningful oversight and supervision, to once again expose Bristol-Myers to further liability, including massive liability in the form of class action lawsuits and criminal conduct, by approving the Apotex Agreement.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

139.    Plaintiff brings this action derivatively in the right and for the benefit of Bristol-Myers to redress injuries suffered, and to be suffered, by Bristol-Myers as a direct result of the violations of federal law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Director Defendants. Bristol-Myers is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

140.    Plaintiff will adequately and fairly represent the interests of Bristol-Myers and its shareholders in enforcing and prosecuting its rights.

141.    Plaintiff is and was an owner of Bristol-Myers common stock during time relevant to the Director Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

142.    The Board of Bristol-Myers consists of the following nine (9) individuals: Director Defendants James D. Robinson III, Lewis B. Campbell, James M. Cornelius, Laurie H. Glimcher, M.D., Vicki L. Sato, Ph.D., Leif Johansson, Louis J. Freeh, Michael Grobstein, and R. Sanders Williams, M.D.    During the relevant period of wrongdoing, *seven* of *nine* Director

43

Defendants were members of the Bristol-Myers Board -- James D. Robinson III, Lewis B. Campbell, James M. Cornelius, Laurie H. Glimcher, M.D., Vicki L. Sato, Ph.D, Leif Johansson, and Louis J. Freeh. Plaintiff has not made any demand on the present Bristol-Myers Board to institute this action because such a demand would be a futile, wasteful and useless act, as to a majority of the Board, particularly for the following reasons:

143.    Demand is excused because the acts and practices alleged herein constitute unlawful conduct that is not within the protection of the business judgment rule.

144.    Demand is excused because the unlawful acts and practices alleged herein cannot be approved by Director Defendants and are not subject to the protection of the business judgment rule because Director Defendants knowingly approved, or unreasonably acquiesced through their inaction, Bristol-Myers' violations of law and illegal conduct, and were aware of, or should have been aware of, the consequences to Bristol-Myers and its shareholders from their earlier experiences with BUSPAR® and TAXOL®.

145.    Demand is also excused because the Bristol-Myers Board of Directors has demonstrated a sustained and systematic failure to manage and oversee the Company's operations, as evidenced by a long history of regulatory violations. As a result of this failure, all of Director Defendants face a substantial likelihood of liability for their breaches of duties.

146.    Demand is also excused because a majority of Director Defendants serving on the Bristol-Myers Board of Directors consciously and knowingly ignored numerous "red flags" regarding the unlawfulness surrounding the initial Apotex Agreement. Ignoring these multiple red flags has caused the Company to suffer damages.

147.    As detailed above, the Company entered into the FTC Consent Order, which restricted its ability to take affirmative action in response to generic competition absent approval

44

from regulators. For example, its prior anti-competitive conduct resulted in the Company paying hundreds of millions of dollars in settlements and fines in connection with BUSPAR® and TAXOL®. Accordingly, as stated above, the Bristol-Myers Board was obligated – given this record – to take affirmative action to stop the Company's management from entering into any agreement with Apotex that was a violation of law, especially once the initial Apotex Agreement faltered.

148.    The FTC's rejection of the initial Apotex Agreement on grounds that it smacked of anti-competitive conduct that mirrored the Company's checkered past was a "red flag" that should have alerted the Board that it was obligated to actively participate in the negotiations and process leading to the execution of the revised Apotex Agreement. The Bristol-Myers Board, instead, was supine in the face of this information. It allowed, absent direct involvement, Mr. Dolan and his lieutenants to negotiate with Apotex representatives surreptitiously. The result of this inaction in the face of information commanding action was the execution of an illegal arrangement that forced DOJ intervention and resulted in guilty pleas to a Felony Information.

149.    Moreover, the Bristol-Myers Board was obligated to exercise a greater degree of care and fidelity given the Company's history of misconduct. Bristol-Myers was already subject to a federal monitor under the FTC Consent Order. These circumstances alone confirm that once the initial Apotex Agreement was repudiated by the FTC -- for being potentially unlawful -- the Bristol-Myers Board was presented with a "red flag" indicating that something at the Company had gone awry and that the law was probably being broken, yet again. Once the initial Apotex Agreement was not approved by the FTC, the Bristol-Myers Board was obligated to conduct an investigation into the circumstances leading to the potentially unlawful agreement. It was obligated to insert its own representative at the negotiation table -- not leave the process to Mr.

Dolan and his staff -- given that it was obvious that they had endeavored to engage in malfeasance. Furthermore, the Bristol-Myers Board should have discovered through simple acts of due diligence that the revised Apotex Agreement contained impermissible oral agreements restricting the Company's entrance into the generic arena. It should have inquired about and learned that Mr. Dolan and his colleagues agreed to forego recoverable damages in a desperate effort to secure near term profits and secure their positions as company managers. In light of all these "red flags" ignored by the Bristol-Myers Board, demand would be futile against them.

150.    Demand is also excused because the overwhelming majority of Director Defendants have ratified the egregious actions outlined herein, and these same Director Defendants cannot be expected to prosecute claims against themselves, and persons with whom they have extensive business and personal entanglements, if plaintiff demanded that they do so.

151.    Demand is also excused because Director Defendants participated in, approved, and/or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly and/or negligently disregarded them, and are therefore not disinterested parties and lack sufficient independence to exercise proper business judgment. The Apotex Agreement was of such significance to the Company that Director Defendants must have known of and approved it or were so grossly uninformed as to abdicate their responsibility as directors of Bristol-Myers.

152.    Accordingly, there is reasonable doubt that Director Defendants Robinson, Campbell, Cornelius, Glimcher, Sato, Johansson, and Freeh are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Bristol-Myers. Thus, demand is futile as to Director Defendants Robinson, Campbell, Cornelius, Glimcher, Sato, Johansson, and Freeh.

**The Audit Committee**

153.    The Audit Committee is comprised of Director Defendants Campbell, Glimcher, Freeh, Johansson, as well as Director Defendant Grobstein. In addition, Director Defendant Robinson serves as a member, *ex-officio*, of all Bristol-Myers Board committees, including the Audit Committee.  By its charter, the Audit Committee's function is oversight. The Audit Committee is responsible for: (i) meeting to review Bristol-Myers' disclosure controls and procedures, internal controls, periodic filings with the SEC, earnings releases and earnings guidance; (ii) producing the required Audit Committee Report for inclusion in the Company's annual proxy statements; and (iii) overseeing investigations into complaints concerning financial or accounting matters.  Other specific duties and responsibilities include working closely with management, as well as the Company's independent registered public accounting firm.

154.    The Bristol-Myers Audit Committee is primarily responsible for overseeing and monitoring the quality of the Company's accounting and auditing practices and is directly responsible for the appointment, compensation and oversight of the Company's independent registered public accounting firm for the purpose of preparing or issuing audit reports and related work regarding its financial statements. The Audit Committee also assists the Bristol-Myers Board in fulfilling its responsibilities for general oversight of compliance with legal and regulatory requirements, the performance of Bristol-Myers' internal audit function and business risk assessment and business risk management.

155.    These Director Defendants were responsible as members of the Audit Committee for ensuring that Bristol-Myers' internal controls were adequate. Bristol-Myers' internal controls, however, were deficient, as evidenced by Mr. Dolan's and his lieutenants': (i) negotiation of and participation in the unlawful Apotex Agreement, (ii) agreement to waive a valuable right to collect treble damages in a patent suit against Apotex in which Bristol-Myers

has now prevailed, and (iii) agreement not to seek an injunction prohibiting Apotex from selling its then-existing inventory of generic Plavix. As a result, the Company has been subjected to, *inter alia,* investigations by all 50 state attorneys general, the DOJ, the FTC, and even raids by the FBI.

156.    The Audit Committee was charged with the duty to ensure that internal controls were strictly followed.   This responsibility is greater where a company has a history of malfeasance. Here, the Company's anti-competitive conduct is well-documented and gave rise to governmental sanctions on many occasions.   The FTC's criticism of the initial Apotex Agreement on three distinct grounds thus served as a "red flag" calling out to the Audit Committee to engage an investigation.   That investigation should have stopped Mr. Dolan and his lieutenants from further negotiations with Apotex absent the Audit Committee's involvement. The Audit Committee was obligated to demand a fulsome explanation concerning the circumstances, including whether secret arrangements were in place to restrict trade.

157.    If the Audit Committee simply failed to do this, demand on them is futile given their inaction in the face of clear warnings.   If the Audit Committee was aware of the malfeasance and failed to act, demand is equally futile because each member thereof faces a substantial likelihood of either or both civil and criminal liability.  In short, it is impossible for members of the Audit Committee to contend that they are not culpable given the record of reckless inaction or conscious misconduct. Accordingly, there is reasonable doubt that Director Defendants Campbell, Glimcher, Johansson, and Freeh, as well as Director Defendant Robinson, are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Bristol-Myers. Thus, demand is futile as to Director Defendants Campbell, Glimcher, Johansson, Freeh, and Robinson.

**The Committee on Directors and Corporate Governance**

158.    The Committee on Directors and Corporate Governance is comprised of Director Defendants Campbell, Glimcher, and Freeh, as well as Director Defendant Williams. In addition, Director Defendant Robinson serves as a member, *ex-officio*, of all Bristol-Myers Board committees, including the Compensation and Management Development Committee. By its charter, the Committee on Directors and Corporate Governance is responsible for (i) identifying individuals qualified to become Bristol-Myer Board members, (ii) recommending that the Board select the director nominees for the next annual meeting of stockholders, and (iii) overseeing the Board's annual evaluation of its performance. It is also responsible for developing and recommending to the Board a set of corporate governance guidelines applicable to the company and for periodically reviewing such guidelines. Furthermore, the Committee on Directors and Corporate Governance is charged with the responsibility of, *inter alia*, (a) considering questions of possible conflicts of interest of Board members and the Executive Committee members; (b) annually reviewing and assessing the adequacy of the Company's corporate governance guidelines and recommend any changes to the Board for its approval and adoption; and (c) considering matters relating to the Company's responsibilities as a global corporate citizen pertaining to corporate social responsibility and corporate public policy and the impact on the Company's employees and stockholders.

159.    These Director Defendants were responsible as members of the Committee on Directors and Corporate Governance for establishing a set of guidelines of corporate governance that were adequate and would serve to prevent the exact type of wrongdoing that occurred and has been alleged herein. Bristol-Myers' internal controls, however, were deficient, as evidenced by Mr. Dolan's and his lieutenants': (i) negotiation of and participation in the unlawful Apotex Agreement, (ii) agreement to waive a valuable right to collect treble damages in a patent suit

49

against Apotex in which Bristol-Myers has now prevailed, and (iii) agreement not to seek an injunction prohibiting Apotex from selling its then-existing inventory of generic Plavix. As a result, the Company has been subjected to, *inter alia,* investigations by all 50 state attorneys general, the DOJ, the FTC, and even raids by the FBI.

160. The Committee on Directors and Corporate Governance was charged with the duty to ensure that a heightened level of corporate governance was strictly administered, especially with respect the accountability and fiduciary duties of the Bristol-Myers Board. This responsibility is greater where a company has a history of malfeasance. Here, the Company's anti-competitive conduct is well-documented and gave rise to governmental sanctions on many occasions. The FTC's criticism of the initial Apotex Agreement on three distinct grounds thus served as a "red flag" calling out to the Committee on Directors and Corporate Governance to scrutinize the performance of the Board and the effectiveness of the corporate governance guidelines it had established. Such a re-evaluation should have restricted further negotiations with Apotex absent more stringent corporate governance guidelines. The Committee on Directors and Corporate Governance Committee was obligated to demand a fulsome explanation concerning the circumstances surrounding the behavior and decisions made by Mr. Dolan, his lieutenants, as well as the Bristol-Myers Board, including whether secret arrangements were in place to restrict trade.

161. If the Committee on Directors and Corporate Governance simply failed to do this, demand on them is futile given their inaction in the face of clear warnings. If the Committee on Directors and Corporate Governance was aware of the malfeasance and failed to act, demand is equally futile because each member thereof faces a substantial likelihood of either or both civil and criminal liability. In short, it is impossible for members of the Committee on Directors and

Corporate Governance to contend that they are not culpable given the Company's record of reckless inaction or conscious misconduct. Accordingly, there is reasonable doubt that Director Defendants Campbell, Glimcher, and Freeh, as well as Robinson, are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Bristol-Myers. Thus, demand is futile as to Director Defendants Campbell, Glimcher, Freeh, and Robinson.

162. The Sarbanes-Oxley Act of 2002 (the "SOX") placed significant additional responsibilities on the boards of directors of public companies subject to the Act, like Bristol-Myers, to improve corporate financial accounting and internal controls and to improve corporate financial responsibility and disclosure. This new law was a disaster for the Bristol-Myers Board, since, despite its public posture of concern over good corporate governance, controls, disclosure and integrity; it was sitting atop a massive ongoing scheme to keep its generic competition off the market as evidenced by, *inter alia,* the Apotex Agreement. Any real compliance with the SOX would have exposed this scheme, brought it to an end and resulted in embarrassing discharges. Thus, the Bristol-Myers Board of Directors did not enforce or comply with the SOX, despite its legal obligation under federal law to do so. Clearly, the Bristol-Myers Board of Directors will not sue themselves for this failure.

163. Demand is also excused because insurance policies covering the liability of a Company's directors and officers purport to exclude legal claims asserted directly by the Company against such persons. Thus, there was, and is, a substantial disincentive for Bristol-Myers to bring any action directly against Director Defendants. Generally, under the terms of such directors' and officers' insurance policies, a company would be required by the carriers to cooperate in the defense of any claims, such as the present action, which seek to impose liability upon certain officers and directors of Bristol-Myers, including Director Defendants in this action,

for misconduct and mismanagement. Thus, if the policy or policies which Bristol-Myers maintains contain the foregoing provision, the insurance carriers would argue that Bristol-Myers and its Board of Directors are thereby contractually disabled from complying with any demand that would cause Bristol-Myers to institute, and/or prosecute any action against Director Defendants for such misconduct and mismanagement; because to do so could result in the loss to Bristol-Myers of its insurance coverage. Similarly, Bristol-Myers would be disabled from pursuing Director Defendants as it would not benefit from any insurance they may have.

164. In addition, Director Defendants suffer from irreconcilable conflicts. As members of the Board of Directors of Bristol-Myers during this relevant time period, they were privy to Bristol-Myers' improper practices, and had personal and financial interests in the actions challenged herein. Since Director Defendants took no action at the time the relevant breaches and frauds were perpetrated, they cannot be expected to take action now. Furthermore, given Director Defendants' personal exposure to liability from the conduct described herein, they suffer from an irreconcilable conflict in considering the prosecution of those involved. As such, Director Defendants will not take any steps on behalf of the Company since such a corrective action would necessitate that the Bristol-Myers initiate litigation against themselves.

165. Finally, demand is futile because the Bristol-Myers Board of Directors cannot be presumed to exercise independent judgment in assessing the merits of a demand due to their personal and financial interest in the subject matter of many of the claims raised in this Complaint. The Bristol-Myers Board of Directors would thus be required potentially to investigate and bring claims against themselves for their own misconduct. No shareholder demand could or would prompt the Bristol-Myers Board of Directors to take action. As such, demand is excused.

166.    Demand is futile as to at least Director Defendants James D. Robinson III, Lewis B. Campbell, James M. Cornelius, Laurie H. Glimcher, M.D., Vicki L. Sato, Leif Johansson, Louis J. Freeh, *seven of nine members*, constituting a majority of the Bristol-Myers Board as required under the law.

## COUNT I

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
### (Against Director Defendants)

167.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

168.    Director Defendants all owed a fiduciary duty to Bristol-Myers and its shareholders, the duty to exercise due care and diligence in the management and administration of the affairs of the Company, as well as in the auditing and reporting of the Company, and owed the duty of full and candid disclosure of all material facts thereto.

169.    As fiduciaries, to discharge these duties, Director Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Bristol-Myers.

170.    In performing the aforementioned services, Director Defendants all breached, and continue to breach, their fiduciary duties, causing damages to Bristol-Myers, by, *inter alia*, (i) failing to discover and prevent Bristol-Myers's violations of law (ii) failing to properly implement, oversee and maintain appropriate and adequate internal controls, practices, and procedures for Bristol-Myers; (iii) failing to ensure that Bristol-Myers operated in compliance with all applicable federal and state laws, rules, and regulations the development, marketing and distribution of Plavix; (iv) failing to ensure that Bristol-Myers did not engage in any unsafe, unsound, or illegal business practices; and (v) causing Bristol-Myers to be sued for, and exposed to, liability for anti-trust and anti-fraud violations, as well as exposure to criminal and regulatory

sanctions, as previously described herein.

171.     Director Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Bristol-Myers to suffer substantial monetary damages as a result of the wrongdoing herein, as well as further and even greater damage in the future, including exposure to forfeitures, fines and penalties (including the potential for massive monetary damages resulting from its anti-trust violations), damage to Bristol-Myers's reputation and good will, the resulting loss of business, increased costs of capital, and otherwise.

172.     Bristol-Myers has been directly and substantially injured by reason of Director Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder and representative of Bristol-Myers, seeks damages and other relief for the Company, in an amount to be proven at trial.

## COUNT II

### DERIVATIVE CLAIM FOR CONTRIBUTION AND INDEMNIFICATION
### (Against Director Defendants)

173.     Plaintiff incorporates by reference all paragraphs above as if set forth herein.

174.     Bristol-Myers is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Director Defendants' liability to Bristol-Myers.

175.     In addition, Director Defendants' misconduct and wrongdoing, and the disclosures and events described herein, have had, and will continue to have, a series of deleterious effects on Bristol-Myers, including but not limited to:

(a)     Loss of confidence of the investing public in the integrity and management of Bristol-Myers, thereby resulting in Bristol-Myers losing market value; and

(b)     As a result of Director Defendants' misconduct, Bristol-Myers is now exposed to

54

criminal and regulatory scrutiny, as well as anti-fraud and anti-trust lawsuits resulting from their misconduct and fraudulent activities and anti-competitive behavior, thereby, at a minimum, causing the Company to incur unnecessary direct and indirect investigatory, litigation and administrative costs, and potentially resulting in awards, judgments or settlements against Bristol-Myers.

176.    By reason of the misconduct described herein, Bristol-Myers's alleged liability arises, in whole or in part, from the intentional, knowing, reckless, disloyal and bad faith acts or omissions of Director Defendants as previously alleged herein.

177.    Bristol-Myers is therefore entitled to contribution and indemnification from each of the Director Defendants in connection with all such claims that have been, are or may in the future be asserted against Bristol-Myers by virtue of Director Defendants' misconduct and wrongdoing.

## COUNT III

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH IN CONNECTION WITH MANAGEMENT OF BRISTOL-MYERS
### (Against Director Defendants)

178.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

179.    Each of the Director Defendants had a duty to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct.

180.    As alleged in detail herein, Director Defendants have failed to seek recompense from any of the Director Defendants named herein for any of the claims alleged herein that to remedy the damages that Bristol-Myers has suffered.

181.   As a direct and proximate result of Director Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## COUNT IV

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH FOR DISSEMINATION OF MISLEADING AND INACCURATE INFORMATION
### (Against Director Defendants)

182.   Plaintiff incorporates by reference all paragraphs above as if set forth herein.

183.   As alleged in detail herein, each of the Director Defendants had a duty to ensure that Bristol-Myers disseminated accurate, truthful, and complete information to the market.

184.   As alleged in detail herein, Director Defendants failed to issue timely disclosures regarding the Company's procurement of the Plavix patent and the details surrounding the agreed-to terms of Apotex Agreement.

185.   Each of the Director Defendants violated the fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to the market materially misleading and inaccurate information through public statements, including, but not limited to, press releases, SEC filings, and the FTC Certification, as described herein. Each of the Director Defendants also failed to ensure that the Company provided accurate and truthful disclosures of material information to the market in a timely manner.

186.   For example, the Director Defendants allowed the Company to issue press releases that failed to disclose the size of the promised payment to Apotex, $60 million, in connection with the Apotex Agreement, which, among other things, ultimately exposed the Company to serious criminal charges and liability from class action lawsuits, in addition to heightened regulatory scrutiny.

187.   The Director Defendants allowed BMS Executive-1 and outside counsel to submit a revised Apotex Agreement to the FTC, which purposely did not disclose the oral

representations or understandings regarding the launch of an authorized generic between Bristol-Myers and Apotex. In fact, Director Defendants failed to ensure that the FTC Certification submitted by Bristol-Myers to the FTC was accurate and truthful.

188.    Also, the Director Defendants allowed the Company to omit from public dissemination its decision to relinquish material legal rights -- the waiver of both treble damages and the right to enjoin Apotex's "at-risk" distribution of its generic inventory -- in order to induce the patent litigation settlement with Apotex.

189.    These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's legitimate corporate interests.

190.    As a direct and proximate result of Director Defendants' foregoing breaches of fiduciary duties, Bristol-Myers has suffered damages, as set forth herein.

## COUNT V

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH FOR FAILURE TO ESTABLISH ADEQUATE INTERNAL CONTROLS
### (Against Director Defendants)

191.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

192.    As alleged in detail herein, each of the Director Defendants had a duty to Bristol-Myers and its shareholders to establish and maintain adequate internal controls to ensure that the Company's valuable franchise was adequately protected.

193.    Director Defendants, despite being on notice of the red flags described herein, abdicated their responsibility to establish and maintain adequate internal controls at Bristol-Myers, having made no good faith effort to fulfill their fiduciary duties.

194.    As a direct and proximate result of Director Defendants' failure to perform their fiduciary duties, Bristol-Myers engaged in imprudent and unlawful activities that have caused it to suffer damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf, and derivatively on behalf of Bristol-Myers, demands judgment as follows:

A.    As to Counts I, III, IV and V, Breaches of Fiduciary Duty, against all Director Defendants: An award of monetary damages to Plaintiff, on behalf of Bristol-Myers, against all of Director Defendants, for all losses and/or damages suffered by Bristol-Myers as a result of the wrongdoings complained of herein, together with pre-judgment and post-judgment interest thereon, in an amount to be proved at trial.

B.    As to Count II, Contribution and Indemnification, against all Director Defendants: Contribution and indemnification from each of Director Defendants in connection with all such claims that have been, are or may in the future be asserted against Bristol-Myers by virtue of Director Defendants' misconduct and wrongdoing alleged herein.

C.    Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts; and

D.    Granting Plaintiff such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  October 15, 2007

*Respectfully submitted,*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By:

Daniel W. Krasner (DK-6881)
Gregory Mark Nespole (GN-6820)
Alex H. Schmidt (AS- 8304)
Paulette S. Fox (PF-2145)
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**LAW OFFICES OF BRUCE G. MURPHY**

Bruce G. Murphy, Esq.
265 Llwyds Lane
Vero Beach, Florida  32963
Telephone:  (772) 231-4202
Facsimile:  (772) 492-1044

**GAINEY & MCKENNA**

Thomas J. McKenna, Esq.
295 Madison Avenue, 4th Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

**ATTORNEYS FOR PLAINTIFF**

/490559v2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN W. SAMPSON, TRUSTEE,<br><br>Plaintiff,<br><br>- against -<br><br>JAMES D. ROBINSON III, LEWIS B. CAMPBELL, JAMES M. CORNELIUS, LAURIE H. GLIMCHER, M.D., VICKI L. SATO, PH.D., LEIF JOHANSSON, LOUIS J. FREEH, MICHAEL GROBSTEIN, and R. SANDERS WILLIAMS, M.D.,<br><br>Defendants,<br><br>and<br><br>BRISTOL-MYERS SQUIBB COMPANY,<br><br>Nominal Defendant. | Case No. 1:07-CV-06890-PAC<br><br>Related Case No. 1:07-cv-05867-PAC<br><br><br><u>**CERTIFICATE OF SERVICE**</u> |

I, Paulette S. Fox, hereby certify that on October 15, 2007, I caused the following document:

**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

to be filed with the United States District Court for the Southern District of New York. I further certify that on October 16, 2007, I caused copies of the foregoing document to be emailed via .PDF and mailed via Federal Express to the following counsel:

Lorin L. Reisner
Michael Potenza
DEBEVOISE & PLIMPTON, LLP
919 Third Avenue
New York, NY 10022
Email: llreisner@debevoise.com
Email: mpotenza@debevoise.com

**Counsel for Nominal Defendant Bristol-Myers Squibb Company**

Kenneth Conboy
LATHAM & WATKINS LLP
885 Third Avenue
New York NY 10022
Email: kenneth.conboy@lw.com

**Counsel for Individually-Named Director Defendants**

Dated: October 16, 2007

PAULETTE S. FOX