UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

STEVEN W. SAMPSON, TRUSTEE,                       :
                                                  :
                              Plaintiff,          :
                                                  :
            -against-                             :        07 Civ. 6890 (PAC)
                                                  :
JAMES D. ROBINSON III, LEWIS B. CAMPBELL,         :        **FILED**
JAMES M. CORNELIUS, LAURIE H. GLIMCHER,           :        **ELECTRONICALLY**
M.D., VICKI L. SATO, PH.D., LEIF JOHANSSON,       :
LOUIS J. FREEH, MICHAEL GROBSTEIN, and            :
R. SANDERS WILLIAMS, M.D.,                        :
                                                  :
                              Defendants,         :
                                                  :
            and                                   :
                                                  :
BRISTOL-MYERS SQUIBB COMPANY,                     :
                                                  :
                              Nominal Defendant.  :
                                                  :
-----------------------------------------------------------------------x

## DECLARATION OF LORIN L. REISNER
## IN SUPPORT OF MOTION TO DISMISS

Lorin L. Reisner hereby declares as follows:

1.      I am a member of the bar of this Court and the law firm Debevoise &

Plimpton LLP, counsel for nominal defendant Bristol-Myers Squibb Company ("BMS").

This declaration is submitted in support of the motion to dismiss this action.

2.      Attached as Exhibit A is a true and correct copy of excerpts from a Form

14A Proxy Statement publicly filed by BMS with the Securities and Exchange

Commission on March 22, 2007.

3.      Attached as Exhibit B is a true and correct copy of a Form 8-K publicly filed by BMS on March 21, 2006.

4.      Attached as Exhibit C is a true and correct copy of a Deferred Prosecution Agreement dated June 15, 2005, and filed in the United States District Court for the District of New Jersey.

I declare under penalty of perjury that the foregoing is true and correct.

                          /s/  Lorin L. Reisner
                          Lorin L. Reisner

Dated:  New York, New York
          November 12, 2007

2

22600031v1

# EXHIBIT A

# BRISTOL MYERS SQUIBB CO

# FORM DEF 14A

### (Proxy Statement (definitive))

## Filed 03/22/07 for the Period Ending 05/01/07

| | |
|---|---|
| Address | 345 PARK AVE |
| | NEW YORK, NY 10154 |
| Telephone | 2125464000 |
| CIK | 0000014272 |
| Symbol | BMY |
| SIC Code | 2834 - Pharmaceutical Preparations |
| Industry | Major Drugs |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2007, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

Table of Contents

## ITEM 1—ELECTION OF DIRECTORS

Our Board of Directors has nominated nine current directors, Lewis B. Campbell, James M. Cornelius, Louis J. Freeh, Laurie H. Glimcher, M.D., Michael Grobstein, Leif Johansson, James D. Robinson III, Vicki L. Sato, Ph. D. and R. Sanders Williams, M.D., to serve as directors of Bristol-Myers Squibb. The directors will hold office from election until the 2008 Annual Meeting. If any nominee is unable to serve, proxies will be voted in favor of the remainder of those nominated and may be voted for substitute nominees, unless our Board of Directors provides for a lesser number of directors.

A majority of the votes cast is required to elect directors. A majority of the votes cast means that the number of shares voted "FOR" a director must exceed the number of votes cast "AGAINST" that director.

Listed below is certain biographical information of each of the nominees for election including his or her principal occupation and other business affiliations.

### Nominees for Directors



**Director since 1998**

### LEWIS B. CAMPBELL

Chairman, President and Chief Executive Officer since February 1999 of Textron Inc., a multi-industry company serving the aircraft, industrial products and components and financial industries. Mr. Campbell is a Director of Dow Jones & Company. Mr. Campbell is a member of The Business Council and The Business Roundtable where he serves on the Security Task Force and the International Trade and Investment Task Force. Age 60.



**Director since 2005**

### JAMES M. CORNELIUS

Chief Executive Officer of our company since September 12, 2006. Mr. Cornelius is Chairman Emeritus of Guidant Corporation, a U.S. cardiac and vascular medical device company. From November 2005 through April 2006, Mr. Cornelius served as the Chairman of the Board and Chief Executive Officer (interim) of Guidant Corporation. He served as Chairman of the Board (Non-Executive) from 2000 until 2005 and Senior Executive and Chairman from 1995 to 2000. From 1983 to 1994, Mr. Cornelius was a Director, a member of the Executive Committee and Chief Financial Officer of Eli Lilly and Company. Mr. Cornelius is a Director of The DIRECTV Group and Given Imaging Ltd. Age 63.



**Director since 2005**

### LOUIS J. FREEH

Mr. Freeh served as Vice Chairman, General Counsel, Corporate Secretary and Ethics Officer to MBNA Corporation, a bank holding company, from 2001 until its acquisition by Bank of America in January 2006. He served as FBI Director from 1993 to 2001 and previously as a U.S. District Judge, Assistant U.S. Attorney and FBI Special Agent. Mr. Freeh is a Director of L-1 Identity Solutions, Inc. Age 57.

**Table of Contents**



Director since 1997

### LAURIE H. GLIMCHER, M.D.

Irene Heinz Given Professor of Immunology at the Harvard School of Public Health and Professor of Medicine at Harvard Medical School since 1991. Dr. Glimcher is a Director of Waters Corporation. She is a Fellow of the American Academy of Arts and Sciences and a member of the National Academy of Sciences and the Institutes of Medicine of the National Academy of Sciences. She sits on the Memorial Sloan-Kettering Cancer Center Board of Scientific Consultants and on the Scientific Advisory Boards of the Burroughs-Wellcome Fund, Center for Blood Research, Health Care Ventures, Inc., Sandler Foundation Fund, and IE Labs Inc. Age 55.



Director since 2007

### MICHAEL GROBSTEIN

Retired Vice Chairman of Ernst & Young LLP, an independent registered public accounting firm. Mr. Grobstein worked with Ernst & Young from 1964 to 1998, and was admitted as a partner in 1975. He served as a Vice Chairman-International Operations from 1993 to 1998, as Vice Chairman-Planning, Marketing and Industry Services from 1987 to 1993, and Vice Chairman-Accounting and Auditing Services from 1984 to 1987. He is a Director of Given Imaging Ltd. He serves on the Board of Trustees and Executive Committee of the Central Park Conservancy and on the Board of Directors of New Yorkers for Parks. Age 64.



Director since 1998

### LEIF JOHANSSON

President of AB Volvo, an automotive company, and Chief Executive Officer of the Volvo Group, a global leading manufacturer of trucks, buses and construction equipment, drive systems for marine and industrial applications, aerospace components and services, since 1997. Prior to joining Volvo, he was with Electrolux, an international appliance company, for 17 years where he served as President and Chief Executive Officer for six years. He is a member of the Board of Svenska Cellulosa Aktiebolaget SCA in Sweden, The Confederation of Swedish Enterprise, Royal Swedish Academy of Engineering Sciences, the Association of Swedish Engineering Industries, ACEA and ACEA CV. He is also a member of the European Business Roundtable of Industrialists. Age 55.



Director since 1976

### JAMES D. ROBINSON III

Chairman of the Board of our company since June 2005. Co-founder and General Partner of RRE Ventures, a private information technology venture investment firm, since 1994. He previously served as Chairman and Chief Executive Officer of American Express Company, a financial services company, from 1977 to 1993. Mr. Robinson is a Director of Novell, Inc., The Coca-Cola Company and First Data Corporation. Mr. Robinson is a member of The Business Council, the Council on Foreign Relations and the Committee for Economic Development. He is Honorary Chairman of Memorial Sloan-Kettering Cancer Center and an Honorary Trustee of The Brookings Institution. Age 71.

Table of Contents



**Director since 2006**

### VICKI L. SATO, PH.D.

Professor of Management Practice at the Harvard Business School and Professor of the Practice in the Department of Molecular and Cell Biology at Harvard University since July 2006. In December 2005, Dr. Sato became a business advisor to Atlas Venture, a global venture capital firm. In May 2005, Dr. Sato retired as President of Vertex Pharmaceuticals Incorporated a global biotechnology company, where she was responsible for research and development, business and corporate development, commercial operations, legal, and finance. Dr. Sato also served as Chief Scientific Officer, Senior Vice President of Research and Development, and Chair of the Scientific Advisory Board at Vertex before being named President in 2000. Prior to joining Vertex, Dr. Sato was Vice President of Research at Biogen, Inc. and served on the Biogen Scientific Board. She is a Director of PerkinElmer Corporation, Infinity Pharmaceuticals and Alnylam Pharmaceuticals. Age 58.



**Director since 2006**

### R. SANDERS WILLIAMS, M.D.

Senior Vice Chancellor for Academic Affairs at Duke University Medical Center since 2007 and Dean of Duke University School of Medicine since 2001. Dr. Williams joined the Duke faculty in 1980 as an assistant professor of medicine, physiology and cell biology. He was a visiting professor of biochemistry medicine at Oxford University in 1984-1985 and returned to Duke from 1986 to 1990. In 1990, he joined the University of Texas Southwestern Medical Center as a professor, chief of cardiology, and director of the Ryburn Center for Molecular Cardiology. Dr. Williams serves on the Director's Advisory Committee of the National Institutes of Health and the Board of External Advisors to the National Heart, Lung and Blood Institute. He is also a member of the Institutes of Medicine of the National Academy of Sciences and a fellow of the American Association for the Advancement of Science. Age 58.

## Communications with our Board of Directors

The Committee on Directors and Corporate Governance has created a process by which an interested party may communicate directly with our non-management directors. Any interested party wishing to contact a non-management director may do so in writing by sending a letter to: [Name of Director], c/o Secretary, Bristol-Myers Squibb Company, 345 Park Avenue, New York, New York 10154.

Any matter relating to our financial statements, accounting practices or internal controls should be addressed to the Chair of the Audit Committee. All other matters should be addressed to the Chair of the Committee on Directors and Corporate Governance. Our Corporate Secretary reviews all correspondence and regularly forwards to our Board a summary of all such correspondence and copies of all correspondence that, in the opinion of our Corporate Secretary, deals with the functions of our Board or its committees, or that our Corporate Secretary otherwise determines requires Board attention. Directors may at any time review a log of the correspondence we receive that is addressed to members of the Board and request copies of any such correspondence.

## Codes of Conduct

Our Board of Directors has adopted the Standards of Business Conduct and Ethics that sets forth important company policies and procedures in conducting our business in a legal, ethical and responsible manner. These standards are applicable to all of our employees, including the Chief Executive Officer, the Chief Financial Officer and the Controller. In addition, the Audit Committee has adopted the Code of Ethics for Senior Financial Officers that supplements the Standards of Business

# EXHIBIT B



# BRISTOL MYERS SQUIBB CO (BMY)

345 PARK AVE
NEW YORK, NY 10154
212. 546.4000
http://www.bms.com/

# 8–K

**FORM 8–K**
**Filed on 03/21/2006 – Period: 03/21/2006**
File Number 001–01136



# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8–K

---

**CURRENT REPORT**

**Pursuant to Section 13 OR 15(d) of The Securities Exchange Act Of 1934**

**Date of Report (Date of earliest event reported): March 21, 2006**

---

# BRISTOL–MYERS SQUIBB COMPANY
**(Exact Name of Registrant as Specified in its Charter)**

---

| **Delaware** | **1–1136** | **22–079–0350** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

**345 Park Avenue**
**New York, NY, 10154**
**(Address of Principal Executive Office)**

**Registrant's telephone number, including area code: (212) 546–4000**

---

Check the appropriate box below if the Form 8–K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a–12 under the Exchange Act (17 CFR 240.14a–12)

☐    Pre–commencement communications pursuant to Rule 14d–2(b) under the Exchange Act (17 CFR 240.14d–2(b))

☐    Pre–commencement communications pursuant to Rule 13e–4(c) under the Exchange Act (17 CFR 240.13e–4(c))

**Item 8.01. Other Events.**

On March 21, 2006, sanofi–aventis and Bristol–Myers Squibb Company (the "Company) issued a joint press release announcing that they have reached an agreement subject to certain conditions with Apotex Inc. and Apotex Corp. to settle the patent infringement lawsuit pending between the parties in the U.S. District Court for the Southern District of New York. The lawsuit relates to the validity of a composition of matter patent for clopidogrel bisulfate, a medicine made available in the United States by sanofi–aventis and the Company as PLAVIX[®]. The trial in the lawsuit had previously been scheduled to begin in June 2006. As a result of the agreement, the Court has now suspended the trial date pending the possible finalization of the proposed settlement.

The agreement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general. There is a significant risk that required antitrust clearance will not be obtained. In such event, the proposed settlement would be terminated, and the litigation would be reinstated in the same Court. If the litigation were reinstated, sanofi–aventis and the Company intend to vigorously pursue patent enforcement of their patent rights in PLAVIX[®].

It is not possible at this time reasonably to assess the outcome of this lawsuit or the timing of potential generic competition for PLAVIX[®]. Apotex announced in January 2006 that it had received final approval of its aNDA for clopidogrel bifulfate from the FDA. As a result, if the litigation were reinstated, Apotex could launch a generic clopidogrel at risk.

A copy of the press release is attached to this report as Exhibit 99.1. Also attached to this report as Exhibit 99.2 is supplemental information posted on the Company's website at www.bms.com.

**Item 9.01 Financial Statement and Exhibits.**

**(d) Exhibits**

99.1    Press release, dated March 21, 2006

99.2    Supplemental information posted on Bristol–Myers Squibb Company's website at www.bms.com

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: March 21, 2006

Bristol–Myers Squibb Company

By:    /s/ Sandra Leung
Name:  Sandra Leung
Title:   Secretary

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press release, dated March 21, 2006 |
| 99.2 | Supplemental information posted on Bristol–Myers Squibb Company's website at www.bms.com |

 **BRISTOL MYERS SQUIBB CO** (BMY)

345 PARK AVE
NEW YORK, NY 10154
212. 546.4000
http://www.bms.com/

# EX–99.1

**PRESS RELEASE**
**8–K Filed on 03/21/2006 – Period: 03/21/2006**
File Number 001–01136



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 99.1

                                         Bristol-Myers Squibb Company

**MEDIA**
Jean–Marc Podvin
33–1–53–77–42–43
jean–marc.podvin@sanofi–aventis.com

**INVESTORS**
Sanjay Gupta
33–1–53–77–45–45
sanjay.gupta@sanofi–aventis.com

Laura Hortas
609–252–4587
laura.hortas@bms.com

Tony Plohoros
609–252–7938
tony.plohoros@bms.com

John Elicker
212–546–3775
john.elicker@bms.com

**SANOFI–AVENTIS AND BRISTOL–MYERS SQUIBB ANNOUNCE
AGREEMENT TO SETTLE U.S. PLAVIX® LITIGATION WITH APOTEX
SUBJECT TO CERTAIN CONDITIONS**

**PARIS, FRANCE AND NEW YORK, NEW YORK (March 21, 2006)** – Sanofi–aventis (Paris Bourse: EURONEXT: SAN; and New York: NYSE: SNY) and Bristol–Myers Squibb Company (NYSE: BMY) announced today that they have reached an agreement subject to certain conditions with Apotex Inc. and Apotex Corp. to settle the patent infringement lawsuit pending between the parties in the U.S. District Court for the Southern District of New York. The lawsuit relates to the validity of a composition of matter patent for clopidogrel bisulfate (the '265 patent), a medicine made available in the United States by sanofi–aventis and Bristol–Myers Squibb as PLAVIX®. The trial in the lawsuit had previously been scheduled to begin in June 2006. As a result of the agreement, the Court has now suspended the trial date pending the possible finalization of the proposed settlement.

Under the terms of the proposed settlement, sanofi–aventis would grant Apotex a royalty–bearing license under the '265 patent to manufacture and sell its FDA–approved clopidogrel bisulfate product in the United States, and Apotex would agree not to sell a clopidogrel product in the United States until the effective date of the license. The license would be exclusive (except for the PLAVIX® brand product) and would be effective on September 17, 2011, with

the possibility of an effective date earlier in 2011 if sanofi–aventis does not receive an extension of exclusivity for pediatric use under the '265 patent. If a third party obtains a final decision that the '265 patent is invalid or unenforceable, under certain circumstances, the license to Apotex may become effective earlier. As previously disclosed, sanofi–aventis and Bristol–Myers Squibb have filed a patent infringement claim against Dr. Reddy's Laboratories with respect to the '265 patent. Sanofi–aventis and Bristol–Myers Squibb have approached Dr. Reddy's to discuss a possible settlement of this matter. The outcome of these discussions cannot be assured.

The agreement includes other provisions, including payments by sanofi–aventis and Bristol–Myers Squibb to Apotex in the event of either finalization of the proposed settlement or termination of the agreement. Payments due to Apotex under the agreement are payable 50% by sanofi–aventis and 50% by Bristol–Myers Squibb.

The proposed settlement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general. There is a significant risk that required antitrust clearance will not be obtained. In such event, the proposed settlement would be terminated, and the litigation would be reinstated in the same Court.

If the litigation were reinstated, sanofi–aventis and Bristol–Myers Squibb intend to vigorously pursue enforcement of their patent rights in PLAVIX[®]. It is not possible at this time reasonably to assess the outcome of this lawsuit or the timing of potential generic competition for PLAVIX[®]. Apotex announced in January 2006 that it had received final approval of its aNDA for clopidogrel bisulfate from the FDA. As a result, if the litigation were reinstated, Apotex could launch a generic clopidogrel product at risk.

It also is not possible reasonably to estimate the impact of this lawsuit on sanofi–aventis and Bristol–Myers Squibb. However, loss of market exclusivity of PLAVIX[®] and the subsequent development of generic competition would be material to Sanofi–Aventis' and Bristol–Myers Squibb's sales of PLAVIX[®] and results of operations and cash flows, and could be material to sanofi–aventis' and Bristol–Myers Squibb's financial condition and liquidity.

2

Questions and answers relating to this press release are posted at www.sanofi–aventis.com and www.bms.com/news.

**Statements on Cautionary Factors**

*Sanofi–aventis*

This press release contains forward–looking statements as defined in the Private Securities Litigation Reform Act of 1995. Forward–looking statements are statements that are not historical facts. These statements include financial projections and estimates and their underlying assumptions, statements regarding plans, objectives and expectations with respect to future operations, products and services, and statements regarding future performance. Forward–looking statements are generally identified by the words "expect," "anticipates," "believes," "intends," "estimates," "plans" and similar expressions. Although sanofi–aventis' management believes that the expectations reflected in such forward–looking statements are reasonable, investors are cautioned that forward–looking information and statements are subject to various risks and uncertainties, many of which are difficult to predict and generally beyond the control of sanofi–aventis, that could cause actual results and developments to differ materially from those expressed in, or implied or projected by, the forward–looking information and statements. These factors include, among other things, the likelihood of obtaining the required antitrust clearance and satisfying the other conditions to the proposed settlement and, if such conditions are not satisfied, the outcome of the Apotex lawsuit, as well as the risk of a third party obtaining a decision of invalidity or unenforceability of the '265 patent notwithstanding finalization of the proposed settlement. These risks and uncertainties include those discussed or identified in the public filings with the SEC and the AMF made by sanofi–aventis, including those listed under "Risk Factors" and "Cautionary Statement Regarding Forward–Looking Statements" in sanofi–aventis' annual report on Form 20–F for the year ended December 31, 2004. Other than as required by applicable law, sanofi–aventis does not undertake any obligation to update or revise any forward–looking information or statements.

3

***Bristol–Myers Squibb***

This press release contains certain forward–looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 regarding, among other things, statements relating to goals, plans and projections regarding Bristol–Myers Squibb's financial position, results of operations, financial condition, liquidity and other operating matters. These statements may be identified by the fact that they use words such as "anticipate," "estimates," "should," "expect," "guidance," "project," "intend," "plan," "believe" and other words and terms of similar meaning in connection with any discussion of future operating or financial performance. Such forward–looking statements are based on current expectations and involve inherent risks and uncertainties, including factors that could delay, divert or change any of them, and could cause actual outcomes and results to differ materially from current expectations. These factors include, among other things, the likelihood of obtaining the required antitrust clearance, the risk of a third party obtaining a decision of invalidity or unenforceability of the '265 patent notwithstanding finalization of the proposed settlement, and satisfying the other conditions to the proposed settlement and, if such conditions are not satisfied, the outcome of the Apotex lawsuit. For further details and a discussion of these and other risks and uncertainties, see Bristol–Myers Squibb's periodic reports, including current reports on Form 8–K, quarterly reports on Form 10–Q and those listed under "Risk Factors" and "Cautionary Statement Regarding Forward–Looking Statements" in the annual report on Form 10–K for the year ended December 31, 2005, furnished to and filed with the Securities and Exchange Commission. Bristol–Myers Squibb undertakes no obligation to publicly update any forward–looking statement, whether as a result of new information, future events or otherwise.

**About Sanofi–Aventis**

Sanofi–aventis is the world's third largest pharmaceutical company, ranking number one in Europe. Backed by a world–class R&D organization, sanofi–aventis is developing leading positions in seven major therapeutic areas: cardiovascular, thrombosis, oncology, metabolic diseases, central nervous system, internal medicine, and vaccines. Sanofi–aventis U.S. is listed in Paris (EURONEXT: SAN) and New York (NYSE: SNY).

4

**About Bristol–Myers Squibb**

Bristol–Myers Squibb is a global pharmaceutical and related health care company whose mission is to extend and enhance human life.

###

5

 **BRISTOL MYERS SQUIBB CO** (BMY)

345 PARK AVE
NEW YORK, NY 10154
212. 546.4000
http://www.bms.com/

# EX–99.2

**SUPPLEMENTAL INFORMATION**
**8–K Filed on 03/21/2006 – Period: 03/21/2006**
File Number 001–01136



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 99.2

 

**SANOFI–AVENTIS AND BRISTOL–MYERS SQUIBB ANNOUNCE AGREEMENT
TO SETTLE U.S. PLAVIX® LITIGATION WITH APOTEX
SUBJECT TO CERTAIN CONDITIONS**

<u>Questions and Answers</u>

Q1.    **Why did sanofi–aventis and Bristol–Myers Squibb (BMS) enter into this agreement?**

A1.    Sanofi–aventis and BMS entered into this agreement based on the balance between the risk of outcome in the litigation and the certainty of a settlement.

Q2.    **Does this mean that you think that Apotex's invalidity case is strong?**

A2.    No. We continue to believe that the '265 patent is valid. If the settlement is not finalized, we intend to vigorously pursue enforcement of our patent rights in PLAVIX.

Q3.    **What is the status of the other defendants (Dr. Reddy's, Cobalt, Teva)?**

A3.    We have contacted Dr. Reddy's to discuss a settlement with them. There can be no assurance that a settlement will be reached. We will communicate with Teva and Cobalt in due course.

Q4.    **Is this another case of an innovator company and generic company colluding to prevent a generic from coming on the market sooner?**

A4.    No. Under the agreement, Apotex will in fact enter the market before exclusivity on the '265 patent expires.

Q5:    **How long will the license to Apotex be in effect prior to the loss of exclusivity?**

A5     We expect the license will be in effect eight months prior to the loss of exclusivity.

Q6.    **What do you think about the prospects for obtaining FTC and state attorneys general antitrust review and clearance?**

A6     As we said in the release, there is a significant risk that the required antitrust clearance will not be obtained.

**Q7.    What is the process for obtaining antitrust review and clearance? How long do you think that will take?**

A7.    We will submit the settlement agreement to the FTC and state attorneys general for review promptly. We cannot predict how long they will take to evaluate the agreement.

**Q8.    What happens if the antitrust review and clearance is not obtained?**

A8.    As discussed in the release, if antitrust review and clearance is not obtained, the agreement would be terminated, Apotex would receive a payment, the litigation would be reinstated and Apotex could launch a generic clopidogrel at risk. If the litigation is reinstated, we would vigorously pursue enforcement of our patent rights in Plavix.

**Q9.    What are the financial terms of the settlement? Will you establish a reserve for the settlement?**

A9.    In the first quarter of 2006, sanofi–aventis and BMS each expect to establish a reserve that we do not expect to be material which represents the minimum estimated amount of payments under the agreement. Sanofi–aventis and BMS may record additional reserves in the future. At this time, we cannot reasonably estimate the amount of any future reserves. If the settlement is finalized, the agreement provides for certain possible payments to Apotex at the time the license becomes effective. While we do not currently believe it is likely that the conditions requiring such payments will occur, such payments, if required, could be material.

**Q10.    What are the other conditions to the settlement?**

A10.    We will not discuss the conditions and terms of the settlement other than what is disclosed in the press release.

###

# EXHIBIT C

# Deferred Prosecution Agreement

1.      Bristol-Myers Squibb Company ("BMS" or the "Company") by its undersigned attorneys, pursuant to authority granted by its Board of Directors, and the United States Attorney's Office for the District of New Jersey (the "Office"), enter into this Deferred Prosecution Agreement (the "Agreement").  Except as specifically provided below, the Agreement shall be in effect for a period of two years from the date it is fully executed.

2.      The Office has informed BMS that it will file, on or shortly after the date this Agreement is fully executed, a criminal complaint in the United States District Court for the District of New Jersey charging BMS with conspiracy to commit securities fraud, contrary to Title 15, United States Code, Sections 78j(b) & 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5, in violation of Title 18, United States Code, Section 371, during the period of 2000 through 2001.

3.      BMS and the Office agree that, upon filing of the criminal complaint in accordance with the preceding paragraph, this Agreement shall be publicly filed in the United States District Court for the District of New Jersey, and BMS agrees to post the Agreement prominently on its website.

4.      In light of BMS's remedial actions to date and its willingness to (a) undertake additional remediation; (b) acknowledge responsibility for its behavior; (c) continue its cooperation with the Office and other governmental regulatory agencies; (d) demonstrate its future good conduct and full compliance with the securities laws and Generally Accepted Accounting Principles; and (e) consent to payment of additional restitution as set forth in paragraph 21, the Office shall recommend to the Court that prosecution of BMS on the criminal complaint filed pursuant to paragraph 2 be deferred for a period of twenty-four (24) months from the filing date of the criminal complaint.  If the Court declines to defer prosecution for any reason, this Agreement shall be null and void, and the parties will revert to their pre-Agreement positions.

5.      BMS has undertaken extensive reforms and remedial actions in response to the conduct at BMS that is and has been the subject of the investigation by the Office.  These reforms and remedial actions have included:

(a)      Retaining the Honorable Frederick B. Lacey as Independent Advisor, to conduct a comprehensive review of the implementation and effectiveness of the internal controls, financial reporting, disclosure, planning, budget and projection processes and related compliance functions of the Company, as well as to serve additional supervisory and monitoring functions described herein;

(b)      Entering a Consent filed in the United States District Court for the District of New Jersey in United States Securities Exchange Commission v. Bristol-Myers Squibb Company, Civ. Action No. 04-3680 (FSH) (the "D.N.J. Action") providing for, among other

1

things, the payment of a $100 million Civil Penalty and an additional $50 million Shareholder Fund payment, both of which amounts are to be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002, as well as incorporating an array of remedial measures to be undertaken by BMS together with extensive supervisory and monitoring responsibilities to be carried out by the Independent Advisor during a review period extending through the filing of the Company's Form 10-K for the year ended 2005;

(c)    Making a payment of an additional $300 million to compensate present and former BMS shareholders in connection with lawsuits filed and consolidated in In re Bristol-Myers Squibb Securities Litigation, Master File No. 02-CV-2251 (LAP) (S.D.N.Y.) (the "Consolidated Shareholder Litigation");

(d)    Making significant personnel changes after April 2002 and after the Office commenced its investigation including:

(i) replacing the former Chief Financial Officer (CFO);

(ii) replacing the former President of the Worldwide Medicines Group;

(iii) replacing the former Controller;

(iv) establishing the position of Assistant Controller for Financial Compliance and Control;

(v) establishing the position of Chief Compliance Officer;

(vi) establishing a position for an experienced securities regulation and disclosure lawyer who has a significant role in all BMS disclosure responsibilities;

(e)    Changing its budget process, to assure that appropriate consideration is given to input and analysis from the bottom to top, and not exclusively from top to bottom, and adequately documenting that process;

(f)    Forming a business risk and disclosure group that includes senior management, the Independent Advisor and counsel to the Independent Advisor;

(g)    Identifying and implementing actions to improve the effectiveness of its disclosure controls and procedures and internal controls, including enhancing its resources and training with respect to financial reporting and disclosure responsibilities, and reviewing such actions with its Audit Committee and independent auditors;

2

      (h)     Implementing a formal review and certification process of its annual and quarterly reports filed with the Securities and Exchange Commission (SEC); and

      (i)     Providing an effective mechanism in the form of a confidential hotline and e-mail address, of which BMS employees are informed and can use to notify BMS of any concerns about wholesaler inventory levels or the integrity of the financial disclosures, books and records of BMS.

6.     BMS shall maintain and continue to implement any remedial measures already undertaken or mandated as part of agreements BMS has reached in the following matters: In re Bristol-Myers Squibb Derivative Litigation, Master File No. 02-CV-8571 (LAP) (S.D.N.Y.) (the "Shareholder Derivative Action"); the "D.N.J. Action"; and the "Consolidated Shareholder Litigation."

7.     In addition to the extensive remedial actions that it has taken to date, BMS agrees to undertake additional remedial actions and corporate reforms as set forth herein.

8.     BMS shall establish the position of non-executive Chairman of the BMS Board of Directors (the "Non-Executive Chairman"), to advance and underscore the Company's commitment to exemplary corporate citizenship, to best practices of effective corporate governance and the highest principles of integrity and professionalism, and to fostering a culture of openness, accountability and compliance throughout the Company. BMS shall retain the position of Non-Executive Chairman at least throughout the term of this Agreement.

9.     BMS agrees to appoint an additional non-executive Director acceptable to the Office to the BMS Board of Directors within sixty (60) days of the execution of this Agreement.

10.     The Company's CFO, General Counsel, and Chief Compliance Officer regularly shall brief and provide information to the Non-Executive Chairman, in a manner to be determined by the Non-Executive Chairman. In addition, the Non-Executive Chairman shall have the authority to meet with, and require reports on any subject from, any officer or employee of the Company.

11.     BMS agrees that until at least the date of the filing of the Company's Form 10-K for the year ended 2006, it will retain an outside, independent individual or entity (the "Monitor"), selected by BMS and approved by the Office. BMS may employ as the Monitor the Honorable Frederick B. Lacey. It shall be a condition of the Monitor's retention that the Monitor is independent of BMS and that no attorney-client relationship shall be formed between the Monitor and BMS.

12.     The Monitor shall:

      (a)     Monitor BMS's compliance with this Agreement, and have authority to require BMS to take any steps he believes are necessary to comply with the terms of this Agreement;

(b)      Continue the review, reforms and other functions undertaken as the Independent Advisor;

(c)      Report to the Office, on at least a quarterly basis and between thirty and forty-five calendar days after the filing of the Company's Form 10-K for the year ended 2006, as to BMS's compliance with this Agreement and the implementation and effectiveness of the internal controls, financial reporting, disclosure processes and related compliance functions of the Company.  The first report to the Office shall be due within forty-five (45) days after the close of the second quarter 2005, and subsequent quarterly reports (other than the final report) shall be due by the close of the quarter.  The reporting function of the Monitor shall extend until forty-five (45) days subsequent to the filing of the Company's Form 10-K for the year ended 2006 in order to facilitate the submission of the Monitor's final report to the Office;

(d)      Cooperate with the SEC and provide information about BMS as requested by that agency;

(e)      Monitor BMS's compliance with applicable federal securities laws, and in his quarterly reports make recommendations necessary to ensure that the Company complies with applicable federal securities laws;

(f)      Monitor BMS's compliance with agreements BMS has reached in the Shareholder Derivative Action, the D.N.J. Action, and the Consolidated Shareholder Litigation; and

(g)      Monitor the information received by the confidential hotline and e-mail address described in paragraph 5(i).

13.    BMS agrees that the Chief Executive Officer (CEO), Non-Executive Chairman, and General Counsel will meet quarterly with the Office and the Monitor, in conjunction with the Monitor's quarterly reports.

14.    BMS shall adopt all recommendations contained in each report submitted by the Monitor to the Office unless BMS objects to the recommendation and the Office agrees that adoption of the recommendation should not be required.  The Monitor's reports to the Office shall not be received or reviewed by BMS prior to submission to the Office; such reports will be preliminary until senior management of BMS is given the opportunity, within ten (10) days after the submission of the report to the Office, to comment to the Monitor and the Office in writing upon such reports, and the Monitor has reviewed and provided to the Office responses to such comments, upon which such reports shall be considered final.

15.    BMS agrees that the Monitor may also disclose his reports, as directed by the Office,

4

to any other federal, state or foreign law enforcement or regulatory agency in furtherance of an investigation of any other matters discovered by, or brought to the attention of, the Office in connection with the Office's investigation of BMS or the implementation of this Agreement.

16.    BMS agrees that if the Monitor resigns or is unable to serve the balance of his term, a successor shall be selected by BMS and approved by the Office within forty-five (45) days. BMS agrees that all provisions in this Agreement that apply to the Monitor shall apply to any successor Monitor.

17.    The Non-Executive Chairman and the Compensation Committee of the Board of Directors shall set goals and objectives relevant to compensation of the CEO, evaluate the CEO's performance in light of those goals and objectives, and recommend to the Board of Directors compensation based on this evaluation.

18.    BMS agrees that it will establish and maintain a training and education program, which shall be reviewed and approved by the Board of Directors, designed to advance and underscore the Company's commitment to exemplary corporate citizenship, to best practices of effective corporate governance and the highest principles of integrity and professionalism, and to fostering a culture of openness, accountability and compliance throughout the Company. Completion of such training shall be mandatory for (a) all BMS officers, executives and employees who are involved in accounting and financial reporting functions, or the oversight thereof, whether at the corporate or the division level, including but not limited to each officer or employee responsible for closing the books within his or her area of responsibility at the end of a quarterly or annual reporting period; (b) all employees of the BMS legal division with responsibility for finance, business risk or disclosure issues; and (c) other senior officers and executives at BMS, at both the corporate and operating levels, as proposed by BMS and approved by the Office (collectively the "Mandatory Participants"). Such training and education program will cover, at a minimum, the following subjects: (a) the obligations imposed by the federal securities laws, including disclosure obligations; (b) proper internal accounting controls and procedures; (c) discovering and recognizing accounting practices that do not conform to Generally Accepted Accounting Principles or that are otherwise improper; and (d) the obligations assumed by, and responses expected of, the Mandatory Participants upon learning of improper, illegal or potentially illegal acts relating to BMS's accounting and financial reporting. The Board of Directors shall communicate to the Mandatory Participants, in writing or by video, its review and endorsement of the training and education program.

19.    BMS shall commence providing the training mandated by paragraph 18 within ninety (90) days after the date of the execution of this Agreement and shall, at that time, submit to the Office a written description of the content and planned implementation of the training and education program. BMS shall thereafter provide such training and education on an annual basis for all those who become Mandatory Participants during the preceding twelve months.

20.     BMS shall endow a chair at Seton Hall University School of Law dedicated to the teaching of business ethics and corporate governance, which position shall include conducting one or more seminars per year on business ethics and corporate governance at Seton Hall University School of Law that members of BMS's executive and management staff, along with representatives of the executive and management staffs of other companies in the New Jersey area, may attend.

21.     BMS shall make an additional payment of $300 million into the shareholder compensation fund established pursuant to the consent judgment in the D.N.J. Action.  This payment shall be administered according to the terms of such fund.  Together with this payment, BMS will have paid a total of $839 million in compensation to its shareholders and former shareholders.  This sum includes payments already made by BMS of $300 million in the Consolidated Shareholder Litigation, $150 million in the D.N.J. Action, and $89 million in actions by shareholders who requested to be excluded from the settlement in the Consolidated Shareholder Litigation, as well as the additional $300 million that BMS shall pay pursuant to this Agreement.  BMS may make the additional payment of $300 million in a single payment at or before the close of the third quarter of 2005, or in four approximately equal quarterly installments, with the first installment due at the close of the third quarter of 2005.  None of the proceeds of the payment required by this Agreement shall be payable as attorney's fees.  Any costs of administering the distribution of the additional payment called for by this agreement shall be borne by BMS.  To the extent that any money paid into the D.N.J. shareholder compensation fund pursuant to this Agreement is not claimed by shareholders or former shareholders within three years, the remaining amount shall be paid to the United States Treasury.

22.     Within thirty (30) days of the execution of this Agreement, BMS agrees to call a meeting, on a date mutually agreed upon by BMS and the Office, of its senior executives and any senior financial personnel, and any other BMS employees who the Company desires to attend, such meeting to be attended by the United States Attorney and other representatives of the Office for the purpose of communicating the goals and expected effect of this Agreement.

23.     For a period of one year from the execution of this Agreement, the Non-Executive Chairman, CEO, and General Counsel shall contemporaneously monitor either in person or telephonically BMS's quarterly conference calls for analysts ("analyst calls"), and the Non-Executive Chairman shall attend and participate in any preparatory meetings held among the CEO, the CFO, the General Counsel and other members of BMS senior management in anticipation of the analyst calls. The General Counsel shall ensure that representatives of the BMS legal division are informed and consulted regarding, at a minimum, issues relating to disclosure or securities law that may arise in the course of preparing for the analyst calls.

24.     The CEO and CFO shall prepare and submit to the Non-Executive Chairman, Chief Compliance Officer and the Monitor described in paragraph 11 written reports on the following subjects:

     (a)     all non-standard transactions with major U.S. wholesalers, such written report to be submitted within fifteen (15) days of such transaction;

     (b)     an overview and analysis of BMS's annual budget process for its major business units, including description of significant instances of any top-down changes to business unit submissions, such written report to be submitted together with the proposed budget submitted for approval to the Board of Directors;

     (c)     sales and earnings forecasts or projections at the corporate or major business unit level which indicate a quarterly target will not be met, together with a description of steps subsequently taken, if any, to achieve the budget target, such written report to be submitted quarterly and at least ten (10) business days prior to the Company's scheduled quarterly analyst call;

     (d)     description of significant instances in which the preliminary quarterly closing of the books of any major business unit indicated that the business unit would not meet its budget target for any sales or earnings measure.

25.     BMS agrees that it shall include in its quarterly and annual public filings with the SEC and its annual report to shareholders financial disclosures concerning the following: (a)(i) for the Company's U.S. Pharmaceuticals business, estimated wholesaler/direct-customer inventory levels of the top fifteen (15) products sold by such business and (ii) for major non-U.S. countries, estimated aggregate wholesaler/direct-customer inventory levels of the top fifteen (15) pharmaceutical products sold in such countries taken as a whole measured by aggregate annual sales in such countries; (b) arrangements with and policies concerning wholesalers/direct customers and other distributors of such products, including but not limited to efforts by BMS to control and monitor wholesaler/distributor inventory levels; (c) data concerning prescriptions or other measures of end-user demand for such top fifteen (15) BMS pharmaceutical products sold within the U.S. and in major non-U.S. countries; (d) acquisition, divestiture, and restructuring reserve policies and activity; and (e) rebate accrual policies and activity. The CEO shall, at the annual BMS shareholder meeting, report to the shareholders on these topics.

26.     BMS agrees that it will continue to review and improve, where necessary, the content of its public financial and non-financial public disclosures, including periodic SEC filings, annual and other shareholder reports, press releases, and disclosures during analyst conference calls, as well as during meetings with investors and credit ratings agencies. BMS agrees that it will at all times strive for openness and transparency in its public reporting and disclosures.

27.     BMS shall encourage the free flow of information between its employees and its external auditor, and encourage its CFO and senior finance personnel to seek advice from the external auditor. The CEO, CFO, General Counsel, and Chief Compliance Officer shall meet quarterly with the

Company's external auditors, such meeting to occur following the closing of the Company's books for the quarter and prior to the Company's scheduled quarterly analyst call. At the quarterly meeting, the BMS attendees shall discuss business and financial reporting developments, issues and trends with the external auditor, as well as provide information to the external auditor concerning the subjects described in paragraph 24 above, and shall respond to inquiries from the external auditor.

28.    BMS accepts and acknowledges responsibility for the facts set forth in the Statement of Facts attached as Appendix A (the "Statement of Facts") and incorporated by reference herein by entering into this Agreement and by, among other things, (a) the extensive remedial actions that it has taken to date, (b) its continuing commitment to full cooperation with the Office and other governmental agencies, and (c) and the other undertakings it has made as set forth in this Agreement.

29.    BMS agrees that in the event that future criminal proceedings are brought by the Office in accordance with paragraphs 4 and 36 through 39 of this Agreement, BMS will not contest the admissibility of the Statement of Facts in any such proceedings. Nothing in this Agreement shall be construed as an acknowledgment by BMS that the Agreement, including the Statement of Facts, is admissible or may be used in any proceeding other than in a proceeding brought by the Office.

30.    BMS expressly agrees that it shall not, through its present or future attorneys, Board of Directors, agents, officers or employees, make any public statement contradicting any statement of fact contained in the Statement of Facts. Any such contradictory public statement by BMS, its present or future attorneys, Board of Directors, agents, officers or employees, shall constitute a breach of this Agreement as governed by paragraphs 36 and 37 of this Agreement, and BMS would thereafter be subject to prosecution pursuant to the terms of this Agreement. The decision of whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to BMS for the purpose of determining whether BMS has committed a knowing and material breach of this Agreement shall be at the sole discretion of the Office. Should the Office notify BMS of a public statement by any such person that in whole or in part contradicts a statement of fact contained in the Statement of Facts, BMS may avoid breach of this Agreement by publicly repudiating such statement within forty-eight (48) hours after such notification. This paragraph is not intended to apply to any statement by any former BMS employee, officer or director, or any BMS employee, officer or director testifying in any proceeding in an individual capacity and not on behalf of BMS.

31.    BMS agrees that its continuing cooperation during the term of this Agreement shall include, but shall not be not limited to, the following:

(a)    Not engaging in or attempting to engage in any criminal conduct as defined in paragraph 34.

(b)    Completely, truthfully and promptly disclosing all information concerning all matters about which the Office and other government agencies designated by the Office may

inquire, and continuing to provide the Office, upon request, all documents and other materials relating to matters about which the Office inquires, and analysis or other work product as may be requested by the Office, as promptly as is practicable.  Cooperation under this paragraph shall include identification of documents that may be relevant to the matters under investigation.

(c)     Consenting to any order sought by the Office permitting disclosure of any materials that constitute "matters occurring before the grand jury" within the meaning of Rule 6(e) of the Federal Rules of Criminal Procedure.

(d)     Not asserting, in relation to any request of the Office, any claims of attorney-client privilege or attorney work-product doctrine as to any documents,  records, information or testimony requested by the Office related to:  (i) factual internal investigations undertaken by the Company or its counsel relating to the matters under investigation by the Office; (ii) legal advice given contemporaneously with, and related to, such matters.  Such materials are referred to hereinafter as the "Confidential Materials."  By producing the Confidential Materials pursuant to this Agreement, BMS does not intend to waive the protection of the attorney-client privilege or the attorney work-product doctrine, or any other applicable privilege, as to third parties.  The Office will maintain the confidentiality of the Confidential Materials pursuant to this Agreement and will not disclose them to any third party, except to the extent that the Office determines, in its sole discretion, that disclosure is otherwise required by law or would be in furtherance of the discharge of the duties and responsibilities of the Office.

(e)     Making available BMS officers, directors, and employees and using its best efforts to make available former BMS officers, directors, and employees to provide information and/or testimony at all reasonable times as requested by the Office, including sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement authorities.  Cooperation under this paragraph shall include identification of witnesses who, to BMS's knowledge, may have material information regarding the matters under investigation.

(f)     Providing testimony, certifications, and other information deemed necessary by the Office or a court to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents in any criminal or other proceeding as requested by the Office.

32.    BMS has provided extensive cooperation to the Office in connection with its investigation.  BMS acknowledges and understands that its prior, ongoing and future cooperation are important factors in the decision of the Office to enter into this Agreement, and BMS agrees to continue to cooperate fully with the Office, and with any other governmental agency designated by the Office, regarding any issue about which BMS has knowledge or information.

9

33.    BMS authorizes the Office and the SEC to share information from and about BMS with each other and hereby waives any confidentiality accorded to that information by law, agreement or otherwise that would, absent authorization by BMS, prohibit or limit such sharing. No other waivers of confidentiality shall be required in that regard.

34.    BMS will inform the Office of any credible evidence of criminal conduct at BMS occurring after the date of the Agreement, including making available internal audit reports, letters threatening litigation, "whistleblower" complaints, civil complaints, and documents produced in civil litigation so evidencing such criminal conduct. For purposes of this Agreement, "criminal conduct" is defined as (a) any crime related to BMS's business activities committed by one or more BMS executive officers or directors; (b) securities fraud, accounting fraud, financial fraud or other business fraud materially affecting the books, records or publicly-filed reports of BMS; and (c) obstruction of justice.

35.    The Office may continue to investigate current and former BMS employees. Nothing in this Agreement restricts in any way the ability of the Office to investigate and prosecute any BMS employee or former BMS employee.

36.    Should the Office determine during the term of this Agreement that BMS has committed any criminal conduct as defined in paragraph 34 commenced subsequent to the date of this Agreement, or otherwise in any other respect knowingly and materially breached this Agreement, BMS shall, in the discretion of the Office, thereafter be subject to prosecution for any federal crimes of which the Office has knowledge, including crimes relating to the matters set forth in the Statement of Facts. Except in the event of a breach of this Agreement, it is the intention of the parties to this Agreement that all investigations of BMS relating to the matters set forth in the Statement of Facts that have been, or could have been, conducted by the Office prior to the date of this Agreement shall not be pursued further as to BMS.

37.    Should the Office determine that BMS has knowingly and materially breached any provision of this Agreement, the Office shall provide written notice to BMS of the alleged breach and provide BMS with a two-week period in which to make a presentation to the Office to demonstrate that no breach occurred, or, to the extent applicable, that the breach was not material or knowingly committed or has been cured. The parties understand and agree that should BMS fail to make a presentation to the Office within a two-week period after receiving written notice of an alleged breach, it shall be conclusively presumed that BMS is in breach of this Agreement. The parties further understand and agree that the determination whether BMS has breached this Agreement rests solely in the discretion of the Office, and the exercise of discretion by the Office under this paragraph is not subject to review in any court or tribunal outside the Department of Justice. In the event of a breach of this Agreement that results in a prosecution of BMS, such prosecution may be premised upon any information provided by or on behalf of BMS to the Office at any time, unless otherwise agreed when the information was provided.

38.    BMS shall expressly waive all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the District of New Jersey, for the period that this Agreement is in effect.

39.    In case of a knowing material breach of this Agreement, any prosecution of BMS relating to the facts set forth in Appendix A that are not time-barred by the applicable statute of limitations as of the execution of this Agreement may be commenced against BMS notwithstanding the expiration of any applicable statute of limitations during the deferred prosecution period.  BMS agrees to waive the statute of limitations with respect to any crime that would otherwise expire during the two-year term of this Agreement, and this waiver is knowing and voluntary and in express reliance on the advice of counsel.

40.    This agreement expires twenty-four (24) months after the date of its execution, except that, in the event that the Office is conducting an ongoing investigation, prosecution or proceeding related to the facts set forth in the Statement of Facts, the provisions of paragraph 31(b)-(f) regarding the Company's cooperation shall remain in effect until such investigation, prosecution or proceeding is concluded.

41.    The Office agrees that if BMS is in full compliance with all of its obligations under this Agreement, the Office, within ten (10) days of the expiration of twenty-four (24) months from the execution of this Agreement, will seek dismissal with prejudice of the criminal complaint filed pursuant to paragraph 2.  Except as otherwise provided herein, during and upon the conclusion of the term of this Agreement, the Office agrees that it will not prosecute BMS further for the matters that have been the subject of the Office's investigation relating to this Agreement.

42.    BMS agrees that, if it sells or merges all or substantially all of its business operations as they exist as of the date of this Agreement to or into a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall include in any contract for sale or merger a provision binding the purchaser/successor to the obligations described in this Agreement.

43.    It is understood that this Agreement is limited to BMS and the Office on behalf of the U.S. Department of Justice and cannot bind other federal, state or local authorities.  However, the Office will bring this Agreement and the cooperation of BMS and its compliance with its other obligations under this Agreement to the attention of other prosecuting offices, if requested to do so.

11

44.     This Agreement constitutes the full and complete agreement between BMS and the Office and supersedes any previous agreement between them.  No additional promises, agreements, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by the Office, BMS's counsel, and a duly authorized representative of BMS.  It is understood that the Office may permit exceptions to or excuse particular requirements set forth in this Agreement at the written request of BMS or the Monitor, but any such permission shall be in writing.

AGREED TO:


_____
Bristol-Myers Squibb Company


_____
Christopher J. Christie
United States Attorney
District of New Jersey


Date: June 15, 2005

Date: _____

12

## APPENDIX A - STATEMENT OF FACTS

Bristol-Myers Squibb Company ("BMS" or the "Company") is a Delaware corporation with offices in New Jersey and one of the world's leading producers of pharmaceuticals and health care products. For 2000, BMS reported sales of $18.216 billion and net earnings of $4.711 billion. For 2001, BMS reported sales of $19.423 billion and net earnings of $5.245 billion. The great majority of BMS's sales and earnings in 2000 and 2001 were from sales of pharmaceutical products.

BMS is a publicly traded corporation, the common stock of which is listed on the New York Stock Exchange. BMS's shareholders are located throughout the United States, including in the District of New Jersey.

## Wholesaler Sales & Channel Stuffing

BMS manufactures pharmaceutical products and distributes those products through wholesalers. In 2000 to 2001, four U.S. wholesalers handled the distribution of approximately 85% of BMS's U.S. pharmaceutical products. These wholesalers delivered BMS pharmaceutical products to thousands of independent pharmacies, retail chains, hospitals and other health care providers across the country. Wholesalers generally purchased product at least sufficient to meet the demand of these retail businesses.

In 2000 to 2001, BMS regularly used financial incentives to spur wholesalers to buy product in excess of prescription demand, so that BMS could report higher sales and earnings. This practice, which is commonly known as "channel stuffing," was also referred to as "sales acceleration" or "trade loading."

BMS used a variety of financial incentives to spur wholesalers to buy and hold additional product in excess of prescription demand. The financial incentives included:

(a) pre-price increase buy-ins - allowing wholesalers to purchase product in advance of a BMS price increase for the product;

(b) "extended datings" of invoices - extending the due date for the wholesaler's payment beyond the usual thirty days;

(c) additional early payment discounts - discounts beyond those customarily offered to wholesalers for paying early for product; and

(d) "future file" purchases - allowing wholesalers to buy at an old, lower price, even after a price increase had become effective.

**Growth of Excess Inventory**

Channel stuffing in 2000 to 2001 resulted in "excess inventory" at the wholesalers, because the wholesalers took on more inventory than the amount needed to meet anticipated demand. In the absence of sales incentives or investment purchases, a wholesaler's "normal" inventory level was generally in the approximate range of three weeks' to one month's supply of a mature prescription drug.

The process of reducing excess inventory to levels closer to normal was often called a "workdown," and generally involved selling less than demand during the workdown period. High levels of excess inventory were therefore likely to have an adverse effect on future sales.

**Double-Double, Mega-Double and "Top Down" Budgeting**

In 1994, BMS announced what became known as the "Double-Double" goal: to double BMS's sales, earnings and earnings per share ("EPS") in a seven year period. The Double-Double required average compound annual growth of approximately 10%. The last year of the Double-Double was 2000, and at the end of the year BMS announced that it had achieved the doubling of earnings and EPS, and that it "virtually" doubled its sales since 1993.

In September 2000 BMS announced the "Strategy for Growth," which incorporated what became known as the "Mega-Double" goal, a plan to double year-end 2000 sales and earnings by the end of 2005, a five-year period. Achievement of the Mega-Double required average compound annual growth of nearly 15%.

The Double-Double and Mega-Double goals were accompanied by what was known as a "top-down" budget process. BMS set aggressive sales and earnings budget targets for the Company and its business units, consistent with the Double-Double and Mega-Double goals.

**Earnings Guidance and Estimates**

The management of many public companies, including BMS, provided "guidance" to the investing public regarding the expected performance of the business, including EPS, for upcoming quarters and years. In 2000 and at least until December 13, 2001, BMS advised the investing public through its guidance that it expected performance consistent with the Double-Double and Mega-Double.

Relying in part on a company's guidance, professional securities analysts then made public their own estimates of the company's expected performance. These "earnings estimates" or "analyst expectations"--which when averaged were referred to as the "consensus estimates"--were closely followed by investors.

By 2000, BMS had met or exceeded analysts' consensus estimates for at least twenty-four

2

(24) straight quarters, and this consistency was part of the company's public image. BMS understood that its failure to meet or exceed the consensus estimates for a quarter likely would result in a decrease in the company's stock price.

## SEC Reporting

As a public company, BMS was required to comply with the rules and regulations of the United States Securities and Exchange Commission (SEC). The SEC is an independent agency of the United States government which was charged by law with maintaining honest and efficient markets in securities. The SEC's rules and regulations were designed to protect members of the investing public by, among other things, ensuring that a company's financial information was accurately disclosed to the investing public.

Under the SEC's rules and regulations, BMS and its officers were required to submit quarterly reports on Form 10-Q and annual reports on Form 10-K which included financial statements that accurately presented BMS's financial condition and the results of its business operations. Federal law further required the data in these reports to be truthful and consistent with the underlying facts and required the accounting treatments employed in these reports to be consistent with generally accepted accounting principles ("GAAP").

Federal law also required that the Forms 10-Q and 10-K include a section entitled Management's Discussion and Analysis ("MD&A") containing additional information about the company's financial condition and operations. MD&A must contain any material information necessary to make the accompanying financial statements not misleading. The purpose of MD&A was to give investors an opportunity to look at the company through the eyes of management, and understand the company's prospects for the future. MD&A is required to focus on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

## Press Releases and Conference Calls

After the end of each quarter, BMS made public announcements about its sales, earnings and business operations generally. The company issued press releases which described sales performance, overall and by product, and held conference calls for analysts regarding the performance of the business. In preparation for the conference calls, senior BMS executives met and discussed issues expected to arise and how to respond to those issues.

## The Scheme to Defraud

### "Making the Numbers"

BMS promoted a corporate culture in which meeting or exceeding company budget targets and the consensus estimates was considered mandatory. Achieving these goals was known as "making the

3

numbers" or "hitting the numbers." Meeting internal BMS budget targets generally also resulted in sales and earnings that met or exceeded the consensus estimates.

To this end, BMS set aggressive internal sales and earnings targets for 2000, 2001 and earlier periods that would enable the company to hit the widely-touted Double-Double and Mega-Double goals. Every quarter, and at year-end, BMS pressured lower-level employees to meet their budget targets. Certain employees who suggested that the company's budget targets were too aggressive or expressed doubts that they could make the numbers were transferred or demoted.

In the late 1990s, BMS's use of channel stuffing and the accompanying build-up of excess inventory at the wholesalers caused concern among several BMS executives, and during 1999 the Company made some effort to reduce or slow the growth of excess inventory. At the end of 1999, however, senior management refused to accept a proposed BMS budget that would have missed the Double-Double goal, and reassigned the senior executive responsible for the budget proposal. No serious or systematic effort to work down inventory was adopted or undertaken by BMS during the period 2000 to 2001.

Throughout 2000 and 2001, BMS used channel stuffing to boost its sales and artificially inflate its earnings, which enabled BMS to make its numbers and report results consistent with the Double-Double and Mega-Double. This use of channel stuffing to boost sales and earnings, and the resulting steadily increasing levels of excess inventory at the wholesalers, was concealed from the investing public, and was not disclosed to BMS's external auditors and Board of Directors. Without channel stuffing, BMS would have missed its budget targets and the consensus estimates.

Manipulation of Corporate Reserves

BMS regularly set aside funds in "reserve" accounts, to be used for costs related to events such as corporate acquisitions, divestitures or restructuring. Under GAAP, reserves were to be based on good-faith estimates of costs that were reasonably likely to occur. BMS was not permitted to establish reserves that were not based on good-faith estimates of reasonably likely future costs, or to carry excess amounts in its reserve accounts for future use. BMS was not permitted to use reserves to increase revenue in the future or for expenses not related to the purpose for which the funds were originally set aside.

BMS maintained a "reserve schedule" showing available funds from BMS's improperly-established reserves, as well as excess amounts from other reserves. BMS used funds from the reserve schedule for improper purposes, in particular to boost BMS revenue when the company needed additional income to hit the consensus estimates.

Deliberate Rebate Under-Accrual

BMS expected, at the time it sold its products, that at a later time it would have to pay rebates in connection with a portion of those sales. These rebates included Medicaid, "prime vendor" and

"managed health care" rebates. Because BMS sold its products to wholesalers, there was a period of time -- a "lag"-- between the time of sale and when BMS received and paid the rebate claims. In keeping with GAAP, BMS was required to set aside funds to pay for expected rebates at the time it booked revenue from its sales.

As BMS's excess inventory at the wholesalers grew in 2000 and 2001, BMS imposed accounting policies and procedures which caused BMS not to accrue for the rebate liabilities for excess inventory. These policies were inconsistent with GAAP and resulted in an under-accrual in BMS's rebate accounts.

Throughout 2000 and 2001 BMS finance staff used an artificially low lag period of six months to estimate accrual balances, even as the excess inventory at the wholesalers grew steadily. By deviating from GAAP and intentionally under-accruing in the Medicaid rebate account, BMS hid the growth of excess inventory and made BMS's sales figures look stronger than they actually were.

Closing Budget Gaps Through Channel Stuffing and Improper Accounting

In 2000 and 2001, BMS often approached the end of a quarter with a gap between actual sales and earnings and the level of sales necessary to hit the company's budget targets. BMS used channel stuffing to make up the company's sales and earnings shortfalls and close the gap. This practice led to a steady increase in excess inventory at the wholesalers.

At various times during a quarter or at quarter-end, in order to supplement the revenue from channel stuffing activity, BMS used funds from improperly-established reserves to bolster income and enable BMS to hit its earnings targets and the consensus estimates.

In every quarter in 2000 and 2001, BMS publicly announced that it had met or exceeded the consensus estimates. BMS would not have been able to make its numbers without channel stuffing and improper accounting measures. BMS did not disclose to the investing public that its success in makings its numbers was due to channel stuffing and improper accounting measures.

False and Misleading Disclosure

In 2000 and 2001, BMS did not disclose the nature or extent of the company's channel stuffing in its 10Ks and 10Qs or in its quarterly press releases and analyst conference calls. For example, BMS did not disclose:

(a) the use of financial incentives to the wholesalers to generate sales in excess of demand;

(b) the use of sales in excess of demand to close budget gaps and hit budget targets;

(c) the level of excess inventory at the wholesalers; and

5

(d) the amount that excess inventory increased each quarter in 2000 and 2001.

Items (a) through (d) above constituted information reasonably likely to have a material effect on BMS's financial condition or results of its business operations.  Failure to disclose this information deprived the investing public of information regarding BMS's past performance and future prospects. Further, in addition to omitting material information, BMS made or caused others to make or permitted false and misleading statements of material fact on the quarterly analyst conference calls and in the company's SEC filings.

## DIRECTOR'S CERTIFICATE

I have read this agreement and carefully reviewed every part of it with counsel for Bristol-Myers Squibb Company ("BMS"). I understand the terms of this Agreement and voluntarily agree, on behalf of BMS, to each of the terms. Before signing this Agreement, I consulted with the attorney for BMS. The attorney fully advised me of BMS's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BMS, in any way to enter into this Agreement. I am also satisfied with the attorney's representation in this matter. I certify that I am a director of BMS, and that I have been duly authorized by the Board of Directors of BMS to execute this certificate on behalf of BMS.

6/13/05
_____
Date

James D. Robinson
_____
Bristol-Myers Squibb Company

## CERTIFICATE OF COUNSEL

I am counsel for Bristol-Myers Squibb Company ("BMS"). In connection with such representation, I have examined relevant BMS documents, and have discussed this Agreement with the authorized representative of BMS. Based on my review of the foregoing materials and discussions, I am of the opinion that:

1. The undersigned counsel is duly authorized to enter into this Agreement on behalf of BMS.

2. This Agreement has been duly and validly authorized, executed and delivered on behalf of BMS, and is a valid and binding obligation of BMS.

Further, I have carefully reviewed every part of this Agreement with directors of BMS. I have fully advised these directors of BMS's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. To my knowledge, BMS's decision to enter into this Agreement is an informed and voluntary one.


_____          6/15/05 _____ Date


_____          6/15/05 _____ Date

Attorneys for Bristol-Myers Squibb Company

<u>CERTIFIED COPY OF RESOLUTION</u>

Upon motion duly made, seconded, and unanimously carried by the affirmative vote of all the Directors present, the following resolutions were adopted:

WHEREAS, Bristol-Myers Squibb Company ("BMS") has been engaged in discussions with the United States Attorney's Office for the District of New Jersey (the "Office") in connection with an investigation being conducted by the Office into activities of BMS relating to wholesaler inventory and certain accounting issues;

WHEREAS, the Board of Directors of BMS consents to resolution of these discussions by entering into a deferred prosecution agreement that the Board of Directors has reviewed with outside counsel representing BMS, relating to a criminal complaint to be filed in the U.S. District Court for the District of New Jersey charging BMS with conspiracy to commit securities fraud,

NOW THEREFORE, BE IT RESOLVED that outside counsel representing BMS from Debevoise & Plimpton LLP be, and they hereby are authorized to execute the Deferred Prosecution Agreement on behalf of BMS substantially in the same form as reviewed by the Board of Directors at this meeting and as attached hereto as Exhibit A, and that a Director of the Company is authorized to execute the Director's Certificate attached thereto.

SECRETARY'S CERTIFICATION

I, Sandra Leung, the duly elected Secretary of Bristol-Myers Squibb Company (the "Company") a corporation duly organized under the laws of the State of Delaware, hereby certify that the following is a true and exact copy of a resolution approved by the Board of Directors of the Company at a meeting held at New York, New York on June 12, 2005;

WHEREAS, Bristol-Myers Squibb Company ("BMS") has been engaged in discussions with the United States Attorney's Office for the District of New Jersey (the "Office") in connection with an investigation being conducted by the Office into activities of BMS relating to wholesaler inventory and certain accounting issues;

WHEREAS, the Board of Directors of BMS consents to resolution of these discussions by entering into a deferred prosecution agreement that the Board of Directors has reviewed with outside counsel representing BMS, relating to a criminal complaint to be filed in the U.S. District Court for the District of New Jersey charging BMS with conspiracy to commit securities fraud,

NOW THEREFORE, BE IT RESOLVED that outside counsel representing BMS from Debevoise & Plimpton LLP be, and they hereby are authorized to execute the Deferred Prosecution Agreement on behalf of BMS substantially in the same form as reviewed by the Board of Directors at this meeting and as attached hereto as Exhibit A, and that a Director of the Company is authorized to execute the Director's Certificate attached thereto.

IN WITNESS WHEREOF, I have hereunto signed my name as Secretary and affixed the Seal of said Corporation this 13th day of June, 2005.


_____
Secretary


CORPORATE SEAL