**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN W. SAMPSON, TRUSTEE, | |
| Plaintiff, | Case No. 1:07-CV-06890-PAC |
| - against - | |
| JAMES D. ROBINSON III, LEWIS B. CAMPBELL, JAMES M. CORNELIUS, LAURIE H. GLIMCHER, M.D., VICKI L. SATO, PH.D., LEIF JOHANSSON, LOUIS J. FREEH, MICHAEL GROBSTEIN, and R. SANDERS WILLIAMS, M.D., | Related Case No. 1:07-cv-05867-PAC |
| Defendants, | **FILED ELECTRONICALLY** |
| and | |
| BRISTOL-MYERS SQUIBB COMPANY, | |
| Nominal Defendant. | |

**DERIVATIVE PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS OF NOMINAL DEFENDANT BRISTOL-MYERS SQUIBB COMPANY AND THE DIRECTOR DEFENDANTS**

Daniel W. Krasner (DK-6381)
Gregory Mark Nespole (GN-6820)
Alexander H. Schmidt (AS-8304)
Paulette S. Fox (PF-2145)
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600

*Counsel for Derivative Plaintiff*

Dated: New York, New York
        December 17, 2007

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ........................................................................................................ 1

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 3

ARGUMENT ............................................................................................................... 11

   I.     The Complaint Sufficiently Alleges Demand Futility ............................... 11

      A.      Applicable Legal Standards ............................................... 11

          1.     Delaware Law Applies To This Action ........................... 11

          2.     Demand Futility Under Delaware Law ............................ 11

              A.   Demand Futility Under Aronson ................... 13

              B.   Demand Futility Under Rales ....................... 15

      B.      The Alleged Particularized Facts Adequately Plead Demand Futility ................ 16

          1.     Pre-Suit Demand Is Excused Because Director Defendants' Conscious Failure To Act Is Not Protected By The Business Judgment Rule................... 17

          2.     Pre-Suit Demand Is Excused Because A Majority Of The BMY Board Is Not Disinterested ................................................................. 19

   II.    The Complaint Adequately States Claims For Violation Of State Laws.................... 25

      A.      The Complaint States A Claim Upon Which Relief May Be Granted Under Rule 12(b)(6)........................................................................................... 25

CONCLUSION.............................................................................................................. 25

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*In re Abbott Laboratories Derivative Shareholders Litigation*,
   325 F.3d 795 (7th Cir. 2003) .............................................................................. *passim*

*Anthem, Inc. v. Bristol-Myers Squibb Co.*,
   Civ. No. 03-0008, 2003 U.S. Dist. LEXIS 15762 (D.N.J. Mar. 18, 2003).................................3

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) ................................................................................. *passim*

*Bergstein v. Texas International Co.*,
   453 A.2d 467 (Del. Ch. 1982)..................................................................................22

*In re Caremark International Inc. Derivative Litigation*,
   698 A.2d 959 (Del. Ch. 1996)..................................................................................15

*In re Cendant Corp. Derivative Litigation*,
   189 F.R.D. 117 (D.N.J. 1999)..............................................................................14, 22

*In re Citigroup, Inc. Shareholders Litigation*,
   Civ. No. 19827, 2003 Del. Ch. LEXIS 61 (Del. Ch. June 5, 2003)..........................................12

*Cortec Industries, Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991)......................................................................................3

*David B. Shaev Profit Sharing Account v. Armstrong*,
   C.A. No. 1449-N, 2006 Del. Ch. LEXIS 33 (Feb. 13, 2006) ...................................................15

*Edgeworth v. First National Bank*,
   677 F. Supp. 982 (S.D. Ind. 1988) ............................................................................22

*Foman v. Davis*,
   371 U.S. 178 (1962)............................................................................................25

*In re General Instrument Corp. Securities Litigation*,
   23 F. Supp. 2d 867 (N.D. Ill. 1998) ..........................................................................22

*Grimes v. Donald*,
   673 A.2d 1207 (Del. 1996) ....................................................................................13

*Grobow v. Perot*,
   539 A.2d 180 (Del. 1988) .....................................................................................14

**PAGE(S)**

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003)......................................................................21

*Jacobson v. Ronsdorf*,
  C.A. No. 518-N, 2005 Del. Ch. LEXIS 2 (Del. Ch. Jan. 6, 2005)...........................25

*Kamen v. Kemper Financial Services, Inc.*,
  500 U.S. 90 (1991).................................................................................11

*Levine v. Smith*,
  591 A.2d 194 (Del. 1991) ..........................................................................14

*Louisiana Wholesale Drug Co. v. Bristol-Meyers Squibb Co.*
  *(In re Buspirone Antitrust Litigation)*,
  MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 17, 2003).......................3

*Markowski v. S.E.C.*,
  34 F.3d 99 (2d Cir. 1994)..........................................................................18

*McCall v. Scott*,
  239 F.3d 808 (6th Cir. 2001),
  *amended in part, rehearing denied,* 250 F.3d 997 (6th Cir. 2001).................................... *passim*

*McSparran v. Larson*,
  No. 04 C 0041, 2006 U.S. Dist. LEXIS 3787 (N.D. Ill. Jan. 27, 2006)......................................21

*Nagy v. Bistricer*,
  770 A.2d 43 (Del. Ch. 2000)..........................................................................24

*In re Oxford Health Plans, Inc., Securities Litigation*,
  192 F.R.D. 111 (S.D.N.Y. 2000) .................................................................21, 22

*Pereira v. Cogan (In re Trace International Holdings, Inc.)*,
  00 Civ. 619 (RWS), 2001 U.S. Dist. LEXIS 2461 (S.D.N.Y. Mar. 13, 2001),
  *affirmed,* 52 Fed. App'x 536 (2d Cir. 2002) .........................................................14, 15

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993) ....................................................... *passim*

*S.E.C. v. Enterprises Solutions, Inc.*,
  142 F. Supp. 2d 561, (S.D.N.Y. 2001) ...............................................................18

*Solomon v. Pathe Communications Corp.*,
  672 A.2d 35 (Del. 1996) ...........................................................................25

**PAGE(S)**

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
  911 A.2d 362 (Del. 2006) ..........................................................................................21

*Strougo v. Carrell*,
  Civ. A. No. 8040, 1991 WL 9978 (Del. Ch. Jan. 29, 1991) .......................................20

*In re Veeco Instruments, Inc. Securities Litigation*,
  434 F. Supp. 2d 267 (S.D.N.Y. 2006)....................................................................22, 23

*Vista Healthplan, Inc. v. Bristol-Myers Squibb, Co.*,
  Civ. No. 01CV01295 (EGS) (AK), 2003 U.S. Dist. LEXIS 9556 (D.D.C. June 4, 2003) ...........3

*In re VistaCare, Inc. Derivative Litigation*,
  No. CIV 04-1739-PHX RCB, 2006 U.S. Dist. LEXIS 62021 (D. Ariz. Aug. 29, 2006) ...........14

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
  372 F.3d 899 (7th Cir. 2004) .....................................................................................3

## STATUTES AND RULES

Federal Rules of Civil Procedure
  Rule 12(b)(6).........................................................................................................23, 25
  Rule 15(a)....................................................................................................................25
  Rule 23.1 .....................................................................................................................14

## OTHER AUTHORITIES

A. Gilchrist Sparks, III, et al., *Trends in the Delaware Corp. Law:*
  *Director Liability and Indemnification*,
  1405 PLI/Corp. 331 (2004)........................................................................................13

Louis F. Herzeca and Ruke Ku, *Directors Take an Active Role,*
  *Courts and Regulators Heightening Scrutiny of Board Independence, Oversight*,
  230 N.Y.L.J. 9 (2003) ...............................................................................................13

Renee M. Jones, *Rethinking Corporate Federalism in the Era of Corporate Reform*,
  29 J. Corp. L. 625 (2004)...........................................................................................13

## INTRODUCTION

Derivative Plaintiff Steven W. Sampson, Trustee, respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss the Amended Verified Shareholder Derivative Complaint filed by Nominal Defendant Bristol-Myers Squibb Company ("BMY" or the "Company") and the Director Defendants (collectively, "Defendants").

## PRELIMINARY STATEMENT

The board of directors of a company is elected by its shareholders and is accountable to them for the company's activities. Inherent in this is the duty to supervise the conduct of management and ensure that they comply with all applicable laws and regulations, especially where management's malfeasance was documented and gave rise to regulatory sanction in the past. This is not to say that a board must micro-manage each aspect of a company's business or scrutinize every transaction. It does mean, however, that a board must act reasonably to monitor with greater scrutiny transactions and activities that previously gave rise to problems and exposed the corporation to criminal or civil liability. More importantly, a board must never remain directionless and unresponsive when presented with evidence that management may be continuing to digress in a similar fashion. Bristol-Myers' Board of Directors was confronted with such a set of circumstances and, instead of acting in manner to prevent harm to the Company, consciously chose to disregard its duties and responsibilities.

As detailed below, Bristol-Myers' prior misconduct in violation of antitrust laws subjected it to a restrictive consent degree with regulators that limited the Company's ability to settle patent related disputes absent Federal Trade Commission ("FTC") approval and review by all 50 state attorneys general. But instead of complying with its terms, Bristol-Myers's management endeavored to circumvent the consent decree on two occasions by negotiating secret anticompetitive terms with a generic competitor, Apotex Corporation ("Apotex").

Importantly, the BMY Board *knew* that the agreement with Apotex was facially unlawful *after the FTC refused to approve it* the first time, but the Board failed to insert itself in the process to ensure that subsequent iterations complied with the consent decree. The Board's failure to intervene and either conduct the negotiations itself, or demand that a representative be present, is inexcusable given that it is purportedly packed with "titans" of industry, including former high ranking government officials. The Board, instead, was supine in the face of these storm clouds and allowed management to continue unchecked. The result was that the highest ranking members of management knowingly structured an illegal arrangement for a second time and exposed the Company to a criminal fine, a two count felony plea, and large civil damages.

## THE PARTIES AND PROCEDURAL HISTORY

Derivative plaintiff Sampson, as Trustee, owns and has owned shares of BMY at all times relevant to this action. Mr. Sampson filed this shareholder derivative action on behalf of nominal defendant BMY on July 31, 2007, and filed his Amended Verified Shareholder Derivative Complaint ("Complaint," cited herein as "¶ __") on October 15, 2007.

The Complaint alleges, derivatively, breaches of fiduciary duty by the BMY Board of Directors and seeks damages on behalf of the Company. It names as defendants Bristol-Myers' Board: James D. Robinson III, Lewis B. Campbell, James M. Cornelius (who is also the Company's current Chief Executive Officer), Laurie H. Glimcher, M.D., Vicki L. Sato, Ph.D., Leif Johansson, Louis J. Freeh, Michael Grobstein, and R. Sanders Williams, M.D. (collectively, "Director Defendants"). ¶¶ 1, 25-43. Defendants subsequently moved to dismiss the Complaint, and in accordance with the Court's October 9, 2007 Scheduling Order, derivative plaintiff submits this memorandum of law opposing defendants' motion to dismiss. Nominal Defendant BMY joined in the Director Defendants' motion (both sets of Defendants filed one brief), even though no claims were directed against Bristol-Myers.

## STATEMENT OF FACTS

**Bristol-Myer's History Of Relevant Anticompetitive Conduct**

BMY is engaged in the discovery, development, manufacturing, licensing, marketing, and sale of pharmaceutical products in the United States and abroad. ¶ 24.

BMY is no stranger to anticompetitive conduct and regulatory criticism in connection with efforts to corner drug markets and unlawfully maximize profits from its patented drug products. ¶¶ 131-37. For example, the Company tried to maintain its monopoly-hold over its anti-anxiety drug BUSPAR by unlawfully preventing or delaying generic competition (¶ 31), resulting in a suit by the FTC and more than 30 state attorneys general and a class action and other suits asserting antitrust violations. ¶ 132.[1] The Company also engaged in anticompetitive activity to limit generic competition with its cancer drug TAXOL®. ¶ 131. This again prompted regulatory suits, a class action and other civil suits. ¶ 137.[2] The Company settled the BUSPAR attorneys general actions and civil suits by paying $551 million, and settled the similar TAXOL® proceedings for $144 million. *See* Excerpts from Bristol-Myers' 2003 Form 10-K/A, filed June 28, 2004 ("2003 10-K/A"), at 114-15 (a copy of which appears as Exhibit A to the accompanying Declaration of Gregory Mark Nespole ("Nespole Decl.")).[3]

---

[1] The Company settled a BUSPAR related antitrust class action, and was sued in several non-class actions relating to its conduct. *See, e.g., La. Wholesale Drug Co. v. Bristol-Meyers Squibb Co. (In re Buspirone Antitrust Litig.)*, MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 26538, at *6 (S.D.N.Y. Apr. 17, 2003); *Anthem, Inc. v. Bristol-Myers Squibb Co.*, Civ. No. 03-0008, 2003 U.S. Dist. LEXIS 15762, at *11-13 (D.N.J. Mar. 18, 2003).

[2] The Company settled a TAXOL® related antitrust class action and was involved in at least one other non-class suit involving its anticompetitive conduct. *See Vista Healthplan, Inc. v. Bristol-Myers Squibb, Co.*, Civ. No. 01CV01295 (EGS) (AK), 2003 U.S. Dist. LEXIS 9556 (D.D.C. June 4, 2003); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004).

[3] This Court may consider the contents of public filings on this motion without converting it into a motion for summary judgment. *E.g., Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

As a result of these and other illegal anticompetitive acts, BMY entered into a 10-year consent decree with the FTC in April 2003, which enjoined the Company from engaging in similar future misconduct (the "FTC Consent Order"). ¶¶ 84, 137. *See also* 2003 10-K/A, Nespole Decl., Ex. A at 114-15. Significantly, the FTC Consent Order enjoined BMY from settling any future patent litigation with a generic drug manufacturer without first obtaining the approval of both the FTC and all 50 state attorneys general. ¶¶ 10-11, 84-85, 136.

Bristol-Myers' Board was fully aware of managements' chronic and recent history of anticompetitive conduct in connection with attempts to unlawfully prevent or limit generic competition. The combined *$695 million* BUSPAR and TAXOL® settlements were described in public filings signed by each of the named Director Defendants who were Board members at the time. *See* 2003 10-K/A, Nespole Decl., Ex. A at 114-15; Excerpts from Bristol-Myers' 2002 Form 10-K, filed March 28, 2003, Nespole Decl., Ex. B at 89-91.[4] In a similar vein, the Board knew that management was accused of anticompetitive conduct when it attempted to protect its cancer drug PLATINOL® from generic competition. *See* 2003 10-K/A, Nespole Decl., Ex. A at p. 114. Moreover, the Board knew about the investigations into a kickback scheme that resulted in an additional *$499 million* loss to the Company. *See* Excerpts from Bristol-Myers' 2004 Form 10-K, filed March 4, 2005, Nespole Decl., Ex. C at 113-14; Excerpts from Bristol-Myers' 2005 Form 10-K, filed March 14, 2006, Nespole Decl., Ex. D at 116-17.[5] *See also* Bristol-Myers' Form 8-K, filed September 28, 2007, Nespole Decl., Ex. E (announcing $499 million

---

[4] Director Defendants Campbell, Glimcher, Johansson and Robinson are the current Board members who signed the 2002 and 2003 10-K's.

[5] Director Defendants Campbell, Cornelius, Glimcher, Johansson and Robinson are the current Board members who signed the 2004 10-K, and Director Defendant Freeh joined those Defendants in signing the 2005 10-K.

settlement).  Also, the BMY Board knew about the FTC Consent Order and knew that the FTC would scrutinize any future patent litigation settlements with generic manufacturers through April 2013.  *See* 2003 10-K/A, Nespole Decl., Ex. A at 114-15.  And finally, the Board knew – and is certainly charged with responsibility for knowing – that management would expose BMY to additional enormous criminal and civil liability if it attempted to evade the FTC's requirements and continued to behave consistent with its pattern of violating the antitrust laws when competing against generic drug manufacturers.

As discussed below, despite all this knowledge, the Board turned a blind eye to its duty to oversee management's conduct in connection with settling a patent action involving PLAVIX®, the Company's top-selling drug.  ¶ 3.  The Board's conscious disregard of its duty resulted in an unprecedented $1 million criminal fine, an agreement to pay a wasteful $60 million kickback to a generic drug manufacturer, and more than $1 billion in other damages to the Company.

**The PLAVIX® Patent Dispute**

BMY and its partner Sanofi-Aventis ("Sanofi") jointly market the blood thinner PLAVIX® pursuant to Food and Drug Administration ("FDA") approval granted in 1997.  ¶¶ 2, 68-69.  PLAVIX® was the world's second-best selling drug in 2005, with global sales exceeding $6 billion.  PLAVIX® sales account for 30% of Bristol-Myers' earning per share.  ¶ 3.  In November 2001, Apotex, Canada's largest generic drug manufacturer, filed an ANDA[6] with the FDA seeking to market a generic version of PLAVIX®.  Apotex argued that Bristol-Myers's patent for PLAVIX® was invalid and unenforceable.  ¶ 70.  BMY countered by suing to enforce its patent and stop Apotex from releasing its generic version.  ¶ 71.  Trial was set for April 2006

---

[6] "ANDA" is the acronym for an Abbreviated New Drug Application, a procedure that streamlines the FDA regulatory approval process for generic drugs.  ¶ 55.

in the Southern District of New York. ¶ 72.

Apotex was not deterred by the lawsuit and prepared to launch its generic "at risk" of later being found liable for violating Bristol-Myers' patent. ¶ 73. On January 20, 2006, the FDA approved Apotex's ANDA and granted Apotex a 180-day marketing exclusivity period because Apotex was the first company to file for an approvable generic. ¶ 74. BMY elected not to seek a preliminary injunction to halt the launch of Apotex's generic. ¶ 76.

Instead, Bristol-Myers' management approached Apotex to settle the dispute. Predictably, they sought to end the PLAVIX® patent suit by entering into an anticompetitive "pay-not-to-play" deal by which BMY would share its PLAVIX® monopoly profits with Apotex in exchange for Apotex delaying its generic launch for five years. ¶¶ 77-81. Following negotiations, the two sides signed the Initial Apotex Agreement ("IAA"),[7] on March 17, 2006, which BMY publicly disclosed (in part) in a March 21, 2006 press release. *Id.*

The March 21 press release stated the parties agreed Apotex would refrain from launching its generic until September, 17, 2011, and the IAA provided that BMY would refrain from launching its own generic for 180 days from that date. ¶ 81. While the press release disclosed that BMY and Sanofi would make "payments" to Apotex if the settlement was finally approved by the FTC (or even if it was not approved and the deal was terminated), it failed to disclose that the amount of the payments was to be at least ***$60 million*** in either event. ¶¶ 82-83. Defendants assert that this March 21st announcement "described key terms of the proposed settlement." Defs. Br., at p. 8. However, notably absent from these key terms was any mention of the astounding $60 million fee.

---

[7] The Complaint's averments concerning the IAA are detailed in the Department of Justice's ("DOJ") Felony Information, dated May 30, 2007, attached as Exhibit F to the Nespole Declaration.

Under the FTC Consent Order, BMY was required to seek approval of the IAA from the FTC and the state attorneys general before finalizing it with Apotex. ¶ 85. On April 4, 2006, the FTC advised the Company that it objected to the IAA on three separate grounds. *First*, the FTC objected to the provisions prohibiting BMY from launching an authorized generic version of PLAVIX® during the period of Apotex's exclusive license. *Second*, the FTC objected to the provision requiring that BMY make a $60 million payment to Apotex even if there was a "regulatory denial." *Finally*, the FTC balked at the provision requiring BMY to compensate Apotex if annualized PLAVIX® sales did not reach specified minimum levels in the three months preceding Apotex's market entry. ¶ 88. In short, the IAA ran afoul of the law by including anticompetitive provisions similar to those for which the FTC had previously penalized BMY and which gave rise to the FTC Consent Order in the first place.

On May 5, 2006, the FTC informed BMY that it would reject the IAA because of its three objectionable provisions. Instead of rejecting it outright, however, the FTC allowed BMY to withdraw it and try to reach a lawful agreement with Apotex. ¶ 89. The FTC's pointed criticism on at least three fronts (coupled with the Company's history of similar misconduct) was a clear "red flag" warning to the BMY Board that something untoward was occurring. The Board, however, failed to take action and allowed the same management (that had recently committed antitrust violations in connection with at least three other generics) to take matters into its own hands with respect to the PLAVIX® settlement, including entering into subsequent negotiations that, it turned out, were designed intentionally to circumvent the FTC Consent Order. ¶¶ 90-92.

Specifically, according to the DOJ's Felony Information against the Company, on May 12 and May 24, 2006, a senior BMY executive (who reported directly to the Company's chief

executive, Peter R. Dolan), referred to as "BMS Executive-1," and Apotex's owner, referred to as "Apotex Executive-1," executed a Revised Apotex Agreement ("RAA"). ¶ 92.[8]  The written terms of the RAA did *not* include any reference to the three provisions the FTC had previously rejected as anticompetitive.  ¶ 102.

That management had within a few short weeks "successfully renegotiated" the PLAVIX® patent settlement in a manner by which Apotex had supposedly dropped the three provisions to which the FTC had objected – provisions that were highly material and beneficial to Apotex – was another "red flag" that should have alerted the Board that something was amiss, thereby warranting its scrutiny.  ¶¶ 148-49.  The PLAVIX® patent dispute was hotly contested and trial ready, and Apotex was confident it would succeed.  ¶¶ 70-73, 75-76.

Why then would Apotex, after forging a settlement under which it was guaranteed at least $60 million and had obtained critical market concessions, suddenly surrender those hard-earned material benefits?  The answer is obvious – and it should have been obvious to Bristol-Myers' Board – Apotex did not really give up those benefits at all; no rational litigant would.

Bristol-Myers' management instead drafted the RAA to make it appear that the Company had crafted a lawful arrangement the FTC would approve. This, however, was not the case. In actuality, BMY agreed in the actual settlement to a secret oral "side deal" in which BMY promised both to pay the $60 million and not to launch its own generic version of PLAVIX® – plain violations of the FTC Consent Order.  ¶ 103.  BMY submitted the written form of the RAA to the FTC and the attorneys general for approval on May 30, 2006.  The submission to the FTC, however, failed to describe the oral "side deal" that was fraught with illegal terms.  *Id.*

---

[8] *See also* ¶¶ 93-107 and Nespole Decl., Ex. F at 5-6 for a detailed discussion of the RAA and how it violated both the FTC Consent Order and federal law.

Bristol-Myers' management's attempt to defraud the FTC and commit antitrust violations in connection with the PLAVIX® settlement quickly unraveled. On June 5, 2006, in its own filing with the FTC concerning the settlement, *Apotex disclosed* the oral agreement that restrained Bristol-Myers's launch of a generic. Apotex also disclosed that BMY had orally agreed to pay the $60 million fee notwithstanding the FTC's objection, as well as other oral agreements, not reduced to writing, that BMY failed to not disclose, as mandated by the FTC Consent Order. ¶¶ 104-05, 119.

After obtaining the contradictory filings from BMY and Apotex, the FTC asked BMY to confirm that it had not entered into any side agreements in connection with the RAA. On June 12, 2006, management filed a plainly false certification stating that no such oral agreements existed. ¶¶ 106-07.

In July 2006, the Company revealed that the DOJ had commenced a criminal investigation surrounding the RAA. Within days, all 50 attorneys general rejected the RAA, and federal agents raided the office of the Company's former Chief Executive Officer ("CEO"), Mr. Dolan, armed with search warrants. ¶¶ 110-13. The DOJ later disclosed that its Antitrust Division had charged that BMY "*took steps deliberately to mislead the FTC by first concealing and then later lying about the existence of its representations to and understanding with Apotex Inc*." ¶ 114.

Once the settlement was scuttled, Apotex launched its generic version of PLAVIX® on August 8, 2006, and by the end of that month 78% of all U.S. prescriptions filled for blood clot medicine were for the Apotex generic. ¶ 115.

Circumstances continued to unfold. Sources revealed that BMY executives intentionally misled regulators and told Apotex executives to lie or risk not receiving FTC approval for the

RAA.  ¶¶ 116-22.  It was also disclosed that BMY had agreed to waive claims for treble damages in connection with the patent litigation in exchange for Apotex agreeing to the RAA, and BMY had agreed to waive the right to seek a temporary or preliminary injunction to prevent Apotex's announced "at risk" launch.  ¶ 116.

In May 2007, BMY admitted to making false statements to the FTC, pled guilty to a two-count criminal information and paid a $1 million fine related to the PLAVIX® debacle.  ¶¶ 123-27.  Ironically, on June 19, 2007, BMY won the patent dispute following a lengthy bench trial, thereby blocking Apotex from selling its generic until 2011.  ¶ 128.  Bristol-Myers, however, had waived its right to treble damages, thus forfeiting billions in recoverable damages.  ¶¶ 129-30.

**Bristol-Myers' Board's Awareness Of The IAA And RAA**

Bristol-Myers' internal reporting systems were such that the Board had to know about the Apotex/PLAVIX® litigation, the FTC's rejection of the IAA, and management's subsequent submission of the RAA to the FTC without the previously rejected terms that were highly favorable to – indeed, likely the *sine qua non* of the deal for – Apotex.

First, six of the nine Director Defendants were Board members during the critical events in the Spring of 2006 and signed public filings that referred to the PLAVIX® lawsuit, the earlier patent disputes that led to the FTC Consent Order, and the Apotex settlement agreement.  *See* p. 6 & n.7, *supra*.  A seventh Director Defendant, Sato, joined the Board in early July 2006 as the liability-imposing events were culminating.  ¶ 34.

Second, former CEO Dolan and the "BMS Executive-1" who had negotiated the RAA and its attendant illegal side deals were both members of Bristol-Myers' Executive Committee, which also included Director Defendant Robinson.  ¶¶ 47, 93, 96.  Since Mr. Dolan and "BMS Executive-1" had a fiduciary duty to report their settlement activities to the Executive Committee and the Board, and since Director Defendant Robinson had a duty to report the same information

to other Board members, including Director Defendant Sato when she joined the Board, the then-existing BMY Board members – *six (to seven) of the nine Director Defendants herein* – are presumed to have known about the "red flags" that should reasonably have warned them to exercise greater scrutiny over management's attempt to settle the Apotex litigation.[9]

## ARGUMENT

## I.    THE COMPLAINT SUFFICIENTLY ALLEGES DEMAND FUTILITY

### A.    Applicable Legal Standards

#### 1.    Delaware Law Applies To This Action

Delaware law applies to this action.  In *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 108-09 (1991), the Supreme Court held demand futility must be determined under the substantive law of the state of incorporation, "even when derivative claims are brought under federal law."  *McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001), *amended in part, rehearing denied,* 250 F.3d 997 (6th Cir. 2001) (applying Delaware law and citing *Kamen*, 500 U.S. at 96-97).  Because BMY is incorporated in Delaware, its law governs whether pre-suit demand upon the BMY Board should be excused based upon the allegations contained in the Complaint.  Derivative plaintiff submits that based on the factual allegations in the Complaint and under Delaware's controlling authority a pre-suit demand is excused because it would be futile.

#### 2.    Demand Futility Under Delaware Law

Delaware law utilizes two alternative tests for determining demand futility, depending on the degree to which the Board's challenged conduct was "conscious."  The test for "conscious"

---

[9] "Where there is a corporate governance structure in place, [a court must] then assume the corporate governance procedures were followed and that the board knew of the problems and decided that no action was required."  *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 806 (7th Cir. 2003) (interpreting Delaware law).

action or inaction is known as the "*Aronson*" test.  The test for "unconsidered" inaction is called the "*Rales*" test.  As shown below, demand is futile here under either test.

The allegations in the Complaint concern the Board's inaction and acquiescence in management misconduct and improper practices in the face of numerous red flags that were waved in front of, and well known to, the Board.  While the Board did not formally vote to ignore management's improper conduct, its failure to act despite the red flags was nonetheless presumptively deliberate and, thus, a "conscious decision" under Delaware law.  *See Abbott Labs.*, 325 F.3d at 803, 805-06 (7th Cir. 2003) (assessing what standard to be applied under Delaware law when weighing demand futility); *see also In re Citigroup, Inc. S'holders Litig.*, Civ. No. 19827, 2003 Del. Ch. LEXIS 61, at *8 & n.8 (Del. Ch. June 5, 2003) ("Red flags" useful for inferring board's knowledge when they are "waved in one's face or displayed so that they are visible to the careful observer") (citing *Abbott Labs.*, 325 F.3d at 809).

Because Bristol-Myers' Board knew about management's propensity to violate the antitrust laws but consciously failed to take oversight action that could have prevented the company's losses resulting from the PLAVIX® antitrust violations, serving a demand on the Board would have been futile under *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), which governs cases involving conscious board actions.  *See Abbott Labs.*, 325 F.3d at 806.

Even if no "red flags" had been waved, and Bristol-Myers' Board had no reason to suspect management's propensity to circumvent the FTC Consent Order in connection with the PLAVIX® settlement, demand on the Board still would have been futile under the alternative demand futility test set forth in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993), which governs "unconsidered" failures to act.  *Abbott Labs.*, 325 F.3d at 805 (citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967-68 (Del. Ch. 1996)).

a.    **Demand Futility under *Aronson***

The Delaware Supreme set forth the demand futility test for conscious board decisions in

*Aronson*, 473 A.2d 805. As later articulated by the Delaware Supreme Court, *Aronson* holds that

a derivative plaintiff satisfies the demand futility requirement if

> under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.

*Rales*, 634 A.2d at 933 (quoting *Aronson*, 473 A.2d at 814) (brackets supplied by *Rales* court).

Pleading demand futility is not the impossible task Defendants suggest.  *See* Defs. Br., at

pp. 3, 13.[10]  "Reasonable doubt can be said to mean that there is a reason to doubt.  This concept

is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse'

in an appropriate case where the claim is not based on mere suspicions or stated solely in

conclusory terms."  *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996).  "Stated obversely, the

concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief'

that the board lacks independence or that the transaction was not protected by the business

judgment rule."  *Id.* at 1207, n.17.

Although a plaintiff bringing a derivative action on behalf of a company is held to a

---

[10] In fact, "recent Delaware decisions suggest a trend toward stricter judicial scrutiny of director decision-making." Renee M. Jones, *Rethinking Corporate Federalism in the Era of Corporate Reform*, 29 J. Corp. L. 625, 645 (2004). "Recent case law has tightened the definition of 'independent' and expanded the concept of 'good faith.'" A. Gilchrist Sparks, III, et al., *Trends in the Delaware Corp. Law: Director Liability and Indemnification*, 1405 PLI/Corp. 331, 333 (2004). "Recent judicial decisions …indicate that the traditional safeguards of the business judgment rule, and charter provisions that eliminate personal liability for duty of care violations, will not protect directors that intentionally disregard their duties." Louis F. Herzeca and Ruke Ku, *Directors Take an Active Role, Courts and Regulators Heightening Scrutiny of Board Independence, Oversight*, 230 N.Y.L.J. 9 (Sept. 29, 2003).

particularized standard in pleading futility,[11] the plaintiff need not plead evidence, *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991), nor is proof of success on the merits required, *McCall*, 239 F.3d at 816 (citing *Rales*, 634 A.2d at 934). The "reasonable doubt" standard is not a restrictive test that requires plaintiffs to plead facts sufficient to sustain a "judicial finding" that the test for excusing demand is satisfied. *Grobow v. Perot,* 539 A.2d 180, 183 (Del. 1988). Rather, in assessing demand under Delaware law, all reasonable inferences must be drawn in the light most favorable to the plaintiff, and the well-pled factual allegations of the complaint must be accepted as true. *See, e.g., In re VistaCare, Inc. Derivative Litig.*, No. CIV 04-1739-PHX RCB, 2006 U.S. Dist. LEXIS 62021, at *7 (D. Ariz. Aug. 29, 2006); *In re Cendant Corp. Derivative Action,* 189 F.R.D. 117, 127 (D.N.J. 1999) (applying Delaware law).

The *Aronson* Court stated that, in the context of conscious board actions, "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's [*i.e.*, the business judgment rule's] applicability." 473 A.2d at 812. The Court noted "that the business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act." *Id.* at 813. In *Pereia v. Cogan,* the court held that under Delaware law, the business judgment rule does not apply to claims that a director neglected to carry out, or abdicated, his responsibility to make management decisions in the first place. *Pereira v. Cogan (In re Trace Int'l Holdings, Inc.),* 00 Civ. 619 (RWS), 2001 U.S. Dist.

---

[11] Similarly to *Aronson's* requirement of pleading particularized facts, Fed. R. Civ. P. 23.1 requires that the complaint in a shareholders' derivative action "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

LEXIS 2461, at *41 (S.D.N.Y. May 13, 2001), *aff'd,* 52 Fed. App'x 536 (2d Cir. 2002).

### b.    Demand Futility under *Rales*

Directors can be held liable for "*an unconsidered failure . . . to act* in circumstances in which due attention would, arguably, have prevented the loss." *Caremark*, 698 A.2d at 967 (emphasis in original). An "unconsidered" failure to act arises where directors were ignorant of management's wrongful acts because "'there were *no grounds for suspicion* . . . and the directors were *blamelessly unaware* of the conduct leading to the corporate liability.'" *Abbott Labs.*, 325 F.3d at 805-06 (citing *Caremark*, 698 A.2d at 969-70) (internal quotation omitted) (emphasis supplied by *Abbott Labs.*).

Where a director's prospective liability is premised on unconsidered inaction rather than a conscious or presumptively conscious decision not to act, the standard for determining demand futility is set forth in *Rales*, 634 A.2d at 927. *See McCall*, 239 F.3d at 816 (in "'absence of a conscious board decision,' demand futility should be evaluated under the *Rales* test rather than the *Aronson* test") (quotation omitted).

To determine whether a pre-suit demand would have been futile under *Rales*, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint [was] filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *David B. Shaev Profit Sharing Account v. Armstrong*, C.A. No. 1449-N, 2006 Del. Ch. LEXIS 33, at *13-14 (Feb. 13, 2006) (citing *Rales,* 634 A.2d at 934). *See also McCall,* 239 F.3d at 816-17 ("[W]hether plaintiffs have alleged facts sufficient to create a reasonable doubt concerning the disinterestedness and independence of a majority of the Board must be determined from the accumulation of all the facts taken together.") (citing *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990)).

Put simply, the "*Rales* test" is merely the first prong of the *Aronson* standard – *i.e.*, whether a majority of the board may be interested or non-independent – without the second, or business judgment inquiry, prong. The *Rales* Court confirmed *Aronson's* earlier conclusion that "[w]here there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no application." 634 A.2d at 933. In the context of "unconsidered" board actions where the directors did not know or have reason to know about the management violations at issue, therefore, it is appropriate only "to examine whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations." *Rales* at 934.[12]

Thus, under Delaware law, where a board "consciously" fails to act, demand is excused if the particularized facts, accepted as true, give rise to (1) a "reasonable doubt" that the board was disinterested or independent, *or* (2) a reasonable doubt that the board's failure to act falls within the protections of the business judgment rule. *Aronson,* 473 A.2d at 814. Where the board's failure to act was "blamelessly" not conscious or knowing, then demand is excused only if there is a reasonable doubt that the board was disinterested or independent. *Rales,* 634 A.2d at 933.

### B.    The Alleged Particularized Facts Adequately Plead Demand Futility

As shown below, in this case the well-pleaded facts establish a reasonable doubt both as to whether a majority of the Defendant Directors was disinterested and as to whether the Board's decision not to oversee the PLAVIX® settlement was grossly negligent and therefore not entitled to the protection of the business judgment rule. Consequently, demand would have been futile

---

[12] Where directors are "blamelessly ignorant" and thus do not consciously permit a corporate violation, "the true intent" of a demand futility review "is based more upon corporate governance" considerations rather than the policies underlying the business judgment rule. *Abbott Labs.*, 325 F.3d at 806.

16

under either *Aronson* or *Rales*.

1. **Pre-Suit Demand Is Excused Because Director Defendants' Conscious Failure To Act Is Not Protected By The Business Judgment Rule**

While "a conscious decision to refrain from acting may…be a valid exercise of business judgment and enjoy the protections of the [business judgment] rule," *Aronson*, 473 A.2d at 813, "to invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them" *Id*. At 812. Once so informed, directors then have a consequent duty to "act with requisite care," and will be liable for nonfeasance if their failure to act was predicated upon "gross negligence," or worse.  *Id*.

Here, the particularized facts give rise to a "reasonable doubt" whether Bristol-Myers' Board members performed consistently with *either* their duty to be reasonably informed *or* their duty to act with requisite care.  Hence six to seven of the nine Director Defendants here – a majority of the Board – are not entitled to the protection of the business judgment rule, rendering demand upon them futile in this case.

Confronted with regular and repeated information that management was predisposed to counter generic competition through anticompetitive and illegal means that caused the Company to pay ***more than $1 billion*** in previous fines and civil damages and subjected every proposed patent litigation settlement to scrutiny by the federal government and every state in the union, this Board deliberately turned a blind eye to glaring, if not iridescent red flags that management was committing similar violations in its effort to prevent generic competition with Bristol-Myers' top-selling drug PLAVIX®.

A reasonable board seeking to fulfill its duty to the corporation and its shareholders in the circumstances in which Bristol-Myers' Board found itself in early 2006 would have actively intervened and supervised the Company's settlement discussions with Apotex from the outset.

The Board certainly should have interjected and directly overseen the PLAVIX® settlement negotiations after the FTC rejected the IAA because it contained the very type of anticompetitive provisions that had sunk the Company in deep regulatory waters to begin with. Contrary to Defendants' argument (Defs. Br., at p. 20), the FTC's refusal to approve the IAA should have been an "obvious danger sign" concerning the Apotex negotiations.  Finally, fireworks should have gone off in the Director Defendants' heads, much less visions of red flags, when Bristol-Myers' already proven-to-be unscrupulous management suddenly and miraculously resolved both the FTC's objections and the Apotex litigation within a few short weeks by representing on paper in the RAA that Apotex had agreed to forego virtually the entire substantial consideration it had bargained for in the IAA – *i.e.*, the $60 million fee and Bristol-Myers' agreement not to launch its own generic form of PLAVIX®.[13]

The particularized facts alleged here square well with those in *Abbott Labs.*, where the Seventh Circuit ruled that a pharmaceutical company's board was not entitled to the benefit of the business judgment rule for consciously ignoring red flags of management misconduct.  There Abbott had to enter into a consent decree with FDA, to which it paid a $100 million fine, and withdraw more than 100 products from the market because Abbott's board (like Bristol-Myers')

---

[13] Defendants unpersuasively raise an advice-of-counsel defense to excuse the Board's own failure to respond. *See, e.g.,* Defs. Br., at 4, 8, 18.  To raise this defense, Defendants must "show that [they] made complete disclosure to counsel, sought advice as to the legality of [their] conduct, received advice that [their] conduct was legal, and relied on that advice in good faith." *Markowski v. S.E.C.,* 34 F.3d 99, 105 (2d Cir. 1994). Furthermore, to establish good faith reliance, Defendants must show that they actually acted upon their counsel's advice.  *See S.E.C. v. Enterprises Solutions, Inc.,* 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001). Here, Defendants merely assert that "the Board took active and responsible steps to address the Plavix matter. It requested and received reports from the Company's outside counsel." Defs. Br., at p. 18. In no way does this argument rise to the level necessary to establish an advice-of-counsel defense. Nor does it absolve the Board from its fiduciary obligations to further scrutinize the Apotex negotiations. Accordingly, any attempt made by Defendants to deflect responsibility onto its outside counsel must fail.

failed to intervene to correct management's years-long habit of ignoring FDA requirements. *Abbott Labs.,* 325 F.3d at 798-802. The plaintiffs there, like plaintiff here, complained that Abbott's directors knew of management's FDA noncompliance because they signed SEC filings alluding to regulatory problems and ignored warning letters and other "repeated red flags raised by the FDA and in media reports" yet did nothing to halt management's improper conduct. *Id.* at 802-03, 806. The *Abbott Labs.* court held that the board "consciously disregarded" its duties and that its "egregious" lack of oversight in the face of the repeated red flags created a reasonable doubt about the directors' good faith, rendering both the business judgment rule inapplicable and demand on the board futile. *Id.* at 807-09.[14]

The same result should obtain here. Bristol-Myers's Board's refusal to get involved in the PLAVIX® suit settlement under the circumstances extant in 2006 was inexcusable. The facts certainly, at a minimum, give rise to a "reasonable doubt" that the Director Defendants breached their duties both to be reasonably informed and to exercise due care given the red flags fluttering under their noses. The business judgment rule does not apply, and demand is therefore excused in this case.

> ## 2.    Pre-Suit Demand Is Excused Because A Majority Of The BMY Board Is Not Disinterested

Even if the Board's inaction surrounding the PLAVIX® settlement is not deemed a "conscious" failure to act and the Board, instead, is assumed to have been "blamelessly unaware" of management's propensity for misconduct, demand is still futile in this case because the

---

[14] The *Abbott Labs.* court took into consideration that evidently neither FDA censures nor public notice motivated the directors to take any action concerning the problems, and held that the plaintiffs had sufficiently pleaded allegations of a breach of the duty of good faith to reasonably conclude that the directors' actions fell outside the protection of the business judgment rule. *Id.* at 809.

Director Defendants faced a substantial likelihood of liability at the time this suit was filed, creating a reasonable doubt as to whether a majority of the BMY Board is disinterested.

Under both *Aronson* and *Rales*, demand is deemed futile if a majority of the board is not impartial or disinterested in the subject matter or outcome of the suit. This rule reflects the principle "that where officers and directors are under an influence which sterilizes their discretion, they cannot be considered proper persons to conduct litigation on behalf of the corporation." *Aronson*, 473 A.2d at 814. Plaintiffs may raise a reason to doubt a director's disinterestedness in one of two ways: (i) by alleging that the director received "a personal financial benefit from a transaction that is not equally shared by the stockholders;" or (ii) by alleging facts demonstrating a sufficient likelihood that the director will be held personally liable for the alleged misconduct. *Rales*, 634 A.2d at 936. If the director's impartiality is compromised by a financial interest or other consideration, the law does not expect him or her to exercise independent business judgment. *Strougo v. Carrell*, Civ. A. No. 8040, 1991 WL 9978, at *4 (Jan. 29, 1991) (directors who allegedly engaged in insider trading were interested for purposes of demand futility analysis).

Moreover, while the mere threat of personal liability is not sufficient, reasonable doubt as to the disinterestedness of a director is created when the allegations of the Complaint – which are assumed to be true – present "'a substantial likelihood'" of liability on the part of a director. *See Rales*, 634 A.2d at 936 (quoting *Aronson*, 473 A.2d at 815). Here, the Complaint has sufficiently established reasonable doubt as to the disinterestedness of a majority of the Director Defendants. The Complaint alleges that six to seven of the nine Director Defendants face a substantial likelihood of liability resulting from their breaches of fiduciary duty enabling management to engage in violations of federal law in connection with the Apotex settlement and, consequently,

20

exposing BMY to substantial criminal and civil liability.

Numerous courts have excused demand in shareholder derivative actions similar to this one. Federal courts interpreting Delaware law have held that a director's liability for breaching his or her duty of good faith "can be established by showing a sustained or systematic failure to exercise oversight," *In re Oxford Health Plans, Inc. Securities Litig.,* 192 F.R.D. 111, 117 (S.D.N.Y. 2000), and that "a board's extreme indifference or failure to act may create individual liability for board members," *McSparran v. Larson*, No. 04 C 0041, 2006 U.S. Dist. LEXIS 3787, at *14 (N.D. Ill. Jan. 27, 2006). Where, as here, plaintiffs allege that the defendants' failure to supervise and monitor involved a scheme of "significant magnitude and duration," "demand futility is ordinarily found." *Oxford Health*, 192 F.R.D. at 117 (defendants asserted in their motion to dismiss to no avail that they "immediately took steps to respond to the Company's unexpected and highly publicized problems").[15]

In concluding that a pre-suit demand would have been futile on the company's board of directors in *McCall*, 239 F.3d at 808 (applying Delaware law), the Sixth Circuit affirmed that directors are interested when they receive a financial benefit not equally shared by the stockholders, or when a corporate decision will have a "materially detrimental impact" on a director but not the corporation. *Id.* at 817. The *McCall* Court then looked to *Caremark* to define liability for breach of the duty to exercise appropriate attention to potentially improper

---

[15] Defendants' cases are distinguishable. *See Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003) (cited at Defs. Br., at pp. 14, 15, 17, 19, 20, 22, 23) (plaintiffs failed to allege "the precise roles that [the] directors played at the company, the information that would have come to their attention in those roles, …any indication as to why they would have perceived the accounting irregularities," "whether [the company] had a standing audit committee or whether it met."); *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006) (cited at Defs. Br., at pp. 18-19) (failures by lower-level employees to report deficiencies to Board not a basis for liability of directors).

corporate activities.    The Court reversed the district court's dismissal of the plaintiffs'

complaint, and determined that: (i) "the district court erred in concluding that only intentional

conduct would escape the protection of the provision adopted" (*id*. at 819) in defendant's

certificate of incorporation; and (ii) the particularized facts (drawing the reasonable inferences in

plaintiffs' favor) were sufficient to create a reasonable doubt as to the disinterestedness of a

majority of the board, because the alleged facts presented a substantial likelihood of director

liability for intentional or reckless breach of the duty of care.  *Id*.  The *McCall* Court looked at

the "particularized allegations [] taken together" in concluding that plaintiffs had established that

a pre-suit demand would have been futile.  *Id.* at 823.[16]

In *McCall*, the complaint cited significant factors demonstrating that the board must have

been aware of the alleged fraud, including: (1) "the prior experience of a number of the

defendants as directors or managers" (which, the Court noted, was a "significant factor" in its

assessment); (2) the existence of numerous federal investigations; and (3) numerous articles

published regarding the alleged improprieties.  *Id*. at 819-23.

More recently, Judge McMahon in the Southern District of New York denied the

---

[16] Defendants excel at isolating handpicked demand futility allegations from the Complaint and remarking how conclusory or legally insufficient they are.  *See, e.g.,* Defs. Br., at p. 16.  However, this Court must review derivative plaintiff's particularized allegations in totality and not as independent allegations.  *See In re Veeco Instruments, Inc. Sec. Litig.,* 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) (a court must review plaintiff's particularized allegations in totality and not as independent allegations); *McCall,* 239 F.3d at 816 (applying Delaware law); *Cendant,* 189 F.R.D. at 129 (applying Delaware law, "the transactions should not be evaluated individually to determine whether a majority of the directors was 'interested.' Rather, the Court should determine whether a majority of the directors was interested with respect to the challenged transactions as a whole."); *Oxford Health,* 192 F.R.D. at 118 (denied motion to dismiss applying Delaware law) (evaluating demand futility in the context of the totality of the circumstances); *In re Gen. Instrument Corp. Sec. Litig.,* 23 F. Supp. 2d 867, 875 (N.D. Ill. 1998) (denied motion to dismiss applying Delaware law) (same); *Edgeworth v. First Nat'l Bank,* 677 F. Supp. 982, 993 (S.D. Ind. 1988) (denied motion for summary judgment applying federal law) (same); *Bergstein v. Texas Int'l Co.,* 453 A.2d 467, 469 (Del. Ch. 1982) (denied motion to dismiss applying Delaware law) (same).

defendants' motion to dismiss plaintiffs' derivative action on behalf of Veeco Instruments because she found that the plaintiffs adequately pled that demand on the company's board of directors would have been futile.  *Veeco*, 434 F. Supp. 2d at 267.  Judge McMahon noted that "a Rule 23.1 motion to dismiss for failure to make a demand is not intended to test the legal sufficiency of the plaintiffs' substantive claim."  *Id*. at 273 (emphasis added).  Furthermore, like a Fed. R. Civ. P. 12(b)(6) motion to dismiss, "plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged."  *Id*. at 274 (citing *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000)).  The *Veeco* plaintiffs alleged the board, despite many meetings, did not strengthen internal controls until it was too late to avoid harm to the Company:

> Indeed, in its Form 10-K for the period ending December 31, 2004, which each of the five director-Committee members signed, Veeco admitted that "…a deficiency existed in the internal control over financial reporting…."  Despite the fact that the Audit Committee met 27 times during 2003 and 2004, plaintiffs assert that the Committee took no action for more than a year after the TurboDisc acquisition to strengthen the existing system or implement a new system of internal accounting controls. …[B]y the time the Committee reacted to these shortcomings, substantial harm had already been done to the Company.

*Id*. at 277 (internal citations omitted).  Judge McMahon concluded that "[t]his is not a case where the directors had 'no grounds for suspicion' or 'were blamelessly unaware of the conduct leading to the corporate liability.'"  *Id*. at 278 (citing *In re Caremark*, 698 A.2d at 969).  Instead, taking all of plaintiffs' allegations as true, she concluded that "demand would have been futile."  *Id*.

Here, the facts alleged in the Complaint are analogous to those described above in the *McCall* and *Veeco* decisions.  The BUSPAR and TAXOL® fines and damages payments and the resulting FTC Consent Order plainly put Bristol-Myers' Board of Directors on notice of management's propensity to engage in anticompetitive conduct respecting PLAVIX®, and yet it did nothing to prevent further misconduct, not even when the FTC objected to the IAA for again violating the antitrust laws.  These myriad red flags warning of anticompetitive behavior, and a

number of stories printed in various reputable newspapers all plainly put Bristol Myers' experienced Board on notice that the Company's negotiations with Apotex may have reeked of its old habit of anticompetitive dealings – and yet the Board did nothing.[17] "[R]egardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes." *Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ch. 2000).

Consequently, a majority of the Director Defendant (six to seven of nine), who were BMY Board members in 2006, are by law deemed unable to objectively consider a demand to pursue the claims in the Complaint for the reason that they face a substantial likelihood of liability for violation of the federal securities laws[18] and breach of their fiduciary duties. Under *Rales*, a director is interested, and thus unable to objectively consider a demand, "where a corporate decision" to pursue the corporate claim "will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales*, 634 A.2d at 936. Such is the case where a director has a "'substantial likelihood'" of liability if the Company's claims are prosecuted. *Id*. As such, there is a reasonable doubt as to a majority of the Bristol-Myers' board's disinterestedness here, rendering demand futile.

---

[17] Contrary to Defendants' contentions, the regulatory difficulties BMY has faced (*i.e.,* from the FTC and DOJ) are inextricably tied to the wrongdoing surrounding the unlawful negotiations with Apotex. Defs. Br., at pp. 20-21. Rising to a level that far exceeds J.P. Morgan Chase's mere ties to "the Enron debacle, but also to several other corporate scandals," Defs. Br., at p. 21 (citing *Halpert Enterprises, Inc. v. Harrison*, No. 02 Civ 9501 SHS, 2005 WL 1773686, at *2 (S.D.N.Y. July 26, 2005)), the Complaint here delineates particularized details of Bristol-Myers' orchestration of its *own* scandal that raised the red flags which evidenced the futility of demand.

[18] Also pending before this Court is the related class action securities litigation, *In Re: Bristol-Meyers Squibb Co. Securities Litigation* (1:07-cv-05867-PAC).

## II.    THE COMPLAINT ADEQUATELY STATES CLAIMS FOR VIOLATION OF STATE LAWS

### A.    The Complaint States A Claim Upon Which Relief May Be Granted Under Rule 12(b)(6)

Here, the Complaint sufficiently alleges facts and states claims that at the pleading stage must be accepted as true under Fed. R. Civ. 12(b)(6).[19]  Perhaps that is why Defendants have chosen not to move to dismiss any of derivative plaintiff's claims on their merits.[20]  Accordingly, derivative plaintiff stands by the well-pleaded allegations of his Complaint.

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint should be denied in its entirety.[21]

---

[19] In considering a motion to dismiss under Rule 12(b)(6), the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint and all inferences that can reasonably be drawn from the complaint. *Jacobson v. Ronsdorf*, C.A. No. 518-N, 2005 Del. Ch. LEXIS 2, at *11 (Del. Ch. Jan. 6, 2005).  The Complaint should not be dismissed unless it is determined with reasonable certainty that there is no set of facts that can be inferred from the Complaint on which Plaintiffs could prevail. *Solomon v. Pathe Commc'ns. Corp.,* 672 A.2d 35, 39 (Del. 1996).

[20] The Complaint alleges derivative claims for breach of fiduciary duty (Count I), contribution and indemnification (Count II), Breach of Fiduciary Duty of Good Faith in connection with Management of Bristol-Myers (Count III), Breach of Fiduciary Duty of Good Faith for Dissemination of Misleading and Inaccurate Information (Count IV), and Breach of Fiduciary Duty of Good Faith for Failure to Establish Adequate Internal Controls (Count V).

[21] As demonstrated herein, the Complaint properly alleges demand futility and states a claim.  However, if the Court determines that there are any deficiencies in the allegations against Defendants, derivative plaintiff respectfully requests he be granted leave to replead.  *See* Fed. R. Civ. P. 15(a) (leave to replead shall be freely given).  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (leave to replead "should, as the rules require, be 'freely given'").

Dated:  December 17, 2007

*Respectfully submitted,*

**WOLF HALDENSTEIN ADLER
        FREEMAN & HERZ LLP**

By: ___/s/ Gregory M. Nespole_____
    Daniel W. Krasner (DK-6381)
    Gregory Mark Nespole (GN-6820)
    Alexander H. Schmidt (AS-8304)
    Paulette S. Fox (PF-2145)
    270 Madison Avenue
    New York, New York 10016
    Telephone: (212) 545-4600
    Facsimile: (212) 545-4653

**LAW OFFICES OF BRUCE G. MURPHY**
    Bruce G. Murphy, Esq.
    265 Llwyds Lane
    Vero Beach, Florida  32963
    Telephone:  (772) 231-4202
    Facsimile:  (772) 492-1044

**GAINEY & MCKENNA**
    Thomas J. McKenna, Esq.
    295 Madison Avenue, 4th Floor
    New York, NY 10017
    Tel: (212) 983-1300
    Fax: (212) 983-0383

**COUNSEL FOR DERIVATIVE PLAINTIFF**

/495515v5