# Exhibit A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K/A
## (Amendment No. 1)

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2003

Commission File Number 1-1136

# BRISTOL-MYERS SQUIBB COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **22-079-0350** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

345 Park Avenue, New York, N.Y. 10154
(Address of principal executive offices)
Telephone: (212) 546-4000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.10 Par Value | New York Stock Exchange<br>Pacific Exchange, Inc. |
| $2 Convertible Preferred Stock, $1 Par Value | New York Stock Exchange<br>Pacific Exchange, Inc. |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).   Yes ☒   No ☐

The aggregate market value of the 1,940,460,562 shares of voting common equity held by non-affiliates of the registrant, computed by reference to the closing price as reported on the New York Stock Exchange, as of the last business day of the registrant's most recently completed second fiscal quarter (June 30, 2003) was approximately $52,683,504,258. Bristol-Myers Squibb has no non-voting common equity. At February 18, 2004, there were 1,941,090,408 shares of common stock outstanding.

BRISTOL-MYERS SQUIBB COMPANY
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Note 22 LEGAL PROCEEDINGS AND CONTINGENCIES**

Various lawsuits, claims, proceedings and investigations are pending against the Company and certain of its subsidiaries. In accordance with SFAS No. 5, *Accounting for Contingencies,* the Company records accruals for such contingencies when it is probable that a liability will be incurred and the amount of loss can be reasonably estimated. These matters involve antitrust, securities, patent infringement, the Employee Retirement Income Security Act of 1974, as amended (ERISA), pricing, sales and marketing practices, environmental, health and safety matters, product liability and insurance coverage. The most significant of these matters are described below.

In the fourth quarter of 2003, the Company established reserves for liabilities of $250 million, comprised of $150 million in relation to wholesaler inventory issues and certain other accounting matters as discussed below under Other Securities Matters, and $100 million in relation to pharmaceutical pricing and sales and marketing practices as discussed below under Pricing, Sales and Promotional Practices Litigation and Investigations. It is not possible at this time to reasonably assess the final outcome of these matters. In accordance with GAAP, the Company has determined that the above amounts represent minimum expected probable losses with respect to these groups of matters. Eventual losses related to these matters may exceed these reserves, and the further impact of either one of these groups of matters could be material. The Company does not believe that the top-end of the range for these losses can be estimated. With the exception of the above accruals and those for TAXOL*, BUSPAR, environmental and product liability proceedings, the Company has not established reserves for the matters described below. There can be no assurance that there will not be an increase in the scope of these matters or that any future lawsuits, claims, proceedings or investigations will not be material. Management continues to believe, as previously disclosed, that during the next few years, the aggregate impact, beyond current reserves, of these and other legal matters affecting the Company is reasonably likely to be material to the Company's results of operations and cash flows, and may be material to its financial condition and liquidity.

**PLAVIX* Litigation**

The Company's U.S. territory partnership under its alliance with Sanofi is a plaintiff in two pending patent infringement lawsuits instituted in the U. S. District Court for the Southern District of New York entitled Sanofi-Synthelabo, Sanofi-Synthelabo Inc., and Bristol-Myers Squibb Sanofi Pharmaceuticals Holding Partnership v. Apotex Inc. and Apotex Corp., 02-CV-2255 (RWS) and Sanofi-Synthelabo, Sanofi-Synthelabo Inc. and Bristol-Myers Squibb Sanofi Pharmaceuticals Holding Partnership v. Dr. Reddy's Laboratories, LTD, and Dr. Reddy's Laboratories, Inc., 02-CV-3672 (RWS). Similar proceedings involving PLAVIX* also have been instituted outside the United States.

The suits were filed on March 21, 2002 and May 14, 2002, respectively, and are based on U.S. Patent No. 4,847,265, a composition of matter patent, which discloses and claims, among other things, the hydrogen sulfate salt of clopidogrel, which is marketed as PLAVIX*, and on U.S. Patent No. 5,576,328, which discloses and claims, among other things, the use of clopidogrel to prevent a secondary ischemic event. The plaintiffs later withdrew Patent No. 5,576,328 from the lawsuit. Plaintiffs' infringement position is based on defendants' filing of their Abbreviated New Drug Application (ANDA) with the FDA, seeking approval to sell generic clopidogrel prior to the expiration of the composition of matter patent in 2011. The defendants responded by alleging that the patent is invalid and/or unenforceable. The cases were consolidated for discovery, and fact discovery closed on October 15, 2003.

Teva Pharmaceuticals USA, or Teva, a generic drug manufacturer, has filed an ANDA with the FDA claiming that patent No. 5576328 relating to PLAVIX* is invalid and that two others will not be infringed by Teva. None of these patents is involved in the pending patent infringement litigation involving PLAVIX*. The Teva filing does not challenge the patent at issue in the PLAVIX* litigation and therefore is not expected to have any impact on that litigation; nor does it appear that Teva intends to commercialize a generic form of PLAVIX* prior to the expiration or termination of the patent at issue in the litigation, although there can be no assurance that this will continue to be the case.

Net sales of PLAVIX* were approximately $2.5 billion in 2003 and are expected to grow substantially over the next several years. The Company anticipates that this revenue growth will be an important factor in offsetting

expected decreases in sales of the Company's other products that recently have or will experience exclusivity losses during this period.

Currently, the Company expects PLAVIX* to have market exclusivity in the United States until 2011. If the composition of matter patent for PLAVIX* is found not infringed, invalid and/or unenforceable at the district court level, the FDA could then approve the defendants' ANDAs to sell generic clopidogrel, and generic competition for PLAVIX* could begin, before the Company has exhausted its appeals. Such generic competition would likely result in substantial decreases in the sales of PLAVIX* in the United States.

Although the plaintiffs intend to vigorously pursue enforcement of their patent rights in PLAVIX*, it is not possible at this time reasonably to assess the outcome of these lawsuits, or, if the Company were not to prevail in these lawsuits, the timing of

108

1. **Table of Contents**

**BRISTOL-MYERS SQUIBB COMPANY**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Note 22 LEGAL PROCEEDINGS AND CONTINGENCIES (Continued)**

potential generic competition for PLAVIX*. However, if such generic competition were to occur, the Company believes it is very unlikely to occur before sometime in the year 2005. It also is not possible reasonably to estimate the impact of these lawsuits on the Company. However, loss of market exclusivity of PLAVIX* and the subsequent development of generic competition would be material to the Company's sales of PLAVIX* and results of operations and cash flows and could be material to its financial condition and liquidity.

**VANLEV Litigation**

In April, May and June 2000, the Company, its former chairman of the board and chief executive officer, Charles A. Heimbold, Jr., and its former chief scientific officer, Peter S. Ringrose, Ph.D., were named as defendants in a number of class action lawsuits alleging violations of federal securities laws and regulations. These actions have been consolidated into one action in the U.S. District Court for the District of New Jersey. The plaintiff claims that the defendants disseminated materially false and misleading statements and/or failed to disclose material information concerning the safety, efficacy and commercial viability of its product VANLEV during the period November 8, 1999 through April 19, 2000.

In May 2002, the plaintiff submitted an amended complaint adding allegations that the Company, its present chairman of the board and chief executive officer, Peter R. Dolan, its former chairman of the board and chief executive officer, Charles A. Heimbold, Jr., and its former chief scientific officer, Peter S. Ringrose, Ph.D., disseminated materially false and misleading statements and/or failed to disclose material information concerning the safety, efficacy, and commercial viability of VANLEV during the period April 19, 2000 through March 20, 2002. A number of related class actions, making essentially the same allegations, were also filed in the U.S. District Court for the Southern District of New York. These actions have been transferred to the U.S. District Court for the District of New Jersey. The Company has filed a motion for partial judgment in its favor based upon the pleadings. The plaintiff has opposed the motion, in part by seeking again to amend its complaint, including another attempt to expand the proposed class period. The court has not ruled on the Company's motion to dismiss nor the plaintiff's motion for leave to amend. Discovery is ongoing. The plaintiff purports to seek compensatory damages, costs and expenses on behalf of shareholders.

It is not possible at this time reasonably to assess the final outcome of this litigation or reasonably to estimate the possible loss or range of loss with respect to this litigation. If the Company were not to prevail in final, non-appealable determinations of this litigation, the impact could be material.

**Other Securities Matters**

The Company intends to vigorously defend its product liability lawsuits and believes that the majority of these cases and claims are without merit. While it is not possible at this time to reasonably assess the final outcome of the Company's pending product liability lawsuits and unfiled claims with certainty, management is of the opinion that the ultimate disposition of these matters should not have a material adverse effect on the Company's financial position. The Company believes that it has adequate self-insurance reserves and commercially available excess insurance to cover potential loss related to its product liability cases and claims.

**PLATINOL Litigation**

On February 13, 2004, a class action complaint was filed by North Shore Hematology-Oncology Associates, P.C. against the Company in the U.S. District Court for the District of Columbia. This is a putative class action brought on behalf of direct purchasers of PLATINOL that alleges that the Company violated federal antitrust laws by maintaining a monopoly in the U.S. market. The allegations focus on the Company's actions concerning U.S. Patent No. 5,562,925 ('925 patent), including the procurement of the '925 patent, submission of information relating to the '925 patent for listing in the Orange Book, and initiation of previous lawsuits against potential generic manufacturers based on the '925 patent. Plaintiffs seek declaratory judgment and damages (including treble damages).

The Company markets PLATINOL under exclusive patent licenses from Research Corporation Technologies (RCT).

The Federal Trade Commission (FTC) also opened an investigation relating to PLATINOL. This matter was settled with the entry of a consent decree, which is in effect until April 14, 2013.

It is not possible at this time reasonably to assess the final outcome of this litigation or reasonably to estimate the possible loss or range of loss with respect to this litigation. If the Company were not to prevail in final, non-appealable determinations of this litigation, the impact could be material.

**TAXOL® Litigation**

In 2000, 2001 and 2002, a number of putative class actions were brought against the Company, alleging antitrust, consumer protection and similar claims concerning the Company's actions to obtain and enforce patent rights relating to TAXOL®. A number of state attorneys general brought similar claims, and certain insurers asserted similar claims without filing suits. All of these matters have been settled, and those that required court approval had been given final approval by the supervising court. The total amount of the settlements was $144 million. Of that amount, $135 million was accrued in 2002. The remaining $9 million was accrued in 2003.

The FTC also opened an investigation relating to TAXOL®. This matter was settled with the entry of a consent decree, which is in effect until April 14, 2013.

An additional case based on the same allegations was brought by a small generic drug manufacturer in 2003. The Company moved to dismiss that case, and the court granted the motion in July 2003. The plaintiff sought reconsideration of this decision and was unsuccessful. The plaintiff has filed a notice of appeal in the U.S. Court of Appeals for the Seventh Circuit. It is not possible at this time reasonably to assess the final outcome of this suit or reasonably to estimate the possible loss or range of loss if the dismissal were reversed. If the dismissal were reversed, and if the Company were not to prevail in a final, non-appealable determination of the action, the impact could be material.

**BUSPAR Litigation**

In 2001, a number of putative class actions were brought against the Company, alleging antitrust, consumer protection and similar claims concerning the Company's actions to obtain and enforce patent rights relating to BUSPAR. A number of state attorneys general brought similar claims, and certain insurers, generic drug manufacturers and chain drug stores asserted similar

7.    **Table of Contents**

**BRISTOL-MYERS SQUIBB COMPANY**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Note 22 LEGAL PROCEEDINGS AND CONTINGENCIES (Continued)**

claims. All of these matters have been settled, and those that required court approval have been given final approval by the supervising court. The total amount of the settlements was $551 million. Of that amount, $35 million was accrued in 2001, and $500 million was accrued in 2002. The remaining $16 million was accrued in 2003.

The FTC also opened an investigation relating to BUSPAR. This matter was settled with the entry of a consent decree, which is in effect until April 14, 2013.

**Environmental Proceedings**

The following discussion describes (1) environmental proceedings with a governmental authority which may involve potential monetary sanctions of $100,000 or more (the threshold prescribed by specific SEC rule), (2) a civil action or an environmental claim that could result in significant liabilities, (3) updates of ongoing matters, or the resolution of other matters, disclosed in recent public filings and (4) a summary of environmental remediation costs.

The preliminary results of an internal audit performed at the Company's facility in Hopewell, N.J. indicate that operations at the site's wastewater treatment plant and related discharges may not be in compliance with the New Jersey Water Pollution Control Act and its implementing regulations or the terms of the Company's discharge permits. The Company reported its findings to the New Jersey Department of Environmental Protection (NJDEP) in February 2004, and is currently engaged in settlement discussions with the State. None of the results of the audit suggest that there has been any adverse impact to public health. The Company has taken, and will continue to take, corrective actions to address identified deficiencies and to prevent future occurrences.

In January 2004, NJDEP sent the Company and approximately five other companies, an information request letter relating to a site in North Brunswick Township, N.J. where waste materials from E.R. Squibb & Sons (Squibb), a wholly owned subsidiary of BMS, may have been disposed of from the 1940s through the 1960s. Fill material containing industrial waste and heavy metals in excess of residential standards was discovered in Fall 2003 during an expansion project at the North Brunswick Township High School. The school board and the Township, who are the current owners of the site, are preparing to submit a workplan to the NJDEP and have asked the Company to contribute to the cost of remediation. The Company is in discussions with NJDEP, the site owners and other potentially responsible parties. The site investigation is ongoing, and no claims have been asserted against the Company.

In September 2003, the NJDEP issued an administrative enforcement Directive and Notice under the New Jersey Spill Compensation and Control Act requiring the Company and approximately 65 other companies to perform an assessment of natural resource damages and to implement unspecified interim remedial measures to restore conditions in the Lower Passaic River. The Directive alleges that the Company is liable because it historically sent bulk waste to the former Inland Chemical Company facility in Newark, New Jersey, and that releases of hazardous substances from this facility have migrated into Newark Bay and continue to have an adverse impact on the Lower Passaic River watershed. Subsequently, the U.S. Environmental Protection Agency (USEPA) also issued a notice letter under the U.S. Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) to numerous parties—but not including BMS—seeking their cooperation in a study of conditions in substantially the same stretch of the Passaic River that is the subject of NJDEP's Directive. USEPA estimates this study will cost $20 million. This study may also lead to clean-up actions, directed by USEPA and the Army Corps of Engineers. The extent of any liability, under either the Directive or USEPA's notice letter, cannot yet be determined. Although the Company does not believe BMS has caused or contributed to any contamination in the Lower Passaic River watershed, the Company has informed NJDEP that it is willing to discuss their allegations against the Company. The NJDEP Directive states that if the responsible parties do not cooperate, the NJDEP may perform the damage assessment and restoration and take civil action to recover its remedial costs, treble damages for administrative costs, and penalties.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15 (d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

BRISTOL-MYERS SQUIBB COMPANY
(Registrant)

By         /s/ Peter R. DOLAN

**Peter R. Dolan**
*Chairman of the Board of Directors and Chief Executive Officer*

Date: June 28, 2004

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ PETER R. DOLAN<br>(Peter R. Dolan) | Chairman of the Board of Directors and Chief Executive Officer (Principal Executive Officer) | June 28, 2004 |
| /s/ ANDREW R.J. BONFIELD<br>(Andrew R.J. Bonfield) | Senior Vice President and Chief Financial Officer (Principal Financial Officer) | June 28, 2004 |
| /s/ PAUL W. KARR<br>(Paul W. Karr) | Vice President and Financial Controller (Principal Accounting Officer) | June 28, 2004 |
| /s/ ROBERT E. ALLEN<br>(Robert E. Allen) | Director | June 28, 2004 |
| /s/ LEWIS B. CAMPBELL<br>(Lewis B. Campbell) | Director | June 28, 2004 |
| /s/ VANCE D. COFFMAN<br>(Vance D. Coffman) | Director | June 28, 2004 |
| /s/ ELLEN V. FUTTER<br>(Ellen V. Futter) | Director | June 28, 2004 |
| /s/ LOUIS V. GERSTNER, JR. | Director | June 28, 2004 |

(Louis V. Gerstner, Jr.)

| /s/ LAURIE H. GLIMCHER, M.D. | Director | June 28, 2004 |
|---|---|---|
| (Laurie H. Glimcher, M.D.) | | |
| /s/ LEIF JOHANSSON | Director | June 28, 2004 |
| (Leif Johansson) | | |
| /s/ JAMES D. ROBINSON III | Director | June 28, 2004 |
| (James D. Robinson III) | | |
| /s/ LOUIS W. SULLIVAN, M.D. | Director | June 28, 2004 |
| (Louis W. Sullivan, M.D.) | | |