# Exhibit B

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2002

Commission File Number 1-1136

# BRISTOL-MYERS SQUIBB COMPANY
(Exact name of registrant as specified in its charter)

| Delaware | 22-079-0350 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

345 Park Avenue, New York, N.Y. 10154
(Address of principal executive offices)
Telephone: **(212) 546-4000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.10 Par Value | New York Stock Exchange<br>Pacific Exchange, Inc. |
| $2 Convertible Preferred Stock, $1 Par Value | New York Stock Exchange<br>Pacific Exchange, Inc. |

Securities registered pursuant to Section 12(g) of the Act: **None**

---

    Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

    Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

    Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒  No ☐

The aggregate market value of the 1,937,127,101 shares of voting common equity held by non-affiliates of the registrant, computed by reference to the closing price as reported on the New York Stock Exchange, as of the last business day of the registrant's most recently completed second fiscal quarter (June 28, 2002) was approximately $49,784,166,496. Bristol-Myers Squibb has no non-voting common equity. At February 28, 2003, there were 1,937,432,047 shares of common stock outstanding.

BRISTOL-MYERS SQUIBB COMPANY
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 22   LITIGATION MATTERS**

Various lawsuits, claims and proceedings are pending against the Company and certain of its subsidiaries. In accordance with SFAS No. 5, *Accounting for Contingencies,* the Company records accruals for such contingencies when it is probable that a liability will be incurred and the amount of loss can be reasonably estimated. In the years ended December 31, 2002 and 2001, the Company recognized $669 million (includes $10 million for discontinued operations) and $77 million, respectively, related to litigation matters. The most significant of the Company's litigation matters are described below.

*TAXOL® LITIGATION*

In 1997 and 1998, the Company filed several lawsuits asserting that a number of generic drug companies infringed its patents covering methods of administering paclitaxel when they filed Abbreviated New Drug Applications seeking regulatory approval to sell paclitaxel. These actions were consolidated for discovery in the U.S. District Court for the District of New Jersey (District Court). The Company did not assert a monetary claim against any of the defendants, but sought to prevent the defendants from marketing paclitaxel in a manner that violates its patents. The defendants asserted that they did not infringe the Company's patents and that these patents are invalid and unenforceable.

In early 2000, the District Court invalidated most claims of the Company's patents at issue. On April 20, 2001, the U.S. Court of Appeals for the Federal Circuit affirmed the District Court's summary judgment of the invalidity of all but two claims of the patents at issue. Those two claims relate to the low-dose, three-hour administration of paclitaxel in which the patient is given a specified regimen of premedicants before the administration of paclitaxel. The appellate court remanded those two claims to the District Court for further proceedings. In 2001, the Company filed an additional patent infringement suit against another company seeking to market generic paclitaxel.

In September 2000, one of the defendants received final approval from the FDA for its Abbreviated New Drug Application for paclitaxel and is marketing the product. The FDA has since announced additional final approvals and sales of additional generic products have begun.

Some of the defendants asserted counterclaims seeking damages for alleged antitrust and unfair competition violations. The Company believed its patents were valid when it filed the suits, and the counterclaims asserted are believed to be without merit. The lawsuits with all defendants who asserted counterclaims have been settled, with the defendants agreeing to drop all claims relating to paclitaxel and the Company granting licenses to them under certain paclitaxel patent rights.

Since the filing of the initial patent infringement suits, six private actions have been filed by parties alleging antitrust, consumer protection and similar claims relating to the Company's actions to obtain and enforce patent rights. The plaintiffs seek declaratory judgment, damages (including treble and/or punitive damages where allowed), disgorgement and injunctive relief. In June 2002, a group of 32 state attorneys general, the District of Colombia, Puerto Rico and the Virgin Islands brought similar claims. In September 2000, the Federal Trade Commission (FTC) initiated an investigation relating to paclitaxel.

On January 7, 2003, the Company announced that it reached agreements in principle that would settle substantially all antitrust litigation surrounding TAXOL®. The amount of the TAXOL® antitrust settlements is expected to be $135 million, the full amount of which was accrued in the third quarter of 2002. Certain important terms and conditions of the settlements remain to be finalized, and certain

89

settlements require court approval. Final approval by the state attorneys general in the TAXOL® litigation is contingent upon further agreements relating to the terms of injunctive relief. Among the provisions remaining to be negotiated are the terms for incorporating certain claimants, including a number of health insurers, into the existing settlement framework. The Company is in discussions with a number of insurers. Whether they will ultimately join the proposed settlement cannot be predicted with certainty at this time.

The Company has also reached agreement with the FTC staff on the terms of a consent order that would resolve the FTC's investigation. The proposed consent order is subject to review and approval by the FTC commissioners.

Other than with respect to the abovementioned proposed settlements, it is not possible at this time reasonably to assess the final outcome of these lawsuits or reasonably to estimate the possible loss or range of loss with respect to these lawsuits. If the proposed settlements do not become final or do not resolve all TAXOL®-related antitrust, consumer protection and similar claims, and if the Company were not to prevail in final, non-appealable determinations of ensuing litigation, the impact could be material.

*BUSPAR LITIGATION*

On November 21, 2000, the Company obtained a patent, U.S. Patent No. 6,150,365 ('365 patent), relating to a method of using BUSPAR or buspirone. The Company timely submitted information relating to the '365 patent to the FDA for listing in an FDA publication commonly known as the "Orange Book", and the FDA thereafter listed the patent in the Orange Book.

Delisting and Patent Suits. Generic-drug manufacturers sued the FDA and the Company to compel the delisting of the '365 patent from the Orange Book. Although one district court declined to order the delisting of the '365 patent, another ordered the Company to cause the delisting of the patent from the Orange Book. The Company complied with the court's order but appealed the decision to the United States Court of Appeals for the Federal Circuit. The appellate court reversed the district court that ordered the delisting. Concurrently, the Company sought to enforce the '365 patent in actions against two generic drug manufacturers.

Antitrust Suits. Following the delisting of the '365 patent from the Orange Book, a number of purchasers of buspirone and several generic drug makers filed lawsuits against the Company alleging that it improperly triggered statutory marketing exclusivity. The plaintiffs claimed that this was a violation of antitrust, consumer protection and other similar laws. The attorneys general of 36 states and Puerto Rico also filed suit against the Company with parallel allegations. The plaintiffs have amended their allegations to include charges that a 1994 agreement between the Company and a generic company improperly blocked the entry of generic buspirone into the market. Plaintiffs seek declaratory judgment, damages (including treble and/or punitive damages where allowed), disgorgement and injunctive relief.

Multidistrict Litigation (MDL) Proceedings. The Judicial Panel on MDL granted the Company's motions to have all of the patent and antitrust cases consolidated in a single forum. The court before which the buspirone litigations are now pending issued two opinions dated February 14, 2002. In the first opinion, the court found that the '365 patent does not cover uses of buspirone and therefore is not infringed. In the second opinion, the court denied the Company's motion to dismiss the federal

90

antitrust and various state law claims. The second opinion allows the claims against the Company to proceed, except as to federal antitrust claims for damages accrued more than four years before the filing of the complaints.

Government Investigations. The FTC and a number of state attorneys general initiated investigations concerning the matters alleged in the antitrust suits and discussed above. The Company cooperated in these investigations. A number of attorneys general, but not all of them, filed an action against the Company, as noted above.

Proposed Settlements. On January 7, 2003, the Company announced that it reached agreements in principle that would settle substantially all antitrust litigation surrounding BUSPAR. The amount of the BUSPAR settlements is expected to be $535 million, of which $35 million was accrued in the fourth quarter of 2001, $90 million was accrued in the first quarter of 2002 and $410 million was accrued in the third quarter of 2002. Written settlement agreements with a number of parties have now been signed. Certain of these settlements require court approval. A number of health insurers have not agreed to the proposed settlement framework. Whether these cases will ultimately be settled cannot be predicted with certainty at this time.

The Company has also reached agreement with the FTC staff on the terms of a consent order that would resolve the FTC's investigation. The proposed consent order is subject to review and approval by the FTC commissioners.

Other than with respect to the abovementioned proposed settlements of BUSPAR antitrust litigation, it is not possible at this time reasonably to assess the final outcome of these lawsuits or reasonably to estimate the possible loss or range of loss with respect to these lawsuits. If the proposed settlements do not become final or do not resolve all BUSPAR-related antitrust, consumer protection and similar claims, and if the Company were not to prevail in final, non-appealable determinations of ensuing litigation, the impact could be material.

*VANLEV LITIGATION*

In April, May and June 2000, the Company, its former chairman of the board and chief executive officer, Charles A. Heimbold, Jr., and its former chief scientific officer, Peter S. Ringrose, Ph.D., were named as defendants in a number of class action lawsuits alleging violations of federal securities laws and regulations. These actions have been consolidated into one action in the U.S. District Court for the District of New Jersey. The plaintiff claims that the defendants disseminated materially false and misleading statements and/or failed to disclose material information concerning the safety, efficacy, and commercial viability of its product VANLEV during the period November 8, 1999 through April 19, 2000.

In May 2002, the plaintiff submitted an amended complaint adding allegations that the Company, its present chairman of the board and chief executive officer, Peter R. Dolan, its former chairman of the board and chief executive officer, Charles A. Heimbold, Jr., and its former chief scientific officer, Peter S. Ringrose, Ph.D., disseminated materially false and misleading statements and/or failed to disclose material information concerning the safety, efficacy, and commercial viability of VANLEV during the period April 19, 2000 through March 20, 2002. A number of related class actions, making essentially the same allegations, were also filed in the U.S. District Court for the Southern District of New York. These actions have been transferred to the U.S. District Court for the District of New

91

Jersey. The plaintiff purports to seek compensatory damages, costs, and expenses on behalf of shareholders.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15 (d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

BRISTOL-MYERS SQUIBB COMPANY
(Registrant)

By  /s/  PETER R. DOLAN

Peter R. Dolan
*Chairman of the Board of Directors and Chief Executive Officer*

Date: March 28, 2003

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |
| /s/ PETER R. DOLAN (Peter R. Dolan) | Chairman of the Board of Directors and Chief Executive Officer (Principal Executive Officer) | March 28, 2003 |
| /s/ ANDREW R.J. BONFIELD (Andrew R.J. Bonfield) | Senior Vice President and Chief Financial Officer (Principal Financial Officer) | March 28, 2003 |
| /s/ DAVID L. ZABOR (David L. Zabor) | Vice President and Controller (Principal Accounting Officer) | March 28, 2003 |
| /s/ ROBERT E. ALLEN (Robert E. Allen) | Director | March 28, 2003 |
| /s/ LEWIS B. CAMPBELL (Lewis B. Campbell) | Director | March 28, 2003 |

104

| /s/ VANCE D. COFFMAN (Vance D. Coffman) | Director | March 28, 2003 |

| | | |
|---|---|---|
| /s/ ELLEN V. FUTTER | | March 28, 2003 |
| (Ellen V. Futter) | Director | |
| /s/ LOUIS V. GERSTNER, JR. | | March 28, 2003 |
| (Louis V. Gerstner, Jr.) | Director | |
| /s/ LAURIE H. GLIMCHER, M.D. | | March 28, 2003 |
| (Laurie H. Glimcher, M.D.) | Director | |
| /s/ LEIF JOHANSSON | | March 28, 2003 |
| (Leif Johansson) | Director | |
| /s/ JAMES D. ROBINSON III | | March 28, 2003 |
| (James D. Robinson III) | Director | |
| /s/ LOUIS W. SULLIVAN, M.D. | | March 28, 2003 |
| (Louis W. Sullivan, M.D.) | Director | |

105