# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
STEVEN W. SAMPSON, TRUSTEE,                              :

        Plaintiff,                                        :

                                                      07 Civ. 6890 (PAC)
        -against-                                         :                    Related Case: 07 Civ. 5867

JAMES D. ROBINSON III, LEWIS B.                         :
CAMPBELL, JAMES M. CORNELIUS,
LAURIE H. GLIMCHER, M.D., VICKI L.                      :            OPINION AND ORDER
SATO, PH.D., LEIF JOHANSSON, LOUIS
J. FREEH, MICHAEL GROBSTEIN, and R.                     :
SANDERS WILLIAMS, M.D.,
                                        :

        Defendants.                                       :

    and                                                   :

BRISTOL-MYERS SQUIBB COMPANY,                           :

        Nominal Defendant.                                :

                                         :
-------------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Steven W. Sampson ("Sampson" or "Plaintiff") brings this shareholder's

derivative action on behalf of Nominal Defendant Bristol-Myers Squibb Co. ("Bristol-Myers" or

the "Company") against nine members of the Bristol-Myers Board of Directors (the "Board"):

James D. Robinson III ("Robinson"); Lewis B. Campbell ("Campbell"); James M. Cornelius

("Cornelius"); Laurie H. Glimcher, M.D. ("Glimcher"); Vicki L. Sato, Ph.D. ("Sato"); Leif

Johansson ("Johansson"); Louis J. Freeh ("Freeh"); Michael Grobstein ("Grobstein"); and R.

Sanders Williams, M.D. ("Sanders"), (collectively the "Directors" or "Defendants"). The action

seeks redress for the harm purportedly caused to the Company by the Board's actions and/or

inactions concerning the Company's efforts to settle patent litigation with a Canadian generic

pharmaceutical drug company, Apotex Inc. ("Apotex"), over the highly profitable prescription

drug Plavix.  Plaintiff alleges derivative claims for: general breach of fiduciary duty; contribution

and indemnification; breach of fiduciary duty of good faith in connection with management of

Bristol-Myers; breach of fiduciary duty of good faith for dissemination of misleading and

inaccurate information; and breach of fiduciary duty of good faith for failure to establish adequate

internal controls.

Defendants move to dismiss for Plaintiff's failure to satisfy the pre-suit demand

requirement of Federal Rule of Civil Procedure 23.1.  For the reasons set forth below, Defendants'

motion is granted.

## BACKGROUND

The factual allegations concerning this case are set forth in the Court's Opinion and Order

of August 19, 2008 in the related securities class action case of In re Bristol-Myers Squibb Co.

Sec. Litig., No. 07 Civ. 5867 (PAC) (S.D.N.Y. Aug. 19, 2008), familiarity with which is assumed.

The factual allegations are supplemented only as necessary.

Plaintiff asserts demand on the Bristol-Myers Board would be futile because, inter alia: (1)

the acts and practices taken by the Board in the Apotex matter were unlawful, and therefore not

within the protection of the business judgment rule (Am. Compl. ¶ 143); (2) the Defendants

knowingly approved or unreasonably acquiesced to illegal conduct through their inaction, and/or

should have been aware of the consequences of the Company's misconduct because of its history

with regard to other generic drug settlements (Am. Compl. ¶ 144); (3) the Board demonstrated a

sustained and systematic failure to manage the Company's operations (Am. Compl. ¶ 145); (4) a

majority of Directors consciously and knowingly ignored "red flags" (Am. Compl. ¶ 146); (5) the

Board was obligated to exercise a higher degree of care given the Company's history of

misconduct (Am. Compl. ¶ 149); and (6) the Defendants ratified the purportedly fraudulent conduct, participated in, approved, and/or permitted the alleged wrongs, and are "interested" because they face a "substantial likelihood of liability for their breaches of fiduciary duty" (Am. Compl. ¶¶ 150-52). These allegations are vague, conclusory, unsupported, and insufficient to survive this motion to dismiss.

The stock price declines which provided the basis for the securities class action suit took place in late July and early August 2006, and the purported misconduct "tolerated" by the Board occurred well before that date, beginning no later than Spring 2006. Defendant Williams joined the Board on September 11, 2006, over one month after the alleged misconduct ended (Am. Compl. ¶ 42), and Defendant Grobstein did not join the Board until March 2007, long after the events in question. (Am. Compl. ¶ 40). Clearly, Williams and Grobstein played no role in the actions leading up to the stock price declines. Defendant Sato became a Board member on July 11, 2006, well after the Apotex settlement negotiations took place and the material misstatements were made to the public and to the Government (Am. Compl. ¶ 34). These three Defendants are quite removed from the allegations of wrongdoing so that demand on them would not have been futile.

Plaintiff alleges as to each of the other six Defendants that they "owed a duty to . . . be reasonably informed about the business, operations, and finances of the Company . . ." but instead of fulfilling these duties, "actively participated in or knowingly encouraged, sponsored or approved" the fraudulent acts alleged, and in so doing, violated their duties to the Company. (Am. Compl. ¶¶ 27, 29, 31, 33, 37, 39.) These sweeping allegations are unaccompanied by specific and particularized allegations (dates, statements, actions) concerning the conduct of each Defendant.

Additionally, Plaintiff alleges that certain Defendants belonged to corporate committees, giving rise to additional fiduciary duties which, in turn, were breached in conjunction with the Apotex settlement. Defendants Campbell, Glimcher, Johansson, Freeh, and Robinson, are all members of the Audit Committee, which purportedly had insufficient internal controls in place. (Am. Compl. 155.) Defendants Campbell, Glimcher, Freeh, Williams and Robinson are members of the Committee on Directors and Corporate Governance, which failed to establish and enforce "guidelines of corporate governance." (Am. Compl. ¶¶ 158-61). For good measure, Plaintiff claims that the combined impact of the Sarbanes-Oxley Act (Am. Compl. ¶ 162), the relevant Company insurance policies (Am. Compl. ¶ 163), unspecified "irreconcilable conflicts" between Board members and the Company (Am. Compl. ¶ 164), and the Board Members' "personal and financial interest" in the Company (Am. Compl. ¶ 165) would also have made demand futile. Plaintiff's assumption appears to be that the individual and collective maledictions of the Board are so egregious that, a fortiori, demand would be futile. (Am. Compl. 1-6).

The Court declines to leap to Plaintiff's conclusions that demand would be futile. Rather, the Court notes other (relevant) allegations to this motion:

(1)    Aware of Bristol-Myers's less-than-stellar record of regulatory compliance as a result of prior misconduct, and in light of the federal consent decree and/or deferred prosecution agreement under which it was operating,[1] the Board appointed a monitor (a retired United States District Court judge) to act as an overseer of the Company. (Am. Compl. ¶ 122)

---

[1] According to the Amended Complaint, Bristol-Myers entered into a consent order with the FTC in April 2003 in response to misconduct surrounding the use of its patents to "thwart" other generic drugs. (Am. Compl. ¶ 84.) The consent decree requires Bristol-Myers to obtain antitrust approval from the state attorneys general and the FTC before finalizing a settlement agreement with a generic drug maker. (Am. Compl. ¶ 84.)

(2)     The Company submitted its initial Apotex settlement agreement—as required—for

regulatory approval, thus complying with the oversight mechanism put in place by the

consent decree. (Am. Compl. ¶ 85)

(3)     Upon rejection of the initial settlement, the Company was invited by regulators to

renegotiate the terms of the settlement and resubmit the agreement for approval.  (Am.

Compl. ¶ 89)

(4)     After discovering the misconduct regarding the Apotex settlement, the Board took

immediate action and involuntarily terminated the CEO and the General Counsel. (Am.

Compl. ¶ 122)

## DISCUSSION

### I. Motion to Dismiss Standard

The complaint in a shareholder derivative action "must . . . state with particularity: (A) any

effort by the plaintiff to obtain the desired action from the directors . . .; and (B) the reasons for

not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3)(A) and (B).  Failure

to comply may result in dismissal.  The shareholder, therefore, must plead "with particularity why

a demand would have been futile."  In re Abbott Labs. Derivative S'holder Litig., 325 F.3d 795,

804 (7th Cir. 2001).  It is clearly "not sufficient for the shareholder to simply state in conclusory

terms that he made no demand because it would have been futile," instead, the allegations must be

supported with specific facts demonstrating that it is so.  Id. 325 F.3d at 804 (quotations and

citations omitted).

In determining whether the pleadings have satisfied this standard, the court "must apply

the demand futility exception as it is defined by the law of the State of incorporation."  Kamen v.

Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 (1991).  Bristol-Myers is a Delaware corporation,

and Delaware law therefore governs.  (Derivative Plaintiff's Memorandum of Law in Opposition

to the Motion to Dismiss ("Pl. Mem.") at 11); (Defendants' Memorandum of Law in Support of

Motion to Dismiss ("Def. Mem.") at 11).

## II. Demand Requirement & Futility Exception (Aronson, Rales and Caremark)

Under Delaware law, there are two separate tests for demand futility in the shareholder

derivative context: the Aronson test and the Rales test (and the Caremark elaboration on the Rales

test.)  Aronson v. Lewis, 473 A.2d 805 (Del. 1984) (overruled on other grounds); Rales v.

Blasband, 634 A.2d 927 (Del. 1993); In re Caremark, 698 A.2d 959 (Del. Ch. 1996).  Each is

applied in a different corporate context: Aronson is a two-part test which is applied when the

challenged board conduct is "conscious," that is, when a Board has consciously decided whether

or not to act in a given circumstance.  See Aronson, 473 A.2d at 813.  Application of the Aronson

test, therefore, implies some volition on the part of the Board.  Id.

Rales, on the other hand, is a single-part inquiry which is applied when the challenged

board conduct is inaction, that is, "[w]here there is no conscious decision by directors to act or

refrain from acting . . . ."  Rales, 634 A.2d at 933.  Although the parties dispute whether Aronson

or Rales controls here (see Pl. Mem at 13, 15; Def. Mem. at 23), the Court need not resolve that

issue because it finds that these pleadings fail under either test.

### 1. Aronson

Aronson holds that a plaintiff has demonstrated that demand is futile when there is

reasonable doubt that either: (1) the directors are disinterested and independent, or (2) the board's

inaction is protected by the business judgment rule.  Aronson, 473 A.2d at 814.  The Court

addresses each part in turn.

6

"A director is considered <u>interested</u> where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." <u>Rales</u>, 634 A.2d at 936 (emphasis added).  A director is also interested "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders."  <u>Id.</u>  Under such circumstances, a director is not presumed able to exercise independent business judgment "without being influenced by the adverse personal consequences resulting from the decision."  <u>Id.</u> For example, the "mere threat" of personal liability for a board's decision does not render a director "interested," but a "substantial likelihood" that the director faces such liability may.  <u>In re Veeco Instruments, Inc. Sec. Litig.</u>, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) (quotations and citations omitted).  Independence, in turn, "means that a director's decision is based on the corporate merits of the subject . . . rather than extraneous considerations or influences." <u>Rales,</u> 634 A.2d at 936 (quoting <u>Aronson</u>, 473 A.2d at 816).

With respect to the second part of the <u>Aronson</u> test (the business judgment rule inquiry), the rule presumes that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." <u>Aronson</u>, 473 A.2d at 812.  When allegations suggests that a Board's decision was not informed, not in good faith, or not in the best interests of the Company, the Board's decisions will not be protected by the business judgment rule.

### 2. <u>Rales</u>

The <u>Rales</u> test, in contrast, is applied in cases or claims when a derivative plaintiff challenges a board's <u>inaction</u>.  <u>Rales</u>, 634 A.2d at 933.  This test essentially consists of the first part of the <u>Aronson</u> test (asking whether board members are interested and/or independent), without the corresponding review of the business judgment rule.  In short, <u>Rales</u> simply asks

whether the plaintiff's factual allegations are sufficiently particularized so that there is a reasonable doubt that the board acted in an independent and disinterested manner. See id. at 934. Rales explains that "[w]here there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no application." Id., 634 A.2d at 933. Rales does, however, require a plaintiff to demonstrate that there is a "substantial likelihood" of personal liability by the directors. Id., 634 A.2d at 936.

**3.     The "Caremark Claim" (an application of Rales)**

Following Rales, Delaware imposed another limitation on instituting a derivative action without prior demand.  In In re Caremark, the Court of Chancery of Delaware held that when a Plaintiff does not (or cannot) allege any particular wrongful action by a Board, a plaintiff may still argue that demand should be excused based on a Board's failure to manage and oversee a company.  See In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996).  But the Caremark theory of recovery "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." Id. at 967.  When a plaintiff asserts a Caremark derivative claim, "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." Id. at 971 (emphasis added).  Therefore, where a plaintiff challenges the inaction of a board, the pleading standard is "quite high" and "demanding." Loveman v. Lauder, 484 F. Supp. 2d 259, 265 (S.D.N.Y. 2007) (holding that the shareholder failed to allege sufficient particularized facts to demonstrate that demand would have been futile, even when certain board members were related both to each other and to other individuals from whom the board purchased stock).

8

### III. The Parties' Arguments

#### 1. Plaintiff's Argument

Plaintiff argues that the presence of red flags or storm warnings in this case meant that the Board "consciously failed to take oversight action" such that the Aronson test, and not the more difficult Rales-Caremark standard, should apply. (Pl. Mem. at 12.) In support of his position, Plaintiff cites to Abbott Labs, which held that where a Board had notice of Company misconduct from "red flags" or "storm warnings" (in the form of regulatory warning letters and meetings with regulators), the Board's decision not to act on the warnings was considered to be conscious. Abbott Labs, 325 F.3d at 808-10. In light of a conscious Board decision, the Seventh Circuit held that demand would be futile. Id.

Under Aronson, Plaintiff argues that at least six of the nine Defendants were "interested" because they faced the threat of personal liability (in the form of contribution or indemnity claims), and that they could not have been exercising good business judgment when they failed to carefully scrutinize management's conduct in the Apotex settlement negotiations. Plaintiff contends that this demonstrates demand futility under the Abbott Labs standard. According to the Plaintiff, the Bristol-Myers Board consciously ignored the teachings of Abbott Labs as to "red flags" or "storm warnings," including: the prior regulatory violations, the Company's entry into a consent order, the appointment of a federal monitor; and the FTC/regulatory disapproval of the initial Apotex settlement. In light of this history, Plaintiff contends that the Board should have been hyper-vigilant and "actively intervened and supervised the Company's settlement discussions with Apotex from the outset." (Pl. Mem. at 17.) Specifically, Plaintiff argues that the Board should have "intervene[d] and either conduct[ed] the [Apotex] negotiations itself, or demand[ed] that a [board] representative be present [during negotiations]." (Pl. Mem. at 2.) Instead, Plaintiff

alleges that the Board gave the Company leadership too much leeway in conducting the Apotex negotiations without sufficient oversight.

The duty to provide careful oversight was heightened, Plaintiff argues, in light of the initial regulatory rejection of the settlement agreement. According to Plaintiff, the non-approval should have provided an indication to the Board that something was defective with the original Apotex settlement. The rejection of the initial settlement proposal, coupled with the Board's awareness of prior compliance problems with respect to countering the threat of generic drugs, should have alerted the Board to potential misconduct. Furthermore, the haste with which a new settlement was negotiated and submitted should have alarmed the directors. Considering all of the relevant history, the Plaintiff argues that the Board should have been sensitized to misconduct, which should have given rise to greater scrutiny of the Apotex negotiations and executive activity.

## 2. Defendant's Argument

Defendants respond that Plaintiff has failed to make sufficiently particularized allegations against the Defendants and that the conclusory allegations that have been raised are insufficient to withstand a motion to dismiss. Vague and sweeping assertions that the Board "failed to fulfill duties" are simply not enough to meet the threshold pleading requirements of alleging demand futility, especially where the Amended Complaint acknowledges that as soon as the Board became aware of misconduct, it took responsible, affirmative steps to take control of the situation and provide oversight. First, the Defendants appropriately relied on the regulatory review and approval process to evaluate the settlement agreement. The fact that a review was conducted at all reflected that a safeguard was in place and the Company had every intention of complying with the relevant regulations. (Defendants' Reply Memorandum of Law ("Def. Reply") at 2.) The disapproval of the initial settlement meant that the appropriate oversight mechanism was

10

functioning, not that there was a lack of oversight.  Defendants also argue that the initial rejection

of the settlement did not constitute a "red flag" when the FTC invited the companies to submit a

revised settlement agreement after further negotiations.  With respect to the haste with which the

agreement was re-negotiated, Defendants argue that nothing was obviously amiss when material

terms of the agreement changed in Apotex's favor: the revised agreement provided for earlier

entry and longer exclusivity of Apotex's generic product.  (See Bristol-Myers Form 10-Q, Aug. 8,

2006).[2]  The fact that it was later suggested that the CEO and another Bristol-Myers officer—

acting in secret—had agreed to other more onerous terms, as part of unlawful oral side

agreements, was simply not known to the Board.  Second, Defendants rely on their retention of a

federal monitor to provide advice and oversight in the time leading up to the Apotex litigation,

charged him with conducting his own investigation of the settlement negotiations, and after the

misconduct was revealed, acted on the monitor's recommendation that they terminate the CEO

and General Counsel.  Under such circumstances, Defendants assert that they acted appropriately.

Finally, the Directors argue that they consulted outside counsel about the settlement process,

thereby adding another level of oversight to both the process and their actions;[3] appointed a "Non-

Executive Chairman" to evaluate the Company's corporate governance; and initiated other

safeguards to prevent further misconduct.  In light of the actions taken by the Board, Defendants

argue that there simply was no additional obligation to intervene directly in the negotiations, or to

demand a Board representative (or a Board-appointed representative) be present for the actual

conduct of the negotiations.

---

[2] On this motion to dismiss, the Court may take judicial notice of the SEC filings.  See In re Gen. Dev. Corp. Bond Litig., 800 F. Supp. 1128, 1135-36 (S.D.N.Y. 1992), ("The Second Circuit ... made clear that consideration of documents publicly filed by defendants in securities cases is not foreclosed to district courts in deciding motions to dismiss.") (citing Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)).

[3] Plaintiff rejects the suggestion that the Board's consultation with outside counsel mitigates its oversight failure here. Plaintiff argues that Defendant has failed to adequately allege and support an "advice-of-counsel" defense, and therefore, the Board is not absolved from its failure to act in accordance with its fiduciary obligations. (Pl. Mem. at 18 n.13.)

11

ANALYSIS

### 1. Aronson

Under the Aronson test, the Complaint is clearly inadequate. Plaintiff points to no specific individuals who are "interested" or lack "independence," and makes no particularized allegations that the Board members would be liable for their actions with regard to the Apotex settlement. Two of the Directors (Williams and Grobstein) were not even members of the Board at the time the relevant actions took place and they should be dismissed from the case immediately. Director Vicki Sato arrived only at the very end of the actions in question, and likewise lacks culpability. With respect to the remaining six defendants, and the various committees on which they served (the Audit Committee and the Corporate Governance Committee), the Plaintiff totally fails to allege any facts, let alone sufficiently particularized facts, which give rise to an inference that they were interested, lacked independence, and had not exercised their best business judgment. Other than conclusory allegations of a general failure to oversee, some threat of personal liability, and some extraneous claims regarding director and officer "insurance" coverage and "irreconcilable conflicts" (Am. Compl. ¶ 163 and 164), the Plaintiff does not even come close to approaching the pleading threshold.

Abbott Labs is Plaintiff's strongest case, but it is clearly distinguishable. The Abbott board members received numerous, written "red flags" and "storm warnings," attended several meetings with regulators where they were briefed on the company's problems, and were aware of the company's total and complete regulatory non-compliance for six years, and still did nothing. While the Bristol-Myers Board was aware of prior misconduct, it took affirmative steps to address the concerns of the regulatory agencies. The Defendants entered into a Consent Decree requiring regulatory approval of settlements; appointed a federal monitor; submitted to regulatory oversight;

and consulted outside counsel. These actions reflect a desire to comply with the regulatory scheme, not as in Abbott Labs, an attempt to avoid or ignore regulatory concerns.

Given Bristol-Myers Board's steps to address prior misconduct, it is fair to say that the Board believed that the Apotex situation was under control and that management was behaving in accordance with both its Consent Decree and accepted principles of corporate governance. Under such circumstances, "absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists." Graham v. Allis-Chalmers Mfg. Co., 188 A.2d 125, 130 (Del. 1963).

### 2. Rales & Caremark

Applying the Rales-Caremark standard of demonstrating futility, Plaintiff must show a sustained and systematic failure to oversee management in order to survive a motion to dismiss. It has not done so, and certainly has not done so with the requisite "sufficient particularity" called for by Rule 23.1. Plaintiff alleges only a generalized failure to scrutinize management's conduct. Given the affirmative steps taken by the Bristol-Myers Board, however, the Plaintiff simply cannot demonstrate a "sustained and systematic" oversight failure.

First, Plaintiff presents no particularized factual allegations that Board members were interested or lacked independence. Second, the Caremark standard is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." Caremark, 698 A.2d at 967. While it is clear under Caremark that a director has a duty to attempt in good faith to ensure that an adequate information and reporting system exists, "no rationally designed information and reporting system will remove the possibility that the corporation will violate laws or regulations, or that senior officers or directors may nevertheless sometimes be misled or otherwise fail reasonably to detect acts material to the corporation's compliance with the law." Id.

at 970. Equally compelling is <u>Caremark's</u> caution that mere labels describing Board actions—"stupid," "egregious," "irrational,"—do not provide grounds for liability. Rather, the inquiry is whether the Board's process was rational and employed in "a good faith effort to advance corporate interests." <u>Id.</u> at 967. Given the safeguards put in place by the Board, the Board had no reason to suspect that the CEO and other members of senior management would continue to engage in suspect practices with regard to generic drug settlement agreements.

## CONCLUSION

For the reasons set forth above, Plaintiff has failed to explain why demand would be futile; accordingly, Defendants' motion to dismiss is GRANTED. The Clerk of Court is directed to terminate this motion and close this case.

Dated:  New York, New York
        August 20, 2008

SO ORDERED

PAUL A. CROTTY
United States District Judge

14