**The Revised Apotex Agreement**

92.    According to the DOJ Felony Information, the negotiations leading to the second iteration of the Apotex Agreement took place primarily during face-to-face meetings on May 12 and May 24, 2006, at Apotex's offices in Toronto, Canada (the "revised Apotex Agreement"). These meetings were attended on behalf of Bristol-Myers by only one individual, referred to by the DOJ as "BMS Executive-1," and they were attended on behalf of Apotex by one individual, referred to by the DOJ as "Apotex Executive-1." Two other Apotex officers participated in portions of the May 12 meeting.

### *"BMS Executive-1"*

93.    The DOJ describes the "BMS Executive-1" as a former senior executive of Bristol-Myers who, in 2006, reported directly to the Company's then-CEO, Mr. Dolan, and was a member of Bristol-Myers' Executive Committee.

94.    The DOJ's Felony Information provides that, in 2006, BMS Executive-1 "had primary responsibility for negotiating a settlement of patent litigation involving Plavix®. During that same time, he also represented [Bristol-Myers] on the Alliance Steering Committee of the Bristol-Myers Squibb Sanofi Pharmaceuticals Holding Partnership, which was a committee responsible for handling strategic issues relating to sales and marketing of Plavix® worldwide."

95.    While "BMS Executive-1" has not been formally identified by the DOJ, a May 11, 2007 article in *The New York Times*, "Bristol-Myers Agrees to Plead Guilty in Plavix Case," pointed to Mr. Dolan's assistant at the time, Dr. Andrew G. Bodnar, as the one who negotiated the secret agreement with Apotex. According to the Company's Annual Report for Fiscal Year 2005, filed on Form 10-K with the SEC on March 24, 2006, Dr. Bodnar was Senior Vice President of Strategy and Medical & External Affairs, as well as a Corporate Staff Member of the Company's Executive Committee.

96.     During the relevant time period, according to the Company's Proxy Statement, filed with the SEC on Form DEF 14A on March 22, 2006, the Bristol-Myers Executive Committee, which reported directly to the Board of Directors, consisted of the following four (4) individuals: Mr. Dolan (as Chairman), Mr. Allen, Louis V. Gerstner, Jr. and Director Defendant Robinson. In addition, at one time, BMS Executive-1 (or Dr. Bodnar), was a member as well.

97.     According to the Company's next annual Proxy Statement, filed with the SEC on Form DEF 14A on March 22, 2007, Bristol-Myers announced that it had eliminated its Executive Committee. Further, of the previous year's Executive Committee members, only Director Defendant Robinson currently remains with the Company.

### *"Apotex Executive-1"*

98.     "Apotex Executive-1" also was not formally identified by the DOJ, but referred to as a senior executive of Apotex and an owner of the privately held company, with primary responsibility for overseeing patent litigation involving Plavix and the proposed settlement of that litigation. On August 18, 2006, *The New York Times* reported in an article "New Details in Reported Secret Deal Over Generic Drug," that Apotex's chief executive, Bernard C. Sherman, had lied to the federal government about the secret agreement to sabotage the settlement agreement and clear the way for his company's sales of the product.

99.     During the aforementioned meeting on May 12, 2006, between Bristol-Myers' BMS Executive-1 and Apotex's Executive-1 (upon information and belief, Dr. Bodnar and Mr. Sherman, respectively), the parties discussed the FTC's refusal to approve a revised settlement agreement that contained a written term committing Bristol-Myers not to launch an authorized generic. However, during that May 12 meeting, according to the DOJ, "BMS Executive-1 made oral representations to Apotex for the purpose of causing Apotex to conclude that [Bristol-Myers] would not launch an authorized generic in the event that the parties reached a final

31

revised settlement agreement."

100.    In fact, according to the DOJ, BMS Executive-1's oral representations to Apotex resulted in an understanding that Bristol-Myers would not launch an authorized generic version of Plavix in the event that the parties reached a final settlement.

101.    On May 24, 2006, BMS Executive-1 met with Apotex Executive-1 again, and at this meeting, the parties came to an agreement on the remaining terms of the revised Apotex Agreement, subject to review of a final draft of the agreement.

102.    The revised Apotex Agreement was formally executed by Bristol-Myers on May 25, 2006, and by Apotex on May 26, 2006. It no longer included any mention of the three provisions from the initial Apotex Agreement to which the FTC had objected: (i) the commitment not to launch an authorized generic version of Plavix during Apotex's license period; (ii) the break-up fee; and (iii) the market guarantee.

103.    Bristol-Myers then submitted the revised Apotex Agreement to the FTC for review and approval on May 30, 2006, pursuant to the FTC Consent Order. However, according to the DOJ, this submission did *not* disclose any of the oral representations or understandings regarding the launch of an authorized generic that occurred during the May 12, 2006 meeting. In short, Bristol-Myers' submission to the FTC omitted referencing the illegal oral agreement to refrain from launching an authorized generic.

104.    Then, on June 5, 2006, Apotex submitted the revised Apotex Agreement to the FTC, as required under the Medicare Prescription Drug Improvement and Modernization Act of 2003, Pub. L. No. 108-173, Title XI, § 1112, 117 Stat. 2066 (Dec. 8, 2003), together with a letter *disclosing certain oral agreements* reached between Apotex and Bristol-Myers relating to the revised Apotex Agreement.

105.    In its letter, according to the DOJ, Apotex reported that it had reached an oral

agreement with Bristol-Myers, whereby Bristol-Myers agreed that it would not launch an

authorized generic version of Plavix during the license period granted to Apotex under the

revised Apotex Agreement. This information materially contradicted Bristol-Myers' submission.

**FTC Certification**

106.    After receiving Apotex's disclosure, according to the DOJ, the FTC requested a

written certification from Bristol-Myers confirming that Bristol-Myers "ha[d] not made any

representation, commitment, or promise to Apotex, whether oral or written, that is not explicitly

set forth in the Revised Agreement, including the representation that [DEFENDANT] would not

launch an authorized generic version of Plavix during Apotex's period of exclusivity" (the "FTC

Certification").

107.    The FTC Certification was executed and submitted by Bristol-Myers to the FTC

on June 12, 2006. According to the DOJ, the certification was signed on behalf of Bristol-Myers

by BMS Executive-1 and outside counsel, and did not disclose any of those oral representations

or understandings regarding the launch of an authorized generic from the May 12, 2006 meeting,

which were subsequently disclosed by Apotex in its June 5, 2006 letter to the FTC. Bristol-

Myers' FTC Certification was plainly false.

**The Unraveling of the Apotex Agreement**

108.    Shortly after signing the FTC Certification, Bristol-Myers and Sanofi announced

in a June 25, 2006 press release entitled "Update on Plavix® Litigation Settlement," that they

had revised the Apotex Agreement in response to concerns raised by the FTC and the state

attorneys general over the previously announced initial Apotex Agreement. According to the

press release, under the terms of the revised Apotex Agreement, Apotex shortened the period by

which it agreed not to enter the market with its generic version of Plavix to last through June 1,

33

2011, instead of September 17, 2011.

109. Yet again, Bristol-Myers' press release was silent as to Apotex's secret $60 million fee, among other things, in a purported effort to evade the scrutiny of federal and state regulators reviewing the arrangement.

110. Almost one month later, on July 27, 2006, the Company issued a press release announcing Second Quarter financial results for Fiscal Year 2006, entitled "Bristol-Myers Squibb Company Reports Financial Results for the Second Quarter and First Half of 2006." Therein, the Company, in relevant part, revealed:

> In the response to concerns raised by the FTC and state attorneys general to that proposed settlement agreement, the company, sanofi-aventis and Apotex have amended the agreement.

*     *     *

> The company learned yesterday that the Antitrust Division of the United States Department of Justice is conducting a criminal investigation regarding the proposed settlement of the Apotex litigation described above.

111. Shortly thereafter, all 50 state attorneys general informed Bristol-Myers, Sanofi, and Apotex that they would not approve the Apotex Agreement, even in its revised form. Because effectuation of the Apotex Agreement was contingent upon the approval of both the FTC and all 50 state attorneys general, the deal was effectively dead.

112. On July 28, 2006, as the Company issued a press release entitled "PLAVIX® Litigation Settlement Fails to Receive Antitrust Clearance From States Attorneys General," numerous news sources reported the Antitrust Division of the DOJ's investigation into allegations that Bristol-Myers deceived federal antitrust enforcers about the events surrounding the rejected Apotex Agreement to limit generic competition for Plavix. Reportedly, the FTC sought this criminal investigation after officials at Apotex seriously contradicted statements

34

Bristol-Myers made to the FTC.

113.   It was also reported on this same day that, as part of its on-going criminal investigation into to the Apotex Agreement, two days earlier, on July 26, 2006, FBI agents executed a search warrant at the headquarters of Bristol-Myers in Manhattan and raided the Company's New York City offices, with their search focusing on the offices of Mr. Dolan and Dr. Bodnar for documents and emails that might provide evidence to support the FTC complaint.

114.   The DOJ summarized the basis of the investigation, as well as Bristol-Myers' wrongdoing, as follows:

> In 2006, BMS and another company, Apotex Inc., were engaged in litigation over the validity of the patent for Plavix and were negotiating a settlement of that litigation. At the time, BMS was subject to a separate consent decree for unrelated conduct with the Federal Trade Commission (FTC) that required BMS to submit any proposed patent settlements for review and approval by the FTC. The FTC warned BMS that it would not approve a settlement of the Plavix litigation if BMS agreed not to launch its own generic version of Plavix that would compete against Apotex for generic sales. A former senior BMS executive made oral representations to Apotex with the purpose of causing Apotex to conclude that BMS would not launch its own generic version of Plavix in the event that the parties reached a final settlement agreement. The [Antitrust] Division further alleged that these representations ultimately resulted in an understanding between BMS and Apotex that BMS would not launch its own generic version of Plavix. Finally, the [Antitrust] Division charged that ***BMS took steps deliberately to mislead the FTC by first concealing and then later lying about the existence of its representations to and understanding with Apotex Inc.***

See Statement Of Thomas O. Barnett, Assistant Attorney General, Antitrust Division, Before The Task Force On Antitrust And Competition Committee On The Judiciary, United States House Of Representatives Concerning Oversight Of The United States Department Of Justice, Antitrust Division, http://www.usdoj.gov/atr/public/testimony/226322.htm (presented Sept. 25, 2007) (emphasis added).

115.   In light of the foregoing events of late-July 2006, the chances of a settlement fell apart and on August 8, 2006, Apotex announced that is was launching its generic version of

Plavix in the United States. By the end of August 2006, it was reported that 78% of all new U.S.

prescriptions filled for the blood clot medicine were for the Apotex generic.

116.    That same day, Bristol-Myers filed its Quarterly Report with the SEC, and for the

first time revealed that it had substantially modified the Plavix settlement agreement with

Apotex, to the Company's detriment.  Therein, the Company, in relevant part, stated:

> The [initial Apotex] Agreement included the following provisions, among others:
> The companies would grant Apotex a royalty-bearing license under the '265
> patent to manufacture and sell its FDA-approved generic clopidogrel bisulfate
> product in the United States, and Apotex would agree not to sell a clopidogrel
> product in the United States until the effective date of the license.

*     *     *

> *In addition, the companies waived their right to seek treble damages under
> applicable patent laws if they were to prevail in the pending patent litigation.
> The companies also agreed not to seek a temporary restraining order or a
> preliminary injunction against a launch by Apotex of its generic clopidogrel
> bisulfate product* (which could not occur until five business days after failure to
> obtain antitrust clearance) *until either they had first given Apotex five business
> days prior notice of their intention to do so, or Apotex had initiated a launch*.

*     *     *

> In response to concerns expressed by the FTC and state attorneys general, the
> parties modified the [initial Apotex] Agreement…. Under the terms of the
> Modified Agreement, Apotex's license would be effective on June 1, 2011, or
> earlier in certain circumstances. The companies' agreement not to launch an
> authorized generic product during the term at the Apotex license was also deleted.
> The provisions relating to a payment to Apotex in the event U.S. sales of
> PLAVIX were lower than specified amounts and to a payment to Apotex in the
> event the required antitrust clearances were not obtained also were deleted. *The
> limitation on damages in the event Apotex launched at risk and the companies
> prevailed in the pending litigation was reduced to 40% of Apotex's net sales if
> the companies had launched an authorized generic clopidogrel bisulfate
> product and otherwise 50% of Apotex's net sales. In addition, the companies
> again waived their right to seek treble damages under applicable patent laws if
> they were to prevail in the pending patent litigation. The companies agreed not
> to seek a temporary restraining order and agreed they could seek a preliminary
> injunction only after giving Apotex five business days' notice, which notice
> could be given only after Apotex had initiated a launch.*

36

(Emphasis added.)

117.    Bristol-Myers and Sanofi knew that there was a "significant risk" that the settlement with Apotex would not be consummated because it would not be approved by the FTC. Indeed, *The New York Times* reported on August 9, 2006 that the Company's CEO, Mr. Dolan, said that "he had never expected the American government to approve the deal...."

118.    Then, on August 18, 2006, *The New York Times* reported in an article titled "New Details in Reported Secret Deal Over Generic Drug," that on August 17, 2006, lawyers for Apotex filed allegations against Bristol-Myers in the Federal District Court in Manhattan accusing Bristol-Myers of making the secret side-agreement part of a proposed settlement of the patent lawsuit with Apotex. The secret deal, Apotex asserted, was an effort to evade the scrutiny of the federal and state regulators who were reviewing the settlement.

119.    In this filing, Apotex came forward and admitted that Dr. Bodnar, "a top assistant to Bristol-Myers's chief executive, Peter R. Dolan, negotiated the secret deal after regulators objected to an earlier version of the patent settlement because it would have restricted competition." In fact, Apotex's filing provided many new details about its agreement with Bristol-Myers, which were concealed from the public until August 17, 2006, including Apotex's admission of the $60 million secret fee. Specifically, according to *The New York Times* article:

> The side deal, the filing said, contained two provisions that had been in the original version of the settlement agreement but that were not included when the companies formally submitted their revised version.
>
> One provision called for Bristol-Myers and Sanofi to give Apotex a six-month head start to introduce its generic version of Plavix in 2011 before the two big companies would introduce their own generic, according to today's court filing.
>
> Under the other provision, ***Bristol-Myers and Sanofi would secretly give Apotex a $60 million fee that had been part of the original settlement agreement.***

(Emphasis added.)

120.    Furthermore, *The New York Times* article reported that, in a hearing before Judge

Stein in early August 2006, a lawyer for Bristol and Sanofi asserted that Apotex's chief

executive, Bernard C. Sherman, "had lied to the federal government about the secret agreement

to sabotage the settlement agreement and clear the way for his company's sales of the product."

121.    However, the August 17, 2006 filing by Apotex fired back in its own defense and

alleged the following with respect to the roles played by Dr. Bodnar and Mr. Sherman in the

unraveling of the Apotex Agreement, according to *The New York Times* article:

> [T]hat to induce Mr. Sherman to go along with the new arrangement, Dr. Bodnar
> made a number of oral commitments not included in the written document
> submitted to the government. The filing asserts that Dr. Bodnar had told Apotex
> that the oral agreements should not be included in the written document because
> their inclusion might hinder attempts to obtain regulatory clearance.

> When Mr. Sherman relayed the new agreement to his lawyers, they advised him
> that it was necessary to disclose both the written and oral agreements to the
> Federal Trade Commission, according to the document filed yesterday. The filing
> cites an e-mail message from Dr. Bodnar to Mr. Sherman on May 27, the day
> after the revised agreement was signed, as evidence of an oral side agreement.

> The e-mail message, the filing said, was a response to a demand by an Apotex
> lawyer, Robert S. Silver, that Bristol-Myers and Sanofi pay the $60 million fee
> that had been included in the original settlement submitted to the government but
> omitted from the revised written agreement. The payment was a break-up fee that
> Apotex would receive if the government rejected the initial settlement deal.

> In the e-mail message to Mr. Sherman, Dr. Bodnar objected to the request for the
> $60 million payment: "You explicitly assured me that you would not initiate such
> action at this point and would wait until matters had resolved themselves. Unless
> Silver immediately withdraws his demand, I will consider myself not bound by
> any restriction as to this issue to which I am bound by agreement with you."

122.    On September 12, 2006, Bristol-Myers announced the sudden departure of two

key executives. The Company stated that Mr. Dolan "will leave the position of chief executive

officer, effective immediately," and that Richard Willard "will leave the position of senior vice

president and general counsel, effective immediately." The Company also stated:

At a previously scheduled meeting of the company's Board yesterday, the Board received reports from the company's outside counsel on issues relating to the PLAVIX® patent litigation with Apotex Inc. and Apotex Corp. These reports were prepared and delivered at the request of the Board as part of its ongoing assessment of this matter. *During the Board's deliberations, the Board also heard from former Federal Judge Frederick B. Lacey, the Monitor under the company's deferred prosecution agreement with the office of the U.S. Attorney for the District of New Jersey, who made his own preliminary recommendation to the Board that the employment of both Mr. Dolan and Mr. Willard be terminated.* The U.S. Attorney for New Jersey, Christopher J. Christie, also attended a portion of the Board meeting.

Judge Lacey's recommendation followed an inquiry by the Monitor and the U.S. Attorney into issues related to corporate governance in connection with the negotiation of a settlement agreement of the pending PLAVIX patent litigation with Apotex Inc. and Apotex Corp.

(Emphasis added.)

123.    Eight months later, on May 10, 2007, the *Associated Press* reported and the Company confirmed by press release, that "Bristol-Myers to Admit to False Statements." In particular, Bristol-Myers announced that it had agreed to plead guilty to federal charges of making false statements to a government agency and pay a fine of up to $1 million in connection with its failed attempt to resolve the Plavix patent dispute in 2006. The agreement in principle, subject to court approval, would essentially resolve the criminal investigation launched by the U.S. Justice Department's Antitrust Division, which centered on Bristol-Myers' actions in trying to settle the Plavix patent dispute with Apotex.

124.    The *Associated Press* article further noted, in relevant part:

Last year, Apotex alleged in court documents that a Bristol executive involved in the negotiations, Andrew Bodnar, reached certain side agreements with Apotex that weren't included in the written settlement agreement submitted to government regulators.

Bristol said Thursday it would plead guilty to two counts of violating a federal law prohibiting making false statements to a government agency. Bristol said "the charges relate to representations made by a former Bristol-Myers Squibb senior executive during the renegotiation of the proposed settlement agreement in May

2006 that were not disclosed to the U.S. Federal Trade Commission."

125.    On May 30, 2007, the Antitrust Division of the DOJ filed a Felony Information with the United States District Court for the District of Columbia (Criminal No.: 07-140 (RMU)) charging Bristol-Myers with the wrongdoing alleged herein.

126.    The next day, on May 31, 2007, the DOJ entered into a Plea Agreement with Bristol-Myers, whereby Bristol-Myers pleaded guilty to two counts of violating 18 U.S.C. Section 1001. This guilty plea resolved the investigation by the Antitrust Division of the DOJ into the proposed settlement of the Plavix patent litigation with Apotex. As a result of the plea, the Company paid a fine of $1 million.

127.    On June 11, 2007, the Company issued a press release entitled "U.S. Department of Justice Investigation of Bristol-Myers Squibb in Proposed Plavix Patent Settlement Is Resolved," announcing its May 31, 2007 Plea Agreement with the DOJ.

128.    Then, on June 19, 2007, the U.S. District Court for the Southern District of New York upheld the validity and enforceability of the Plavix patent, thereby permanently blocking the sale of Apotex's generic version. The Court ruled that Apotex's generic infringes Bristol-Myers' patent, and enjoined Apotex from marketing this product in the United States until the patent expires in November 2011.

129.    The Court stated it would calculate damages relating to Apotex's "at-risk" launch of its generic in August 2006, at a later date. Press reports estimate those damages to be $1.2 billion to $1.4 billion in 2006, and $250 million to $350 million in 2007.

130.    Consequently, by waiving treble damages as part of its "pay-not-to-play" deal with Apotex, Bristol-Myers' officers and directors unreasonably vitiated the Company's right to recover more than $3 billion.

40

## A Prior History Of Anti-competitive Behavior

131.    As previously alleged, this was not the first time Bristol-Myers engaged in such illegal and anti-competitive conduct.  In fact, Bristol-Myers engaged in similar conduct when seeking to prolong its monopoly for two of its other blockbuster drugs, BUSPAR® and TAXOL®.

132.    As a result of its earlier behavior regarding BUSPAR®, Bristol-Myers was sued by the FTC, the attorney generals of over 35 states, and nationwide classes of direct and indirect purchasers.

133.    While the Apotex Agreement fallout was on-going, on December 21, 2006, Bristol-Myers announced that it had reached an agreement in principle with the DOJ and the Office of the United States Attorney for the District of Massachusetts to settle several separate investigations into the Company's drug pricing and sales and marketing activities, subject to approval by the DOJ. These investigations began several years ago. The agreement in principle provided for a civil resolution and a tentative settlement payment by Bristol-Myers of $499 million.

134.    On September 28, 2007, it was announced that Bristol-Myers agreed to pay *more than $515 million* to settle these fraud charges involving kickbacks to doctors and inflated drug prices.   Michael Sullivan, the U.S. Attorney in Boston, said Bristol-Myers agreed to settle charges that the Company illegally compensated doctors to induce them to prescribe Bristol-Myers drugs, ostensibly for their participation in various programs which included trips to luxurious resorts. Other allegations included that a Bristol-Myers unit, Apothecon, paid retailers and wholesalers to stock its drugs, and that it promoted the sale and use of the schizophrenia drug Abilify for use in children for dementia-related psychosis.

135.    As part of that approximate $515 million settlement, Bristol-Myers said that it

41

entered into a five-year "corporate integrity agreement" with the Office of the Inspector General of the U.S. Department of Health and Human Services.

136.    Additionally, as referenced above, Bristol-Myers was also enjoined from resolving or settling patent infringement actions in which an ANDA filer receives anything of value unless Bristol-Myers obtains an advisory opinion from the FTC that the settlement agreement would not raise issues under Section 5 of the Federal Trade Commission Act.

137.    Regarding its scheme to block generic competition for TAXOL®, Bristol-Myers was similarly sued by the FTC, the Attorney Generals of all 50 states, and nationwide classes of direct purchasers and third-party payors. Bristol-Myers agreed to pay over $335 million to settle those charges, and also agreed to the entry of permanent injunctive relief barring it from engaging in similar misconduct in the future. Bristol-Myers was enjoined from, *inter alia*:

(a)    Improperly listing any patent in the Orange Book in the future;

(b)    Taking any action in connection with any Bristol-Myers patent improperly listed in the Orange Book, or encouraging any other person to take any action, that initiates, maintains, or causes to be initiated or maintained, a 30-Month Stay of FDA approval of any competing generic application;

(c)    Making any statements to the FDA that are (i) false and misleading; and (ii) material to either the approvability of a competing generic application;

(d)    Asserting any fraudulent or objectively baseless claim, or otherwise engaging in sham litigation for the purpose of injuring a competing generic application;

(e)    Enforcing or seeking to enforce any patent that it knows is invalid, unenforceable, or not infringed; and

(f)    Acquiring from another person a patent or an exclusive license to a patent if

42

Bristol-Myers seeks or secures the patent's listing in the Orange Book in reference to an already approved drug without providing prior written notification to the States.

138.     Notwithstanding this track record, Director Defendants gave Mr. Dolan the green-light, absent meaningful oversight and supervision, to once again expose Bristol-Myers to further liability, including massive liability in the form of class action lawsuits and criminal conduct, by approving the Apotex Agreement.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

139.     Plaintiff brings this action derivatively in the right and for the benefit of Bristol-Myers to redress injuries suffered, and to be suffered, by Bristol-Myers as a direct result of the violations of federal law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Director Defendants. Bristol-Myers is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

140.     Plaintiff will adequately and fairly represent the interests of Bristol-Myers and its shareholders in enforcing and prosecuting its rights.

141.     Plaintiff is and was an owner of Bristol-Myers common stock during time relevant to the Director Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

142.     The Board of Bristol-Myers consists of the following nine (9) individuals: Director Defendants James D. Robinson III, Lewis B. Campbell, James M. Cornelius, Laurie H. Glimcher, M.D., Vicki L. Sato, Ph.D., Leif Johansson, Louis J. Freeh, Michael Grobstein, and R. Sanders Williams, M.D. During the relevant period of wrongdoing, *seven* of *nine* Director

43

Defendants were members of the Bristol-Myers Board -- James D. Robinson III, Lewis B. Campbell, James M. Cornelius, Laurie H. Glimcher, M.D., Vicki L. Sato, Ph.D, Leif Johansson, and Louis J. Freeh. Plaintiff has not made any demand on the present Bristol-Myers Board to institute this action because such a demand would be a futile, wasteful and useless act, as to a majority of the Board, particularly for the following reasons:

143.    Demand is excused because the acts and practices alleged herein constitute unlawful conduct that is not within the protection of the business judgment rule.

144.    Demand is excused because the unlawful acts and practices alleged herein cannot be approved by Director Defendants and are not subject to the protection of the business judgment rule because Director Defendants knowingly approved, or unreasonably acquiesced through their inaction, Bristol-Myers' violations of law and illegal conduct, and were aware of, or should have been aware of, the consequences to Bristol-Myers and its shareholders from their earlier experiences with BUSPAR® and TAXOL®.

145.    Demand is also excused because the Bristol-Myers Board of Directors has demonstrated a sustained and systematic failure to manage and oversee the Company's operations, as evidenced by a long history of regulatory violations. As a result of this failure, all of Director Defendants face a substantial likelihood of liability for their breaches of duties.

146.    Demand is also excused because a majority of Director Defendants serving on the Bristol-Myers Board of Directors consciously and knowingly ignored numerous "red flags" regarding the unlawfulness surrounding the initial Apotex Agreement. Ignoring these multiple red flags has caused the Company to suffer damages.

147.    As detailed above, the Company entered into the FTC Consent Order, which restricted its ability to take affirmative action in response to generic competition absent approval

44

from regulators. For example, its prior anti-competitive conduct resulted in the Company paying hundreds of millions of dollars in settlements and fines in connection with BUSPAR® and TAXOL®. Accordingly, as stated above, the Bristol-Myers Board was obligated – given this record – to take affirmative action to stop the Company's management from entering into any agreement with Apotex that was a violation of law, especially once the initial Apotex Agreement faltered.

148.    The FTC's rejection of the initial Apotex Agreement on grounds that it smacked of anti-competitive conduct that mirrored the Company's checkered past was a "red flag" that should have alerted the Board that it was obligated to actively participate in the negotiations and process leading to the execution of the revised Apotex Agreement. The Bristol-Myers Board, instead, was supine in the face of this information. It allowed, absent direct involvement, Mr. Dolan and his lieutenants to negotiate with Apotex representatives surreptitiously. The result of this inaction in the face of information commanding action was the execution of an illegal arrangement that forced DOJ intervention and resulted in guilty pleas to a Felony Information.

149.    Moreover, the Bristol-Myers Board was obligated to exercise a greater degree of care and fidelity given the Company's history of misconduct. Bristol-Myers was already subject to a federal monitor under the FTC Consent Order. These circumstances alone confirm that once the initial Apotex Agreement was repudiated by the FTC -- for being potentially unlawful -- the Bristol-Myers Board was presented with a "red flag" indicating that something at the Company had gone awry and that the law was probably being broken, yet again. Once the initial Apotex Agreement was not approved by the FTC, the Bristol-Myers Board was obligated to conduct an investigation into the circumstances leading to the potentially unlawful agreement. It was obligated to insert its own representative at the negotiation table -- not leave the process to Mr.

Dolan and his staff -- given that it was obvious that they had endeavored to engage in malfeasance. Furthermore, the Bristol-Myers Board should have discovered through simple acts of due diligence that the revised Apotex Agreement contained impermissible oral agreements restricting the Company's entrance into the generic arena. It should have inquired about and learned that Mr. Dolan and his colleagues agreed to forego recoverable damages in a desperate effort to secure near term profits and secure their positions as company managers. In light of all these "red flags" ignored by the Bristol-Myers Board, demand would be futile against them.

150. Demand is also excused because the overwhelming majority of Director Defendants have ratified the egregious actions outlined herein, and these same Director Defendants cannot be expected to prosecute claims against themselves, and persons with whom they have extensive business and personal entanglements, if plaintiff demanded that they do so.

151. Demand is also excused because Director Defendants participated in, approved, and/or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly and/or negligently disregarded them, and are therefore not disinterested parties and lack sufficient independence to exercise proper business judgment. The Apotex Agreement was of such significance to the Company that Director Defendants must have known of and approved it or were so grossly uninformed as to abdicate their responsibility as directors of Bristol-Myers.

152. Accordingly, there is reasonable doubt that Director Defendants Robinson, Campbell, Cornelius, Glimcher, Sato, Johansson, and Freeh are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Bristol-Myers. Thus, demand is futile as to Director Defendants Robinson, Campbell, Cornelius, Glimcher, Sato, Johansson, and Freeh.

**The Audit Committee**

153.    The Audit Committee is comprised of Director Defendants Campbell, Glimcher, Freeh, Johansson, as well as Director Defendant Grobstein. In addition, Director Defendant Robinson serves as a member, *ex-officio*, of all Bristol-Myers Board committees, including the Audit Committee.  By its charter, the Audit Committee's function is oversight. The Audit Committee is responsible for: (i) meeting to review Bristol-Myers' disclosure controls and procedures, internal controls, periodic filings with the SEC, earnings releases and earnings guidance; (ii) producing the required Audit Committee Report for inclusion in the Company's annual proxy statements; and (iii) overseeing investigations into complaints concerning financial or accounting matters.  Other specific duties and responsibilities include working closely with management, as well as the Company's independent registered public accounting firm.

154.    The Bristol-Myers Audit Committee is primarily responsible for overseeing and monitoring the quality of the Company's accounting and auditing practices and is directly responsible for the appointment, compensation and oversight of the Company's independent registered public accounting firm for the purpose of preparing or issuing audit reports and related work regarding its financial statements. The Audit Committee also assists the Bristol-Myers Board in fulfilling its responsibilities for general oversight of compliance with legal and regulatory requirements, the performance of Bristol-Myers' internal audit function and business risk assessment and business risk management.

155.    These Director Defendants were responsible as members of the Audit Committee for ensuring that Bristol-Myers' internal controls were adequate. Bristol-Myers' internal controls, however, were deficient, as evidenced by Mr. Dolan's and his lieutenants': (i) negotiation of and participation in the unlawful Apotex Agreement, (ii) agreement to waive a valuable right to collect treble damages in a patent suit against Apotex in which Bristol-Myers

47

has now prevailed, and (iii) agreement not to seek an injunction prohibiting Apotex from selling its then-existing inventory of generic Plavix. As a result, the Company has been subjected to, *inter alia*, investigations by all 50 state attorneys general, the DOJ, the FTC, and even raids by the FBI.

156. The Audit Committee was charged with the duty to ensure that internal controls were strictly followed. This responsibility is greater where a company has a history of malfeasance. Here, the Company's anti-competitive conduct is well-documented and gave rise to governmental sanctions on many occasions. The FTC's criticism of the initial Apotex Agreement on three distinct grounds thus served as a "red flag" calling out to the Audit Committee to engage an investigation. That investigation should have stopped Mr. Dolan and his lieutenants from further negotiations with Apotex absent the Audit Committee's involvement. The Audit Committee was obligated to demand a fulsome explanation concerning the circumstances, including whether secret arrangements were in place to restrict trade.

157. If the Audit Committee simply failed to do this, demand on them is futile given their inaction in the face of clear warnings. If the Audit Committee was aware of the malfeasance and failed to act, demand is equally futile because each member thereof faces a substantial likelihood of either or both civil and criminal liability. In short, it is impossible for members of the Audit Committee to contend that they are not culpable given the record of reckless inaction or conscious misconduct. Accordingly, there is reasonable doubt that Director Defendants Campbell, Glimcher, Johansson, and Freeh, as well as Director Defendant Robinson, are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Bristol-Myers. Thus, demand is futile as to Director Defendants Campbell, Glimcher, Johansson, Freeh, and Robinson.

48

**The Committee on Directors and Corporate Governance**

158.    The Committee on Directors and Corporate Governance is comprised of Director

Defendants Campbell, Glimcher, and Freeh, as well as Director Defendant Williams. In addition,

Director Defendant Robinson serves as a member, *ex-officio*, of all Bristol-Myers Board

committees, including the Compensation and Management Development Committee.  By its

charter, the Committee on Directors and Corporate Governance is responsible for (i) identifying

individuals qualified to become Bristol-Myer Board members, (ii) recommending that the Board

select the director nominees for the next annual meeting of stockholders, and (iii) overseeing the

Board's annual evaluation of its performance. It is also responsible for developing and

recommending to the Board a set of corporate governance guidelines applicable to the company

and for periodically reviewing such guidelines. Furthermore, the Committee on Directors and

Corporate Governance is charged with the responsibility of, *inter alia*, (a) considering questions

of possible conflicts of interest of Board members and the Executive Committee members; (b)

annually reviewing and assessing the adequacy of the Company's corporate governance

guidelines and recommend any changes to the Board for its approval and adoption; and (c)

considering matters relating to the Company's responsibilities as a global corporate citizen

pertaining to corporate social responsibility and corporate public policy and the impact on the

Company's employees and stockholders.

159.    These Director Defendants were responsible as members of the Committee on

Directors and Corporate Governance for establishing a set of guidelines of corporate governance

that were adequate and would serve to prevent the exact type of wrongdoing that occurred and

has been alleged herein. Bristol-Myers' internal controls, however, were deficient, as evidenced

by Mr. Dolan's and his lieutenants': (i) negotiation of and participation in the unlawful Apotex

Agreement, (ii) agreement to waive a valuable right to collect treble damages in a patent suit

against Apotex in which Bristol-Myers has now prevailed, and (iii) agreement not to seek an injunction prohibiting Apotex from selling its then-existing inventory of generic Plavix. As a result, the Company has been subjected to, *inter alia,* investigations by all 50 state attorneys general, the DOJ, the FTC, and even raids by the FBI.

160.    The Committee on Directors and Corporate Governance was charged with the duty to ensure that a heightened level of corporate governance was strictly administered, especially with respect the accountability and fiduciary duties of the Bristol-Myers Board. This responsibility is greater where a company has a history of malfeasance. Here, the Company's anti-competitive conduct is well-documented and gave rise to governmental sanctions on many occasions. The FTC's criticism of the initial Apotex Agreement on three distinct grounds thus served as a "red flag" calling out to the Committee on Directors and Corporate Governance to scrutinize the performance of the Board and the effectiveness of the corporate governance guidelines it had established.   Such a re-evaluation should have restricted further negotiations with Apotex absent more stringent corporate governance guidelines. The Committee on Directors and Corporate Governance Committee was obligated to demand a fulsome explanation concerning the circumstances surrounding the behavior and decisions made by Mr. Dolan, his lieutenants, as well as the Bristol-Myers Board, including whether secret arrangements were in place to restrict trade.

161.    If the Committee on Directors and Corporate Governance simply failed to do this, demand on them is futile given their inaction in the face of clear warnings. If the Committee on Directors and Corporate Governance was aware of the malfeasance and failed to act, demand is equally futile because each member thereof faces a substantial likelihood of either or both civil and criminal liability.  In short, it is impossible for members of the Committee on Directors and

50

Corporate Governance to contend that they are not culpable given the Company's record of reckless inaction or conscious misconduct. Accordingly, there is reasonable doubt that Director Defendants Campbell, Glimcher, and Freeh, as well as Robinson, are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Bristol-Myers. Thus, demand is futile as to Director Defendants Campbell, Glimcher, Freeh, and Robinson.

162.    The Sarbanes-Oxley Act of 2002 (the "SOX") placed significant additional responsibilities on the boards of directors of public companies subject to the Act, like Bristol-Myers, to improve corporate financial accounting and internal controls and to improve corporate financial responsibility and disclosure. This new law was a disaster for the Bristol-Myers Board, since, despite its public posture of concern over good corporate governance, controls, disclosure and integrity; it was sitting atop a massive ongoing scheme to keep its generic competition off the market as evidenced by, *inter alia,* the Apotex Agreement. Any real compliance with the SOX would have exposed this scheme, brought it to an end and resulted in embarrassing discharges. Thus, the Bristol-Myers Board of Directors did not enforce or comply with the SOX, despite its legal obligation under federal law to do so. Clearly, the Bristol-Myers Board of Directors will not sue themselves for this failure.

163.    Demand is also excused because insurance policies covering the liability of a Company's directors and officers purport to exclude legal claims asserted directly by the Company against such persons. Thus, there was, and is, a substantial disincentive for Bristol-Myers to bring any action directly against Director Defendants. Generally, under the terms of such directors' and officers' insurance policies, a company would be required by the carriers to cooperate in the defense of any claims, such as the present action, which seek to impose liability upon certain officers and directors of Bristol-Myers, including Director Defendants in this action,

51

for misconduct and mismanagement. Thus, if the policy or policies which Bristol-Myers maintains contain the foregoing provision, the insurance carriers would argue that Bristol-Myers and its Board of Directors are thereby contractually disabled from complying with any demand that would cause Bristol-Myers to institute, and/or prosecute any action against Director Defendants for such misconduct and mismanagement; because to do so could result in the loss to Bristol-Myers of its insurance coverage. Similarly, Bristol-Myers would be disabled from pursuing Director Defendants as it would not benefit from any insurance they may have.

164. In addition, Director Defendants suffer from irreconcilable conflicts. As members of the Board of Directors of Bristol-Myers during this relevant time period, they were privy to Bristol-Myers' improper practices, and had personal and financial interests in the actions challenged herein. Since Director Defendants took no action at the time the relevant breaches and frauds were perpetrated, they cannot be expected to take action now. Furthermore, given Director Defendants' personal exposure to liability from the conduct described herein, they suffer from an irreconcilable conflict in considering the prosecution of those involved. As such, Director Defendants will not take any steps on behalf of the Company since such a corrective action would necessitate that the Bristol-Myers initiate litigation against themselves.

165. Finally, demand is futile because the Bristol-Myers Board of Directors cannot be presumed to exercise independent judgment in assessing the merits of a demand due to their personal and financial interest in the subject matter of many of the claims raised in this Complaint. The Bristol-Myers Board of Directors would thus be required potentially to investigate and bring claims against themselves for their own misconduct. No shareholder demand could or would prompt the Bristol-Myers Board of Directors to take action. As such, demand is excused.

166.    Demand is futile as to at least Director Defendants James D. Robinson III, Lewis B. Campbell, James M. Cornelius, Laurie H. Glimcher, M.D., Vicki L. Sato, Leif Johansson, Louis J. Freeh, *seven of nine members*, constituting a majority of the Bristol-Myers Board as required under the law.

## COUNT I

## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
### (Against Director Defendants)

167.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

168.    Director Defendants all owed a fiduciary duty to Bristol-Myers and its shareholders, the duty to exercise due care and diligence in the management and administration of the affairs of the Company, as well as in the auditing and reporting of the Company, and owed the duty of full and candid disclosure of all material facts thereto.

169.    As fiduciaries, to discharge these duties, Director Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Bristol-Myers.

170.    In performing the aforementioned services, Director Defendants all breached, and continue to breach, their fiduciary duties, causing damages to Bristol-Myers, by, *inter alia*, (i) failing to discover and prevent Bristol-Myers's violations of law (ii) failing to properly implement, oversee and maintain appropriate and adequate internal controls, practices, and procedures for Bristol-Myers; (iii) failing to ensure that Bristol-Myers operated in compliance with all applicable federal and state laws, rules, and regulations the development, marketing and distribution of Plavix; (iv) failing to ensure that Bristol-Myers did not engage in any unsafe, unsound, or illegal business practices; and (v) causing Bristol-Myers to be sued for, and exposed to, liability for anti-trust and anti-fraud violations, as well as exposure to criminal and regulatory

sanctions, as previously described herein.

171.    Director Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Bristol-Myers to suffer substantial monetary damages as a result of the wrongdoing herein, as well as further and even greater damage in the future, including exposure to forfeitures, fines and penalties (including the potential for massive monetary damages resulting from its anti-trust violations), damage to Bristol-Myers's reputation and good will, the resulting loss of business, increased costs of capital, and otherwise.

172.    Bristol-Myers has been directly and substantially injured by reason of Director Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiff, as a shareholder and representative of Bristol-Myers, seeks damages and other relief for the Company, in an amount to be proven at trial.

## COUNT II

### DERIVATIVE CLAIM FOR CONTRIBUTION AND INDEMNIFICATION
### (Against Director Defendants)

173.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

174.    Bristol-Myers is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Director Defendants' liability to Bristol-Myers.

175.    In addition, Director Defendants' misconduct and wrongdoing, and the disclosures and events described herein, have had, and will continue to have, a series of deleterious effects on Bristol-Myers, including but not limited to:

(a)    Loss of confidence of the investing public in the integrity and management of Bristol-Myers, thereby resulting in Bristol-Myers losing market value; and

(b)    As a result of Director Defendants' misconduct, Bristol-Myers is now exposed to

54

criminal and regulatory scrutiny, as well as anti-fraud and anti-trust lawsuits resulting from their misconduct and fraudulent activities and anti-competitive behavior, thereby, at a minimum, causing the Company to incur unnecessary direct and indirect investigatory, litigation and administrative costs, and potentially resulting in awards, judgments or settlements against Bristol-Myers.

176.    By reason of the misconduct described herein, Bristol-Myers's alleged liability arises, in whole or in part, from the intentional, knowing, reckless, disloyal and bad faith acts or omissions of Director Defendants as previously alleged herein.

177.    Bristol-Myers is therefore entitled to contribution and indemnification from each of the Director Defendants in connection with all such claims that have been, are or may in the future be asserted against Bristol-Myers by virtue of Director Defendants' misconduct and wrongdoing.

## COUNT III

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH IN CONNECTION WITH MANAGEMENT OF BRISTOL-MYERS
#### (Against Director Defendants)

178.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

179.    Each of the Director Defendants had a duty to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct.

180.    As alleged in detail herein, Director Defendants have failed to seek recompense from any of the Director Defendants named herein for any of the claims alleged herein that to remedy the damages that Bristol-Myers has suffered.

181.    As a direct and proximate result of Director Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## COUNT IV

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH FOR DISSEMINATION OF MISLEADING AND INACCURATE INFORMATION
### (Against Director Defendants)

182.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

183.    As alleged in detail herein, each of the Director Defendants had a duty to ensure that Bristol-Myers disseminated accurate, truthful, and complete information to the market.

184.    As alleged in detail herein, Director Defendants failed to issue timely disclosures regarding the Company's procurement of the Plavix patent and the details surrounding the agreed-to terms of Apotex Agreement.

185.    Each of the Director Defendants violated the fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to the market materially misleading and inaccurate information through public statements, including, but not limited to, press releases, SEC filings, and the FTC Certification, as described herein. Each of the Director Defendants also failed to ensure that the Company provided accurate and truthful disclosures of material information to the market in a timely manner.

186.    For example, the Director Defendants allowed the Company to issue press releases that failed to disclose the size of the promised payment to Apotex, $60 million, in connection with the Apotex Agreement, which, among other things, ultimately exposed the Company to serious criminal charges and liability from class action lawsuits, in addition to heightened regulatory scrutiny.

187.    The Director Defendants allowed BMS Executive-1 and outside counsel to submit a revised Apotex Agreement to the FTC, which purposely did not disclose the oral

representations or understandings regarding the launch of an authorized generic between Bristol-Myers and Apotex. In fact, Director Defendants failed to ensure that the FTC Certification submitted by Bristol-Myers to the FTC was accurate and truthful.

188.   Also, the Director Defendants allowed the Company to omit from public dissemination its decision to relinquish material legal rights -- the waiver of both treble damages and the right to enjoin Apotex's "at-risk" distribution of its generic inventory -- in order to induce the patent litigation settlement with Apotex.

189.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's legitimate corporate interests.

190.   As a direct and proximate result of Director Defendants' foregoing breaches of fiduciary duties, Bristol-Myers has suffered damages, as set forth herein.

### COUNT V

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH FOR FAILURE TO ESTABLISH ADEQUATE INTERNAL CONTROLS
(Against Director Defendants)

191.   Plaintiff incorporates by reference all paragraphs above as if set forth herein.

192.   As alleged in detail herein, each of the Director Defendants had a duty to Bristol-Myers and its shareholders to establish and maintain adequate internal controls to ensure that the Company's valuable franchise was adequately protected.

193.   Director Defendants, despite being on notice of the red flags described herein, abdicated their responsibility to establish and maintain adequate internal controls at Bristol-Myers, having made no good faith effort to fulfill their fiduciary duties.

194.   As a direct and proximate result of Director Defendants' failure to perform their fiduciary duties, Bristol-Myers engaged in imprudent and unlawful activities that have caused it to suffer damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf, and derivatively on behalf of Bristol-Myers, demands judgment as follows:

A.      As to Counts I, III, IV and V, Breaches of Fiduciary Duty, against all Director Defendants: An award of monetary damages to Plaintiff, on behalf of Bristol-Myers, against all of Director Defendants, for all losses and/or damages suffered by Bristol-Myers as a result of the wrongdoings complained of herein, together with pre-judgment and post-judgment interest thereon, in an amount to be proved at trial.

B.      As to Count II, Contribution and Indemnification, against all Director Defendants: Contribution and indemnification from each of Director Defendants in connection with all such claims that have been, are or may in the future be asserted against Bristol-Myers by virtue of Director Defendants' misconduct and wrongdoing alleged herein.

C.      Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts; and

D.      Granting Plaintiff such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated:  October 15, 2007

Respectfully submitted,

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: _____

Daniel W. Krasner (DK-6381)
Gregory Mark Nespole (GN-6820)
Alex H. Schmidt (AS- 8304)
Paulette S. Fox (PF-2145)
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**LAW OFFICES OF BRUCE G. MURPHY**

Bruce G. Murphy, Esq.
265 Llwyds Lane
Vero Beach, Florida  32963
Telephone:  (772) 231-4202
Facsimile:  (772) 492-1044

**GAINEY & MCKENNA**

Thomas J. McKenna, Esq.
295 Madison Avenue, 4th Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

**ATTORNEYS FOR PLAINTIFF**

/490559v2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STEVEN W. SAMPSON, TRUSTEE,

            Plaintiff,

    - against -

JAMES D. ROBINSON III, LEWIS B.
CAMPBELL, JAMES M. CORNELIUS,
LAURIE H. GLIMCHER, M.D., VICKI L.
SATO, PH.D., LEIF JOHANSSON, LOUIS
J. FREEH, MICHAEL GROBSTEIN, and R.
SANDERS WILLIAMS, M.D.,

            Defendants,

    and

BRISTOL-MYERS SQUIBB COMPANY,

            Nominal Defendant.

Case No. 1:07-CV-06890-PAC

Related Case No. 1:07-cv-05867-PAC

**CERTIFICATE OF SERVICE**

    I, Paulette S. Fox, hereby certify that on October 15, 2007, I caused the following document:

### AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

to be filed with the United States District Court for the Southern District of New York.  I further certify that on October 16, 2007, I caused copies of the foregoing document to be emailed via .PDF and mailed via Federal Express to the following counsel:

Lorin L. Reisner
Michael Potenza
DEBEVOISE & PLIMPTON, LLP
919 Third Avenue
New York, NY 10022
Email: llreisner@debevoise.com
Email: mpotenza@debevoise.com

**Counsel for Nominal Defendant Bristol-Myers Squibb Company**

Kenneth Conboy
LATHAM & WATKINS LLP
885 Third Avenue
New York NY 10022
Email: kenneth.conboy@lw.com

**Counsel for Individually-Named Director Defendants**

Dated: October 16, 2007

PAULETTE S. FOX

2