# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                    :
                                                              07 Civ. 5867 (PAC)
IN RE BRISTOL MYERS SQUIBB CO.                                 OPINION & ORDER
SECURITIES LITIGATION                               :

-------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

Lead Plaintiff Ontario Teachers Pension Plan Board and Plaintiff Minneapolis

Firefighters' Relief Association (collectively, "Plaintiffs") bring this class action securities fraud

suit challenging the adequacy of Bristol Myers Squibb Co.'s ("Bristol-Myers" or "the

Company") public disclosures concerning its attempts to settle patent litigation with generic

pharmaceutical drug company Apotex, Inc. ("Apotex") over its patented and highly profitable

blood-thinning medication, Plavix. The gravamen of Plaintiffs' Amended Complaint is that

Bristol-Myers failed to disclose that the Company had agreed to relinquish certain material legal

rights under its settlement agreements with Apotex and failed to disclose that it had entered into

"secret" oral side agreements related to the Apotex litigation. Plaintiffs claim that the failure to

disclose these critical facts rendered Bristol-Myers's public statements that it would "vigorously

pursue" the Apotex litigation, and that Apotex would be "at risk" if it were to launch its generic

product, materially false, incomplete, and misleading. Plaintiffs also complain that the existence

of the unlawful oral side agreements greatly increased the risk of regulatory rejection of the

settlement agreement, and that the Company failed to report the initial regulatory rejection of the

settlement in a timely manner. According to the allegations of the Amended Complaint, when

the omissions complained of and the true facts surrounding the settlement negotiations were

eventually disclosed, securities analysts noted their significance, and the price of Bristol-Myers's

stock declined. Plaintiffs seek relief pursuant to sections 10(b) and 20(a) of the Securities

Exchange Act of 1934. The class includes all individuals who purchased or acquired Bristol-

Myers common stock from after the close of the market on March 21, 2006 through August 8,

2006 (the "Class Period").

     Bristol-Myers and individual Defendants Peter Dolan and Andrew Bodnar move to

dismiss the Amended Complaint ("Am. Compl.") on the grounds that: (1) the disclosures made

by Bristol-Myers regarding the settlement attempts were adequate; (2) Plaintiffs fail to

adequately plead loss causation; and (3) Plaintiffs fail to adequately plead scienter. Individual

Defendants Bodnar and Dolan also move to dismiss on the basis that Plaintiffs have inadequately

pleaded their individual 10(b) claims, and that Plaintiffs inadequately pleaded control person

liability pursuant to section 20(a). For the reasons set forth below, Defendants' motions to

dismiss are denied.

## SUMMARY OF ALLEGED FACTS

     Bristol-Myers, one of the world's largest pharmaceutical companies, is engaged in the

research, discovery, development, licensing, manufacturing, marketing, distribution, and sale of

pharmaceutical drugs and related health care products worldwide. (Am. Compl. ¶ 15.) During

the Class Period, Defendant Peter Dolan served as the Company's Chief Executive Officer,

Director, and Chairman of its Executive Committee, (Am. Compl. ¶ 16), and Defendant Andrew

Bodnar, a medical doctor and attorney, was Bristol-Myers's Senior Vice President for Strategy

and Medical and External Affairs, and also a member of the Company's Executive Committee.

(Am. Compl. ¶ 18.) According to the Amended Complaint, Dr. Bodnar was the lead Bristol-

Myers representative involved in the settlement negotiations at issue in this lawsuit.

Bristol-Myers and Sanofi-Aventis ("Sanofi"), a French pharmaceutical company, jointly manufacture and sell the prescription drug Plavix, a very successful and highly prescribed blood-thinning medication which treats or prevents a myriad of cardiac conditions, including heart attack, stroke, arterial disease, acute coronary syndrome, and other heart conditions. (Am. Compl. ¶ 30.) Bristol-Myers sells the drug in the United States, and Sanofi sells it in most other countries. Originally approved by the Food and Drug Administration ("FDA") in 1997, Plavix sales in the United States totaled more than $3.8 billion in 2005. (Am. Compl. ¶ 30.) It is Bristol-Myers's largest selling drug, and the second largest-selling drug in the entire world. (Am. Compl. ¶ 30.) The primary patent covering the pharmaceutical compounds contained in Plavix is scheduled to expire on November 11, 2011. (Am. Compl. ¶ 30.)

In November 2001, Canadian generic pharmaceutical company Apotex filed an Abbreviated New Drug Application ("ANDA") with the FDA seeking permission to introduce a generic form of Plavix in the United States prior to the expiration of the Plavix patent. (Am. Compl. ¶ 31.) As part of that application, Apotex argued that the Plavix patent was invalid and unenforceable, and therefore would not be infringed by the proposed generic product.[1] (Am. Compl. ¶ 31.) If granted, the ANDA would guarantee Apotex 180 days of marketing exclusivity over other generic Plavix drugs; that is, for the first six months after ANDA approval, the Apotex generic would be the sole Plavix alternative marketed to consumers. (Am. Compl. ¶ 31.) Given the tremendous popularity of Plavix, and the enormous potential market for a generic form of the drug, it was apparent that an Apotex generic launch would not only likely be successful, but could pose a significant threat to a key element of Bristol-Myers's core business and profitability.

---

[1] These claims were based on the assertion that Bristol-Myers's patent on the drug covered only some, and not all, of the medicinal compounds contained in Plavix; specifically, Apotex sought to introduce a generic version of the compound clopidogrel bisulfate. (Am. Compl. ¶¶ 58, 63.)

In response to this application, in March 2002 Bristol-Myers (and Sanofi) sued Apotex for patent infringement in the Southern District of New York, and a statutory stay of the ANDA application was invoked. (Am. Compl. ¶ 32.) The stay expired in May 2005 and Apotex immediately began manufacturing and preparing for the sale of generic Plavix. (Am. Compl. ¶ 32.) At that point, Bristol-Myers sought to negotiate a settlement with Apotex by which Bristol-Myers would agree to certain limitations on its patent rights in exchange for a promise by Apotex to delay its generic product launch until shortly before the official patent expiration in November 2011. (Am. Compl. ¶ 32.)

Bristol-Myers and Apotex did, in fact, successfully negotiate a settlement of the patent litigation in March 2006, but due to a consent decree involving prior similar conduct, Bristol-Myers could not finalize the settlement on its own.[2] (Am. Compl. ¶ 34.) Rather, Bristol-Myers had to submit all of its settlement agreements to two separate groups: (1) the Federal Trade Commission ("FTC"), and (2) the state attorneys general of all fifty states, for their review and approval. (Am. Compl. ¶ 34.)

In the initial settlement agreement negotiated with Apotex, Bristol-Myers bargained away certain statutory rights with respect to the damages it was entitled to seek, and the injunctive relief it could pursue, if the settlement did not gain regulatory approval and Apotex was able to continue its generic launch. If Apotex launched a generic drug following regulatory disapproval of the settlement agreement but before resolution of the patent litigation, Bristol-Myers agreed, inter alia, to the following terms with respect to the patent litigation:

---

[2] According to the allegations of the Amended Complaint, in 2003 the Federal Trade Commission alleged that Bristol-Myers violated antitrust laws in connection with another agreement involving a generic drug company, and the settlement of patent litigation involving the cancer drug Taxol. (Am. Compl. ¶ 34.) As a result of these allegations of anticompetitive conduct, Bristol-Myers entered into a consent decree and, in June 2005, a deferred prosecution agreement, requiring, among other things, regulatory approval of settlement agreements involving generic drug-makers. Pursuant to the terms of the consent decree, the Company also appointed a corporate monitor, former United States District Judge Frederick Lacey, to provide oversight and ensure compliance with the agreement. (Am. Compl. ¶¶ 34-35.)

1) Bristol-Myers would seek only 70% of Apotex's profits in damages from net sales of its generic if Bristol-Myers had not launched its own generic; it would seek 60% if it had launched its own;

2) Bristol-Myers would not seek treble damages from Apotex as entitled by statute;

3) Bristol-Myers would not seek a trial date earlier than two and one-half months from the date of request to the court;

4) Bristol-Myers agreed to a five-day waiting period after the Apotex generic drug launch before seeking a temporary restraining order so that Apotex could flood the market with its generic.

(Am. Compl. ¶ 37.)

In light of the agreement, Bristol-Myers publicly announced on March 21, 2006 that it had settled the patent litigation with Apotex, but it did not disclose the precise terms of the settlement in its public statements. Instead, it issued a press release which stated that under the terms of the proposed settlement, Apotex would receive a royalty-bearing license to manufacture and sell a generic form of Plavix over a specific period of time. (Am. Compl. ¶ 58.) The press release also stated that the settlement agreement "includes other provisions." (Am. Compl. ¶ 58.) Beyond the disclosure of a promise of payment from Bristol-Myers to Apotex, however, the statement failed to further explain what those "other provisions" were, and did not disclose that Bristol-Myers had agreed to limitations on damages, nor that the Company had acceded to delays in seeking trial and a restraining order. (See Am. Compl. ¶ 58.) With respect to finalization and approval, Bristol-Myers disclosed the following:

The proposed settlement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general. There is a significant risk that required antitrust clearance will not be obtained. In such event, the proposed settlement would be terminated, and the litigation would be reinstated . . . .

If the litigation were reinstated, [Bristol-Myers] intend[s] to vigorously pursue enforcement of [its] patent rights in Plavix. It is not possible at this time reasonably to

5

assess the outcome of this lawsuit or the timing of potential generic competition for Plavix. . . . Apotex could launch a general [Plavix] product <u>at risk</u> . . . .

[L]oss of market exclusivity of Plavix and the subsequent development of generic competition would be material to [Bristol-Myers's] sales of Plavix and results of operations and cash flows, and could be material to . . . [Bristol-Myers's] financial condition and liquidity.

(Am. Compl. ¶ 58, Press Release of March 21, 2006 (emphasis added).)  According to the

Amended Complaint, these same (or similar) disclosures (that the Company would "vigorously

pursue" its rights, and that an Apotex launch would be "at risk") were repeated in other securities

filings, public statements, and press releases—without further detail or context about the precise

status of the settlement negotiations—from March 14, 2006 through at least May 31, 2006. (<u>See</u>

Am. Compl. ¶¶ 58-76.)[3]

In addition to the March 21, 2006 press release, Bristol-Myers also filed a Form 8-K on

that same day which stated that if antitrust clearance were not obtained, then Bristol-Myers

"intend[ed] to <u>vigorously pursue</u> patent enforcement of [its] patent rights in Plavix" and "if the

litigation were reinstated, Apotex could launch a generic [Plavix product] <u>at risk</u>." (Reisner

Decl. Ex. E (emphasis added); Am. Compl. ¶ 63.)  The Company also posted similar statements

on its website.  ("Questions and Answers" posted March 21, 2006 (Exhibit 99.2 to Form 8-K,

Reisner Decl. Ex. E); Am. Compl. ¶ 65.)  Plaintiffs allege that these assertions—that Bristol-

Myers would "vigorously pursue" patent enforcement, and that any Apotex generic launch

would be "at risk" to Apotex—were issued repeatedly by the Company throughout the class

---

[3] <u>See</u>, <u>e.g.</u>, Form 10-K filed March 14, 2006, attached to Declaration of Lorin L. Reisner in Support of Motion to Dismiss ("Reisner Decl.") Exhibit ("Ex.") D), Form 8-K filed March 21, 2006 (Reisner Decl. Ex. E), Press Release of March 21, 2006 (Exhibit 99.1 to Form 8-K, Reisner Decl. Ex. E; also excerpted at Am. Compl. ¶ 58), "Questions and Answers" website posting, March 21, 2006 (Exhibit 99.2 to Form 8-K, Reisner Decl. Ex. E; also excerpted at Am. Compl. ¶ 65), First Quarter 2006 Press Release of April 27, 2006 (filed on Form 8-K, Reisner Decl. Ex. F), Statements by Dolan at Annual Meeting of Stockholders on May 2, 2006 (excerpted at Am. Compl. ¶ 71), Form 10-Q filed May 8, 2006 (Reisner Decl. Ex. G), Dolan's comment at Sanford C. Bernstein & Co. Conference on May 31, 2006 (excerpted at Am. Compl. ¶ 76).

period, despite the fact that they were materially false and misleading statements of Bristol-Myers's true position due to the fact that they did not reflect the concessions already made in the settlement agreement.

In trading on March 22, 2006, presumably on the basis of the previous day's settlement announcement, Bristol-Myers stock increased in value by 11%. (Am. Compl. ¶ 59.) The positive sentiment surrounding the announcement was premature. Although the settlement had been negotiated, it was not finalized. As the press release made clear, the agreement required the approval of the state attorneys general and the FTC in order to become final. (Press Release of March 21, 2006, Exhibit 99.1 to Form 8-K, Reisner Decl. Ex. E; also excerpted at Am. Compl. ¶ 58.)

Approximately six weeks later, on May 5, 2006, Bristol-Myers received word that the state attorneys general had rejected the initial settlement agreement, (Am. Compl. ¶ 38), but Bristol-Myers did not disclose this fact at that time. Instead, on May 8, 2006, Bristol-Myers filed a Form 10-Q making no mention of the attorneys general non-approval, even though it stated with respect to the settlement that "[t]he proposed settlement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general. There is a significant risk that the required antitrust clearance will not be obtained." (Am. Compl. ¶ 73.) In fact, the "significant risk" mentioned in the 10-Q had already occurred with respect to the first negotiated settlement agreement.

Thereafter, in lieu of disclosing the attorneys general rejection of the initial settlement agreement, Bristol-Myers and Apotex sought to quietly renegotiate the terms of the agreement in order to gain regulatory approval. (Am. Compl. ¶ 39.) According to the Amended Complaint, on May 12 and 24, 2006, at the direction of and/or with the knowledge of Defendant Peter

7

Dolan, Defendant Andrew Bodnar of Bristol-Myers and a representative of Apotex attended "secret" meetings to renegotiate the settlement terms. (Am. Compl. ¶ 39.) These meetings were conducted without lawyers present, and, on May 26, 2006, Bristol-Myers and Apotex entered into an amended settlement agreement. (Am. Compl. ¶ 39). A written agreement which purportedly memorialized the amended settlement terms was produced and resubmitted to the FTC and the state attorneys general for approval. (Am. Compl. ¶ 39.)

According to Plaintiffs' allegations, however, the formal written agreement that was submitted for regulatory approval did not contain all of the terms of the amended settlement agreement. (Am. Compl. ¶ 39.) Instead, unbeknownst to regulators and the general public, the amended settlement actually included both the written terms and terms which were agreed to as part of "secret oral side agreements." (Am. Compl. ¶ 39.) Among other things, the oral side agreements allegedly included promises that Bristol-Myers would pay a large cash sum to Apotex, a term specifically noted by regulators as a concern in the initial settlement. (Am. Compl. ¶ 42.)

On May 31, 2006, Defendant and CEO Dolan made public comments about the settlement at a securities analysts' conference, stating that:

> [The] [k]ey to revenue growth, obviously, is maintaining Plavix exclusivity. You have read that we have a settlement proposal that is being vetted and evaluated. There's a significant risk that it doesn't get approved. I don't have much more to offer today about Plavix, but it clearly is critical to our future growth.

(Am. Compl. ¶ 76.) Despite the fact that this statement directly addressed the ongoing settlement proceedings, it failed to report the initial non-approval of the settlement by the state attorneys general, and did not discuss Bristol-Myers's attempts to renegotiate the settlement. In addition to the failure to publicly report on these matters, Plaintiffs also allege that Dolan and Bodnar informed neither the Bristol-Myers Board of Directors nor their federal monitor about

8

the nature of the renewed settlement negotiations and the secret side agreements,

notwithstanding the fact that Plavix exclusivity was admittedly a critical component of the

Company's business. (Am. Compl. ¶ 123.)

On June 5, 2006, counsel for Apotex sent a letter to the Department of Justice disclosing

that the terms contained in the parties' written agreement were incomplete, and that further terms

were hidden from regulators in an effort to surreptitiously gain regulatory approval. (Am.

Compl. ¶¶ 4, 42, 43.)   Presumably in response to this letter, on June 8, 2006, the FTC requested

written certification from the settling parties that there were no side agreements to the amended

settlement, and that the Company had not made any representation or commitment that was not

explicitly set forth in the written settlement agreement. (Am. Compl. ¶ 50.) On or about June

12, 2006, Bristol-Myers filed the requested certification guaranteeing the absence of oral

agreements, which, according to the Plaintiffs, it "knew to be materially false" at the time it was

filed. (Am. Compl. ¶ 50.)

On June 25, 2006, Bristol-Myers publicly announced that it had renegotiated the Apotex

settlement agreement (Am. Compl. ¶ 79), but still did not disclose the initial non-approval by the

state attorneys general. Instead, Bristol-Myers asserted that the renegotiation was conducted in

response to regulators' "concerns," and revealed only that "[a]mong other revisions," Apotex had

negotiated an earlier licensing date. (Am. Compl. ¶ 79.) No other terms were revealed. (Press

Release, June 25, 2006, attached to Reisner Decl. as Ex. H.)

About one month later, on Wednesday, July 26, 2006, the Federal Bureau of

Investigation ("FBI") searched Bristol-Myers headquarters in New York, and sought information

surrounding the settlement negotiations and agreements. (See Am. Compl. ¶¶ 6, 51.) The next

day, Thursday, July 27, 2006, Bristol-Myers confirmed that a criminal investigation had begun.

(See Form 8-K filed July 27, 2006 (Reisner Decl. Ex. I) ("[Bristol-Myers] learned yesterday that

the Antitrust Division of the United States Department of Justice is conducting a criminal

investigation regarding the proposed settlement of the Apotex litigation described above."); Am.

Compl. ¶ 82.) Bristol-Myers stock price declined 7.5%. (Am. Compl. ¶ 85.) One day later,

Friday, July 28, 2006, the stock rallied briefly as securities analysts commented that an "at-risk"

launch for Apotex was unlikely because it "would be a 'bet-the company' endeavor . . . . [and

Bristol-Myers] might be able to collect treble damages." (J.P. Morgan Securities Inc. Report,

July 28, 2006, excerpted at Am. Compl. ¶ 89). On that same day (after the close of the market),

Bristol-Myers reported that the amended settlement agreement did not win regulatory approval.

(Am. Compl. ¶ 87.) On the next trading day, Monday, July 31, 2006, Bristol-Myers shares

declined another 2%. (Am. Compl. ¶ 94.) Even then, however, Plaintiffs contend that the full

impact of Bristol-Myers's settlement concessions was not apparent to the market, which still

believed that the entire spectrum of statutory relief was available in the event of an Apotex

generic launch. (See Reuters report, July 31, 2006, excerpted at Am. Compl. ¶ 90 ("Industry

analysts cautioned on Monday [July 31, 2006] that Apotex Inc. has the right to immediately

launch its copycat form of [Plavix], although it is unlikely to do so because of huge financial

risks to the generic drug maker.").)

    In fact, it was not until the filing of another Form 10-Q on August 8, 2006 that the exact

terms of the amended settlement agreement were revealed. (Am. Compl. ¶ 95.) The terms were

similar to those of the initial (rejected) settlement, although the amended agreement contained

even more concessions from Bristol-Myers with respect to available damages and injunctive

relief. The amended settlement agreed, inter alia, that:

(1) Bristol-Myers would seek no more than 50% of Apotex's profits in damages from net sales of its generic if Bristol-Myers had not launched its own generic; it would seek only 40% if Bristol-Myers had launched its own;[4]

(2) Bristol-Myers would not seek treble damages;

(3) Bristol-Myers would not seek a trial date earlier than two and one-half months from the date of request to the court;

(4) Bristol-Myers would wait five days after Apotex's generic launch to seek a temporary restraining order or preliminary injunction so that Apotex could flood the market with its generic.

(Am. Compl. ¶ 41.)  The stock declined another 7% following revelation of these terms.  (Am. Compl. ¶ 96.)

On September 12, 2006, Bristol-Myers fired its CEO, Defendant Dolan, and on May 10, 2007, Bristol-Myers agreed to plead guilty to two counts of making false statements to the government in connection with the amended Apotex settlement.  (Am. Compl. ¶¶ 105, 107.)  On June 11, 2007, a hearing was conducted and Bristol-Myers did, in fact, plead guilty to two felony counts of fraud in violation of 18 U.S.C. § 1001.  (See Press Release of June 11, 2007 (Reisner Decl. Ex. P); Am. Compl. ¶ 108.)

## DISCUSSION

### I.    Motion to Dismiss Standard

On a motion to dismiss, the court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff.  Bell Atl. Corp. v. Twombly, --- U.S.---, 127 S.Ct. 1955, 1975 (2007) (citation omitted). But mere "formulaic recitation of the elements of a cause of action" will not suffice; instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Id. at 1965.  To survive a motion to dismiss, courts require "enough facts to state a claim to relief that

---

[4] An amount reduced from 70% and 60%, respectively, in the original Apotex settlement.  (Am. Compl. ¶ 41.)  For additional discussion, see supra page 5.

11

is plausible on its face." Id. at 1974; see also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (a plaintiff must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."). Simply put, plausibility is the touchstone of the pleading standard; Plaintiffs must therefore allege "plausible grounds to infer" that their claims rise "above the speculative level." Twombly, 127 S.Ct. at 1965.

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (citing Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)).

### A. Pleading, Rule 9(b) and the PSLRA

In addition to the threshold pleading requirements of Federal Rule of Civil Procedure 8(a) and the Twombly "plausibility" standard, securities fraud claims under section 10(b) and Rule 10b-5 must also meet the heightened pleading standards set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified at 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the circumstances of any claim for fraud or mistake be stated with particularity. Fed. R. Civ. P. 9(b). This requirement to plead with particularity applies in full force to claims of securities fraud arising under section 10(b) because it "serves to provide a defendant [in a securities fraud case] with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI, 493 F.3d at 99 (citing Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)).

12

A plaintiff in a securities fraud suit must also comply with the exacting pleading requirements of the PSLRA, which was enacted by Congress in 1995 "[i]n order to curtail the filing of meritless lawsuits." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (quotations and citations omitted). In addition to other requirements, the PSLRA requires "plaintiffs to state with particularity both the facts constituting the alleged [securities fraud] violation" and the other elements of the 10(b) cause of action. Tellabs, Inc., v. Makor Issues & Rights, Ltd., --- U.S. ---, 127 S.Ct. 2499, 2504 (2007).[5] In order to effectuate Congress's intent to eliminate baseless lawsuits through the application of rigorous pleading standards, the PSLRA mandates that a plaintiff alleging a section 10(b) action must: (1) specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(1) and (2).

### B. Section 10(b) & Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in violation of the rules set forth by the Securities and Exchange Commission for the protection of investors. 15 U.S.C. § 78(j). Rule 10b-5, promulgated thereunder, makes it unlawful for "any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

---

[5] The PSLRA also adopted reforms with respect to: selection of the lead plaintiff, limitations on fees, a statutory safe harbor for forward-looking statements, sanctions for frivolous litigation, and a discovery stay pending resolution of a motion to dismiss. Tellabs, 127 S.Ct. at 2508.

In order to state a claim for relief under section 10(b) and Rule 10b-5, plaintiffs must allege that "in connection with the purchase or sale of securities, the defendant[s], acting with scienter, made a false material representation or omitted to disclose material information and that the plaintiff[s'] reliance on defendant's action caused [the plaintiff] injury." Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 220 (S.D.N.Y. 2008) (quotations and citations omitted); see also Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005), cert. denied, 546 U.S. 935 (2005) (plaintiffs must allege that the defendants "'(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.'" (quoting In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998)).

## ANALYSIS

Plaintiff's Amended Complaint alleges that Bristol-Myers: (1) negotiated a settlement agreement which bargained away critical statutory relief, yet continued to insist it would "vigorously pursue" its patent rights despite the limited relief available to it; (2) stated that in the event of regulatory disapproval, any generic launch by Apotex would be "at risk", without disclosing that it had bargained away some of the statutory deterrence mechanisms to such a launch; (3) submitted the agreement—without disclosing its terms to the public—for regulatory review as required by the consent decree under which it was operating; (4) did not disclose that the initial settlement agreement was rejected by the state attorneys general and claimed only that there was a "significant risk" of disapproval; (5) secretly sought to renegotiate the settlement's terms after regulatory rejection; (6) eventually assented to a revised settlement agreement which (unbeknownst to both regulators and the general public) retained some of the objectionable terms

of the initial (and rejected) agreement, but only in the form of "secret oral side agreements" which supplemented a revised written agreement; (7) resubmitted the revised written settlement agreement for regulatory approval, without disclosing the secret oral terms; (8) when questioned by regulators as to whether the written agreement embodied all of the terms agreed upon by the parties, submitted a false statement indicating that the agreement completely represented all of the parties' terms; and (9) pleaded guilty to making false statements to the government. With these allegations in mind, the Court turns to Defendants' arguments that the Amended Complaint is deficient.

## I. Bristol-Myers's Motion

Defendants argue that the case must be dismissed because the Amended Complaint is deficient in three respects: (1) Plaintiffs cannot challenge the adequacy of Bristol-Myers's disclosures because they were adequate as a matter of law; (2) Plaintiffs have failed to adequately plead—and cannot plead—loss causation; and (3) Plaintiffs have failed to adequately plead scienter. (Memorandum of Law of Bristol-Myers Squibb Company in Support of Motion to Dismiss ("Bristol-Myers Mem.") at 9-16, 17-20 & 20-24, respectively.) The Court shall address each argument in turn.

### (1) The Adequacy of the Disclosures

Defendants first argue that Bristol-Myers's public disclosures were appropriate and adequate as a matter of law, and there was no duty to disclose any additional information regarding the details of the Plavix/Apotex settlement. This argument is not persuasive. It is undisputed that where "an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." Chiarella v. U.S., 445 U.S. 222, 235 (1980) (discussing disclosure requirements in the context of insider trading and finding that silence is only fraudulent if there

exists a duty to disclose). Once a corporation has elected to speak, however, Rule 10b-5

mandates that its speech must be truthful, accurate, and complete. See Caiola v. Citibank, N.A.,

295 F.3d 312, 331 (2d Cir. 2002) ("Upon choosing to speak, one must speak truthfully about

material issues. Once [a company] chose to discuss its hedging strategy, it had a duty to be both

accurate and complete." (citations omitted)). The requirement to be complete and accurate,

however, does not mean that "by revealing one fact . . . one must reveal all others that, too,

would be interesting . . . but means only such others, if any, that are needed so that what was

revealed would not be so incomplete as to mislead." Backman v. Polaroid Corp., 910 F.2d 10,

16 (1st Cir. 1990) (quotations and citation omitted). Specifically, section 10(b) and Rule 10b-5

"impose[] . . . a duty to disclose only when silence would make other statements misleading or

false." Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992) (quotations and citations

omitted). Therefore, even an entirely truthful statement may provide a basis for liability if

material omissions related to the content of the statement make it—or other statements made—

materially misleading. Indeed, under the plain language of Rule 10b-5, it is impermissible "to

omit to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

　　　Materiality is another matter. It is undisputed that liability for a misstatement or

omission can only be found if the non-disclosure is a material one, or materially affects another

disclosure made. Information is considered material if there is "a substantial likelihood that the

disclosure of the omitted [information] would have been viewed by the reasonable investor as

having significantly altered the 'total mix' of information made available." Basic Inc. v.

Levinson, 485 U.S. 224, 231-32 (1988) (quotations and citations omitted); see also Halperin v.

eBanker USA.COM, Inc., 295 F.3d 352, 357 (2d Cir. 2002) ("Recognizing that the materiality of

an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission.").

With respect to the adequacy of the disclosures here, Defendants contend that it was sufficient for Bristol-Myers to disclose the fact that there was a "significant risk" that regulatory approval would not be obtained, that Apotex might launch a generic version of Plavix in the absence of a settlement agreement, and that while Bristol-Myers would "vigorously pursue" its patent rights, it might suffer serious adverse consequences from a generic launch. (Bristol-Myers Mem. at 1.) This argument, however, fails to address Plaintiffs' chief complaint: that Bristol-Myers failed to disclose in its public statements that, in the event of regulatory disapproval of the settlement and subsequent litigation, Bristol-Myers had relinquished certain legal rights that would otherwise have been available in the patent litigation. Plaintiffs contend that this omission led the market to believe that in the event of regulatory disapproval of the settlement, Apotex would be deterred from launching a generic Plavix product by operation of the statutory deterrence mechanisms, and, in the event of a launch, that the impact on Bristol-Myers could be mitigated through the award of statutory relief. In fact, Plaintiffs contend that much of that relief (including immediate injunctive relief and statutory damages) had already been bargained away in the settlement negotiations. Thus, while the market believed that Bristol-Myers maintained its full arsenal of statutory weapons, in reality, it had secretly agreed to an arms limitation.

It is undisputed that Bristol-Myers did not disclose the information sought by Plaintiffs, including the terms of the initial and revised settlement agreements, and the initial regulatory disapproval by the state attorneys general. What remains is a determination as to whether those

omissions were material and rendered the statements actually made by Bristol-Myers false or misleading.  In the Court's view, Plaintiffs have plausibly pleaded that Bristol-Myers's statements were rendered misleading by the failure to include relevant information about the nature of the settlement negotiations and the terms of the settlement agreement.  That is, Plaintiffs have adequately alleged that a reasonable investor would have considered the undisclosed information material in making investment decisions.  See Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006).

Bristol-Myers issued a series of statements, press releases, regulatory filings, and website postings throughout the relevant period claiming that it would "vigorously pursue" its patent rights and that any generic Apotex launch would be "at risk."[6]  Plaintiffs also provide a host of references to analysts' reports and other industry commentary concerning the settlement agreements.  (See Am. Compl. ¶¶ 86-104.)  Those reports indicate that securities analysts were aware of the statutory implications of a generic Apotex launch and considered these implications relevant in assessing the value of the Bristol-Myers stock.  (See Am. Compl. ¶¶ 89-90.)  More importantly, perhaps, the reports indicate that the analysts were unaware of the impact the settlement agreement's terms had on the availability of the typical statutory remedies.[7]  On July 28, 2006, a J.P. Morgan Securities, Inc. report stated that "[l]aunching at risk would be a 'bet-the-company' endeavor for Apotex . . . .  Bristol . . . might be able to collect treble damages from Apotex . . . ." (J.P. Morgan Securities, Inc. Report, July 28, 2006, excerpted at Am. Compl. ¶ 89.)  On July 31, 2006, Reuters stated, "Apotex Inc. has the right to immediately launch its copycat form of [Bristol-Myers] blockbuster anti-clotting drug, although it is unlikely to do so

---

[6] See supra note 3, at 6.

[7] The Court notes that the analysts' reports are not cited for their truth, but only "to show whether and when information was provided to the market" such that the reports contributed to the total mix of information available to investors.  Patel v. Parnes, No. 07 Civ. 5364 (MMM), 2008 WL 2803076, at *16 (C.D. Cal. May 19, 2008) (quotations and citations omitted).

because of huge financial risks to the generic drug maker." (Reuters, July 31, 2006, excerpted at

Am. Compl. ¶ 90.) On August 5, 2006, a newspaper reported that:

> [a] decision by Apotex to begin marketing the drug while the [Bristol-Myers] patent is
> still in force would be a move known in the industry as an "at-risk launch." It means
> Apotex could be responsible for repaying [Bristol-Myers] three times their sale losses if
> they end up successfully defending their patent in court.

(Am. Compl. ¶ 93.) Assuming, as the Court must, that the allegations of the Amended

Complaint are true, and that the phrase "at risk launch" is a loaded term with a specific and well-

understood industry meaning, then it is plausible that Bristol-Myers's disclosures that Apotex's

launch would be "at risk" and that it would "vigorously pursue" the patent litigation—without

accompanying statements or disclosures that it had bargained away certain statutory remedies—

were materially misleading. As to the adequacy of the disclosures, the Court must merely decide

whether Plaintiffs have pleaded their claims with sufficient particularity and whether it is

plausible that the use of such terms in Bristol-Myers's public disclosures, without more detailed

information about the settlement negotiations, led (or misled) the securities market to believe that

all available statutory remedies were at Bristol-Myers's disposal in the event of a generic Plavix

product launch, and that such a belief (or misbelief) affected the price of Bristol-Myers securities

in the market. The Court finds that such an allegation is plausible in light of the Plaintiffs'

allegations.

In accordance with the requirements of Rule 9(b) and the PSLRA, the Plaintiffs have

identified the purportedly misleading statements and/or omissions ("vigorously pursue" and "at

risk"), identified the relevant speaker (Dolan and/or Bristol-Myers), provided the dates the

statements were made (various), and stated why the statements were fraudulent (because they

materially misled the market with respect to the Plavix negotiations) with sufficient particularity.

(See Am. Compl. ¶¶ 58-81.) These allegations informing the Court what was said, by whom, on

what date, and why it was significant are more than adequate to satisfy 9(b). "To satisfy Rule 9(b), . . . a plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based." In re Revlon, Inc. Sec. Litig., No. 99 Civ. 10192 (SHS), 2001 WL 293820, at *8 (S.D.N.Y. Mar. 27, 2001) (quotations and citations omitted); see also U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C., 554 F. Supp. 2d 523, 536 (S.D.N.Y. 2008) (finding that fraud allegations were sufficiently pleaded under 9(b) when they specified the fraudulent statement, identified the speaker, and made clear when the statements were made, where they were made, and why they were fraudulent); Manavazian v. ATEC Group, Inc., 160 F. Supp. 2d 468, 483 (E.D.N.Y. 2001) (same).

Viewing the Amended Complaint in the light most favorable to the Plaintiffs, and drawing all reasonable inferences in their favor, the Court finds that the Plaintiffs have pleaded their claims with sufficient particularity to survive the threshold pleading standard of a motion to dismiss, and that Plaintiffs have plausibly alleged that Bristol-Myers's silence with regard to the details of the Apotex settlement made its public statements misleading or false. Accordingly, the Court denies Defendants' motion to dismiss on the grounds that the disclosures were adequate.

### (2) Loss Causation

Defendants next argue that Plaintiffs have failed to plead (and cannot plead) loss causation as a matter of law. (Bristol-Myers Mem. at 17.) It is clear that "[p]rivate securities fraud actions are available 'not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'" City of Sterling Heights Police and Fire Retirement System v. Abbey Nat., 423 F. Supp. 2d 348, 357 (S.D.N.Y. 2006) (quoting Dura Pharms. Inc. v. Broudo, 544 U.S. 336, 345 (2005) (emphasis

added).  Accordingly, as the Second Circuit has stated, "[i]t is long settled that a securities-fraud

plaintiff 'must prove both transaction and loss causation.'"  Lentell, 396 F.3d at 172 (quotations

and citations omitted).

To successfully plead loss causation, Plaintiffs must link the defendant's purported

material misstatements or omissions with the harm ultimately suffered.  Id.; see also Emergent

Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 198 (2d Cir. 2003) (finding

that loss causation is satisfied where plaintiffs "specifically asserted a causal connection between

the concealed information . . . and the ultimate failure of the venture"); Citibank, N.A. v. K-H

Corp., 968 F.2d 1489, 1495 (2d Cir. 1992) ("To establish loss causation a plaintiff must show,

that the economic harm that it suffered occurred as a result of the alleged misrepresentations.").

Loss causation is adequately pleaded "if the risk that caused the loss was within the zone of risk

concealed by the misrepresentations and omissions alleged by a disappointed investor."  Lentell,

396 F.3d at 173.  That is,

> loss causation has to do with the relationship between the plaintiff's investment loss and
> the information misstated or concealed by the defendant.  If that relationship is
> sufficiently direct, loss causation is established, but if the connection is attenuated, or if
> the plaintiff fails to demonstrate a causal connection between the content of the alleged
> misstatements or omissions and the harm actually suffered, a fraud claim will not lie.

Id. at 174 (quotations and citations omitted).  An allegation that the value of a stock declined

following the public announcement of "bad news" does not, by itself, demonstrate loss causation.

See Leykin v. AT & T Corp., 423 F. Supp. 2d 229, 245 (S.D.N.Y. 2006) (finding that the

revelation of bad news which is unrelated to the underlying fraud is insufficient to demonstrate

loss causation); In re Tellium, Inc. Sec. Litig., No. 02 Civ. 5878 (FLW), 2005 WL 2090254, at

*4 (D.N.J. Aug. 26, 2005) ("Dura itself makes clear that loss causation is not pled upon

allegations of drops in stock price following an announcement of bad news that does not disclose

the fraud."). Such a decline might be the result of a market-wide downturn, an industry-specific

phenomenon, or other intervening events unrelated to the disclosure defect at issue. <u>Lentell</u>, 396

F.3d at 174. Instead, to survive a 12(b)(6) motion challenging the adequacy of pleadings with

respect to loss causation, "the complaint[] must allege facts that support an inference that [the

defendants'] misstatements and omissions concealed the circumstances that bear upon the loss

suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss

absent the fraud." <u>Id.</u> at 175. Allegations of loss causation, however, are not subject to the

heightened pleading requirements of Rule 9(b) and the PSLRA. Rather, courts in this district

have made it clear that if the complaint connects the Defendants' fraud with Plaintiffs' purported

loss within the "short and plain statement" standard of Rule 8(a), then "[t]hat is all that is

necessary at this stage of the litigation." <u>CompuDyne Corp. v. Shane</u>, 453 F. Supp. 2d 807, 828

(S.D.N.Y. 2006).

It is undisputed that the claims in the Amended Complaint are based on stock-price

declines which occurred on three separate days: July 27, 2006 (the date of the announcement of

the Antitrust Division investigation); July 31, 2006 (the first day of trading after the

announcement of regulatory disapproval); and August 8, 2006 (the date of the announcement of

the Apotex generic launch). (Am. Compl. ¶¶ 111(a)-(c); Bristol-Myers Mem. at 17.) Defendants

claim that Plaintiffs have not, and cannot, plead loss causation as a matter of law because any

losses suffered by Plaintiffs as a result of stock price declines on these three days were linked to

risks that were fully disclosed, or that the declines themselves did not result from the non-

disclosures complained of. (Bristol-Myers Mem. at 17-18.) Specifically, Defendants argue that

they fully and adequately disclosed the risk of both regulatory non-approval and a generic

product launch. Plaintiffs, in contrast, contend that Defendants mischaracterize their loss

causation allegations by recasting the risks which later materialized as risks that were identical to those disclosed.  (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Pl. Mem.") at 33-34.)  In fact, Plaintiffs argue that the losses suffered were caused by risks which were not disclosed, namely, the risk that the terms of the settlement agreement would either fail to deter Apotex from launching in the event of regulatory non-approval (or worse, that the terms would actually aid Apotex by allowing it to flood the market with its generic product) and the risk that the "secret oral side agreements" would either result in regulatory denial of the settlement agreements or otherwise expose Bristol-Myers to adverse consequences.  (Pl. Mem. 32-42).

### (a) July 27, 2006 Loss: Corrective Disclosure

On July 27, 2006, Bristol-Myers's stock price declined 7.5% or $1.95 per share (from $25.99 per share at the close of business on July 26 to $24.04 per share at closing on July 27).  (Am. Compl. ¶ 111(a).)  Defendants characterize this loss as a direct result of the announcement that the Justice Department had commenced a criminal investigation, but Plaintiffs plausibly suggest that it was in fact a partial "corrective disclosure."  A corrective disclosure can be a revelation of a prior statement's falsity or of a material omission, such that the price of a stock declines as the market absorbs the newly revealed information.  See In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 282 (S.D.N.Y. 2008) (citations omitted).  A plaintiff may "successfully allege loss causation by . . . alleging that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted."  In re Merrill Lynch & Co. Research Reports and Sec. Litig., No. 02 Civ. 9690 (JFK), 2008 WL 2324111, at *5 (S.D.N.Y. June 4, 2008).  Plaintiffs contend that the July 27 disclosure of the Justice Department investigation was

"corrective" because it revealed generally that Defendants had not complied with their obligation

to present accurate information to regulators regarding the Apotex settlement, and that the

revelation of this failure to comply is what caused the criminal investigation.

While it may be that mere "allegations of drops in stock price following an

announcement of bad news that does not disclose the fraud" are insufficient to plead loss

causation, what we have here is much different. Tellium, 2005 WL 2090254, at *4 (citations

omitted). The "bad news" was the revelation that a criminal investigation had commenced, but

Plaintiffs also allege why the investigation commenced (the Apotex settlement negotiations).

The Company's own press release confirms the basis for the investigation. (Bristol-Myers Press

Release, July 27, 2006, excerpted at Am. Compl. ¶ 82 ("[Bristol-Myers] learned yesterday that

the Antitrust Division of the United States Department of Justice is conducting a criminal

investigation regarding the proposed settlement of the Apotex litigation . . .")). The Amended

Complaint links the announcement of the investigation to the purportedly fraudulent misconduct:

entering into and then failing to disclose the secret oral side agreements in the settlement

negotiations. This is not "bad news" followed by a stock price decline. The revelation is, in fact,

more akin to a corrective disclosure, and there is no requirement "that [a corrective] disclosure

take a particular form or be of a particular quality. . . . It is the exposure of the fraudulent

representation that is the critical component of loss causation." Lapin, 506 F. Supp. 2d at 243

(quotations and citations omitted). It is also clear that a corrective disclosure need not take the

form of a single announcement, but rather, can occur through a series of disclosing events. In re

Vivendi Universal, S.A., No. 02 Civ. 5571 (RJH), 2004 WL 876050, at *7 (S.D.N.Y. Apr. 22,

2004) (finding loss causation adequately pleaded when a complaint alleged that a series of

corrective disclosures was followed by a material price decline, and the price decline was

attributable to the series of corrective disclosures); <u>see also</u> <u>In re Bradley Pharms., Inc. Sec.</u>

<u>Litig.</u>, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) ("Guided by a pragmatic understanding of

<u>Dura</u>, the Court concludes that Plaintiffs have adequately pled loss causation. The revelation of

the 'truth' about the [alleged fraud] did not take the form of a single, unitary disclosure, but

occurred through a series of disclosing events.").  Drawing all reasonable inferences in Plaintiffs'

favor, it is plausible that the announcement of a criminal investigation into Bristol-Myers's

efforts to settle the Apotex litigation marked the first in a series of corrective disclosures which

would reveal to the market that the Company had engaged in misconduct with respect to the

settlement negotiations.  In essence, the announcement of the investigation was not an isolated

event in itself, it was instead the "tip of the iceberg"—the first in a series of revelations which

would ultimately expose the Company's entire fraudulent scheme to protect Plavix exclusivity.

### (b) July 31, 2006 Loss

On July 31, 2006, the stock price fell 2% or $0.50 per share (from a closing price of

$24.47 on July 28 (the prior trading day) to $23.97 at the close of the market Monday, July 31)

on the announcement that federal regulators had rejected the amended Apotex settlement

agreement.  (Am. Compl. ¶ 111(b).)  Defendants contend that this loss was the result of a risk

which was fully and regularly disclosed: the risk of regulatory rejection of the agreement.  (<u>See,</u>

<u>e.g</u>, Press Release of March 21, 2006, excerpted at Am. Compl. ¶ 58 ("There is a significant risk

that required antitrust clearance will not be obtained.").)  Plaintiffs argue that while the price

drop was the result of the disclosure that regulators had officially rejected the amended Apotex

settlement agreement, the rejection itself was the result of Defendants' fraudulent misconduct

with respect to the settlement negotiations.  (Am. Compl. ¶ 111(b).)  Therefore, according to

Plaintiffs, the price drop was actually the result of Defendants' fraudulent conduct which

virtually assured that regulators would reject the agreement, and not merely the announcement of the rejection itself.

While the Court need not reach the merits of their argument, Plaintiffs' view—that the losses suffered on July 31 were caused by Defendants' misconduct which resulted in regulatory rejection—is plausible.  Accordingly, the allegation survives this motion to dismiss.

### (c) August 8, 2006 Loss: Multiple Causation

On August 8, 2006, the stock price fell 7%, or $1.56 per share, from a close of $22.77 on August 7 to $21.21 on August 8. (Am. Compl. ¶ 111(c).)  Defendants attribute this drop to the announcement on that day that Apotex had launched its generic product—a risk that had been disclosed in Defendants' various public statements (Bristol-Myers Mem. at 18-19) (See, e.g., Press Release of March 21, 2006, excerpted at Am. Compl. ¶ 58 (stating that in the event of regulatory rejection, the settlement would be terminated, and the litigation would be reinstated, and "if the litigation were reinstated, Apotex could launch a generic [Plavix] product at risk.").)  In contrast, Plaintiffs contend that the drop resulted from the long-delayed disclosure of the precise terms of the Apotex settlement agreement, including the fact that Bristol-Myers had agreed not to seek injunctive relief until five business days after the Apotex launch, and had agreed to waive its statutory right to seek treble damages.  (Am. Compl. ¶ 111(c).)  In support of their position, Plaintiffs cite to various news reports explaining the significance of the terms of the settlement agreement to market commentators.  For example, on August 9, 2006, Dow Jones reported that Bristol-Myers had entered into "a rather disadvantageous patent settlement with Apotex," specifically citing the five-day waiting period on injunctive relief.  (Am. Compl. ¶ 99.)  On August 10, 2006, the Financial Times reported that the five-day waiting period provision was "likely to have lasting effects on the market for Plavix" (Am. Compl. ¶ 104), and an analyst from

26

A.G. Edwards & Sons, Inc. called the damages limitation "a big strategic mistake" (Am. Compl. ¶ 101).

At this stage in the proceedings, the Court finds it is plausible that the price drop on August 8, 2006 was the result—at least in part—of the disclosure of the amended settlement agreement's terms. Any further requirement to ascribe the actual amount of loss to one cause or another does not arise on a motion to dismiss. The Plaintiffs need only plead that Defendants' fraudulent behavior concealed facts or circumstances which, when revealed, contributed to the loss. See In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005) (stating that "the loss causation requirement will be satisfied if [Defendants' deceptive or manipulative] conduct had the effect of concealing the circumstances that bore on the ultimate loss."). The Court need not make a final determination as to what losses occurred and what actually caused them, but it is clear from a pleading and plausibility standard that the Amended Complaint is sufficient.

### (3) Scienter

In order to establish liability under section 10(b) and Rule 10b-5, a plaintiff must also prove that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). As with the other elements of a 10(b) claim, allegations regarding scienter must be stated with particularity, and, pursuant to the PSLRA, the plaintiff must put forth "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Indeed, it is not enough "that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." Tellabs, 127 S.Ct. at 2504. Instead, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at

least as compelling as any opposing inference of nonfraudulent intent" in order to survive a
motion to dismiss. Id. at 2504-05.

In order to determine whether a complaint has adequately pleaded scienter, a court should
examine all of the facts alleged collectively or "holistically" (without parsing individual
allegations), and take into account any inference concerning scienter—supporting or opposing—
which can be drawn from the complaint. See id. at 2509. Once it has considered the complaint
in this light, it should find that scienter has been adequately pleaded only if a "cogent and
compelling" inference regarding the requisite state of mind can be drawn. Id. at 2509-10. In
essence, a complaint must "allege facts that give rise to a strong inference of intent to deceive,
manipulate or defraud. That intent can be established either by: (1) alleging facts showing
Defendants had both motive and opportunity to commit fraud; or (2) alleging facts that constitute
strong circumstantial evidence of conscious misbehavior or recklessness." Lapin, 506 F. Supp.
2d at 241 (quotations and citations omitted); see also Novak, 216 F.3d at 307-08. According to
the Supreme Court, the critical inquiry is: "[w]hen the allegations are accepted as true and taken
collectively, would a reasonable person deem the inference of scienter at least as strong as any
opposing inference?" Tellabs, 127 S.Ct. at 2511. If the Court answers in the affirmative, then
scienter has been adequately pleaded. If not, the case may be dismissed.

Here the Amended Complaint specifically alleges with respect to scienter that Dolan
authorized Bodnar to negotiate secret oral side agreements on behalf of the Company in order to
protect its most profitable drug, that Bodnar in fact negotiated those agreements and committed
the Company to their illegal terms, that Dolan was informed and fully aware of the undisclosed
terms of those secret agreements, that Dolan approved the Company's materially incomplete and
misleading public disclosures, and that he personally made materially incomplete and misleading

28

public statements in an effort to gain approval for the settlement and protect Plavix exclusivity. (Am. Compl. ¶ 122.) The Amended Complaint also contends that Dolan and Bodnar kept the Board of Directors and the federal monitor in the dark about the true nature of the settlement negotiations and the secret oral side agreements. (Am. Compl. ¶ 123.)

In addition to these specific claims, the Court adds its own list of allegations relevant to the "holistic" view of the purported facts as they relate to scienter. Tellabs, 127 S.Ct. at 2509.

- Plavix was a highly profitable medication, critical to the Company's success and continuing profitability. (Am. Compl. ¶ 76.)

- Dolan himself made statements about the importance of the drug, stating that the "[k]ey to revenue growth, obviously, is maintaining Plavix exclusivity," reiterating that Plavix "clearly is critical to our future growth" and adding for good measure that "Plavix is, obviously, critical to our future." (Dolan's comments at the Sanford C. Bernstein & Co. Strategic Decisions Conference, May 31, 2006 (excerpted at Am. Compl. ¶ 76).)

- Apotex applied to the FDA to launch a generic form of Plavix, thereby threatening the exclusivity of the drug and perfecting Bristol-Myers's motive. (Am. Compl. ¶ 31.)

- Bristol-Myers responded to the threat by initiating a patent infringement suit and then attempting to enter into a settlement agreement with Apotex. (Am. Compl. ¶¶ 32-33.)

- As part of the settlement agreement, Bristol-Myers made significant concessions limiting the relief it would seek in the event of regulatory disapproval, but failed to disclose those concessions. (Am. Compl. ¶ 37.)

- Regulators rejected the initial terms of the settlement agreement, citing antitrust concerns. (Am. Compl. ¶ 38.)

- Instead of announcing the rejection, Bristol-Myers sought to quietly renegotiate the settlement, agreeing to more onerous demands, and keeping some of the objectionable terms in the form of "secret" oral side agreements (Am. Compl. ¶¶ 38-39) and then failed to disclose the renegotiations and the secret oral side agreements to regulators and/or the general public (Am Compl. ¶¶ 39, 42).

- When asked for written certification that the disclosed terms—those memorialized in the written settlement agreement—were the only terms, Bristol-Myers provided a false certification knowing that other undisclosed terms existed. (Am. Compl. ¶ 50.)

- The Department of Justice launched an investigation into the Apotex settlement negotiations. (Am. Compl. ¶¶ 51-52.)

- Bristol-Myers pleaded guilty to two felony charges of making false statements to a government agency under 18 U.S.C. § 1001. (Am. Compl. ¶ 56.)

Defendants argue that these allegations fail to give rise to the requisite cogent and compelling inference of scienter because there was no clear duty to disclose more detailed information regarding the Plavix settlement. (Bristol-Myers Mem. at 21.) Absent such a duty, Defendants contend that there can be no "strong evidence of conscious misbehavior or recklessness." (Bristol-Myers Mem. at 21 (quoting Kalnit v. Eichler, 264 F.3d 131, 144 (2d Cir. 2001).) In the alternative, Defendants suggest two opposing inferences: that no disclosure was made for fear of competitors using the information to Bristol-Myers's disadvantage, or because

the individuals responsible for the disclosures (e.g. Dolan) were not aware of the secret side agreements. These arguments are disingenuous.

The critical inquiry is whether a reasonable person would deem the inference of scienter at least as strong as any opposing inference. Based on the Plaintiffs' allegations, in toto, a reasonable person is compelled to infer that Defendants acted with scienter. Indeed, the inference is easily drawn. Defendants' own statements show how critical maintaining Plavix exclusivity was to the Company's profitability. Once the exclusivity was threatened by Apotex's application to launch a generic Plavix competitor, Bristol-Myers acted to protect its wonder drug, even if it meant engaging in fraud. Motive quickly turned to opportunity. When the initial settlement agreement was rejected by the regulatory entities, Bristol-Myers did not disclose the rejection, but instead tried to renegotiate. The renegotiated agreement contained secret oral concessions which Bristol-Myers lied about, eventually pleading guilty to two counts of making false statements (providing strong circumstantial evidence of conscious misbehavior or recklessness). On these allegations and facts, it is easy to infer that Defendants acted with scienter, and that conclusion is at least as cogent and compelling as any opposing inferences that can be drawn from the allegations here.

## II. Section 10(b) Claims Against the Individual Defendants

Defendants Peter Dolan and Andrew Bodnar join, adopt, and incorporate by reference[8] Bristol-Myers' motion to dismiss; but also move on separate grounds for dismissal of Plaintiffs' individual section 10(b) and 20(a) claims.

---

[8] See Memorandum of Law in Support of Peter R. Dolan's Motion to Dismiss the Amended Complaint ("Dolan Mem.") at 1-2; Memorandum of Law in Support of Andrew G. Bodnar's Motion to Dismiss ("Bodnar Mem.") at 1.

### A. Section 10(b) Claims Against Dolan

Dolan alleges that Plaintiffs' "generalized allegations" fail to adequately plead scienter against him. (Dolan Mem. at 4-11.)  He contends that absent particularized allegations that he engaged in insider trading, realized specific profits, or demonstrated any other indicia of personal gain, the allegations against him are inadequate. (Dolan Mem. at 6.)  While it is insufficient for Plaintiffs merely to allege that Dolan held a senior position and wished to keep it, (see Kalnit, 264 F.3d at 139), the Second Circuit has found scienter sufficiently alleged where there was a strong motive not to disclose fraud.  In re Time Warner Sec. Litig., 9 F.3d 259, 270 (2d Cir. 1993).

In this case, Dolan is not sued merely because he held a senior position and wished to keep it.  Plaintiffs allege that Dolan was highly motivated to protect Plavix exclusivity, that he concocted a scheme to quietly renegotiate the Apotex settlement after the initial rejection, that he ordered Bodnar to do his bidding in this regard, that he continually made false or misleading statements in order to prevent the market from discovering his fraudulent conduct, and that he was ultimately involuntarily dismissed due to "issues relating to the Plavix patent litigation with Apotex." (Am. Compl. ¶ 124, see generally Am. Compl. ¶¶ 122-27.)  These allegations provide much more than a blanket assertion that Dolan wanted to keep his job and maintain a high level of compensation.  Instead, the Amended Complaint alleges that Dolan was at the very heart of the fraudulent scheme which surrounded him, and was well aware that he and the Company were misrepresenting material facts with respect to the Apotex settlement.  Such allegations are more than sufficient to survive the threshold pleading requirements of scienter on a motion to dismiss. See Borochoff v. GlaxoSmithKline PLC, No. 07 Civ. 5574 (LLS), 2008 WL 2073421, at *8 (S.D.N.Y. May 9, 2008).

## B. Section 10(b) Claims Against Bodnar

Bodnar first argues that Plaintiffs' individual 10(b) claims against him suffer from a "failure of pleading" because the Amended Complaint fails to allege that Bodnar actually made any statements to the public as required by Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994). Bodnar also claims that Plaintiffs have not adequately pleaded: (i) reliance on Bodnar's conduct, (ii) that their loss was caused by his conduct, (iii) that his conduct was "in connection with" Plaintiffs' purchase of Bristol-Myers's stock, (iv) that he acted with scienter, or (v) that his conduct was "deceptive" within the meaning of section 10(b). (Bodnar Mem. at 2.) These arguments, too, are not compelling.

With respect to Central Bank, the Supreme Court's full holding regarding 10(b) liability stated that "we again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." Central Bank, 511 U.S. at 177 (emphasis added). This view comports with the plain language of 10(b) and rule 10b-5, prohibiting deceptive devices, contrivances, and acts. See 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. The allegations that Bodnar: (1) secretly negotiated a settlement with illegal oral side agreements; (2) knowingly withheld information about the negotiations, the terms of the settlement, and the oral side agreements from shareholders, the Board of Directors, and the federal monitor; and (3) failed to correct Dolan and the Company's material misstatements despite his duties as a senior executive are, within the Court's view, "the commission of manipulative acts" sufficient to satisfy the Supreme Court's 10(b) pleading standards. (Am. Compl. ¶¶ 120-127.)

Bodnar tries to escape liability based on Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S.Ct. 761 (2008). In Stoneridge, the Court found that allegations regarding

complicit participation by outside suppliers in a cable company's fraudulent scheme were too remote from the investing public to satisfy the reliance element of the 10(b) standard, and therefore insufficient to allege scheme liability under 10(b). Id. at 770. Here, however, Bodnar's behavior is at the heart of Bristol-Myers's false and misleading conduct. It is neither implausible, nor too remote to find that the investing public relied on the announcement of the Apotex litigation settlement in deciding whether or not to invest in Bristol-Myers stock, and Bodnar was directly responsible for the settlement agreements. Bodnar made no public statements himself, but investors relied on his good faith in negotiating the Apotex settlement agreement and committing the Company to its terms. Furthermore, unlike in Stoneridge where the defendants' "deceptive acts were not communicated to the public," Bodnar's misconduct and deceptive acts were communicated to the public here through the disclosure of the regulatory rejection of the settlement, the disclosure of the amended settlement's terms, and the revelation of the secret oral side agreements. Id. at 769. Bodnar's actions are directly tied to the Apotex settlement, the Justice Department investigation, and the alleged misstatements and omissions. These allegations are more than adequate to satisfy 10(b) and the requirements of the Stoneridge decision.

## C. Section 20(a): "Control Person" Liability

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person" unless the purported control person can demonstrate that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t.

Courts in this district have found that "[i]n order to plead a prima facie case of control person liability under section 20(a), a plaintiff must allege (1) a primary violation by the controlled [entity], (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007) (quotations and citations omitted). It is not sufficient for a plaintiff to allege that an individual defendant has control person status; instead, the plaintiff must assert that the defendant exercised actual control over the matters at issue. Id. Control person liability need not be pleaded with particularity and is generally analyzed under the "short and plain" statement analysis of Rule 8(a). See Sedona Corp. v. Ladenburg Thalmann & Co., Inc., No. 03 Civ. 3120 (LTS) (THK), 2005 WL 1902780, at *16 (S.D.N.Y. Aug. 9, 2005) (holding that a plaintiff's pleading with respect to the elements of control person liability need only meet the requirements of 8(a) since "neither the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element), apply to a Section 20(a) claim."). Some courts, however, analyze the culpable participation prong under the heightened pleading standard of the PSLRA. In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910 (GEL), 2005 WL 1907005, at *5 (S.D.N.Y. Aug. 8, 2005) ("since culpable participation is an element [of 20(a) claims], the PSLRA's heightened pleading requirements apply . . . ."); Burstyn v. Worldwide Xceed Group, Inc., No. 01 Civ. 1125 (GEL), 2002 WL 31191741, at *8 (S.D.N.Y. Sept. 30, 2002) (same). The distinction is immaterial for our purposes since under either pleading standard the Plaintiffs have met their burden to adequately plead control person liability with respect to individual Defendants Dolan and Bodnar.

35

First, the control person claims against Dolan and Bodnar are premised on Bristol-Myers's underlying primary violations of 10(b) and 10b-5. The Court has already found that those claims survive this motion to dismiss; therefore, the requisite primary violation has a sufficient foundation in the pleadings.

Second, Plaintiffs have adequately alleged that both Dolan and Bodnar actually exercised control of the primary defendant, Bristol-Myers. Dolan, as CEO and Chairman of the Company, and signor and speaker of many of the public statements, was clearly in a position to exercise control over the Company. See In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 494 (S.D.N.Y. 2005) ("Although status as officer or committee member is generally not enough to constitute control, and thus a mere recitation of [a defendant's] title as CEO along with the committees upon which [a defendant] sat is not sufficient," the power to sign SEC filings implies that the person had some measure of control over those who write them.). Bodnar, meanwhile, held very high-level executive positions and is also alleged to have been the one to actually negotiate and enter into the disputed settlement agreements on behalf of Bristol-Myers. Given this allegation—that he actually exercised control over the entity by entering into major agreements involving the Company's most profitable drug on its behalf—it is not implausible that he had control over the primary violator. Indeed, Plaintiffs allege that he was, in fact, the key actor of the controlled entity and that he influenced the critical transaction in question, the Apotex settlement (in all of its various forms, both public and private). See Alstom, 496 F. Supp. 2d at 487. These allegations clearly survive a motion to dismiss.

Third, with respect to "culpable participation," the allegations of the Amended Complaint with respect to Dolan and Bodnar are also more than adequate to survive this motion. Dolan is alleged to have actually made materially misleading statements knowing they were false, (see,

36

e.g., Am. Compl. ¶¶ 70, 76, 83), and Bodnar is alleged to have knowingly entered into the secret, unlawful, oral side agreements. Of course, neither Dolan nor Bodnar hesitates to point his finger at the other. Dolan argues that Bodnar, not he, acted as Bristol-Myers's principal negotiator in the Apotex settlements, that he did not participate in the settlement discussions in any way, and that he had no "knowledge" of these agreements. (Dolan Mem. at 3-4.)[9] Bodnar contends that he did not in any way "control" Bristol-Myers, nor did he culpably participate in the fraud. (Bodnar Mem. 10-11). Instead, Bodnar helpfully points out that it was Dolan, not he, who made the misleading public statements. (Bodnar Mem. at 1.)

The culpable participation requirement can be satisfied by a showing of recklessness, for example, where there has been an "extreme departure from the standards of ordinary care," Rothman, 220 F.3d at 90, or when defendants are "aware[] of facts or [have] access to information contradicting their public statements" Alstom, 406 F. Supp. 2d at 491 (citing Novak, 216 F.3d at 308). Suffice it to say that viewing the allegations of the Amended Complaint in the light most favorable to Plaintiffs, both Dolan and Bodnar are adequately alleged to be culpable participants, and their finger-pointing confirms their culpability. Crediting their mutual accusations confirms that both engaged in deceptive and risky conduct involving Bristol-Myers's most profitable drug and the key to its core business, and both were aware of information which contradicted the Company's public statements that it would "vigorously pursue" the Apotex litigation and that a generic launch was "at risk." These allegations—among the countless others made throughout the Amended Complaint—more than satisfy the requirement that the control person was a culpable participant in the fraud in some meaningful sense.

---

[9] Dolan also attacks the Sherman Affidavit as "self-interested" and containing "inadmissible hearsay statements." (Dolan Mem. at 3-4.) These arguments, of course, are inappropriate on a motion to dismiss where the Court is concerned about the allegations of the complaint, must accept its allegations as true, and draws all reasonable inferences in plaintiff's favor.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are DENIED. The parties should confer and contact the Court no later than Friday, August 29, 2008, to schedule a pre-trial conference. The Clerk of Court is directed to terminate all pending motions.

Dated: New York, New York
      August 19, 2008

SO ORDERED

PAUL A. CROTTY
United States District Judge

38